UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CAUSE OF ACTION INSTITUTE,

                           Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
COMMERCE,

                        Defendant.

Civ. A. No. 19-2698 (DLF)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, United States Department of Commerce ("DOC"), respectfully moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting summary judgment on the grounds that no genuine issue as to any material fact exists and DOC is entitled to judgment as a matter of law. In support of this motion, the Court is respectfully referred to DOC's accompanying declarations, exhibits, the Statement of Material Facts As To Which There Is No Genuine Issue, and the Memorandum of Points and Authorities In Support of Defendant's Motion For Summary Judgment.

Dated: March 5, 2020

Respectfully submitted,

TIMOTHY J. SHEA, D.C. Bar # 437437
United States Attorney for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division

By: */s/ John Moustakas*
John Moustakas
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-2518
john.moustakas@usdoj.gov
*Counsel for Defendant*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAUSE OF ACTION INSTITUTE,

       Plaintiff,

            v.

UNITED STATES DEPARTMENT OF
COMMERCE,

       Defendant.

CASE NO. 19-cv-2968 (DLF)

## DEFENDANT'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Rule 7(h), Defendant, the United States Department of Commerce ("DOC"), submits this statement of material facts as to which there is no genuine issue:

1.     By correspondence dated February 18, 2019, Plaintiff submitted identical FOIA requests to the Bureau of Industry and Security (BIS), which is part of the United States Department of Commerce ("DOC"), and to DOC seeking "a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts." Declaration of Grace Agyekum ("Agyekum Decl.") ¶ 7 & Ex. 1 and 2.

2.     The document to which Plaintiff referred is a report that the Secretary of Commerce ("Secretary") submitted to President Donald J. Trump on February 19, 2019 pursuant to Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. §1862 ("Section 232") regarding whether automobile and certain automobile part imports threaten to impair the national security

of the United States.  Three months later, on May 17, 2019, the President issued an Executive

Proclamation entitled Adjusting Imports of Automobiles and Automobile Parts Into the United

States, concurring with the Secretary that these imports constituted a threatened impairment of

American national security and requiring the United States Trade Representative (USTR) to

"pursue negotiations of agreements contemplated in 19 U.S.C. § 1862(c)(3)(A)(i) to address the

threatened impairment of the national security with respect to imported automobiles and  certain

automobile parts from the European Union, Japan and any other country the [USTR] deems

appropriate,  and to update me on the progress of such negotiations within 180 days."  Id. at  ¶ 7

n. 1 & Ex. 3.

     3.     By email dated February 25, 2019, BIS advised Plaintiff that Plaintiff's request

for a waiver of the applicable fees was granted.  *Id*. at ¶ 9 & Ex. 5.

     4.     On March 20, 2019, Plaintiff filed a lawsuit against DOC regarding the

withholding of the Automotive Report.  Cause of Action Inst. v. Dep't of Commerce, Docket No.

19-0778-CJN (D.D.C.), for which the court has taken the parties' cross-motions for summary

judgment under advisement  Id. at  ¶ 10 n. 3.

     5.     By correspondence dated June 13, 2019, DOC advised Plaintiff, on behalf of BIS

and DOC, that:

> We are currently reviewing, in conjunction with the Executive Office of the
> President, whether the Secretary's report constitutes a presidential record within
> the meaning of the Presidential Records Act, 44 U.S.C. 2201 et seq., in which
> case it would not be subject to disclosure under FOIA. However, to the extent
> that the Secretary's Section 232 report to the President of the United States may
> constitute an agency record within the meaning of FOIA, DOC and BIS are
> withholding it in full pursuant to 5 U.S.C. § 552(b)(5), which exempts from
> disclosure inter-agency or intra-agency memorandums or letters which would not
> be available by law to a party other than an agency in litigation with the agency.
> The report, if an agency record, would be exempted from disclosure under FOIA

pursuant to the presidential communications privilege and/or the deliberative process privilege, until all actions deemed necessary to adjust the imports of automobiles and automobile parts so that such imports will not threaten to impair the national security have been completed. See 15 C.F.R. § 705.11.

*Id*. at ¶ 11 & Ex. 6.

6.      Upon completion of this review, DOC concluded that the Automotive Report was subject to the presidential communication privilege and deliberative process privilege pursuant to Exemption 5.  *Id.* at  ¶ 12.

7.      In connection with *Cause of Action Inst. v. Dep't of Commerce*, Docket No. 19-0778-CJN (D.D.C.), Plaintiff submitted a declaration averring that DOC took 270 days to release its 1999 report on "*The Effects of Imports of Crude Oil on National Security*" and "over 600 days" to publish its 1984 report on "The Impact of Ferroalloy Imports on the National Security." See Declaration of R. James Valvo, III, ¶ 8 (ECF No. 23-3)(attached as Exhibit C to Defendant's Motion for Summary Judgment).  An attached chart entitled "Section 232 Investigations Where Reports Issued" reveals five reports being delayed between 106 and 659 days, including the two mentioned above.  *Id*.

8.      By correspondence dated April 15, 2019, Plaintiff submitted identical FOIA requests to BIS and DOC seeking "1. a copy of the Commerce Secretary's final report to the President regarding the Section 232 Investigation on the Effect of Imports of Uranium on the National Security (Uranium Report)" and "2. The DOD response letter to the Section 232 Investigation on the Effect of Imports of Uranium on the National Security."  Declaration of Brian D. Lieberman ("Lieberman Decl."), at  ¶  10 & Ex. 1 and 2; Agyekum Decl.,  at  ¶ 14 & Ex. 7 and 8.

3

9.      The document to which Plaintiff referred in its April 15, 2019 correspondence is a report that the Secretary submitted to President Trump on February 19, 2019 pursuant to Section 232 regarding whether uranium imports threaten to impair the national security.  Lieberman Decl., at ¶¶ 6 and 25.  Subsequently, on July 12, 2019, the President issued a Presidential Memorandum entitled Memorandum on the Effect of Uranium Imports on the National Security and Establishment of the United States Nuclear Fuel Working Group (Presidential Memorandum), in which he did not concur that these imports constituted a threatened impairment of American national security, but agreed with the Secretary's finding that uranium imports affect national security and deciding further investigation was merited.  The President stated:

> Although I agree with the Secretary's findings raise significant concerns regarding the impact of uranium imports on the national security with respect to domestic uranium mining, I find that a fuller analysis of national security considerations with respect to the entire nuclear fuel supply chain is necessary.

*Id.* at  ¶¶  26 and 28 & Ex. 6 at Section 1(c).

10.      In the Presidential Memorandum, the President further stated, "[t]he United States requires domestically produced uranium to satisfy Department of Defense (DOD) requirements for maintaining effective military capabilities----including nuclear fuel for the United States Navy's fleet of nuclear-powered aircraft carriers and nuclear-powered submarines, source material for nuclear weapons and other functions."  In addition, he noted, "[d]omestic mining, milling, and conversion of uranium, however, while significant, are only a part of the nuclear supply chain necessary for national security, including DOD needs."  *Id*. at  ¶ 29 & Ex. 6 at Section 2(a).

4

11.    In the Presidential Memorandum, the President established the U.S. Nuclear Fuel Working Group (Working Group) "[t]o address the concerns identified by the Secretary regarding domestic uranium production and to ensure a comprehensive review of the entire domestic nuclear supply chain."  The President  appointed senior government officials, including the Secretaries of Commerce, Defense, Energy, Interior and State, to the Working Group.  The President directed the Working Group to "examine the current state of domestic nuclear fuel production to reinvigorate the entire nuclear fuel supply chain, consistent with United States national security and nonproliferation goals."  The President further directed the Working Group to "submit a report to the President setting forth the Working Group's findings and making recommendations to further enable domestic nuclear fuel production if needed."  *Id*. at  ¶ 31 & Ex. 6 at Section 2(c).

12.    DOC has determined that the Uranium Report is exempt from disclosure pursuant to the presidential communications privilege and the deliberative process privilege pursuant to Exemption 5.  *Id*., at  ¶¶ 9 and 34-47.

13.    In February 1959, "the Director of the Office of Civil and Defense Mobilization, who exercised the Secretary's authority under section 232's statutory predecessor" advised President Eisenhower "that imports of crude oil and its derivatives threatened to impair the national security."  See *Publication of a Report to the President on the Effect of Automobile and Automobile-Part Imports on National Security*, 44 Op. O.L.C. ---, --- (2020)(attached as Exhibit D to Defendant's Motion for Summary Judgment)(slip op. at 16).  The Report of Investigation of Imports of Crude Oil and its Derivatives and Products was not released until more than four months after President Eisenhower imposed import restrictions.  *Id*.  The report *Effects of*

*Imported Articles on National Security*, 40 Fed. Reg. 4457, 4457 (January 30, 1975), was not published until after President Ford's imposition of supplemental fees.  Id. The same has been true of cases of presidential inaction.  Section 232 reports were released after "no action" decisions in 1988, 1989, 1995 and 2000.  Id. (slip op. at 17 & n.11).


Dated:  March 5, 2020                          Respectfully submitted,

                                               TIMOTHY J. SHEA, D.C. Bar # 437437
                                               United States Attorney for the District of Columbia

                                               DANIEL F. VAN HORN, D.C. Bar # 924092
                                               Chief, Civil Division

                                       By:  */s/ John Moustakas*
                                               John Moustakas
                                               Assistant United States Attorney
                                               555 Fourth Street, N.W.
                                               Washington, D.C. 20530
                                               (202) 252-2518
                                               john.moustakas@usdoj.gov
                                               *Counsel for Defendant*

6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CAUSE OF ACTION INSTITUTE,

Plaintiff,

v.                                                    Civ. A. No. 19-2698 (DLF)

UNITED STATES DEPARTMENT OF
COMMERCE,

Defendant.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, United States Department of Commerce ("DOC"), by and through its undersigned counsel, respectfully submits this memorandum in support of its motion for summary judgment. For the reasons stated below, judgment should be entered in favor of DOC pursuant to Federal Rule of Civil Procedure ("Rule") 56 on Plaintiff's claims in this action, which arise under the Freedom of Information Act ("FOIA").

## BACKGROUND

Under enumerated circumstances, federal law requires the Secretary of Commerce (the "Secretary") to conduct an investigation into whether the importation of certain articles of commerce, in such quantities or under such circumstances, threatens to impair United States national security.  When an investigation is required, so too is a report.  Explicitly designed for the President's benefit, the report must include the Secretary's findings and recommendations, and it must advise the President whether the subject imports threaten to impair national security. Consequential to a wide range of recommended options for eliminating the threat to national security, it is indispensable to one: the adjustment of imports and their derivatives turns on the

report's national security finding.  *See* Compl. ¶¶7, 8.  Historically, once a final Presidential decision has signaled the diminished need to protect the deliberative process that generated the President's options, DOC has released for publication in the Federal Register the Secretary's report—a statutory requirement with no time limit.  *See* Compl. ¶10 (no specific timetable).

By letter dated February 18, 2019, Plaintiff Cause of Action Institute requested a copy of the Secretary's report to the President regarding automobile and automotive parts imports. Plaintiff brought suit to compel disclosure on March 20, 2019, in action captioned, *Cause of Action Institute v. Department of Commerce*, Civ. A. No. 19-0778 (CJN) (D.D.C.) ("the Auto Report Case").  That case remains pending, and the Court is currently receiving supplemental summary judgment briefing from the parties.[1]  By letter dated April 15, 2019, Plaintiff requested a copy of the Secretary's report to the President regarding uranium imports.  Plaintiff has subsequently brought the instant action to compel disclosure of:

1.  a copy of the Commerce Secretary's final report to the President regarding the Section 232 Investigation on the Effects of Imports of Uranium on the National Security and

2.  the "DOD [Department of Defense] response letter to the Section 232 Investigation on the Effects of Imports of Uranium on the National Security."

Declaration of Brian D. Lieberman ("Lieberman Decl."), ¶ 10 & Exs. 1 and 2.

In responding to Plaintiff's request, DOC identified one document responsive to the first part of the request—a report that the Secretary submitted to the President on April 14, 2019, pursuant to Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862 ("Trade Expansion Act"), regarding whether imports of uranium threaten to impair the national security of the United States ("Uranium Report").  *Id.* ¶¶ 6, 25.  DOC identified no documents responsive to the second

---

[1]    *See* Declaration of Grace Agyekum ("Agyekum Decl.") ¶¶ 7-13, nn.1, 3.

portion of Plaintiff's request.  Lieberman Decl. ¶ 10 n. 1.  Accordingly, the Uranium Report is the only document at issue in this matter.

The first count of Plaintiff's two-count Complaint alleges a violation of FOIA on account of DOC's alleged failure to comply with statutory deadlines—to wit, release the Uranium Report. As the accompanying Lieberman Declaration demonstrates,[2] DOC properly withheld the Uranium Report in its entirety pursuant to the presidential communications and deliberative process privileges under FOIA Exemption 5.  There is no genuine issue of material fact as to this issue, and DOC is entitled to judgment as a matter of law.

Asserting a purportedly unlawful and willful pattern of withholding Section 232 reports on the basis of DOC's recent assertion of presidential communications and deliberative process privileges in the Auto Report Case, the second count of Plaintiff's complaint alleges a "policy and practice" claim under FOIA.  This claim lacks merit as it is devoid of factual and legal support. Notably, Plaintiff's complaint is internally inconsistent asserting that DOC's "policy and practice" is simultaneously both longstanding (Compl. ¶ 2 (DOC has "repeatedly withheld" report) and recently changed (*id.* ¶¶ 13, 14 (DOC "recently [ ] changed course" and there has been a "shift in policy and practice illustrated" by Auto Report Case).

Plaintiff's position depends upon the unsupported, illogical and presumptively unconstitutional premise that Congress both could, and did, categorically strip the President and Secretary of executive privileges essential to the very task of preserving national security to which they were entrusted.  It defies credulity and reason that Congress meant publicly to expose the administration's strategy and tactics—e.g., for negotiating import restrictions or other measures with foreign governments to blunt the harmful effects of certain imports—at the moment of its

---

[2]      The Lieberman Declaration describes in detail the nature of the withholding.

greatest importance.  As a matter of general historical practice, DOC has acted sensibly and in good faith when treating the Section 232 reports as protected from public disclosure until at least such time as the report's findings and recommendations have been fully considered, and the President has made the decision the report was intended to inform.  For these reasons, as discussed in detail below, Plaintiff's "policy and practice" claim must also fail.

## STANDARD OF REVIEW FOR MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the trier of fact must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party must show that the dispute is genuine and material to the case.  A "genuine issue" is one whose factual dispute is capable of affecting the substantive outcome of the case and is supported by admissible evidence that a reasonably trier of fact could find for the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.,* 477 U.S. 242, 247-48 (1986).  The burden on the moving party may be discharged by showing that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

FOIA cases are typically and appropriately decided on motions for summary judgment. *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 130 (D.D.C. 2011).  In a FOIA action, an agency that moves for summary judgment "bears the burden of showing that there is no genuine issue of material fact, even when the underlying facts are viewed in the light most favorable to the requester."  *Weisberg v. Dep't of Justice*, 705 F. 2d 1344, 1350 (D.C. Cir. 1983).  An agency can meet its burden by submitting declarations or

affidavits. Fed. R. Civ. P. 56(c)(1)(A). Summary judgment is justified in a FOIA lawsuit once the agency demonstrates that no material facts are in dispute and, if applicable, that each document that falls within the class requested has been produced, is unidentifiable, or is exempt from disclosure. *Students Against Genocide v. Dep't. of State*, 257 F.3d 828, 833 (D.C. Cir. 2001).

**ARGUMENT**

## A.    DOC DID NOT VIOLATE FOIA BECAUSE IT PROPERLY WITHHELD AN EXEMPT DOCUMENT.

FOIA requires federal agencies to release all records responsive to a request for production unless a specific exemption is applicable. 5 U.S.C. §§ 552(a)(3)(A), 552(a)(4)(B), 552(b). It allows agencies to withhold only those documents that fall under one of nine specific exemptions. *See Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010). FOIA recognizes that the release of certain information "may harm legitimate governmental or private interests." *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). To this end, the statute contains nine exemptions that permit an agency to withhold responsive information. 5 U.S.C. § 552(b)(1)-(9). Moreover, as the Supreme Court recently observed, "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (citations omitted).

"In a FOIA case, the Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Citizens for Responsibility & Ethics in Wash. ("CREW") v. U.S. Dep't of Labor,* 478 F. Supp. 2d

5

77, 80 (D.D.C. 2007) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).  Ultimately, if an agency's justifications for invoking a FOIA exemption are logical or plausible, then the agency is entitled to summary judgment. *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007).

DOC properly withheld the Uranium Report because it is protected from disclosure by both the presidential communications privilege and the deliberative process privilege and, thus, exempt from release under FOIA Exemption 5.  Lieberman Decl., ¶¶ 9, 37-47.

1.      **DOC Properly Withheld the Uranium Report Pursuant to <u>Exemption 5.</u>**

Under several enumerated circumstances, the Trade Expansion Act requires the Secretary to initiate an investigation "to determine the effect on the national security of imports of" any article of commerce under certain circumstances, including upon his own motion or upon application of an interested party. *See* 19 U.S.C. § 1862(b)(1)(A).  Here, on July 18, 2018, two interested parties, American businesses named Energy Fuel Resources (US) Inc. and UR-Energy Inc. (USA), filed a joint petition requesting that the Secretary investigate the effects of uranium imports on national security.  Lieberman Decl., ¶ 22.  Subsequently, on July 18, 2019, after having completed his review of the petition, the Secretary initiated the requested investigation, which he formally announced a week later, on July 25, 2019.  *Id*. ¶ 23, Ex.4.

Investigations initiated under the statute are required to culminate in a report.  19 U.S.C. § 1862(b)(3)(A).  The report is required to disclose to the President the Secretary's "findings" concerning the national security implications of the imports investigated.  *Id.*  It is also required to set forth the Secretary's "recommendations" for action or inaction.  *Id.*  And, should he find that the imports threaten to impair national security, the Secretary "shall so 'advise' the President in such report."  *Id.*  Indeed, the President's authority to "adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security" is contingent

upon this finding and the President's concurrence in it.   Consistent with that requirement, on April 14, 2019, the Secretary submitted the Uranium Report, which provided his findings, made his recommendations, and offered his advice to the President.   Lieberman Decl. ¶ 25.

### a.   The Uranium Report is an Inter-Agency or Intra-Agency Memorandum.

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).   It covers, among other things, the presidential communications privilege, the deliberative process privilege, and the attorney-client privilege.  *Judicial Watch, Inc. v. Dep't of Def.*, 913 F.3d 1106, 1109 (D.C. Cir. 2019).  A threshold predicate to application of the Exemption 5 privileges is a record's status as either an inter- or intra-agency memorandum or letter.  5 U.S.C. § 552(b)(5).  Prepared for and submitted to the President by the Secretary, as required by law, the Uranium Report is quintessentially that kind of advice at the heart of Exemption 5's protection of the quality and integrity of executive branch decisionmaking.

Plaintiff has previously argued that DOC cannot rely on Exemption 5 to protect its Section 232 reports from disclosure because, although DOC is an agency, the President is not.  Taken to its logical conclusion, Plaintiff argues that no memorandum sent to the President could ever qualify as either inter- or intra-agency and be protected by Exemption 5.  Obviously, the consequence of Plaintiff's argument is problematic: were Plaintiff right, any advice the President received from his own Cabinet could never be maintained in confidence and would be required to be disclosed to the public on demand.  As this Court has previously ruled, Plaintiff is wrong.  Communications with the President and the White House are protectable under Exemption 5 even though neither is an "agency" subject to FOIA.

In *Judicial Watch Inc. v. Department of Energy*, 412 F.3d 125 (D.C. Cir. 2005), a FOIA requester sought deliberative memoranda from the component agencies whose detailed employees served as the day-to-day staff of the Working Group of the National Energy Policy Development Group ("NEPDG"), an establishment created within the Executive Office of the President by and for the benefit of the President. Gathering information and providing it to the President with recommendations for a national energy policy, the work-product of the nine departments and agencies involved was conveyed to the Working Group, NEPDG, and ultimately the Vice President and the President.[3]    Addressing whether the agencies could withhold documents pertaining not to their own deliberations but to those of the NEPDG, the D.C. Circuit determined that they could, reasoning that "[n]either Exemption 5 nor the cases interpreting it distinguish between the decisionmaking activities of an 'agency' subject to the FOIA and those of the President and his staff, who are not subject to the FOIA." *Id.* at 129.

The Court recognized that "Executive Branch officials who play important roles in the formulation of policy are not necessarily employed by an 'agency' within the meaning of FOIA." *Id.* at 130.  However, mindful that the unitary structure of the Executive Branch is one of its essential features, the Court explained:

> We think it inconceivable [that] Congress intended Exemption 5 to protect the decision-making processes of the Executive Branch when the decision is made by "agency" officials subject to oversight by the President and not when the decision is to be made by the President himself and those same officials are acting in aid of his decision-making processes . . . That the President, rather than an agency, initiated the policy development process is of no moment; what matters is whether

---

[3]    These facts are taken from the District Court opinion, *Judicial Watch v. Department of Energy*, 310 F. Supp. 2d 271, 284 (D.D.C. 2004).

a document will expose the pre-decisional and deliberative processes of the Executive Branch.

*Judicial Watch*, 412 F.3d at 130-31.  Indeed, courts in this District have continually applied Exemption 5 to protect privileged communications between Executive Branch components and the White House despite the President and the White House not being "agencies" subject to FOIA. *See, e.g., Protect Democracy Project, Inc. v. Dep't of Energy*, 330 F. Supp. 3d 515, 527 (D.D.C. 2018) ("The D.C. Circuit has held that agency communications with the White House are 'inter-agency' communications even though the President and his immediate staff are not an 'agency' within the meaning of FOIA."); *Judicial Watch, Inc. v. Consumer Fin. Prot. Bd.*, 60 F. Supp. 3d 1, 10 (D.D.C. 2014) (emails between White House counsel and agency employees covered by privilege, "the threshold requirement is satisfied for communications exchanged between agencies and the Office of the President, even though that office is not an agency for the purposes of FOIA"); *see also Berman v. CIA*, 378 F. Supp. 2d 1209, 1220 (E.D. Cal. 2005) ("Congress exempted the President from the definition of an 'agency' under FOIA because it wanted to protect the President from the burdens and intrusions of FOIA, not because it sought to deny the President the protections afforded by the exemptions for information communicated to the President but retained in an agency file.").

       **b.**      **The Uranium Report is Exempt Under the Presidential Communications Privilege.**

Exemption 5 covers information and records protected by the presidential communications privilege. *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 n. 16 (1975)).  This privilege protects "documents or other materials that reflect presidential decision-making and deliberations that the President believes should remain confidential." *In re Sealed* Case, 121 F.3d 729, 744 (D.C. Cir. 1997).  It is a "presumptive privilege for [p]residential communications." *United States v. Nixon*,

418 U.S. 683, 708, (1974). The privilege "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (citing *Judicial Watch*, 365 F.3d at 1112); *see also Judicial Watch*, 365 F.3d at1113 (privilege concerns "communications in performance of a President's responsibilities, of his office and made in the process of shaping policies and making decisions") (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977)). The privilege encompasses "communications directly involving and documents actually viewed by the President, as well as documents 'solicited and received' by the President or his 'immediate White House advisers with broad and significant responsibility for investigating and formulating the advice to be given the President.'" *Loving,* 550 F.3d at 37 (quoting *Judicial Watch*, 365 F.3d at 1114). Furthermore, the privilege "applies to documents in their entirety and covers final and post-decisional materials as well as pre-deliberative ones." *Elec. Privacy Info. Ctr. ("EPIC") v. Dep't of Justice*, 320 F. Supp. 3d 110, 115 (D.D.C. 2018) (quoting *In re Sealed Case*, 121 F.3d at 745).

An agency has the authority to apply the presidential communications privilege to protect documents from release under FOIA Exemption 5. *See, e.g., EPIC*, 320 F. Supp. 3d at 117 ("an agency has the authority to invoke the presidential communications privilege when making FOIA Exemption 5 withholdings" and may do so "without any action by the President or his staff"); *Am. Ctr. for Law & Justice v. Dep't of State*, 330 F. Supp. 3d 293, 308, 309 (D.D.C. 2018) ("presidential communications privilege does not need to be asserted by the President himself"); *EPIC v. Dep't of Justice*, 584 F. Supp. 2d 65, 80 (D.D.C. 2008) (holding Department could invoke the presidential communications privilege under FOIA). To protect records covered by the presidential communications privilege from release under Exemption 5, the agency need "simply make[] the determination that [the document] is protected from disclosure." *Am. Ctr.*, 330 F. Supp.

3d at 309 (citing *Lardner v. Dep't of Justice*, Civ. A. No. 03-0180 (JDB), 2005 WL 758267 at *8 (D.D.C. Mar. 31, 2005) ("this Court concludes that the personal invocation of the presidential communications privilege is also a civil discovery rule that should not be imported into the FOIA analysis")). Here, DOC determined the presidential communications privilege applied in response to Plaintiff's FOIA request for the Uranium Report. Lieberman Decl. ¶¶ 34-36. Therefore, DOC has properly invoked the privilege.

Courts consider the presidential communications privilege "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution because it relates to the effective discharge of a President's powers." *Judicial Watch*, 913 F.3d at 1110 (quoting *Nixon*, 418 U.S. at 708, 711). It serves to "protect[] the public interest in candid, objective and event blunt or harsh opinions in Presidential decision-making." *Id*. "The scope of the presidential communications privilege is thus defined in terms of communications that involve the Office of the President, the exercise of the President's responsibilities and confidential presidential decision-making." *Id*. (quoting *Nixon,* 433 U.S. at 449).

The Uranium Report fits comfortably within the scope of this privilege. Under the Trade Expansion Act, certain consequential responsibilities are committed to the President's discretion— the exercise of which is significantly informed by the Secretary's findings, recommendations, and advice. Where, as here, the Secretary has concluded that articles are being "imported into the United States in such quantities or under such circumstances as to threaten to impair national security," the President must decide whether he concurs with the Secretary's findings and, if so, determine the "nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article[s] . . . so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A), (i), (ii). The report consists of DOC's analysis and

presentation of industry, market, economic, scientific and statistical and other types of data and information from government and non-government sources, the findings based on this analysis, and the Secretary's recommendations for action. Lieberman Decl. ¶¶ 9, 25, 35. The Uranium Report reflects information and advice that is at the heart of presidential decision-making—decision-making that so frequently depends upon, and is elevated by, the candor of the advice encouraged by the privilege's meaningful protection.

By design and intent, Section 232 "directly involves" the President in the use and review of a report from the Secretary concerning the adjustment of imports that threaten to impair the national security. The Act mandates that "[b]y no later than the date that is 270 days after the date on which an investigation is initiated . . . the Secretary shall submit to the President a report on the findings of such investigation." 19 U.S.C. § 1862(b)(3)(A). When the Secretary has found that imported items represent a threatened impairment, the President must determine whether he concurs with the Secretary's findings, and if, so, what actions to take, within the time limits prescribed by Section 232. *See id.* § 1862(c). Thus, Section 232 requires that the President review and act upon the Secretary's reports.

Furthermore, in the Presidential Memorandum entitled *Memorandum on the Effect of Uranium Imports on the National Security and Establishment of the United States Nuclear Fuel Working Group* (Presidential Memorandum), which the President issued on July 12, 2019, the President stated: "On April 14, 2019, the [Secretary] transmitted to me a report on his investigation into the effect of imports of uranium (uranium ore, uranium concentrate, uranium hexafluoride, enriched uranium and enriched uranium in fuel assemblies [i.e., the Uranium Report])." Lieberman Decl., ¶ 26 & Ex. 6, Presidential Memorandum, at Section 1(a). Accordingly, it is

indisputable that the Uranium Report constitutes a presidential communication for the purposes of the privilege.

The President made clear in the Presidential Memorandum that, while he did not concur with the Secretary's conclusion that uranium imports threaten to impair the national security *id*., at Section 1(c), the Uranium Report nevertheless identifies national security issues requiring further deliberation.   Specifically, the President "agree[d] that the Secretary's findings raised significant concerns regarding the impact of uranium imports on the national security with respect to domestic mining" and decided "that a fuller analysis of national security considerations with respect to the entire nuclear supply chain is necessary at this time"  *Id*. at § 1(c).  The President noted, as a point of concern, that "[t]he United States requires domestically produced uranium to satisfy Department of Defense (DOD) requirements for maintaining effective military capabilities."  *Id*. at Section 2(a).  Further, the President determined this analysis must encompass all domestic nuclear fuel production, emphasizing that "[d]omestic mining, milling and conversion of uranium, however, while significant, are only a part of the nuclear supply chain necessary for national security, including DOD needs."  *Id*.

As a result of the Secretary's investigation and Section 232 Report Uranium, the President established the U.S. Nuclear Fuel Working Group (Working Group)  consisting of some of the most senior government officials, including the Secretaries of Commerce, Defense, Energy, Interior and State, for this purpose. *Id*. at Section 2(c).  He considered the Working Group necessary "*[t]o address the concerns identified by the Secretary regarding domestic uranium* and to ensure a comprehensive review of the entire domestic nuclear supply chain."  *Id.* (emphasis added).  The President directed the Working Group to "examine the current state of domestic nuclear fuel production to reinvigorate the entire nuclear fuel supply chain, consistent with United

13

States national security and nonproliferation goals."[4]    As such, although the President is not

pursuing action under Section 232, he incorporated the Uranium Report into a further national

security investigation concerning potential governmental action to facilitate domestic nuclear fuel

production.

> The President has inherent constitutional authority to protect the national security:
>
> The Founders intended that the President have primary responsibility —along with the necessary power— to protect the national security and to conduct the Nation's foreign relations.  They did so principally because the structural advantages of a unitary Executive are essential in these domains…This Court has long recognized these features and has accordingly held that the President has *constitutional* authority to protect the national security and that this authority carries with it broad discretion.

*Hamdi v. Rumsfeld*, 542 U.S. 507, 580-81 (2004) (Thomas, J., dissenting) (emphasis in original);

*see also Bancoult v. McNamara*, 445 F.3d 427, 434 (D.C. Cir. 2006) ("Article II . . . provides

allocation of foreign relations and national security powers to the President, the unitary chief

executive"); *cf. Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) (noting the reluctance of the

courts "to intrude upon the authority of the Executive in military and national security affairs");

*Haig v. Agee*, 453 U.S. 280, 292 (1981) (recognizing that "[m]atters intimately related to foreign

policy and national security are rarely proper subjects for judicial intervention").

Here, the President has exercised his constitutional authority to protect national security to

enable a review of the Nation's domestic nuclear fuel capacity to determine what measures, if any,

are needed to expand that capacity to meet U.S. military and private sector requirements.  The

contents of the Uranium Report, which analyzes the impact of uranium imports on domestic

---

[4]    The President required the Working Group to "submit a report to the President setting forth the Working Group's finding and making recommendations to further enable domestic nuclear fuel production if needed."  The Working Group did not complete its report by its original 90-day deadline, but it remains engaged in conducting the additional analysis and will be providing its report to the President.  Lieberman Decl. ¶¶ 8, 33.

uranium production and details the characteristics, composition and status of the domestic uranium mining industry, is pertinent to this review and the President's ultimate decision-making. Lieberman Decl. ¶ 35. Therefore, during the pendency of the President's review of the options available to him to address the problems confronting domestic uranium production and other elements of nuclear fuel production, the Uranium Report must remain subject to the presidential communications privilege.

        c.     **The Uranium Report Is Exempt Under the Deliberative Process Privilege.**

Because the Uranium Report is protected by the deliberative process privilege, its withholding was independently proper under Exemption 5. At its core, the deliberative process privilege protects the integrity of the government's decision-making process, and "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front-page news." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001); *Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997) (noting that the privilege "reflect[s] the legislative judgment that the quality of administrative decision-making would be seriously undermined if agencies were forced to' operate in a fishbowl' because the full and frank exchange of ideas on legal or policy matters would be impossible"). "Application of the privilege, therefore, serves to prevent injury to the quality of agency decisions." *Nat'l Labor Relations Bd. ("NLRB") v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-51 (1975).

The deliberative process privilege protects materials that are "pre-decisional" and "deliberative" in nature. *See, e.g., Judicial Watch*, 365 F.3d at 1115; *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002). Categorically, Section 232 reports squarely fit both elements. After concluding his investigation, the Secretary is statutorily required to submit to the

President a report on the "*findings* of [his] investigation," "the *recommendations* . . . for action or inaction," and, if he has found the requisite threat to impairment of national security, "the Secretary shall so *advise* the President in such report."  19 U.S.C. § 1862(b)(3)(A) (emphasis added).

As the statutory language and framework make plain, Section 232 reports are, by definition, pre-decisional: they "precede[ ], in temporal sequence," and are designed by law to inform, presidential decision-making on the subjects they examine.  *See, e.g., Abtew v. Dep't of Homeland Sec.,* 808 F.3d 895, 898 (D.C. Cir. 2015).  Although the statute broadly authorizes the President to take action to ensure that imports "will not threaten to impair the national security," he can only do so "*after* receiving a report submitted under subsection (b)(3)(A)" in which the Secretary makes such a finding.  *Id.* § 1862(c)(1) (emphasis added).

In the exercise of his statutory obligation here, the Secretary and his team set forth DOC's analysis of data and information from DOC and other governmental and non-governmental sources, including proprietary sources, relating to whether uranium imports threaten to impair national security in the Uranium Report.  Lieberman Decl. ¶¶ 35, 43.  While the President did not concur with the Secretary's conclusion that uranium imports threaten to impair the national security, that decision did not end the role that the Uranium Report is to play in presidential decision-making.  Instead, the Uranium Report remains relevant to the President's evaluation of matters fundamental to American national security and nuclear policy.  Lieberman Decl. ¶ 44.

As the President stated in the Presidential Memorandum, the findings in the Uranium Report "raised significant concerns regarding the impact of uranium imports on the national security with respect to domestic mining" necessitating "a fuller analysis of national security considerations with respect to the entire nuclear fuel supply chain."  Lieberman Decl. ¶ 44; Presidential Memo. § 1(c).  The Working Group, charged with conducting this analysis, will

16

submit its report to the President providing recommendations "to further enable domestic nuclear production if needed," including uranium production.  *Id.*  The Uranium Report presents a body of carefully selected and organized factual information and analysis regarding the characteristics, composition, and status of domestic uranium production.  Lieberman Decl. ¶ 45.  Thus, the Uranium Report remains an important and relevant source of deliberative work product submitted to inform—and precede—the ultimate assessment of the options to promote and protect the domestic nuclear supply chain by either the Working Group, the President or, presumably, both.  As such, the Uranium Report is pre-decisional.[5]

The Uranium Report is also deliberative.  Documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated" are at the heart of the privilege's protection.  *Klamath*, 532 U.S. at 8 (quoting *NLRB,* 421 U.S. at 150); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  Section 232 reports—like the one in this case—are quintessentially deliberative: they make recommendations and express opinions on legal or policy matters.  See *Vaughn v, Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975).  The nature, scope and content to the Section 232 Report in this case "reflects the give-and-take of the consultative process" that is a hallmark of the deliberative process.  *See, e.g., Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991).  Such documents are entitled to protection because, by their very nature, their release would like "stifle honest and frank communication."  *See, e,g., Coastal States*, 617 F.2d at 866.

---

[5]      Whether a document is pre-decisional does not depend on the agency's ability to identify a specific decision for which the document was prepared.  *NLRB*, 421 U.S. at 151 n.18.  Rather, the deliberative process privilege applies as long as the document is generated as part of a continuing process of agency decision-making.  *Id.*

"A key feature under both the 'predecisional' and 'deliberative' criteria is the relation between the author and recipients of the document. A document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient. By contrast, one moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement of the decisionmaking rather than part of its give-and-take." *Access Reports*, 926 F.2d at 1195 (citing cases).  This power element—frequently described in terms of subordinates and superiors—correlates highly to the process of deliberation.  In the affairs of government, there is no greater example of this dynamic than the relationship between the President and his advisors; from the most junior contributor to the Secretary, himself, the entirety of DOC's team was geared toward producing advice for the ultimate decision-maker (and superior), rather than for themselves.

In *Bureau of Nat'l Affairs v. Dep't of Justice*, 742 F.2d 1484 (D.C. Cir. 1984), the EPA's final budget, submitted through OMB to the President, was protected by the deliberative process privilege because "the President, not EPA, makes the final decision concerning what budget requests should be submitted to Congress." *Id.* at 1486-87. What mattered was the role EPA's final budget played ***in the President's*** deliberative process, ***not in its own***.  By parity of reasoning, what matters here is the role of the Secretary's Uranium Report in the President' deliberative process, and not in its own.  See also *Judicial Watch*, 412 F.3d at 347-348 (agencies' records protected because pre-decisional and deliberative with respect to President's decisionmaking process, not their own); *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 187-88 (1975).

The deliberative process privilege also protects factual materials that are closely intertwined with opinions, recommendations, and deliberations.  *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) ("[T]he legitimacy of withholding does not turn

on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process."); *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1538-39 (D.C. Cir. 1993).  Likewise, it extends to "compilation[s] of factual material 'assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action.'"  *EPIC*, 320 F. Supp. 3d at 120 (D.D.C. 2018) (quoting *Mapother*, 3 F.3d at 1539).

As the Lieberman Declaration makes clear, the Report contains carefully selected data and factual information, analysis and opinions concerning the adverse effects of uranium imports, and it deals extensively with the state of domestic uranium production and domestic nuclear requirements.  Lieberman Decl. ¶ 45.  This information is critical to the President's decision-making regarding a matter of national security—namely, how to increase the domestic production of uranium and other nuclear fuel sources to meet the needs of the military, other governmental need, and those of the private sector.  Releasing that information prematurely, before the President has had a full opportunity to assess the options available to him, threatens to compromise the implementation of the President's nuclear energy policy.   Lieberman Decl. ¶ 46.

Accordingly, because DOC has withheld pre-decisional, deliberative information that is privileged under the deliberate process privilege, the agency's invocation of Exemption 5 should be upheld.

**B.    DOC DOES NOT HAVE A "POLICY AND PRACTICE" OF UNLAWFULLY WITHHOLDING SECTION 232 REPORTS.**

As demonstrated above (*supra* §§ III.B.1-3), the Secretary's Uranium Report is protected by both forms of executive privilege.  A detailed report from a Cabinet Secretary to the President on a sensitive matter of national security conveying the Secretary's findings, recommendations,

and advice—the Uranium Report is a quintessential presidential communication.  The Report is also protected by the deliberative process privilege because is reflects a recommendation made in connection with, and in support of, deliberations over the President's final decision.  Assuring unfettered and uncompromised access to this advice and counsel is a Constitutional concern, implicating the President's Article II, § 2, cl. 1 power "to require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices."  The case in favor of the Report's protection is, therefore, strong and justified.

Against this backdrop, Plaintiff's assertion that DOC may not, as a categorical matter, assert its right to protect from immediate public disclosure confidential recommendations and advice in the heartland of Exemption 5 is particularly startling.  Indeed, based on the authority Plaintiff invokes and the relief it seeks, one might imagine a pattern of willful, chronic and flagrant of violations of FOIA to match the implication.  There is nothing of the kind.  Wrong on both the facts and the law, Plaintiff's overreach should be rejected out of hand.

DOC's conduct is neither unlawful nor some form of new, unannounced policy or practice departing from prior norms.  On the contrary, since the beginning of the nation, when President Washington declined to produce to the House of Representatives instructions given to one of his diplomatic representatives in 1796,[6] there has been a recognition, distilled over time, that a privilege for presidential communications is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution."  *Nixon*, 418 U.S. at

---

[6]    *See* Message to the House of Representatives (Mar. 30, 1796), *reprinted in* 1 *A Compilation of the Messages and Papers of the Presidents*, 194-95 (James D. Richardson ed., 1896).

708.  Asserting the right to protect those important interests is hardly the stuff of "policy and practice" claims under FOIA.

By Plaintiff's own account, five Section 232 investigations have been initiated during the current administration, covering five separate articles of commerce:  steel, aluminum, automobiles and auto parts, uranium, and titanium sponge.  *See* Compl. ¶ 11.  As of the filing of Plaintiff's complaint, four investigations had been completed and resulted in the submission of reports to the President under 19 U.S.C. § 1862(b)(3)(A).[7]  Of the four reports submitted to the President, two have been since publicly released (Steel and Aluminum) (Compl. ¶ 12); and two continue to be withheld (Automotive and Uranium).  This record plainly fails to support the conclusion that DOC is systematically and unlawfully withholding Section 232 reports from the public and flouting its statutory obligations to make such reports public.  Indeed, that the Aluminum and Steel reports were quickly released cannot be squared with notions of some unlawful "policy and practice."  Instead, what DOC's treatment of Section 232 reports reflects is a flexible, case-specific approach largely revealed by DOC's historic practice of delaying the report's disclosure until its findings have been considered and the President has made his decision—in short, maintaining the privilege's protection when it remains necessary to do so, and releasing or publishing the reports when it no longer is.

Apart from conflicting with other allegations in its complaint (Compl. ¶ 2 ("Commerce [ ] has **repeatedly withheld**")), the assertion that DOC has "**recently**" plotted a "**changed course** and

---

[7]     The Secretary subsequently completed the last investigation—relating to titanium sponge—and submitted it to the President.  Very recently, on February 27, 2020, the President issued a Presidential Memorandum regarding that report, entitled *Memorandum on the Effect of Titanium Sponge Imports on the National Security*.  This Presidential Memorandum may be found on the internet at: https://www.whitehouse.gov/presidential-actions/memorandum-effect-titanium-sponge-imports-national-security/.

started to withhold Section 232 reports" (*id. ¶* 11) is belied by the evidence of past practice. By Plaintiff's own admission, DOC has delayed release of Section 232 reports on 8 of 22 occasions Plaintiff sampled, including five reports released between 106 to 659 days after their submission to the President. *See* Statement of Undisputed Facts ("SMF") ¶ 7 (Declaration of R. James Valvo, III ¶ 8). Historically, with respect to reports that find a national-security threat, practice appears to have been to disclose the reports only after the President decides what action to take to eliminate the threat. *See* SMF ¶ 13.[8] The implication of a systematic overturning of past practice in favor of a new and unprincipled approach to the treatment of Section 232 reports is simply untrue.

Plaintiff simply cannot satisfy the high substantive standard needed to make out a "policy and practice" claim. "Policy and practice" claims are limited to extraordinary circumstances. *See. e.g., Am. Ctr. for Law & Justice v. Dep't of State*, 249 F. Supp. 3d 275, 286 (D.D.C. 2017) ("Only a rare instance of agency delinquency would warrant an injunction [against an agency]"). Indeed, a plaintiff "must show that the agency (1) repeatedly violates FOIA through a (2) policy or practice that is 'sufficiently outrageous.'" *Am. Ctr. for Law & Justice v. Dep't of State*, 289 F. Supp. 3d 81, 87 (D.D.C. 2018) (quoting *Am. Ctr.*, 249 F. Supp. 3d at 281-82). Merely using the adverb "repeatedly" in its complaint does not make an unsubstantiated application against DOC true. Indeed, the facts here support none of the elements required for a pattern and practice claim.

---

[8] The *Report of Investigation of Imports of Crude Oil and its Derivatives and Products* was not released until more than four months *after* President Eisenhower imposed import restrictions. See SMF ¶ 13. The report *Effects of Imported Articles on National Security*, 40 Fed. Reg. 4457, 4457 (January 30, 1975), was not published until *after* President Ford's imposition of supplemental fees. *Id.* The same has been true of cases of presidential inaction. Section 232 reports were released *after* "no action" decisions in 1988, 1989, 1995 and 2000. *Id.*

The complaint's allegation (at ¶ 2), that "Commerce instead has *repeatedly* withheld Section 232 Report*s* in full," creates the impression of some plural number of cases.  But based on the known record, this is inaccurate.  The sole other instance of DOC withholding a Section 232 report is in the Auto Report Case, and DOC's well-supported bases for withholding that report (which are similar to those presented here) are pending review before the court.  Indeed, no court has found that DOC has erred in withholding any Section 232 reports (let alone on repeated occasions), and DOC asserting executive privileges to protect information that may foreseeably harm the United States' positions in negotiating trade with foreign powers is plainly not a "sufficiently outrageous" violation of FOIA.

In support of its request for declaratory and injunctive relief, Plaintiff cites *Payne Enterp., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988).  But *Payne* is thoroughly inapposite.  The FOIA requester in *Payne* had "an undeniable right" to certain bid records he sought from the Air Force.  *Id* at 494.  The FOIA processors knew as much, but they "perfunctorily" invoked exemptions that they never attempted to justify.  The Air Force conceded that the exemptions were inapplicable and "wholly unjustified."  *Id*. at 488-89.  Upon each of the requester's many administrative appeals, the Secretary reversed the withholdings and released the requested documents.  Well aware of the multiple reversals' import, the processors were even affirmatively instructed to fall in line, but failed to do so.  The processors' recalcitrance forced the requester to undertake multiple, serial appeals to obtain the same information to which he had already conclusively established entitlement.  The process unjustifiably multiplied the costs to the requester and injured his business.  Concluding that the agency's behavior over a two-year period amounted to an agency policy of "offensively" using FOIA to "hinder the release of non-exempt

documents" was "sufficiently outrageous" to warrant the fashioning of equitable relief," the court did so. *Id*. at 494.[9]

The extraordinary relief granted in *Payne* was premised on the agency's repeated and conceded violations of FOIA. Having been told so by their own superiors, agency decision-makers knew they were wrong. Their repeated willful disregard for FOIA's requirements prompted the court to find a pattern and practice. *Id*. (using FOIA "offensively" as a weapon, "forcing" the requester "to bring several lawsuits to obtain release," "violat[ing] the purpose and intent of FOIA" – all constituting "abuses" that "the courts have a duty to prevent"). None of those animating features of the court's decision in *Payne* is present here.

DOC engaged in no wrongful conduct, much less repeated and sufficiently outrageous conduct. On the merits, DOC's contention that the Section 232 report is protected by both the presidential communication and deliberative process privileges is well-founded, as demonstrated above. Lieberman Decl. ¶¶ 37-47. DOC has acted consistently with, and not in transgression of, the purpose of Section 232. As a threshold matter, DOC withheld the Automotive Report (in the Auto Report Case) because the U.S. Trade Representative ("USTR") was directed to engage in the negotiation of trade agreements with the European Union, Japan and other countries the USTR deemed appropriate to adjust these imports pursuant to 19 U.S.C. §1862(c)(3)(A)(i). Agyekum Decl. ¶ 7 n.1, Ex. 3; Executive Proclamation entitled *Adjusting Imports of Automobiles and*

---

[9]     *See also Newport Aeronautical Sales v. Dep't of the Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012) (permitting policy and practice claim when requester alleged that Air Force had routine policy of unlawfully denying FOIA requests for certain types of data in order to force requester to obtain data through a more restrictive process); *Long v. IRS*, 693 F.2d 907, 908, 910 (9th Cir. 1982) (permitting policy and practice claim where plaintiffs involved in litigation with the agency for nearly ten years over the disclosure of documents that the agency conceded were not exempt from disclosure under FOIA, but which the agency nevertheless delayed releasing until after plaintiffs were forced to file FOIA lawsuits).

*Automobile Parts Into the United States*, ¶ 15.  Those negotiations remain ongoing.  Agyekum Decl. at n.1.

The strength of DOC's arguments for withholding the Section 232 Automotive Report as both a presidential communication and a reflection of the deliberative process by which it was created to advise and inform executive branch decisionmaking distinguishes this case from *Payne*. So does DOC's good faith in asserting these bases for withholding here.  Additionally, unlike the Air Force in *Payne*, at the time DOC withheld the Uranium Report it had—and it continues to have—no reason to doubt the propriety of its withholdings.  Indeed, the dispute over DOC's determination to withhold the Section 232 Automotive Report is under review.  Consequently, the Section 232 Automotive Report cannot be a predicate for a "policy and practice" claim in this case when the status of the Report is an open question pending a judicial ruling. [10]  And there simply is no repeated and outrageous violation of FOIA.

## C.    PLAINTIFF'S REMAINING CONTENTIONS LACK MERIT.

Based on a dubious contention that, by inclusion of a publication requirement in Section 232, Congress could and did make the assertion of executive privilege categorically unavailable,

---

[10]    Because this case cannot serve as a predicate for itself, an extended discussion beyond the discussion in Sections III.B.1-3 seems unnecessary.  Although the President did not concur with the Secretary's recommendation, he did exercise his constitutional authority to protect the national security by establishing a Working Group to advise him on ways to expand domestic uranium and other nuclear fuel production.  Section 232 requires publication of a report "[u]pon the disposition of each request, application, or motion" for an investigation under the statute.  It also requires that "[a]ny portion of the report submitted by the Secretary" to the President "which does not contain classified information or proprietary information shall be published in the Federal Register." 19 U.S.C. § 1862(b)(3)(B).  Although Section 232 requires the report's publication "upon the disposition" of the Secretary's investigation, the statute does not set any deadline for publication. Thus, consistent with past practice to await a decision on the President's course of action, the Secretary may continue to withhold a Section 232 report from publication while it still has a role in the President's decision-making.  Accordingly, no legal basis exists for Plaintiff's assertion that DOC has acted contrary to Section 232 in withholding both reports.

Plaintiff insists that the Secretary had no option other than to produce the Uranium Report, subject to a limited redaction right to eliminate classified and proprietary information. It is true that, immediately following the statutory subsection governing the Secretary's reporting obligation, Section 232 sets out a publication requirement. But, as Plaintiff concedes (Compl. ¶ 10), the Secretary's requirement for reporting to the President, for which an explicit deadline is set forth ("no later than [ ] 270 day" from the initiation of the investigation), the publication requirement contains no deadline. On several grounds set forth in detail below, DOC disputes that eventual publication has the effect Plaintiff asserts.

The Secretary's Uranium Report—as with its Section 232 Automotive Report —was drafted in connection with a statutory process that contemplates eventual public disclosure. Section 232 provides that "[a]ny portion of the report submitted by the Secretary under subparagraph (A) which does not contain classified information or proprietary information shall be published in the Federal Register." 19 U.S.C. §1862(b)(3)(B). Plaintiff has previously argued that neither the President nor the Secretary could have any expectations of confidentiality in the report as it was prepared with the knowledge that it would be disclosed. Conceding that the statute does not provide a specific timetable for publication, Plaintiff contends that the statute neither provides for "presidential input or control over publication" nor does it "grant Commerce the authority to withhold in full a report in response to a FOIA request." Compl. ¶ 10. But DOC has maintained —and continues to maintain—that the publication requirement does not make the executive privileges applicable to the report categorically unavailable.

The question is not *whether* the report will be disclosed, but rather *when* it will be disclosed. Section 232 does not require publication on any particular timeline. Given the nature of the subject matter to which Section 232 is addressed, this is hardly surprising. Because the report reflects

highly confidential findings, recommendations, and advice designed to inform the steps the President might consider taking to ameliorate a threat to national security posed by certain imports, the importance of preserving flexibility in the timing of public disclosure is crucial to effectuating the statute's very purpose. After all, Section 232 contemplates, among other things, that the negotiation of trade agreements with foreign nations to limit imports in pursuit of the President's obligation to safeguard national security. It would defy logic to require publication of a Section 232 report at the very time its disclosure could do the most harm to the President's efforts to discharge these important duties. Consequently, as indicated earlier, *supra* at pp. 21-22 & n.8, the Secretary has typically made public his Section 232 reports to the President only after the decisional process concerning a national-security threat has concluded.[11]

This practice is consistent with the Congressional mandates of the statute. This practice is consistent with the Congressional mandates of the statute. The section's title and mission— "safeguarding national security"—speaks to the Act's need for a measure of secrecy; less obvious, a desire for transparency is made explicit. A publication requirement without deadline strikes the proper balance. It protects confidential advice in active use, and requires disclosure when secrecy is no longer needed. Moreover, where Congress wished to set certain timeframes, it did so in Section 232 (*see* 19 U.S.C. §§ 1862(b)(3)(A), (c)(1)(A), (c)(1)(B), (c)(2)), but it included no timeframes for publishing Section 232 reports. Having included multiple deadlines in Section 232, the Court should not read additional deadlines into the statute, including a deadline for the publication of Section 232 reports.

---

[11] This approach is also consistent with the FOIA Improvement Act of 2016, Pub. L. No. 114-85, 130 Stat. 538, which requires agencies to release documents otherwise privileged when they cannot articulate a reasonably foreseeable harm that would result from disclosure, including due to the passage of time. *See* 5 U.S.C. §552(a)(8)(A).

Having included multiple deadlines in Section 232, the Court should not read additional deadlines into the statute, including a deadline for the publication of Section 232 reports.

Perhaps in an effort to knock down a strawman of its own creation, Plaintiff identifies a theory of "temporary privileges" it seeks to associate with DOC. But that phrase appeared in none of DOC's prior briefs. Rather than conceive of privileges as temporary or permanent, DOC applies typical concepts of balancing to support its withholdings in this case and in the Auto Report Case. Indeed, both forms of executive privilege (i.e., the presidential communications and deliberative process privileges) are qualified and can be overcome on a basis of need. See, *e.g.*, *Nixon v. Administrator*, 433 U.S. 425 (1977); *Judicial Watch v. Dep't of Justice,* 365 F.3d 1109, 1113-14 (D.C. Cir. 2004); *In re Sealed Case*, 121 F.3d 729, 746 (1997). Such a balancing approximates what has already been the prevailing practice; because that is what DOC has been long and sensibly doing, it would be wrong to deem the agency's conduct in the prior lawsuit evidence supporting a finding of an unlawful "policy and practice."

One additional factor militates against Plaintiff's preference: avoidance of difficult constitutional questions. As a constitutional prerogative of the President, executive privilege may not be eliminated by statute. *Dep't of Justice v. Julian*, 486 U.S. 1, 13 (1988) (if privilege is 'constitutionally rooted,' Congress may not 'determine for itself which privileges the Government may avail itself of and which it may not"). Plaintiff's reading Section 232 to eliminate the executive privilege would do exactly that. It is axiomatic, and often repeated, that statutes should be interpreted to avoid difficult constitutional issues "where the text fairly admits of a less problematic construction." *Public Citizen v. Dep't of* Justice, 491 U.S. 440, 445 (1989). Reading Section 232 to require publication only after the decisional process, and the insulation needed to

protect it, has concluded, is supported by the text, the Act's important goals, and the admonition to avoid difficult constitutional questions.

## D.    DOC HAS COMPLIED WITH FOIA'S SEGREGABILITY REQUIREMENT.

Under FOIA, if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b).  Non-exempt portions of records need not be disclosed if they are "inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).   To establish that all reasonably segregable, non-exempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated.  *Armstrong v. Exec. Office of the President,* 97 F.3d 575, 578-79 (D.C. Cir. 1996); *Canning v. Dep't of Justice*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008).

Here, DOC conducted a line-by-line analysis.  It withheld the  Uranium Report in entirety because the document may either be withheld in entirety as a presidential communication, or the exempt information is so inextricably intertwined with nonexempt information that any segregation would result in a meaningless set of words or phrases with no or minimal content. Lieberman Decl. ¶ 47.   Thus, because DOC conducted a line-by-line review of the material withheld and determined no non-exempt information could be released, the Court should find that the segregability requirement is met.

## <u>CONCLUSION</u>

Accordingly, for all the reasons set forth above, the Court should enter summary judgment in Defendant United States Department of Commerce's favor.

Dated:  March 5, 2020                    Respectfully submitted,

TIMOTHY J. SHEA, D.C. Bar # 437437
United States Attorney for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division

By:  */s/ John Moustakas*
John Moustakas
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-2518
john.moustakas@usdoj.gov
*Counsel for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CAUSE OF ACTION INSTITUTE,

                    Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
COMMERCE,

                  Defendant.

Civ. A. No. 19-2698 (DLF)

## **<u>ORDER</u>**

Upon consideration of Defendant's Motion for Summary Judgment, Plaintiff's Opposition, and the entire record in this case, the Court finds that there are no issues of material fact and the Defendant is entitled to judgment as a matter of law. Therefore, it is hereby

ORDERED that defendant's motion for summary judgment is granted.

This is a final, appealable order.

Dated: _____

_____
UNITED STATES DISTRICT JUDGE