**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
CAUSE OF ACTION INSTITUTE,                )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )          Civil Action No. 19-2698 (DLF)
                                          )
U.S. DEPARTMENT OF COMMERCE,              )          ORAL HEARING REQUESTED
                                          )
            Defendant.                    )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Authorities ................................................................................................... iii

Introduction ................................................................................................................. 1

Factual and Legal Background ................................................................................... 2

  I.    Section 232 of the Trade Expansion Act of 1962 ............................................. 2

  II.   The Section 232 Process Under the Current Administration ............................ 4

  III.  Procedural History ............................................................................................ 6

Standard of Review ..................................................................................................... 7

Argument ..................................................................................................................... 9

  I.    Commerce may not rely on Exemption 5 to withhold the Uranium Report. ..... 9

    A.    The Uranium Report is not an "inter-agency or intra-agency" record........... 10

    B.    The presidential-communications privilege does not protect the Uranium Report. ...... 15

      1.    The President did not "solicit" the Uranium Report. ................................. 15

      2.    The Uranium Report does not implicate inherent Article II authority........ 17

      3.    Section 232 mandates disclosure of the Uranium Report. ........................ 22

      4.    The President has no confidentiality interest in the Uranium Report. ........ 24

    C.    The deliberative-process privilege does not apply to the Uranium Report. ................. 27

      1.    Commerce confuses the interplay between the deliberative-process and presidential-communications privileges. ......................................................... 28

      2.    The deliberative-process privilege does not protect presidential decision-making under Section 232. ............................................................... 28

      3.    The Uranium Report is neither "predecisional" nor "deliberative." ............. 30

  II.   Commerce failed to segregate and release non-exempt information from the Uranium Report. ........................................................................................ 32

  III.  Commerce failed to conduct an adequate search for records responsive to Item Two of CoA Institute's FOIA requests. ...................................................... 34

  IV.  Commerce's policy and practice of withholding Section 232 reports is unlawful. .......... 35

    A.    Commerce has an identifiable policy and practice of outsourcing its FOIA decision-making to the White House and withholding Section 232 reports. ................. 36

    B.    Commerce's refusal to release Section 232 reports until directed to do so by the President violates the FOIA. .............................................................. 39

    C.    CoA Institute is suffering ongoing injury due to Commerce's policy and practice and is likely to be subject to it again in the future. ........................... 44

Conclusion ................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Center for Law & Justice v. Department of State,*
   289 F. Supp. 3d 81 (D.D.C. 2018) ............................................................................8

*American Center for Law & Justice v. Department of State,*
   330 F. Supp. 3d 293 (D.D.C. 2018) .........................................................................42

*Ancient Coin Collectors Guild v. Department of State,*
   641 F.3d 504 (D.C. Cir. 2011) ................................................................................27

*Atlantic Cleaners & Dyers, Inc. v. United States,*
   286 U.S. 427 (1932) ................................................................................................25

*Bruscino v. Federal Bureau of Prisons,*
   No. 94-1955, 1995 WL 444406 (D.D.C. May 15, 1995) ........................................41

*Bureau of National Affairs, Inc. v. Department of Justice,*
   742 F.2d 1484 (D.C. Cir. 1984) .................................................................12, 29, 30

*Cause of Action Institute v. Eggleston,*
   224 F. Supp. 3d 63 (D.D.C. 2016) ...........................................................................38

*Center for Effective Government v. Department of State,*
   7 F. Supp. 3d 16 (D.D.C. 2013) ...................................................................16, 17, 19

*Citizens for Responsibility & Ethics in Washington v.*
   *Department of Housing & Urban Development,*
   415 F. Supp. 3d 215 (D.D.C. 2019) ...................................................................38, 40

*Citizens for Responsibility & Ethics in Washington v.*
   *Federal Election Commission,*
   711 F.3d 180 (D.C. Cir. 2013) ..................................................................................7

*Citizens for Responsibility & Ethics in Washington v. Department of Justice,*
   846 F.3d 1235 (D.C. Cir. 2017) .................................................................................8

*Coastal States Gas Corp. v. Department of Energy,*
   617 F.2d 854 (D.C. Cir. 1980) ................................................................................28

*Competitive Enterprise Institute v. Environmental Protection Agency,*
   232 F. Supp. 3d 172 (D.D.C. 2017) ..........................................................................8

*Defenders of Wildlife v. Department of Agriculture,*
   311 F. Supp. 3d 44 (D.D.C. 2004) ...........................................................................35

*Defenders of Wildlife v. U.S. Border Patrol,*
    623 F. Supp. 2d 83 (D.D.C. 2009) ............................................................................7

*Department of the Interior v. Klamath Water Users Protective Ass'n,*
    532 U.S. 1 (2001) ...........................................................................11, 12, 13

*Dow Jones & Co. v. Department of Justice,*
    917 F.2d 571 (D.C. Cir. 1990) ...........................................................................14, 29

*Edmonds Institute v. Department of the Interior,*
    383 F. Supp. 2d 105 (D.D.C. 2005) ............................................................................32

*Electronic Frontier Foundation v. Department of Justice,*
    739 F.3d 1 (D.C. Cir. 2014) ...........................................................................30

*Electronic Privacy Information Center v. Department of Homeland Security,*
    384 F. Supp. 2d 100 (D.D.C. 2005) ............................................................................41

*Electronic Privacy Information Center v. Department of Justice,*
    320 F. Supp. 3d 110 (D.D.C. 2018) ............................................................................16

*Environmental Defense v. Duke Energy Corp.,*
    549 U.S. 561 (2007) ...........................................................................15

*Environmental Protection Agency v. Mink,*
    410 U.S. 73 (1973) ...........................................................................12, 33

*Federal Energy Administration v. Algonquin SNG, Inc.,*
    426 U.S. 548 (1976) ...........................................................................20

*Federal Open Market Committee of the Federal Reserve System v. Merrill,*
    443 U.S. 340 (1979) ...........................................................................40

*Federal Power Commission v. Tuscarora Indian Nation,*
    362 U.S. 99 (1960) ...........................................................................15

*Food Marketing Institute v. Argus Leader Media,*
    139 S. Ct. 2356 (2019) ...........................................................................10, 11, 24

*Hajro v. U.S. Citizenship & Immigration Services,*
    811 F.3d 1086 (9th Cir. 2016) ...........................................................................38

*Huffman v. Western Nuclear, Inc.,*
    486 U.S. 663 (1988) ...........................................................................8

*Judicial Watch, Inc. v. Department of Commerce,*
    375 F. Supp. 3d 93 (D.D.C. 2019) ...........................................................................43

*Judicial Watch, Inc. v. Department of Defense,*
    913 F.3d 1106 (D.C. Cir. 2019) ................................................................18, 23, 24

*Judicial Watch, Inc. v. Department of Energy,*
    412 F.3d 125 (D.C. Cir. 2005) .........................................................................10, 12

*Judicial Watch, Inc. v. Department of Homeland Security,*
    895 F.3d 770 (D.C. Cir. 2018) .........................................................................39, 40

*Judicial Watch, Inc. v. Department of Justice,*
    102 F. Supp. 2d 6 (D.D.C. 2000) ...........................................................................41

*Judicial Watch, Inc. v. Department of Justice,*
    365 F.3d 1108 (D.C. Cir. 2004) .................................................................... *passim*

*Judicial Watch, Inc. v. Department of Justice,*
    No. 01-639, 2006 WL 2038513 (D.D.C. July 19, 2006) ........................................28

*Judicial Watch, Inc. v. Department of Justice,*
    No. 17-0832, 2019 WL 4644029 (D.D.C. Sept. 24, 2019) ....................................44

*Judicial Watch, Inc. v. Department of the Treasury,*
    796 F. Supp. 2d 13 (D.D.C. 2011) .........................................................................33

*Judicial Watch, Inc. v. U.S. Secret Service,*
    726 F.3d 208 (D.C. Cir. 2013) ...............................................................................14

*K Mart Corp. v. Cartier, Inc.,*
    486 U.S. 281 (1988) ................................................................................................25

*Krikorian v. Department of State,*
    984 F.2d 461 (D.C. Cir. 1993) ...............................................................................32

*Lamie v. U.S. Trustee,*
    540 U.S. 526 (2004) ................................................................................................25

*Lardner v. Department of Justice,*
    No. 03-0180, 2005 WL 758267 (D.D.C. Mar. 31, 2005) .................................16, 42

*Lefkowitz v. Turley,*
    414 U.S. 70 (1973) ..................................................................................................42

*Loving v. Department of Defense,*
    496 F. Supp. 2d 101 (D.D.C. 2007) .......................................................................29

*Loving v. Department of Defense,*
    550 F.3d 32 (D.C. Cir. 2008) ...........................................................................18, 23

v

*Lucaj v. Federal Bureau of Investigation,*
    852 F.3d 541 (6th Cir. 2017) ............................................12

*Meyer v. Bush,*
    981 F.2d 1288 (D.C. Cir. 1993) ........................................10

*Military Audit Project v. Casey,*
    656 F.2d 724 (D.C. Cir. 1981) ..........................................8

*Milner v. Department of the Navy,*
    562 U.S. 562 (2011) ..........................................10, 11, 24

*Miranda v. Arizona,*
    384 U.S. 436 (1966) .........................................................42

*Missouri Coalition for the Environment v. Army Corps of Engineers,*
    No. 18-663, 2019 WL 1411063 (D.D.C. Mar. 28, 2019) ........................9

*Multi Ag Media LLC v. Department of Agriculture,*
    515 F.3d 1224 (D.C. Cir. 2008) ..........................................7

*National Ass'n of Home Builders v. Norton,*
    309 F.3d 26 (D.C. Cir. 2002) ..............................................9

*National Labor Relations Board v. Robbins Tire & Rubber Co.,*
    437 U.S. 214 (1978) ..........................................................9

*National Labor Relations Board v. Sears, Roebuck & Co.,*
    421 U.S. 132 (1975) ....................................................30, 41

*National Security Archive Fund, Inc. v. Central Intelligence Agency,*
    402 F. Supp. 2d 211 (D.D.C. 2005) ......................................33

*National Security Counselors v. Central Intelligence Agency,*
    898 F. Supp. 2d 233 (D.D.C. 2012) ................................8, 36, 39

*Natural Resource Defense Council v. Environmental Protection Agency,*
    No. 16-5928, 2019 WL 3338266 (S.D.N.Y. July 25, 2019) .....................44

*New Prime Inc. v. Oliveira,*
    139 S. Ct. 532 (2019) ......................................................10

*New York Times Co. v. Department of Justice,*
    756 F.3d 100 (2d Cir. 2014) ..............................................31

*New York Times Co. v. Jascalevich,*
    439 U.S. 1317 (1978) ..................................................17, 23

*Oglesby v. Department of the Army*,
  920 F.2d 57 (D.C. Cir. 1990)..............................................................34

*Payne Enterprises, Inc. v. United States*,
  837 F.2d 486 (D.C. Cir. 1988).........................................8, 35, 38, 39

*People for the American Way Foundation v. National Park Service*,
  503 F. Supp. 2d 284 (D.D.C. 2007)...................................................28

*Property of the People, Inc. v. Office of Management & Budget*,
  394 F. Supp. 3d 39 (D.D.C. 2019)......................................................17

*Protect Democracy Project, Inc. v. Department of Defense*,
  320 F. Supp. 3d 162 (D.D.C. 2018)....................................................16

*Robert v. Department of Justice*,
  2008 WL 2039433 (E.D.N.Y. May 9, 2008) .....................................35

*Rockwell International Corp. v. Department of Justice*,
  235 F.3d 598 (D.C. Cir. 2001)............................................................14

*Rojas v. Federal Aviation Administration*,
  927 F.3d 1046 (9th Cir. 2019) ............................................................12

*Rosenberg v. Department of Defense*,
  342 F. Supp. 3d 62 (D.D.C. 2018)......................................................44

*Ryan v. Department of Justice*,
  617 F.2d 781 (D.C. Cir. 1980)......................................................11, 33

*Schlefer v. United States*,
  702 F.2d 233 (D.C. Cir. 1983)............................................................31

*Schoenman v. Federal Bureau of Investigation*,
  575 F. Supp. 2d 136 (D.D.C. 2008) .....................................................8

*United States ex rel. Schweizer v. Oce, N.V.*,
  577 F. Supp. 2d 169 (D.D.C. 2008).....................................................42

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ................................................... *passim*

*Senate of Puerto Rico v. Department of Justice*,
  823 F.2d 574 (D.C. Cir. 1987).............................................................28

*Soucie v. David*,
  448 F.2d 1067 (D.C. Cir. 1971)..........................................................12

*Swan View Coalition v. Department of Agriculture*,
39 F. Supp. 2d 42 (D.D.C. 1999) ...................................................................38

*Tax Analysts v. Internal Revenue Service*,
117 F.3d 607 (D.C. Cir. 1997) ......................................................................27

*Trans-Pacific Policing Agreement v. U.S. Customs Service*,
177 F.3d 1022 (D.C. Cir. 1999) .....................................................................32

*Transpacific Steel LLC v. United States*,
415 F. Supp. 3d 1267 (Ct. Int'l Trade 2019) .............................................20

*Truitt v. Department of State*,
897 F.2d 540 (D.C. Cir. 1990) .......................................................................34

*United States v. Nixon*,
418 U.S. 683 (1974) ...........................................................................17, 23, 24

*United States v. Philip Morris USA, Inc.*,
No. 99-2496, 2004 WL 3253662 (D.D.C. Sept. 9, 2004) ........................19

*United We Stand America, Inc. v. Internal Revenue Service*,
359 F.3d 595 (D.C. Cir. 2004) .......................................................................14

*Valencia-Lucena v. U.S. Coast Guard*,
180 F.3d 321 (D.C. Cir. 1999) .......................................................................34

*Vaughn v. Rosen*,
523 F.2d 1136 (D.C. Cir. 1975) .....................................................................28

*Weinberger v. Catholic Action of Hawaii/Peace Education Project*,
454 U.S. 139 (1981) .........................................................................................23

*Weisberg v. Department of Justice*,
627 F.2d 365 (D.C. Cir. 1980) .......................................................................35

*Wolfe v. Department of Health & Human Services*,
839 F.2d 768 (D.C. Cir. 1988) .......................................................................24

*Yakus v. United States*,
321 U.S. 414 (1944) .........................................................................................19

**Constitutional Provisions**

U.S. Constitution art. I, sec. 8 .....................................................................2

**Statutes**

5 U.S.C. § 552(a)(3)(A) ...................................................................................7

5 U.S.C. § 552(a)(4)(B) .................................................................................................7

5 U.S.C. § 552(a)(6)(C)(i) .............................................................................................7

5 U.S.C. § 552(a)(8)(A)(i)(I) .......................................................................................43

5 U.S.C. § 552(a)(8)(A)(ii)(II) .....................................................................................32

5 U.S.C. § 552(b) ..........................................................................................................32

5 U.S.C. § 552(b)(3) .....................................................................................................22

5 U.S.C. § 552(b)(5) ...........................................................................................9, 10, 11

5 U.S.C. § 552(f)(1) ......................................................................................................15

5 U.S.C. § 603 ...............................................................................................................22

5 U.S.C. § 604 ...............................................................................................................22

19 U.S.C. § 1862(b) ...........................................................................................2, 17, 30

19 U.S.C. § 1862(b)(1) .................................................................................................16

19 U.S.C. § 1862(b)(1)(A) .......................................................................................2, 25

19 U.S.C. § 1862(b)(1)(B) ............................................................................................34

19 U.S.C. § 1862(b)(2)(A) .......................................................................................2, 34

19 U.S.C. § 1862(b)(2)(B) ............................................................................................34

19 U.S.C. § 1862(b)(3)(A) .........................................................................................2, 3

19 U.S.C. § 1862(b)(3)(B) ..................................................................................... *passim*

19 U.S.C. § 1862(c) ...........................................................................................2, 30

19 U.S.C. § 1862(c)(1) ...................................................................................................2

19 U.S.C. § 1862(c)(1)(A) .........................................................................................3, 21

19 U.S.C. § 1862(c)(1)(B) .........................................................................................3, 21

19 U.S.C. § 1862(c)(2) ...............................................................................................3, 4

19 U.S.C. § 1862(c)(3)(A) .....................................................................................3, 4, 21

19 U.S.C. § 1862(c)(3)(B) .........................................................................................3, 21

19 U.S.C. § 1862(d)′ ................................................................................................4

19 U.S.C. § 1862(d)′(1) ..........................................................................................25

42 U.S.C. § 4332 ....................................................................................................22

42 U.S.C. § 4332(2)(C) ..........................................................................................23

44 U.S.C. § 2201(2) ................................................................................................13

44 U.S.C. § 2201(2)(A) ..........................................................................................14

44 U.S.C. § 2204 ....................................................................................................13

50 U.S.C. § 1846(c) ................................................................................................23

**Regulations**

15 C.F.R. § 705.2 ......................................................................................................2

15 C.F.R. § 705.3(a) ..................................................................................................2

15 C.F.R. § 705.5 ......................................................................................................2

15 C.F.R. § 705.7 ......................................................................................................2

15 C.F.R. § 705.8 ......................................................................................................2

15 C.F.R. § 705.10(a) ................................................................................................3

15 C.F.R. § 705.10(b) ................................................................................................3

15 C.F.R. § 705.10(c) ................................................................................................3

15 C.F.R. § 705.11 ....................................................................................................3

15 C.F.R. § 705.11(a) ................................................................................................2

15 C.F.R. § 705.12(a) ................................................................................................3

40 C.F.R. pt. 1501 ..................................................................................................22

**Session Laws**

Federal Reports Elimination and Sunset Act of 1995,
  Pub. L. No. 104-66, 109 Stat. 707 (1995) ..............................................................4

Omnibus Trade and Competitiveness Act of 1988,
  Pub. L. No. 100-418, 102 Stat. 1107 (1988) ..............................................3, 4, 25

Trade Expansion Act of 1962,
   Pub. L. No. 87-794, 76 Stat. 872 (1962) ...............................................................25

**Rules**

Federal Rule of Civil Procedure 56(a) ...........................................................................7

**Legislative Materials**

162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) ..........................................................43

H.R. Rep. No. 1380, 93d Cong., 2d Session (1974) ......................................................10

**Other Authorities**

Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles
   into the United States, 85 Fed. Reg. 5,281 (Jan. 29, 2020) ......................................26

Br. of *Amici Curiae* Sen. Pat Toomey & Members of Congress in Supp. of Pl.,
   *Cause of Action Institute v. Department of Commerce*, No. 19-0778
   (D.D.C. filed Mar. 6, 2020), ECF No. 37 ...........................................................20, 25

Petroleum Import Adjustment Program, 45 Fed. Reg. 22,864 (Apr. 3, 1980) .............26

Publication of Report of Investigation to Determine the Effects on the National
   Security of Oil Imports, 44 Fed. Reg. 18,818 (Mar. 29, 1979) ................................26

*Section 232 Investigations: The Effect of Imports on the National Security*, Bureau
   of Indus. & Sec., Dep't of Commerce, http://bit.ly/2zotcJe ......................................3

Webster's Third New International Dictionary (1961) ...................................................10

## INTRODUCTION

This case presents two questions. *First*, may the Department of Commerce ("Commerce") rely on Exemption 5, along with the presidential-communications and deliberative-process privileges, to refuse to release a final report prepared and transmitted to the President as part of Congress's delegation of tariff authority? *Second*, does Commerce's newfound policy and practice of applying these same privileges to all such reports until directed otherwise by the President represent an ongoing violation of the Freedom of Information Act ("FOIA")?

Congress used Section 232 of the Trade Expansion Act of 1962 ("Section 232") to delegate authority to the President to adjust tariffs on certain goods whose importation affects the national security. Before the President may exercise that authority, however, the Secretary of Commerce must conduct an investigation, prepare findings and recommendations, and transmit a final report to the President for his consideration. Section 232 requires that report to be published in the *Federal Register* after its transmission to the President, subject to redactions only for classified and proprietary information. Here, Commerce completed a report on the national-security impact of the importation of uranium ("Uranium Report"). It transmitted the report to the President, who chose to forgo action under Section 232. But Commerce refuses to publish the report, as required by law. Plaintiff Cause of Action Institute ("CoA Institute") filed a FOIA request for the report, and related records, after Commerce refused to perform its statutory duty.

Commerce maintains that it may withhold the Uranium Report in full by applying the presidential-communications and deliberative-process privileges. Commerce's arguments are meritless. Even if the agency could properly invoke Exemption 5, neither privilege protects the Uranium Report from disclosure. Moreover, Commerce's admitted policy and practice of withholding Section 232 secretarial reports, here and elsewhere, violates the FOIA. Commerce

1

has surrendered its responsibility for administering the FOIA and outsourced withholding determinations to the President.  The Court should therefore deny Commerce's motion for summary judgment and grant CoA Institute's cross-motion.

## FACTUAL AND LEGAL BACKGROUND

I.     **Section 232 of the Trade Expansion Act of 1962**

The United States Constitution grants Congress the sole authority to set tariffs and "regulate Commerce with foreign Nations[.]"  U.S. Const. art. I, sec. 8.  Congress used Section 232 to delegate some of that authority to the President so that he can adjust imports to safeguard national security.  19 U.S.C. § 1862(c).  But Congress conditioned its delegation.  The President cannot act without the Secretary of Commerce first completing an independent investigation, preparing a report on his findings, and recommending action or inaction.  *Id.* §1862(b); *see generally* 15 C.F.R. § 705.2.  The President's ability to exercise delegated authority under Section 232 is contingent on the Secretary determining that the importation of an article threatens to impair national security.  *See* 19 U.S.C. § 1862(b)(3)(A), (c)(1); 15 C.F.R. § 705.11(a).  The President does not enjoy free-standing authority to issue tariffs for the sake of "national security," and Section 232 secretarial reports are not designed exclusively for his benefit.

Section 232 provides that "[u]pon request of the head of any department or agency, upon application of an interested party, or upon his own motion, the Secretary . . . shall" investigate whether importation of an article affects national security.  19 U.S.C. § 1862(b)(1)(A); 15 C.F.R. §§ 705.3(a), 705.5.  That investigation may involve consultation with the Secretary of Defense and other government officials, as well as public hearings and the solicitation of public comments.  19 U.S.C. § 1862(b)(2)(A); 15 C.F.R. §§ 705.7, 705.8.  Within 270 days of starting an investigation, the Secretary must prepare and submit a report to the President with findings and recommendations

about whether to impose tariffs or take other approved actions.  19 U.S.C. § 1862(b)(3)(A); 15 C.F.R. § 705.10(a)–(c).  "Upon the disposition" of an investigation, the Secretary publishes the report in the *Federal Register*, 19 U.S.C. § 1862(d)′[1]; 15 C.F.R. § 705.12(a), subject to the redaction of only "classified" or "proprietary information."  19 U.S.C. § 1862(b)(3)(B); 15 C.F.R. § 705.10(c).[2]  Section 232 does not provide for presidential control over publication of a report.

Within ninety days of receiving a report in which the Secretary has found "that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," the President must choose whether he agrees with that finding and whether he will act to "adjust" imports. 19 U.S.C. § 1862(c)(1)(A).  The President has several options.  If he chooses to adjust tariffs, the President must implement those adjustments within fifteen days.  *Id.* § 1862(c)(1)(B).  Alternatively, the President can try to renegotiate an existing trade agreement.  *Id.* § 1862(c)(3)(A).  In practice, this task is delegated to the U.S. Trade Representative.  If negotiations fail to produce the desired result within 180 days, the President can "take such other actions as [he] deems necessary" to eliminate any threats to national security.  *Id.*  The President can also choose to do nothing or to reject altogether the Secretary's findings and recommendations.  *See id.* § 1862(c)(2).

Section 232 imposes on the President his own unique reporting requirements.  *See generally* 15 C.F.R. § 705.11.  For example, within thirty days of determining how to act under subsection (c)(1), the President must submit a "written statement" to Congress explaining his plan,

---

[1] Subsection 1862(d)′ should have been renumbered as subsection (e) in the U.S. Code.  *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1501(a)(2), 102 Stat. 1107, 1257 (1988).

[2] Although Section 232 requires the Secretary to publish his report in the *Federal Register*, 19 U.S.C. § 1862(b)(3)(B), Commerce's regulations deviate somewhat by merely requiring publication of an "Executive Summary."  15 C.F.R. § 705.10(c).  "Copies of the full report, excluding any classified or proprietary information, [are made] available for public inspection and copying" in an online reading room.  *Id.*; *see Section 232 Investigations: The Effect of Imports on the National Security*, Bureau of Indus. & Sec., Dep't of Commerce, http://bit.ly/2zotcJe (last visited Apr. 3, 2020).  Commerce has not published an executive summary of the Uranium Report in the *Federal Register*.

including a refusal to accept the Secretary's conclusions or recommendations.   19 U.S.C. § 1862(c)(2).[3]   If his attempts to renegotiate agreements under subsection (c)(3) fail, the President must publish a notice of his intended next steps in the *Federal Register*.  *Id.* § 1862(c)(3)(A), (B). Section 232's presidential-reporting obligations exist independent of Commerce's obligation to publish secretarial reports in the *Federal Register*.  *Id.* § 1862(b)(3)(B), (d)′.

## II.      The Section 232 Process Under the Current Administration

The current Administration has invoked the Section 232 process five times.  Over the past several years, Commerce has investigated and finalized secretarial reports on the national-security impacts of the importation of steel, aluminum, automobiles and automobile parts, titanium sponge, and uranium.  Pl.'s Statement of Undisputed Material Facts ¶ 1 [hereinafter Pl.'s SUMF].  When Commerce completed reports on steel and aluminum in 2018, it transmitted those reports to the President and—within one month—disclosed them on its website, subject to redactions of only classified and proprietary information.  *Id.* ¶ 2.  After completing investigations and transmitting reports on automobiles, titanium sponge, and uranium, Commerce refused to comply with Section 232's publication requirement and, to date, has failed to make those reports available through the *Federal Register* or online.  *See id.* ¶¶ 5–28.  This change in practice—*i.e.*, Commerce's new policy of withholding reports until directed by the President to disclose them, *id.* ¶ 41—conflicts with well-recognized agency obligations under the FOIA.

A detailed explanation of how Commerce has treated Section 232 secretarial reports in the recent past exposes the agency's nefarious position here.  In February 2019, Commerce transmitted a report on automobile imports to the White House (the "Autos Report").  *Id.* ¶ 6.  The President

---

[3] Section 232 used to require the President to "submit to the Congress an annual report on the [statute's] operation[.]" Omnibus Trade and Competitiveness Act of 1988, § 1501(b), 102 Stat. at 1259.  That requirement was eliminated by the Federal Reports Elimination and Sunset Act of 1995.  Pub. L. No. 104-66, § 3003, 109 Stat. 707, 734–35 (1995).

acted under Section 232 to pursue trade negotiations, *id.* ¶ 7, but Commerce did not publish the Autos Report in the *Federal Register* or release it in response to FOIA requests filed by CoA Institute.  *Id.* ¶ 8–10.  After CoA Institute filed suit, Commerce suggested the Autos Report was a "presidential record," *id.* ¶ 9, but later changed tack to argue it was exempt under the presidential-communications and deliberative-process privileges, as it does here.  *Id.* ¶ 10.

Frustrated by Commerce's intransigence, Congress included a provision in recent appropriations legislation mandating publication of the Autos Report within thirty days.  *Id.* ¶ 11. Commerce refused to comply and, instead, has argued that Section 232's publication requirement is effectively unconstitutional.  *Id.* ¶¶ 12–13.  When Commerce explained its position in the ongoing litigation over disclosure of the Autos Report, *id.* ¶ 14, it incorporated a recent memorandum opinion from the Department of Justice's Office of Legal Counsel, *id.* ¶ 13, which is highly relevant to this case and CoA Institute's "policy or practice" claim.  CoA Institute and Commerce are still engaged in supplement briefing.  Decl. of Ryan P. Mulvey ¶ 18.  Most recently, a bipartisan group of U.S. Senators intervened as *amici* and filed a brief in support of CoA Institute's position.  *Id.*

As for the secretarial report on titanium sponge, Commerce finalized and transmitted that report to the President in November 2019.  Pl.'s SUMF ¶ 15.  Although the President decided not to act under Section 232, Commerce still has not published the report in the *Federal Register* and has not disclosed it online.  *Id.* ¶¶ 17–19.

Finally, with respect to the Uranium Report, Commerce completed its investigation and transmitted a final report to the President in April 2019.  *Id.* ¶ 20.  About three months later, the President published a memorandum announcing that he did "not concur with the Secretary's finding that uranium imports threaten to impair the national security[.]"  *Id.* ¶ 23.  Rather than act

under Section 232, the President created an inter-agency working group tasked with conducting further research into domestic nuclear fuel production. *Id.* ¶ 24. The President confirmed he was not "tak[ing] any action under [S]ection 232" in a required notice to Congress. *Id.* ¶ 25. To date, Commerce has not published the Uranium Report in the *Federal Register* or disclosed it online. *Id.* ¶¶ 28 & 40. Commerce also has not disclosed the Uranium Report in response to CoA Institute's FOIA requests, despite its commitment to doing so. *Id.* ¶¶ 34–35, 37, 50.

## III. Procedural History

In the face of Commerce's failure to publish or disclose the Uranium Report, CoA Institute filed the FOIA requests at issue. *Id.* ¶ 29. In April 2019, CoA Institute sent requests to Commerce's Office of the Secretary and the Bureau of Industry and Security ("BIS") seeking access to a copy of the Uranium Report and the "DOD response letter" collected as part of the underlying secretarial investigation. *Id.* ¶ 30.

In May 2019, Commerce provided a final determination and granted the request directed to BIS, explaining that the agency "intend[s] to provide all non-exempt documents[.]" *Id.* ¶ 34.[4] Commerce advised that "the [Uranium Report] will be made publicly available . . . after the President's review is complete." *Id.* ¶ 35. After the White House published its memorandum on the Uranium Report, which explained the President's decision not to impose tariffs or to take any other action under Section 232, Commerce informed CoA Institute that "an executive summary [of the report] will be printed in the [*Federal Register*] within the next 30 days and the full report will be on the BIS website." *Id.* ¶ 37. Nearly nine months have now elapsed, but Commerce still has not published the Uranium Report or released it to CoA Institute. *See id.* ¶¶ 28 & 40. By contrast, the FOIA requires an agency, upon issuing its final determination, to make records

---

[4] Although Commerce acknowledged receipt of the FOIA request directed to the Office of the Secretary, it failed to communicate any further with CoA Institute about that request. Pl.'s SUMF ¶ 32–33.

"promptly available," 5 U.S.C. § 552(a)(3)(A), (6)(C)(i)—that is, "within days or a few weeks . . . not months or years[.]" *Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 711 F.3d 180, 188 (D.C. Cir. 2013).

In September 2019, CoA Institute filed its Complaint.  ECF No. 1.  CoA Instituted alleged that Commerce had failed to issue a final determination on the request to the Secretary's office and to make records promptly available on the BIS request.  Pl.'s SUMF ¶¶ 40–47.  CoA Institute also alleged that Commerce maintains an unlawful policy and practice of withholding in full and delaying production of Section 232 secretarial reports until such time as directed by the White House that it may comply with the FOIA.  *Id.* ¶¶ 48–54.  Commerce filed a corrected Answer in October 2019, ECF No. 9, and moved for summary judgment last month.  *See* Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. at 2–3 [hereinafter Def.'s Mot.], ECF No. 17. This opposition and cross-motion follow.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "FOIA cases typically and appropriately are decided on motions for summary judgment."  *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  In a FOIA case, "the burden is on the agency to sustain its action[.]" 5 U.S.C. § 552(a)(4)(B).  The district court must determine *de novo* "'whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure[.]'"  *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation omitted).

An agency can meet its burden on summary judgment by proffering affidavits that "describe the documents and the justifications for nondisclosure with reasonably specific detail"

that is "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). The agency "must show that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed[.]" *Competitive Enter. Inst. v. Envtl. Prot. Agency*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017). Courts should analyze "all underlying facts and inferences . . . in the light most favorable to the FOIA requester." *Schoenman v. Fed. Bureau of Investigation*, 575 F. Supp. 2d 136, 148 (D.D.C. 2008) (citation omitted). If both parties seek summary judgment, each motion must stand on its own. *Huffman v. W. Nuclear, Inc.*, 486 U.S. 663, 664 n.11 (1988).

The "FOIA imposes no limits on courts' equitable powers in enforcing its terms." *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988). Those equitable powers extend to resolving policy-or-practice claims where "(1) the agency in question has adopted, endorsed, or implemented a policy or practice that constitutes an ongoing failure to abide by the terms of the FOIA; and (2) the plaintiff will suffer continuing injury due to this practice." *Nat'l Sec. Counselors v. Cent. Intelligence Agency*, 898 F. Supp. 2d 233, 253 (D.D.C. 2012) (cleaned up and citation omitted). Courts may resolve policy-or-practice claims on summary judgment. *See, e.g.*, *Am. Ctr. for Law & Justice v. Dep't of State*, 289 F. Supp. 3d 81, 90–91 (D.D.C. 2018).

District courts have "wide latitude . . . to fashion remedies under FOIA, including the power to issue prospective injunctive relief." *Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) (citations omitted). That latitude includes the "power to order relief beyond the simple release of extant records," *id.*, such as "the power to enjoin a FOIA procedural violation . . . so long as that violation was 'in connection with the processing of the plaintiff's FOIA requests.'" *Nat'l Sec. Counselors*, 898 F. Supp. 2d at 265

8

(citation omitted).  When an agency "employed the [challenged] policy or practice in violation of FOIA, [the plaintiff] is, at a minimum entitled to a declaratory judgment." *Mo. Coal. for the Env't v. Army Corps of Eng'rs*, No. 18-663, 2019 WL 1411063, at *7 (D.D.C. Mar. 28, 2019). Declaratory relief can "serve a useful purpose in clarifying the legal relations at issue or afford relief from the controversy giving rise to the proceeding[.]" *Id.* (citation omitted).

## ARGUMENT

### I.      Commerce may not rely on Exemption 5 to withhold the Uranium Report.

Commerce argues that it may withhold the Uranium Report in full by relying on Exemption 5 and invoking the presidential-communications and deliberative-process privileges.  *See, e.g.*, Def.'s Mot. at 6.  That reliance is misplaced; neither privilege applies here.[5]

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Courts "must bear in mind that FOIA mandates a strong presumption in favor of disclosure and that the statutory exemptions . . . are to be narrowly construed."  *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (cleaned up and citations omitted).

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]"  5 U.S.C. § 552(b)(5).  This language is understood to cover "those documents normally privileged in . . . civil discovery[.]"  *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) [hereinafter *Judicial Watch I*] (citation omitted).  Exemption 5 incorporates both the presidential-communications and deliberative-process privileges.  *Id.*

---

[5] For reasons discussed in another section of this brief, Commerce also cannot rely on Exemption 5 because it has not satisfied the FOIA's foreseeable harm standard.  *See infra* at pp. 43–44.

### A.        The Uranium Report is not an "inter-agency or intra-agency" record.

Commerce cannot rely on Exemption 5 because the Uranium Report is not an "inter-agency or intra-agency memorandum or letter[.]"  5 U.S.C.  §  552(b)(5).  Although courts in this jurisdiction have read these straightforward words in an expansive way to cover the President and non-agency components of the Executive Office of the President, *see Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129–31 (D.C. Cir. 2005) [hereinafter *Judicial Watch II*], that expansion conflicts with textual limitations imposed by Congress and the plain meaning of Exemption 5.

It is "a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.'" *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citation omitted).  The Supreme Court has confirmed that this canon applies with no less force in the FOIA context.  *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362–63 (2019) ("[A]s usual, we ask what [a statutory] term's 'ordinary, contemporary, common meaning' was when Congress enacted FOIA in 1966.") (citation omitted); *see also Milner v. Dep't of the Navy*, 562 U.S. 562, 569 (2011) ("Our consideration of [FOIA] Exemption 2's scope starts with its text.").

The prefixes "inter-" and "intra-" have ordinary meanings that work in tandem with the term "agency" to define the scope of Exemption 5.  They limit any of its attendant privileges to "memorandums or letters" that have been exchanged *within* or *among* entities subject to the FOIA. *See, e.g.*, Webster's Third New International Dictionary 440 (1961) (defining "inter" to mean "between" or "among"); *id*. at 444 (defining "intra" to mean "within").  Neither the President nor his immediate staff within the White House are an "agency" under the FOIA.  *See Meyer v. Bush*, 981 F.2d 1288, 1291–92 (D.C. Cir. 1993); H.R. Rep. No. 1380, 93d Cong., 2d Session at 14 (1974) ("The term ['agency'] is not to be interpreted as including the President's immediate personal staff

or units in the Executive Office whose sole function is to advise and assistant the President."). Records exchanged between Commerce and the White House, or the President himself, are not "inter-agency or intra-agency" communications[6] and thus are not protected by Exemption 5.[7]

The Supreme Court has increasingly expressed suspicion of interpretations of the FOIA that deviate from the plain meaning of the statute. Earlier this year, the Court rejected the D.C. Circuit's long-standing construction of the term "confidential" in Exemption 4 and chided that precedent as "a relic from a 'bygone era of statutory construction.'" *Food Mktg. Inst.*, 139 S. Ct. at 2364. In 2011, the Court adopted a text-based approach to Exemption 2, rejecting an overbroad reading of the term "personnel." *Milner*, 562 U.S. at 569–71. In each case, the Court abandoned widely held precedents and looked to plain meaning and commonsense readings of the statute.

Courts should adopt the same textual approach with Exemption 5. In fact, the undergirding of the current interpretative regime is already beginning to crumble. Previously, many courts accepted that an agency could withhold a record under Exemption 5 using the deliberative-process privilege if it was "solicited by [an] agency" but created by an "outside consultant." *Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980). The Supreme Court tried to stem the growth of this doctrine nearly twenty years ago when it recognized that agencies tended to treat Exemption 5's threshold requirement—*i.e.*, whether the entity was an "agency"—as "a purely conclusory" matter satisfied whenever "any document [is found] . . . valuable to keep confidential." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 12 (2001). The court stressed

---

[6] Commerce has not argued that the Uranium Report qualifies as an "*intra*-agency memorandum[] or letter[.]" 5 U.S.C. § 552(b)(5) (emphasis added). It assumes that the Uranium Report meets Exemption 5's threshold requirement because it was sent to the President, and the agency's invocation of the presidential-communications and deliberative-process privileges is based on that premise alone. *See* Decl. of Brian D. Lieberman ¶ 36, ECF No. 17-1.

[7] The Court need not prohibit use of the presidential-communications privilege as an absolute matter. The privilege could be limited to instances in which an agency exchanges records with a component of the Executive Office of the President subject to the FOIA, such as the Council on Environmental Quality, Office of Management and Budget, Office of National Drug Control Policy, Office of Science and Technology Policy, or U.S. Trade Representative.

"[t]here is . . . no textual justification for draining [Exemption 5's threshold] of independent vitality[.]" *Id.*

A Ninth Circuit panel recently explained why the "consultant corollary" doctrine explicitly "contravenes Exemption 5's plain language," which clearly refers only to agencies. *Rojas v. Fed. Aviation Admin.*, 927 F.3d 1046, 1055 (9th Cir. 2019) (citation omitted), *reh'g granted*, 948 F.3d 952 (9th Cir. 2020).[8]  That well-founded panel decision is not unprecedented.  The Sixth Circuit has rejected the same atextual expansion of the "consultant corollary" to non-agency entities. *Lucaj v. Fed. Bureau of Investigation*, 852 F.3d 541, 547–48 (6th Cir. 2017).  This Court should follow course and return to a text-based reading of Exemption 5.

Anticipating CoA Institute's position, Commerce proffers little substantive argument beyond rote recitation of prevailing precedent.[9]  But Commerce's reliance on Circuit caselaw reveals the weakness of those cases in the face of a textual reading of the FOIA.  Consider the agency's extended discussion of *Judicial Watch, Inc. v. Department of Energy*, which in turn relies on *Ryan v. Department of Justice*, to support the claim that a record need not be "'created by an agency or remain in [its] possession . . . in order to qualify as 'intra-agency.'" *Judicial Watch II*, 412 F.3d at 130 (citing *Ryan*).  The *Judicial Watch II* and *Ryan* holdings both depend on the consultant-corollary doctrine.  But the consultant corollary, *on its own terms*, cannot apply in this case.  Neither Commerce nor the President "solicited" the Uranium Report. Def.'s Mot. at 6; Pl.'s

---

[8] *Rojas* also is instructive for distinguishing cases used to justify the extension of Exemption 5 to records exchanged with the White House.  For example, the panel criticized the D.C. Circuit's decision in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), which it identified as the "source" of the "consultant corollary."  *See Rojas*, 927 F.3d at 1056 ("The [*Soucie*] court cited no authority for [its] propositions.  Nor did it acknowledge, never mind reconcile, FOIA's text and purpose.").  Other cases are similarly conclusory in addressing the "inter-agency or intra-agency" requirement, *see, e.g.*, *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 85 (1973), or they are inapt because they involved White House components subject to the FOIA.  *See, e.g.*, *Bureau of Nat'l Affairs, Inc. v. Dep't of Justice*, 742 F.2d 1484 (D.C. Cir. 1984) [hereinafter *BNA*] (Office of Management and Budget).

[9] Commerce claims that "this Court has previously ruled [that] Plaintiff is wrong." Def.'s Mot. at 7.  This is incorrect and misleading.  No court—let alone *this* Court—has *ever* held *in a CoA Institute lawsuit* that Exemption 5's threshold requirement is met when an agency submits a record to the President.

SUMF ¶ 21.  The report was not "submitted" by "outside consultants," but created by agency experts.  *Cf.* Lieberman Decl. ¶¶ 25 & 35.  And Commerce itself argues that the Uranium Report was not part of an intra-agency deliberative process but created for the "benefit" of the President and his decision-making.  *See* Def.'s Mot. at 18–19.

The Supreme Court has explained that the consultant corollary grew out of the practice of agencies hiring outside experts who "play[] essentially the same part in an agency's process of deliberation" as its own employees.  *Klamath Water Users Protective Ass'n*, 532 U.S. at 10.  The "consultant," or an analogous equivalent, is expected to "function[] just as an employee[.]"  *Id.* at 11.  But here, the President and White House staff do not serve Commerce's interests.  They do not "step into the shoes" of agency personnel by participating in Commerce's deliberative processes during the Section 232 process.  They are the furthest thing from agency "consultants."  Indeed, there is no evidence the President or his staff were involved in the report's creation at all.

Commerce claims CoA Institute's "argument is problematic" because, if it were correct, then "any advice the President received from his own Cabinet could never be maintained in confidence and would be required to be disclosed to the public on demand."  Def.'s Mot. at 7.  But that is a *non sequitur*.  Adopting the plain meaning of Exemption 5 would hardly threaten the confidentiality of presidential decision-making, nor would it impinge on executive privilege or frustrate the secrecy of presidential advice.  The President can already maintain the confidence of his decision-making, within the bounds of the law.  The Presidential Records Act ("PRA"), for example, governs the management and disclosure of records "created or received by the President," or his staff and advisers, which "relate to or have an effect upon the carrying out of [his] constitutional, statutory, or other official or ceremonial duties[.]"  44 U.S.C. § 2201(2).  Access to those records is unavailable through the FOIA.  *See id.* § 2204.  Although the PRA

includes a carve-out for "official records of an agency," *id.* § 2201(2)(A), there is little concern that presidential records would become subject to disclosure.  So long as the President manifests intent to retain legal control of a record he solicits or creates and restricts an agency's ability to use and dispose of the record, release under the FOIA would be impossible.  *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 221–24 (D.C. Cir. 2013); *see also id.* at 231 ("There are very few instances in which a construction of FOIA would put the President on the horns of a dilemma between surrendering his confidentiality and jeopardizing his safety.").

Courts already recognize the limits of applying Exemption 5 in the analogous instance of records exchanged between agencies and Congress.  The D.C. Circuit has recognized that, while "Congress . . . [could] have drafted [Exemption 5] more broadly to include Executive Branch communications to Congress," it "did not, and the words simply will not stretch to cover this situation, because Congress is simply not an agency." *Dow Jones & Co. v. Dep't of Justice*, 917 F.2d 571, 574 (D.C. Cir. 1990).  Thus, an agency may withhold congressional communications under the deliberative-process privilege so long as they "[a]re 'part and parcel of *the agency's* deliberative process," *id.* at 575, but not if they were "created specifically to assist Congress" and shared "for the sole purpose of assisting [a] Committee with *its* deliberations." *Rockwell Int'l Corp. v. Dep't of Justice*, 235 F.3d 598, 604 (D.C. Cir. 2001) (emphasis added).  Although records exchanged within the Executive Branch are somewhat distinct from those exchanged with another branch of government, the policy concerns are the same.  Congress and the President can both control records they seek to keep as their "own" outside the ambit of the FOIA. *See, e.g.*, *United We Stand Am., Inc. v. Internal Revenue Serv.*, 359 F.3d 595, 597 (D.C. Cir. 2004).

14

Without evidence that the President intended the Uranium Report to be a "presidential record" it is an agency record, and because the President is not an "agency,"[10] Commerce cannot avail itself of an exemption limited to "inter-agency or intra-agency" records.

**B.      The presidential-communications privilege does not protect the Uranium Report.**

Even if Commerce could satisfy Exemption 5's threshold requirement, the presidential-communications privilege does not apply to the Uranium Report because (1) certain technical requirements for the privilege have not been met, (2) the report does not reflect core Article II decision-making, (3) Section 232 mandates its disclosure, and (4) the President has no legitimate confidentiality interest in keeping the report secret.

The presidential-communications privilege protects "'presidential decision-making and deliberations . . . that the President believes should remain confidential.'" *Judicial Watch I*, 365 F.3d at 1113. Yet the privilege is not unbounded and does not apply to *anything* and *everything* that may involve the President. Courts have recognized important limits given "the dangers of expanding [the privilege] too far." *Id.* at 1114–15. Courts also have acknowledged an obligation to construe the privilege "'as narrowly as is consistent with ensuring that the confidentiality of the President's decision-making process is adequately protected.'" *Id.* at 1116 (citation omitted).

**1.      The President did not "solicit" the Uranium Report.**

The presidential-communication privilege applies to records "'solicited and received' by the President or his immediate White House advisers who have 'broad and significant

---

[10] The FOIA includes a clear definition of "agency," 5 U.S.C. § 552(f)(1), and the Supreme Court has held that the judiciary is "bound to give effect to [a statutory] definition . . . for it would be idle for Congress to define the sense in which it used [a term] 'if [courts] were free in despite of it to choose a meaning for [themselves].'" *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 111 (1960) (citation omitted). The "natural presumption" is that words "used in different parts of the same act . . . have the same meaning.'" *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (citation omitted).

responsibility for investigating and formulating the advice to be given to the President." *Id.* at 1114 (citation omitted).  In this sense, it is "narrow with respect to *whose* documents it protects." *Protect Democracy Project, Inc. v. Dep't of Def.*, 320 F. Supp. 3d 162, 172 –73 (D.D.C. 2018).

Section 232 specifies that a secretarial investigation may be conducted "[u]pon request of the head of any department or agency, upon application of an interested party, or upon [the Secretary's] own motion[.]"  19 U.S.C. § 1862(b)(1).  The government concedes that two private companies requested the underlying investigation that gave rise to the Uranium Report.  Pl.'s SUMF ¶ 21.  The report could not have been "solicited" in the sense that term is understood in the relevant caselaw.  Thus, the most basic technical requirement for the privilege has not been met.[11]

Commerce seeks to sidestep the "solicited and received" prong of the presidential-communications privilege by arguing that "[t]he privilege encompasses 'communications directly involving and documents actually viewed by the President[.]'"  Def.'s Mot. at 10 (citing *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008)).  "But no court has suggested that the mere fact [of] a President's direct involvement in a communication, either as an author or recipient, renders it automatically protected."  *Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 28 (D.D.C. 2013).  That would allow agencies to justify withholdings with a short, conclusory, and effectively unchallengeable set of factual allegations, as attempted here.  *See* Lieberman Decl. ¶¶ 38–40 ("The Secretary submitted the Uranium Report . . . [t]he President reviewed [it] . . . [and] DOC concluded that [it] directly involved the President and . . . constitutes a presidential communication.").[12]

---

[11] Commerce discusses other "technical" aspects of the presidential-communications privilege that are not in dispute. *See* Def.'s Mot. at 10–11.  Even so, while "the *manner* in which [an] exemption is raised" may not matter, this court must still attend to the "*content or nature*" of the Uranium Report to ensure that it properly falls within the scope of a recognized Exemption 5 privilege.  *Lardner v. Dep't of Justice*, No. 03-0180, 2005 WL 758267, at *7 (D.D.C. Mar. 31, 2005); *see Elec. Privacy Info. Ctr. v. Dep't of Justice*, 320 F. Supp. 3d 110, 117 (D.D.C. 2018).

[12] Aside from overstating the availability of the privilege for records that have not been "solicited" by the President or his immediate staff, Commerce has provided no evidence that the President *directly* reviewed the Uranium Report.  It

Contrary to Commerce's position, the "privilege has always been limited to certain *types* of communications directly involving the President, specifically those communications in performance of a President's responsibility of his office and made in the process of shaping policies and making decisions." *Ctr. for Effective Gov't*, 7 F. Supp. 3d. at 28 (cleaned up).  Section 232 secretarial reports are not that "*type*" of communication.  They do not reflect the "process of shaping policies and making presidential decisions." *Prop. of the People, Inc. v. Office of Mgmt. & Budget*, 394 F. Supp. 3d 39, 43 (D.D.C. 2019).  They are prepared before presidential decision-making even starts and reflect only the conclusions and recommendations developed by the Secretary of Commerce under a duty assigned to him by law. *See* 19 U.S.C. § 1862(b).

## 2. The Uranium Report does not implicate inherent Article II authority.

Another important factor that courts consider when evaluating an agency's use of the presidential-communications privilege is whether the record at issue concerns the exercise of the President's inherent Article II power.  In *United States v. Nixon*, the Supreme Court grounded the President's unique privileges in his enumerated Article II powers.  418 U.S. 683 (1974).  "Whatever the nature of the privilege of confidentiality of Presidential communications in the exercise of Article II powers, the privilege . . . derive[s] from the supremacy of each branch *within its own assigned area of constitutional duties*." *Id*. at 705 (emphasis added).  Certain "privileges flow from the nature of enumerated powers [and] . . . the protection of the confidentiality of Presidential communications has similar constitutional underpinnings." *Id.* at 705–06.  The Supreme Court soon after reiterated that the "privilege protect[s] Presidential communications *in the exercise of Article II powers*[.]" *N.Y. Times Co. v. Jascalevich*, 439 U.S. 1317, 1323 (1978) (emphasis added).

---

is more likely that White House employees tasked with advising the President and preparing the July 12, 2019 presidential memorandum received and reviewed the Uranium Report.

The D.C. Circuit has followed the Supreme Court's direction and attached special significance to the type of power the President is exercising when considering whether the presidential-communications privilege applies.  In *In re Sealed Case*, for example, the privilege applied to "documents . . . generated in the course of advising the President in the exercise of his appointment and removal power, a *quintessential and nondelegable Presidential power*."  121 F.3d 729, 752–53 (D.C. Cir. 1997) (emphasis added).  So too in *Judicial Watch, Inc. v. Department of Defense*, where the privilege applied to records that reflected "the extraordinary decision confronting the President in considering whether to order a military strike . . . [thus implicating] the exercise of an informed judgment by the President as Commander in Chief[.]"  913 F.3d 1106, 1111 (D.C. Cir. 2019) [hereinafter *Judicial Watch III*] (citing U.S. Const. art. 2, sec. 2).  The D.C. Circuit also found that the privilege applied to certain memoranda in *Loving v. Department of Defense*, where "the Rules for Courts–Martial direct[ed] the Judge Advocate General to submit his recommendation so the President may act upon it, and it is the President who promulgates the Rules for Courts–Martial."  550 F.3d 32, 40 (D.C. Cir. 2008) (citation omitted).  Legal proceedings within the Armed Forces are central to the President's role as Commander-in-Chief.

*Judicial Watch III* shows that, even where an inherent Article II power is in play, the presidential-communications privilege still is not all-encompassing.  In that case, the D.C. Circuit held "that the privilege protected from disclosure pardon documents 'solicited and received' by the President or his immediate White House advisers but not 'all agency documents prepared in the course of developing the [agency's] . . . pardon recommendations for the President.'"  *Judicial Watch III*, 913 F.3d at 1111 (citing *Judicial Watch I*, 365 F.3d at 1114).  The two-fold basis for this holding is evident in *Judicial Watch I*.  *First*, to extend the privilege to cover *anything* relating to presidential decision-making "would sweep within the reach of the presidential privilege much

of the functions of the executive branch, namely, to advise the President in the performance of his Article II duties." *Judicial Watch I*, 365 F.3d at 1122.   And the contrary approach would work against "a democratic form of government where the public's right to know how its government is conducting its business has long been an enduring and cherished value." *Id*.   Yet that is exactly what Commerce advocates here when it points to the President's need for "unfettered and uncompromised access to advice and counsel" of "principal Officer[s]" of the Executive Branch. Def.'s Mot. at 20.   *Second*, to overextend the privilege "would be inconsistent with [DOJ's] historical approach of invoking the deliberative process privilege rather than the presidential communications privilege to protect its internal documents and deliberations from public disclosure." *Judicial Watch I*, 365 F.3d at 1122.

District courts likewise have found the lack of Article II authority relevant in reviewing agency use of the presidential-communications privilege.   *See, e.g.*, *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 25 (finding privilege inapplicable because "this is not a case involving 'a quintessential and nondelegable Presidential power' . . . where separation of powers concerns are at their highest") (citation omitted).   *But see United States v. Philip Morris USA, Inc.*, No. 99-2496, 2004 WL 3253662, at *1–2 (D.D.C. Sept. 9, 2004) (rejecting distinction between delegable and nondelegable powers); *Judicial Watch I*, 365 F.3d at 1123 (calling distinction an "arbitrary line").

Here, the creation, transfer, use, and required publication of the Uranium Report is dictated by statute as part of Congress's delegation of authority to Commerce and the President.   Disclosure of the report is what permits the other branches of government, as well as the public, to "ascertain whether the will of Congress has been obeyed." *Yakus v. United States*, 321 U.S. 414, 426 (1944). The process neither implicates the President's inherent Article II duties nor raises separation-of-powers concerns.   It is not that the statutory, as opposed to constitutional, basis of the President's

Section 232 role *prohibits* the use of the presidential-communications privilege; rather, because the President's authority is statutory and the result of delegation, Congress can *limit* the reach of the privilege, which it has done.

Congress conditioned the President's exercise of tariff authority on the Secretary creating and disclosing a report, and it specified the content that Commerce can redact: "classified" or "proprietary information." 19 U.S.C. § 1862(b)(3)(B); *see Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559 (1976) (independent secretarial investigation and report a "precondition" to presidential action under Section 232).[13]  The release of the secretarial report, regardless of what the President has done or will do, is simply the "logical corollary" of Congress making its delegation "contingent upon facts established by the executive branch."  Br. of *Amici Curiae* Sen. Pat Toomey & Members of Congress in Supp. of Pl. at 7, *Cause of Action Inst. v. Dep't of Commerce*, No. 19-0778 (D.D.C. filed Mar. 6, 2020) [hereinafter Br. of *Amici*], ECF No. 37 (citing *Marshall Field & Co. v. Clark*, 143 U.S. 649, 693) (1892)).

Still, Commerce vigorously argues that the "Uranium Report fits comfortably within the scope" of the presidential-communications privilege because, "[u]nder the Trade Expansion Act, certain consequential responsibilities are committed to the President's discretion[.]"  Def.'s Mot. at 11.  The agency maintains that, "[b]y design and intent, Section 232 'directly involves' the President in the use and review of a report from the Secretary[.]"  *Id.*  But the Uranium Report— or any other secretarial report—does *not* reflect the exercise of discretion delegated to the President because presidential decision-making only starts *after* the Secretary has completed an investigation

---

[13] In this respect, the U.S. Court of International Trade's recent observation is insightful: "The procedural safeguards in section 232 do not merely roadmap action; they are constraints on power.  The Supreme Court has made clear that section 232 avoids running afoul of the non-delegation doctrine because it establishes 'clear preconditions to Presidential action.'"  *Transpacific Steel LLC v. United States*, 415 F. Supp. 3d 1267, 1275–76 (Ct. Int'l Trade 2019) (citation omitted).  The public disclosure requirement for secretarial reports is one such "precondition."

and finalized a report.  *See* 19 U.S.C. § 1862(c)(1)(A).  The Uranium Report also could not provide insight into what the President will do or how he will do it, as Section 232 provides the President with various avenues for action, including the imposition of tariff adjustments, *id.* § 1862(c)(1)(B); renegotiation of existing agreements, *id.* § 1862(c)(3)(A); or even *no* action.  *Id.* § 1862(c)(3)(B).

More to the point, here, the President has explicitly disavowed action under Section 232 and can no longer exercise *any* delegated tariff authority.  Def.'s Mot. at 13–14; Pl.'s SUMF ¶¶ 24–25.  The existence and operation of the Nuclear Fuel Working Group is immaterial.  Commerce had no way to know that the President would choose to disagree with the Secretary's findings when it drafted the Uranium Report, Pl.'s SUMF ¶ 23, and the agency could not have anticipated the creation of a new entity within the White House that would pursue further research.  To be sure, records created by the Working Group or the White House that reflect the *use* of the Uranium Report would fall squarely within the scope of executive privilege, assuming they were subject to the FOIA.  But the Uranium Report itself reflects neither presidential decision-making nor the proceedings of the Working Group and would not provide insight into how the President has otherwise "incorporated [it] into a further national security investigation[.]"  Def.'s Mot. at 14.

Perhaps recognizing that the presidential-communications privilege requires a connection to inherent Article II authority, Commerce tries to tie the Uranium Report to the President's "inherent constitutional authority to protect the national security."  Def.'s Mot. at 14–15. Although the President may enjoy discretionary authority to protect "national security," his *inherent* authority under Article II cannot be stretched so far as to incorporate the exercise of *delegated* authority under a tariff statute.  The logical conclusion of such a move would be the impermissible extension of executive privilege to cover almost *anything* about *everything* in an agency's possession, and it would destroy important distinctions in our system of constitutional

governance.  This Circuit has repeatedly warned that approach would impermissibly "sweep within the reach of the . . .  privilege much of the functions of the executive branch[.]"  *Judicial Watch I*, 365 F.3d at 1122.

Again, the Uranium Report does not reflect how "the President has exercised his constitutional authority to protect national security to enable a review of the Nation's domestic fuel capacity[,]" as Commerce claims.  Def.'s Mot. at 14.  It reflects Commerce's conclusions and recommendations under Section 232.  Commerce prepared the Uranium Report for a statutorily defined purpose: to inform the President's decision to impose tariffs.  While the President is free to use the Uranium Report for other purposes that he considers useful, he cannot bypass Congress's disclosure directives by claiming executive privilege based on "protecting" the "national security."

In this sense, the limits of the presidential-communications privilege are particularly evident when dealing with records arising from decisions required by law to be made by agencies. It is indisputable that the President could not withhold agency reports created under the National Environmental Policy Act ("NEPA") or the Regulatory Flexibility Act ("RFA") simply because they had passed through the White House at some point or were used for presidential deliberations. With both NEPA and the RFA, Congress requires agencies independently to undertake investigations and publish reports.  *See* 42 U.S.C. § 4332; 40 C.F.R. pt. 1501; *see also* 5 U.S.C. §§ 603–04.  Section 232 investigations and secretarial reports are no different, and the President cannot transform their character on a whim to suit his preference for secrecy.

### 3.    Section 232 mandates disclosure of the Uranium Report.

Section 232 is effectively a "reverse Exemption 3" statute, where instead of a secretarial report being "*exempted from disclosure* by [a] statute" other than the FOIA, 5 U.S.C. § 552(b)(3) (emphasis added), Congress has used a statute outside the FOIA to *mandate the disclosure* of

information and specify what an agency may withhold.  Congress's use of this statutory approach is hardly unique.  *See, e.g.*, 50 U.S.C. § 1846(c) (requiring the Department of Justice to publish reports on its use of pen registers and trap and trace devices, subject to redactions for national security).  As highlighted above, NEPA likewise requires the preparation and publication of certain reports, subject to FOIA's exemptions.  42 U.S.C. § 4332(2)(C).  The Supreme Court has reasoned that, under NEPA, "Congress has thus effected a balance between the needs of the public for access to documents prepared by a federal agency and the necessity of nondisclosure or secrecy."  *Weinberger v. Catholic Action of Haw./Peace Educ. Project*, 454 U.S. 139, 145 (1981).  So too here.  Congress struck a balance between the public's and Congress's own need for access to Section 232 secretarial reports and the need for nondisclosure of some portions of those reports.  It did so by requiring Commerce to release "any portion of the report . . . which does not contain classified information or proprietary information[.]"  19 U.S.C. § 1862(b)(3)(B).  NEPA allows an agency to withhold information based on *any* FOIA exemption; Section 232 only allows Commerce to withhold classified or proprietary information.

Congress's ability to balance disclosure and nondisclosure when it designs statutory schemes stands in stark contrast to its inability to intrude on the President's privileges when they are applied to the performance of inherent, nondelegable Article II powers.  The Supreme Court and this Circuit repeatedly have stressed the importance of privilege in that context.  *See Jascalevich*, 439 at 1323; *Nixon*, 418 U.S. at 705; *Judicial Watch III*, 913 F.3d at 1111; *Loving*, 550 F.3d at 40; *In re Sealed Case*, 121 F.3d at 752–53.  Because the President's Section 232 authority depends on a statutory delegation, Congress retains the power to condition the exercise of that authority, including mandating disclosure of materials that Commerce creates for use by

23

the President.  That is exactly what Congress has done.  Commerce cannot now claim the Uranium

Report is exempt, especially when it should have already published it in the *Federal Register*.

### 4.     The President has no confidentiality interest in the Uranium Report.

The purpose of the presidential-communications privilege is to maintain the confidentiality

of presidential advice.  But Section 232's publication requirement makes long-term confidentiality

impossible.  Confidentiality is front and center in every opinion discussing the privilege.  In *Nixon*,

the Supreme Court explained that "the confidentiality of Presidential communications has . . .

constitutional underpinnings[.]"  418 U.S. at 705–06.  The Circuit has directed the privilege "be

construed as narrowly as is consistent with ensuring that the confidentiality of the President's

decisionmaking process is adequately protected."  *In re Sealed Case*, 121 F.3d at 752; *see Judicial

Watch III*, 913 F.3d at 1110; *Judicial Watch I*, 365 F.3d at 1116 (citation omitted).  These cases

harmonize with the rule that FOIA exemptions "must be 'narrowly construed,'" *Milner*, 562 U.S.

at 565 (citation omitted), and that "Exemption 5 is to be construed 'as narrowly as consistent with

efficient Government operation.'"  *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 773–

74 (D.C. Cir. 1988) (citation omitted).

The presidential-communications privilege should be construed narrowly here because, as

a matter of statute, the Uranium Report cannot remain confidential.  Section 232 requires its

publication, and both the creators and readers of the report knew from the outset of the underlying

secretarial investigation that most everything in the report would need to be published shortly after

its transmission to the President.  Publication is the antithesis of confidentiality.  *Cf. Food Mktg.

Inst.*, 139 S. Ct. at 2363 ("'confidential' mean[s] . . . 'private' or 'secret'") (citation omitted).  There

also is a strong countervailing public interest in disclosure because publication of the Uranium

Report impacts both Congress's ability to conduct oversight and legislate (for example, overturn

presidential action), as well as an injured member of the public's ability to challenge tariff action or the findings of a secretarial investigation. *See* Br. of *Amici* at 11–13. Further, for Congress "to effectively debate, design, and possibly enact [any] legislative reforms . . . [it] must have access to the executive's statutorily-required fact-finding. Absent such information, Congress cannot know how the executive is making use of its delegated authority and thus how best to approach efforts to reforming that delegation." *Id.* at 12.

Section 232 requires that, "[u]pon the disposition of each request, application, or motion under subsection (b), the Secretary shall submit to the Congress, and publish in the *Federal Register*, a report on such disposition." 19 U.S.C. § 1862(d)′(1).[14] The phrase "request, application, or motion" appears in only one other provision of Section 232, which requires the Secretary to "immediately initiate an appropriate investigation" upon "request, application, or motion." *Id.* § 1862(b)(1)(A). Read together, subsections (b) and (d)′ prove that Section 232's publication requirement applies to the Secretary, not the President, and it attaches at the end of a secretarial investigation, not Presidential action or inaction. To conclude otherwise would offend fundamental canons of statutory interpretation, which oblige courts to read the "language and design of [a] statute as a whole," *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988), and to give "identical words used in different parts of the same act . . . the same meaning." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932).

---

[14] Section 1862(d)′ is the original publication provision from the Trade Expansion Act of 1962. Pub. L. No. 87-794, § 232(d), 76 Stat. 872, 877 (1962). Congress added the current, more-detailed requirement at subsection (b)(3)(B) with the Omnibus Trade and Competitiveness Act of 1988. *See* § 1501(a), 102 Stat. at 1257–58. The 1988 amendment also separated the Secretary's investigative and reporting responsibilities under subsection (b) from the President's responsibilities after submission of a report under subsection (c). *See id.* The statutory history thus suggests that Congress understood the *Federal Register* publication requirement to be tied to the conclusion of a secretarial investigation and not presidential action. Otherwise, Congress would have added the new publication requirement in another part of Section 232. Although the retention of the partially superfluous original publication requirement may have been inartful, "'[i]t is beyond [the] province [of the courts] to rescue Congress from its drafting error[.]'" *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) (citation omitted).

Past practice and the historical record support CoA Institute's argument.  For example, on March 14, 1979, the Secretary of the Treasury, who played the role now held by the Secretary of Commerce, transmitted a secretarial report to the White House and published it in the *Federal Register*.  *See* Publication of Report of Investigation to Determine the Effects on the National Security of Oil Imports, 44 Fed. Reg. 18,818 (Mar. 29, 1979).  In the publication notice, the Secretary indicated he was publishing his report "pursuant to section 232(d)"—the provision that refers to "disposition" of an "investigation."  *Id.*  President Carter waited almost an entire year before acting on the report and imposing a gasoline conservation fee.  *See* Petroleum Import Adjustment Program, 45 Fed. Reg. 22,864 (Apr. 3, 1980).  If the government were correct in its reading of Section 232, then it would have consistently withheld secretarial reports for much longer than it has historically done.  *See generally* Def.'s Mot. Ex. C ¶¶ 7–9 (Valvo Decl.).

As a matter of common sense, too, the term "disposition" must refer to the conclusion of a secretarial investigation and transmission of a final report because, if taken to its logical conclusion, any other view would justify an absurd result: the President could indefinitely withhold a secretarial report, even after action were taken or if the President decided to do nothing.  Here, Commerce admits that the President disagreed with the Secretary's recommendation and decided not to act under Section 232 on uranium imports.  Pl.'s SUMF ¶¶ 23–25.  As for the Autos Report, the government has argued that the President has continuing authority to act after attempted renegotiation of trade agreements has failed.  *See, e.g.*, Mulvey Decl. Ex. B at 11.  And in the cases of steel and aluminum, Commerce has argued elsewhere that the President enjoys extra-statutory authority to revisit or revise settled tariff decisions.  *See, e.g.*, Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles into the United States, 85 Fed. Reg. 5,281 (Jan. 29, 2020).  The logic of the government's position—which is set-out at length in and Office of

Legal Counsel opinion, *see generally* Mulvey Decl. Ex. B—as applied to any of these situations, would permit the President to require Commerce to keep a secretarial report secret for *any* reason, for an indeterminate amount of time, no matter what has or has not been done, and all under the guise of preserving the "confidentiality" of non-specific presidential decision-making.  If the Court were to accept that position, it would effectively nullify Section 232's publication requirement. Even if Section 232 were ambiguous in setting a deadline for publication of a secretarial report— which it is not—the statute could not give the President such unbridled discretion.[15]  The natural reading of "disposition" is that it refers to the conclusion of a secretarial investigation, not presidential action.  And the existence of a clear disclosure deadline vitiates any long-term confidentiality interest in secretarial reports completed and transmitted to the President.

### C.      The deliberative-process privilege does not apply to the Uranium Report.

Commerce also relies on the deliberative-process privilege to withhold in full the Uranium Report.  *See* Def.'s Mot. at 15–19.  But the agency's invocation of that privilege is infirm because the Uranium Report cannot be protected by both the presidential-communications and deliberative-process privileges at the same time, and Commerce has failed to identify a valid *agency* decision or decision-making process.  More importantly, Commerce has not established how the Uranium Report is both "predecisional" and "deliberative."

"The deliberative process privilege shields only government 'materials which are both predecisional and deliberative.'"  *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 616 (D.C. Cir. 1997) (citation omitted).  A record is "predecisional" when it is generated "'[a]ntecedent to the adoption of an agency policy.'"  *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504,

---

[15] As Commerce and the President have demonstrated with their actions on the Autos Report, even when Congress provides an explicit date by which a secretarial report must be published, they believe a statute has no power to require publication of a report.

513 (D.C. Cir. 2011) (citation omitted).  It is "deliberative" when it forms "a direct part of the deliberative process in that it makes recommendations or expresses opinion on legal or policy matters," *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975), thereby reflecting the "give-and-take of the consultative process" typical of agency decision-making.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980).  "The key question" in deciding if the privilege applies is "whether disclosure would tend to diminish candor within an agency."  *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 298 (D.D.C. 2007).

> **1.  Commerce confuses the interplay between the deliberative-process and presidential-communications privileges.**

As a preliminary matter, Commerce likely means to claim the deliberative-process privilege in the alternative and not along with the presidential-communications privilege.  Courts treat the two privileges as non-overlapping, with the former applying to agencies and the latter to the President.  *See Judicial Watch I*, 365 F.3d at 1122; *Judicial Watch, Inc. v. Dep't of Justice*, No. 01-639, 2006 WL 2038513, at *1 (D.D.C. July 19, 2006).  "While the presidential communications privilege and the deliberative process privilege are closely affiliated, [they] . . . are distinct and have different scopes."  *In re Sealed Case*, 121 F.3d at 745.  Commerce has failed to cite a single case that supports the notion that the deliberative-process privilege can be used to withhold records that do not meet the higher bar for protection under the presidential-communications privilege.

> **2.  The deliberative-process privilege does not protect presidential decision-making under Section 232.**

The caselaw dealing with the deliberative-process privilege associates it with *agency* decision-making.  *See, e.g.*, *Senate of P.R. v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987).  A presumptively privileged record must be predecisional "of an *agency* policy" and "also be a part of the *agency* give-and-take[.]"  *Id*. (emphases added and citations omitted).  Even when courts

28

have considered the possibility of the privilege applying to a record exchanged between an agency and the White House, they have made pains to distinguish *whose* decision-making was implicated. *See Loving v. Dep't of Def.*, 496 F. Supp. 2d 101, 108 (D.D.C. 2007).

Commerce has failed to describe the *agency* decision or *agency* decision-making process reflected in the Uranium Report.  *See supra* note 6.  The agency instead refers to *presidential* decision-making and *presidential* use of the report.  Lieberman Decl. ¶ 43 ("The content of the Uranium Report is pre-decisional because it is provided to the President for *him and his advisers* to consult in deciding what actions if any are required."); *id.* ¶ 46 ("While the Uranium Report here is not being used for the purpose of adjusting imports . . . it is nevertheless critical to *presidential decision-making* regarding national security and nuclear policy.") (emphasis added in both).  Commerce must explain, at the outset, that it created the Uranium Report "for the purpose of aiding [an] agency's deliberative process" and why that deliberative process would be impacted by disclosure.  *Dow Jones & Co.*, 917 F.2d at 575.  It has not done so.

Commerce tries to justify its reference to presidential decision-making by analogizing the relationship between an agency and the White House to the "power element" between "subordinates and superiors."  Def.'s Mot. at 18.  Commerce also cites *Bureau of National Affairs v. Department of Justice* to suggest that courts have extended the deliberative-process privilege to the President.  742 F.2d at 1484.  On each count, Commerce's argument fails.

Although the President may be an ultimate decisionmaker about whether to impose tariffs under Section 232, CoA Institute has not requested records about the President's use of the Uranium Report and, regardless, the President has disavowed action under Section 232.  Pl.'s SUMF ¶¶ 23–25.  What matters is how *Commerce* or another *agency* used the Uranium Report. In that sense, *BNA* is inapt.  Commerce argues "[w]hat mattered [in *BNA*] was the role EPA's final

budget played *in the President's* deliberative process, *not in its own*." Def.'s Mot. at 18.  But in *BNA*, the EPA never transmitted records to the President or even White House advisors.  The court only used the term "President" as a shorthand to refer to another *agency* within the Executive Office of the President: the Office of Management and Budget.  *See BNA*, 742 F.2d at 1496.

The *BNA* court thus clarified that records "submitted by one *agency* to a second *agency* that has final decisional authority are predecisional materials exempt from disclosure under FOIA." *Id.* at 1497.  "Exemption 5 explicitly covers communications *between* agencies, not just within agencies." *Id.*  But the President is not an "agency." *See supra* at 10–15 & note 10.  And under Section 232, Congress assigned responsibility for the creation and publication of the Uranium Report to the Secretary of Commerce—it foresaw no role for the President in the process. *See* 19 U.S.C. § 1862(b).  Presidential decision-making begins only after the report is transmitted to the President, and that decision-making is not reflected in the report. *See* 19 U.S.C. § 1862(c).

### 3.    The Uranium Report is neither "predecisional" nor "deliberative."

The deliberative-process privilege only protects materials that are both "predecisional" and "deliberative," that is, records reflecting "advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated, or the personal opinions of the writer prior to the agency's adoption of a policy." *Elec. Frontier Found. v. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014) (cleaned up and citation omitted).  The privilege does not extend to materials an agency has adopted as its final position because "the public is vitally concerned with the reasons [that] . . . suppl[ied] the basis for an agency policy actually adopted." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 152–53 (1975).  This limitation prevents an agency from "develop[ing] a body of 'secret law,' used . . . in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege

because it is not designated as 'formal,' 'binding,' or 'final.'"  *Schlefer v. United States*, 702 F.2d 233, 244 (D.C. Cir. 1983).

Commerce claims the Uranium Report is pre-decisional.  But in doing so, it ignores that Congress mandated that the report be finalized *before* transmission to the President and publication in the *Federal Regist*er.  19 U.S.C. § 1862(b)(3)(B).  CoA Institute requested the *final* version of the report transmitted by Commerce to the President.  Any "pre-decisional" basis for the privilege is absent.  The Secretary finalized his investigation, prepared his conclusions, and transmitted his recommendations to the President, who chose to forgo action under Section 232.  The Uranium Report is, by definition, Commerce's final decision on what to report to the President.

Commerce further claims that the Uranium Report is "quintessentially deliberative" because it "'reflects the give-and-take of the consultative process'" and disclosure would "'stifle honest and frank communication.'"  Def.'s Mot. at 17 (citations omitted).  But those claims are unfounded.  *First*, the report does not reflect any "give-and-take."  It is a final report written by Commerce and transmitted to the President to advise him and to be published to the world in the *Federal Register*—there is no back-and-forth.  *Second*, Section 232 governs the creation and use of the report, and agency staff must know that Section 232 mandates publication of the report they are creating.  *Cf. N.Y. Times Co. v. Dep't of Justice*, 756 F.3d 100, 116–17 (2d Cir. 2014) (rejecting claim that disclosure of Office of Legal Counsel ("OLC") memorandum would discourage agencies from seeking OLC advice and opining that "[w]e need not fear that OLC will lack for clients") (subsequent procedural history omitted).  Any "chill" that redounds in the Section 232 process is statutory and baked-in when Commerce drafts a secretarial report.  Disclosure through the FOIA is merely an alternative mechanism to publication in the *Federal Register*.  One way or

another, the Uranium Report must be released, and the President cannot disturb that process.  The deliberative-process privilege cannot apply.

## II.    Commerce failed to segregate and release non-exempt information from the Uranium Report.

Assuming Commerce could sustain its use of Exemption 5, it has still failed to show that it released all reasonably segregable portions of the Uranium Report.  The failure to carefully review responsive records conflicts with the explicit mandate of the FOIA, which requires an agency to release "any reasonably segregable portion of a record . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b); *see id.* § 552(a)(8)(A)(ii)(II).  An adequate segregability analysis is so vital to the FOIA's broad mandate of disclosure that a court has "an affirmative duty to consider the segregability issue *sua sponte*."  *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).  "A district court that 'simply approve[s] the withholding of an entire document without entering a finding on segregability, or lack thereof,' errs."  *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993) (citations omitted).

Here, Commerce has failed to defend the reasonableness of its efforts to release segregable portions of the Uranium Report.  Without an adequate showing that "explain[s] in detail which portions of the [report] are disclosable and which are allegedly exempt," an agency cannot carry its burden and is not entitled to summary judgment.  *Edmonds Inst. v. Dep't of the Interior*, 383 F. Supp. 2d 105, 108 (D.D.C. 2005).  Commerce merely asserts, without adequate specificity and in a conclusory fashion, that "exempt information . . . is so inextricable intertwined with nonexempt information" it would be impossible to disclose *anything* short of the full report.  Liberman Decl. ¶ 47 ("[Partial disclosure] would result in a meaningless set of words or phrases which have no or minimal information content.").  Commerce's position is deficient for at least four reasons.

*First*, courts have rejected categorical application of Exemption 5, particularly with the "deliberative or policy-making process[]" privileges, because it blurs the vital distinction between "deliberative" materials, on the one hand, and "purely factual, investigative matters on the other." *Mink*, 410 U.S. at 89.  To the extent there is factual material in the report, Commerce must release it because "factual segments which do not reveal the deliberative process . . . are not intertwined with the policy-making process."  *Ryan*, 617 F.2d at 791.

*Second*, Section 232 already anticipates that its reports will be segregable because Commerce may redact only "classified" and "proprietary" information before publication in the *Federal Register*.  19 U.S.C. § 1862(b)(3)(B).

*Third*, Commerce is mistaken that it need not disclose segregable material that it finds "meaningless" or of little "information content."  Def.'s Mot. at 29; Liberman Decl. ¶ 47.  This confuses the relevant standard, which addresses "non-exempt information so inextricably intertwined with . . . exempt information that [its] release . . . would produce only *incomplete, fragmented, unintelligible sentences* composed of *isolated meaningless words*."  *Nat'l Sec. Archive Fund, Inc. v. Cent. Intelligence Agency*, 402 F. Supp. 2d 211, 220–21 (D.D.C. 2005) (emphasis added).  Commerce is not positioned to judge whether portions of the Uranium Report will be "useful" or informative to CoA Institute.  Courts often require agencies to release names and dates associated with records, even if their substantive content is exempt.  *See, e.g.*, *Judicial Watch, Inc. v. Dep't of the Treasury*, 796 F. Supp. 2d 13, 29–30 (D.D.C. 2011) (ordering agency to release portions of meeting minutes that indicate dates and attendees).  Here, the Uranium Report likely contains significant factual information that is both meaningful *and* informative.

**III.    Commerce failed to conduct an adequate search for records responsive to Item Two of CoA Institute's FOIA requests.**

In addition to seeking access to the Uranium Report, CoA Institute requested a copy of any Department of Defense ("DOD") memorandum, or "response letter," prepared during Commerce's secretarial investigation.  Pl.'s SUMF ¶ 30; *see generally* 19 U.S.C. § 1862(b)(1)(B), (b)(2)(A)– (B) (describing Secretary of Defense's role in the Section 232 process).   Commerce never addressed the existence or availability of records responsive to Item Two of CoA Institute's FOIA requests.  *See* Compl. Ex. 5.  Now, for the first time in its motion for summary judgment, Commerce curtly avers that it has "identified no documents responsive to the second portion of Plaintiff's request" and therefore "the Uranium Report is the only document at issue in this matter." Def.'s Mot. at 2–3.  Such a claim is unsupported and legally unsound.

When the adequacy of an agency's search is at issue, the agency bears the burden of proving "beyond material doubt" that it undertook a search "'reasonably calculated to uncover all relevant documents.'"  *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (citation omitted).  It "must show that it made a good faith effort to conduct a search . . . using methods which can be reasonably expected to produce the information requested."  *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  It must "make more than perfunctory searches and . . . 'cannot limit its search' to only one or more places if . . . [others] 'are likely to turn up the information requested.'"  *Valencia-Lucena*, 180 F.3d at 326 (citations omitted).  "If . . . the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper."  *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

Commerce offers a textbook example of an inadequate search.  Its declarants merely assert that Commerce does not have a responsive record.  *See* Decl. of Grace Agyekum ¶ 14 n.4, ECF No. 17-1 ("[N]either BIS nor DOC has a document responsive to the second portion of Plaintiff's

FOIA request."); Lieberman Decl. ¶ 10 n.1 (same).  Yet Commerce "may not satisfy [its] burden under FOIA by simply stating in conclusory fashion that [it] do[es] not maintain the requested documents."  *Robert v. Dep't of Justice*, 2008 WL 2039433, at *7 (E.D.N.Y. May 9, 2008). Neither of Commerce's declarants explained how a search was conducted.  "[T]he bare assertion that [an official] saw [a] FOIA request and. . . ha[s] no responsive documents is inadequate because it does not indicate that [the agency] performed any search at all."  *Defs. of Wildlife v. Dep't of Agric.*, 311 F. Supp. 3d 44, 55 (D.D.C. 2004).

"[A]gency affidavits that do not denote which files were searched, or by whom, do not reflect any systematic approach to document location, and do not provide information specific enough to enable" a requester to challenge—or a court to adjudicate—the adequacy of the agency's search methodology. *Weisberg v. Dep't of Justice*, 627 F.2d 365, 371 (D.C. Cir. 1980).  Commerce has not explained with sufficient detail how its search was undertaken, and it has not otherwise suggested that it maintains responsive records outside its control—in which case it should have referred the records to the originating agency—or that it possess records that do not qualify as "agency records" under the FOIA.  The Court should therefore order Commerce to conduct a supplemental search for all records responsive to Item Two of the April 15, 2019 FOIA requests.

## IV.   Commerce's policy and practice of withholding Section 232 reports is unlawful.

In addition to a standard FOIA claim related to release of the Uranium Report, CoA Institute's Complaint includes a second claim challenging Commerce's policy and practice of withholding Section 232 secretarial reports, as a rule, under the presidential-communications and deliberative-process privileges until directed otherwise by the President.  *See* Compl. ¶¶ 35 –39, 48–54.  The basis of this second claim is straightforward, and the theory behind "policy or practice" (or "pattern and practice") claims, as set forth in *Payne Enterprises*, is uncontroversial.

Even so, Commerce insists that CoA Institute's allegations are somehow alien and extraordinary.  Nothing could be further from the truth, and Commerce's failure to provide a robust defense is telling.  To prevail on a policy-or-practice claim, a complainant need only demonstrate that an agency has "adopted, endorsed, or implemented a policy or practice that constitutes an ongoing failure to abide by the terms of the FOIA," and that the complainant will "suffer continuing injury due to this practice."  *Nat'l Sec. Counselors*, 898 F. Supp. 2d at 253.  CoA Institute has met its burden in proving these elements.

### A.   Commerce has an identifiable policy and practice of outsourcing its FOIA decision-making to the White House and withholding Section 232 reports.

Commerce's declarants admit the agency maintains a policy and practice of withholding Section 232 secretarial reports in full under the presidential-communications and deliberative-process privileges *until directed otherwise by the President*.  Pl.'s SUMF ¶ 41 (citing Agyekum Decl. ¶ 20 ("BIS intends to and will release the Uranium Report when directed to do so by the President."); Lieberman Decl. ¶ 48 (same)); Lieberman Decl. ¶ 46; Compl. ¶¶ 35, 49.  Moreover, not only is the existence of such a policy and practice evident by Commerce's refusal to disclose the Autos Report and the Uranium Report in response to CoA Institute's FOIA requests, Pl.'s SUMF ¶ 42, it is established by Commerce's adopting an Office of Legal Counsel opinion, which arose in the wake of Commerce's refusal to obey a congressional mandate to publish the Autos Report, and which sets out a detailed basis for the agency's privilege claims.  Pl.'s SUMF ¶ 43.

Commerce's main contention in its motion for summary judgment is that its policy and practice is not "new" or "unannounced" and has not been applied "repeatedly."  Def.'s Mot. at 20 ("Merely using the adverb 'repeatedly' in its complaint does not make an unsubstantiated application against DOC true.").  But the Court should pay little heed to these points.

*First*, Commerce offers no contrary explanation for why this Administration has taken the extraordinary position of withholding or refusing to publish secretarial reports, no matter what action or inaction the President has determined (or is determining) to take under Section 232. Pl.'s SUMF ¶¶ 5–13 (Autos Report); Pl.'s SUMF ¶ 15–19 (Titanium Sponge Report); Pl.'s SUMF ¶¶ 20 – 28 (Uranium Report). Despite a few outliers, the historical record intimates that Commerce has never waited for the President's permission to comply with Section's 232's publication requirement. In this respect, it is important to note that the data compiled by CoA Institute and employed by Commerce in an attempt to discredit CoA Institute's arguments, only addresses the agency's track record in publishing reports in the *Federal Register*. Although that information is insightful, particularly for the validity of Commerce's privilege claims, it must be distinguished from the agency's treatment of requests for disclosure *under the FOIA*. There, it seems that something new is happening at the agency.

In the case of the Autos Report and the Uranium Report, Commerce has changed its legal position. In the former case, the agency first claimed that a secretarial report possibly qualified as a "presidential record." Pl.'s SUMF ¶ 9. And in the second case, Commerce granted CoA Institute's request, but went on to ignore it for months. Pl.'s SUMF ¶¶ 34–37. Only later did the agency decide that both reports were protected from disclosure under executive privilege *until the President determined otherwise*. Commerce has explicitly surrendered its responsibility under the FOIA and instead deferred to the President. Adopting the Office of Legal Counsel opinion, which provides a more detailed argument for Commerce's position, further highlights the novelty (and egregiousness) of what the agency is doing. Pl.'s SUMF ¶ 13.

*Second*, Commerce insists that it has not "repeatedly" and unlawfully withheld secretarial reports in full because "no court has found that DOC erred in [its] withholding[.]" *See* Def.'s Mot.

at 23.  Commerce relatedly maintains that its treatment of the Autos Report "cannot be a predicate for a 'policy and practice' claim . . . when the status of the Report is an open question pending a judicial ruling," *id.* at 25, and this case concerning the Uranium Report "cannot serve as a predicate for itself." *Id.* at 25 n.10.  These arguments only reveal Commerce's ignorance of how a policy-or-practice claim, which is an exception to mootness, operates.  *Payne Enters.*, 837 F.2d at 491.

By definition, "repeatedly" means more than once, and courts have routinely recognized that a requester need only allege more than *one* violation of the FOIA to maintain a policy-or-practice claim.  *See Cause of Action Inst. v. Eggleston*, 224 F. Supp. 3d 63, 72 (D.D.C. 2016) (cannot state claim "based on a single incident"); *Swan View Coal. v. Dep't of Agric.*, 39 F. Supp. 2d 42, 46 (D.D.C. 1999) (more than "an isolated action"); *accord Hajro v. U.S. Citizenship & Immigration Servs.*, 811 F.3d 1086, 1104 (9th Cir. 2016) ("provide evidence. . .  subjected to a FOIA violation more than once").  CoA Institute has done as much.  *See* Compl. ¶¶ 35–39, 48–54.

Commerce also is incorrect to claim that *Payne* and other precedents require a *judicial determination* that an agency has violated the FOIA.  A requester "need not 'point to a regulation that establishes the [alleged] policy [or practice], [and] the agency [need not] concede the policy's existence."  *Citizens for Responsibility & Ethics in Wash. v. Dep't of Housing & Urban Dev.*, 415 F. Supp. 3d 215, 224 (D.D.C. 2019) citation omitted).  Moreover, an "alleged policy may be informal and need not have been published or written anywhere."  *Id.* (citation omitted).  If the validity of a policy-or-practice claim does not depend on the existence of a formal policy or an agency's admittance that a policy exists, then prior judicial determinations cannot be an essential element of the claim.  Indeed, in many cases, such a determination would be impossible to obtain because the alleged ongoing violation of the FOIA would never be addressed in an action to enforce the statute in a discrete instance.  The D.C. Circuit's decision in *Judicial Watch, Inc. v.*

*Department of Homeland Security* is instructive.  895 F.3d 770 (D.C. Cir. 2018).  There, the court explained that a requester raised a valid claim alleging an agency refused to issue timely determinations in response to FOIA requests until being sued by the requester.  *Id.* at 779.  In a standard FOIA lawsuit, no court would issue a judgment on an agency's failure to abide by the statute's pre-litigation requirements because adequate relief would be obtained upon issuance of the determination during the course of proceedings.  Commerce therefore invents elements that no court has recognized.

Finally, as to Commerce's claim that CoA Institute may not rely on "this case" as a "predicate for itself," the agency again misunderstands how policy-or-practice claims work.  It is routine to raise a standard FOIA claim *and* a policy-or-practice claim together because the latter operates as an exception to mootness.  "[E]ven though a party may have obtained relief as to a *specific request* . . . this will not moot a claim that an agency *policy or practice* will impair the party's lawful access to information in the future."  *Payne Enters., Inc.*, 837 F.2d at 491. "[A] party's challenge . . . cannot be mooted by release of the specific documents that prompted the suit."  *Id.*; *see Nat'l Sec. Counselors*, 898 F. Supp. 2d at 265 (prospective injunctive or declaratory relief depends on violation 'in connection with the processing of the plaintiff's FOIA requests'").

**B.      Commerce's refusal to release Section 232 reports until directed to do so by the President violates the FOIA.**

As explained above, Commerce cannot rely on Exemption 5 and the presidential-communications and deliberative-process privileges to withhold Section 232 secretarial reports.  *See supra* at 9–32.  The arguments CoA Institute has articulated about the Uranium Report can be generalized to *any* Section 232 report that has been finalized by the Secretary and transmitted to the President.  These arguments need not be repeated, but merely incorporated here by reference.  Nevertheless, three substantive points concerning Commerce's legal position warrant discussion.

*First*, Commerce repeatedly suggests that a policy-or-practice claim must allege an agency's ongoing violation of the FOIA to be "offensive" and "outrageous." Def.'s Mot. at 23, 24 & 25. But the D.C. Circuit has clarified that the bar is not set so high. "This court did not require [in *Payne* and other cases] egregious agency action to state a policy or practice claim." *Judicial Watch, Inc.*, 895 F.3d at 781. It is enough "that a complaint allege some failure to abide by the terms of the FOIA that could be the basis for finding the agency had an unlawful practice [or] policy." *Citizens for Responsibility & Ethics in Wash.*, 415 F. Supp. 3d at 224 (citation omitted and cleaned up). Commerce's categorical refusal to release secretarial reports, and its reliance on the "temporary" application of executive privilege until directed by the President to release records, is a clear example of willful and ongoing violation of the FOIA.

*Second*, an important aspect of Commerce's policy and practice of invoking Exemption 5, which has not yet been addressed in detail, is that it requires there to be "temporary" privileges. Such a position is unfounded and finds no home in FOIA law. Privileges either apply or not, and their application cannot depend on the President's whim. Although Commerce claims that this "theory of 'temporary privileges' . . . appear[s] in none of DOC's prior briefs" and the agency has "applie[d] typical concepts of balancing," Def.'s Mot. at 28, the mere fact that Commerce has not used the phrase "temporary privilege" does not disprove the logical need for such a notion in the agency's argument that the privileges apply with special force while the President is using a secretarial report for his own decision-making.

The privileges invoked here are subspecies of executive privilege, and the Supreme Court has directed "that documents shielded by executive privilege remain privileged even after the decision to which they pertain may have been effected[.]" *Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 359–60 (1979). The presidential-communications privilege

"covers final and post-decisional materials as well as pre-deliberative ones. . . .  [N]one of the cases suggest that it encompasses only the deliberative or advice portions of documents."  *In re Sealed Case*, 121 F.3d at 745.  Likewise, the deliberative-process privilege does not expire when a final decision is made.  *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 112–13 (D.D.C. 2005); *Judicial Watch, Inc. v. Dep't of Justice*, 102 F. Supp. 2d 6, 16 (D.D.C. 2000) (calling argument that "privilege [is] temporary" "unpersuasive").  Nor is the privilege "lost simply . . . because of the passage of time."  *Bruscino v. Fed. Bureau of Prisons*, No. 94-1955, 1995 WL 444406, at *5 (D.D.C. May 15, 1995) (citation omitted), *vacated on other grounds*, 1996 WL 393101 (D.C. Cir. June 24, 1996).  Potentially deliberative materials are only disclosable under the FOIA if they are incorporated into a final opinion.  *See Sears*, 421 U.S. at 161.

If Commerce is correct that either (or both) privilege applies, then it *must* apply even *after* the President decides to act under Section 232.  But that conclusion defies both Section 232— which mandates publication, 19 U.S.C. § 1862(b)(3)(B)—and the historical record.  *See generally* Def.'s Mot. Ex. C.  Similarly, Commerce offers no legal authority to support the notion that privileges should be afforded special significance in their temporary application while the President is still developing final action under Section 232 or for other purposes.  Because the presidential-communications and deliberative-process privileges are not "temporary," even if they apply at all, they must protect Section 232 reports before *and* after the President acts.  That outcome is impossible to square with the statute.

Assuming Commerce could maintain a theory of "temporary" privileges, it would mean that the agency was *waiving* privileges whenever it did publish or otherwise disclose a secretarial report.  That presents two problems.  First, if a privilege attaches to a secretarial report that Commerce must publish under Section 232, a waiver could not be compelled by statute or

41

otherwise.  *Cf. Lefkowitz v. Turley*, 414 U.S. 70, 76 (1973); *Miranda v. Arizona*, 384 U.S. 436 (1966); *U.S. ex rel. Schweizer v. Oce, N.V.*, 577 F. Supp. 2d 169, 175–76 (D.D.C. 2008) (collecting cases in which court-compelled disclosure did not waive privilege).  Although Commerce has elsewhere suggested that Section 232 may impose an unconstitutional condition on the delegation of tariff authority, *see generally* Mulvey Decl. Ex. B, the more sensible reading of the law is that it prevents executive privilege from attaching in the first place.  *See supra* at 19–20.  This also avoids any problem of constitutional avoidance.  *See* Def.'s Mot. at 28–29.

While Commerce could choose to waive the deliberative-process privilege, it could not waive the presidential-communications privilege.  Although an agency may *assert* presidential privileges in the FOIA context, *see Am. Ctr. for Law & Justice v. Dep't of State*, 330 F. Supp. 3d 293, 308 (D.D.C. 2018), it is a far different matter for it to *waive* the privilege.  This is because, under the FOIA, an agency does not technically invoke privilege but decides "to withhold a document from disclosure under a statute through which the government has chosen to make [agency] records available to the public outside of discovery[.]"  *Lardner*, 2005 WL 758267, at *8.  An "agency does not invoke a privilege against discovery when it withholds a document under one of the [FOIA] exemptions, because there is no discovery to resist."  *Id*.  "[T]he agency simply makes the determination that a statutory provision protects the documents from disclosure[.]"  *Id*.  Conversely, absent a FOIA request for a Section 232 report, Commerce would not be "determin[ing] that a statutory provision protects the documents from disclosure[.]"  *Id*.  Thus, outside the FOIA context, Commerce could not independently treat a Section 232 report as protected by presidential privilege.  If Commerce believed the privilege applied, as it maintains as part of its policy and practice, it would need to determine whether the President waived that privilege before publishing a secretarial report.

In the non-FOIA context, the rule allowing an agency to assert presidential privileges does not apply; only the President, or perhaps his immediate advisors, can invoke or waive the privilege. There is no evidence that, historically, the President has done so with each of the Section 232 reports made public by Commerce and the forebearers of its statutory authority, and Commerce does not suggest otherwise. This lack of evidence is likely because the agency's policy and practice is novel, and it has never grappled with whether secretarial reports are really privileged.

*Third*, Commerce suggests that its "approach" to withholding Section 232 reports is "consistent with the FOIA Improvement Act of 2016" and the foreseeable harm standard. Def.'s Mot. at 27 & n.11. But Commerce reverses the implication of that standard to transform it from an additional burden imposed on an agency into a sword to be used against requesters. If anything, Commerce has failed to offer any explanation for why its policy and practice satisfies the standard, either generally or as applied to the Uranium Report.

With passage of the 2016 FOIA amendments, Congress raised the standard by which an agency must evaluate its withholdings in order to limit the technical application of exemptions. *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 101 (D.D.C. 2019). As the law stands now, an agency may withhold information "only if [it] *reasonably foresees* that disclosure would harm an interest protected by an exemption[.]" 5 U.S.C. § 552(a)(8)(A)(i)(I) (emphasis added). Under this standard, it is not enough that Commerce make a case for technical application of Exemption 5. It must instead articulate *precise* reasons why disclosure of *specific* records could be *reasonably foreseen* to harm an interest protected by the presidential-communications and deliberative-process privileges. *See* 162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) (statement of Sen. Leahy). This burden cannot be satisfied with "general explanations" or "boiler plate language," *Judicial Watch, Inc.*, 375 F. Supp. 3d at 100–01, let alone "across-the-board

articulations of harm." *Nat. Res. Def. Council v. Envtl. Prot. Agency*, No. 16-5928, 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019). Commerce "must do more than perfunctorily state that disclosure of all the withheld information—regardless of category or substance"—will implicate an interest in continued secrecy. *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 79 (D.D.C. 2018).

Here, Commerce merely suggests that its policy and practice *ipso facto* satisfies the foreseeable harm standard because the President makes use of the report in unspecified "decisional process[es] concerning a national-security threat[.]" Def.'s Mot. at 27. And, with respect to the withholding of the Uranium Report, neither of Commerce's declarants mentions the foreseeable harm standard, let alone explains the agency's harm analysis. Commerce "has failed to identify specific harms to the relevant protected interests that it can reasonable foresee would actually ensue from disclosure" of Section 232 reports upon disposition of an investigation and transmission of a report to the President. *Judicial Watch, Inc. v. Dep't of Justice*, No. 17-0832, 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019). Such an undeveloped argument cannot carry the day.

### C. CoA Institute is suffering ongoing injury due to Commerce's policy and practice and is likely to be subject to it again in the future.

Commerce has not challenged CoA Institute's standing to bring a "policy or practice" claim. CoA Institute's allegations about its pending FOIA requests and plans to file additional FOIA requests for Section 232 secretarial reports adequately establish ongoing injury and the likelihood of future injury from Commerce's policy and practice of withholding such reports.

CoA Institute "has suffered a deprivation of access, both with respect to its requests for the . . . Uranium Report and accompanying DOD memoranda, as well as the [Autos] Report, which is already the subject o[f] ongoing litigation." Compl. ⁋ 37; *see* Pl.'s SUMF ⁋⁋ 41–43. Moreover, "[b]ased on Commerce's past treat of CoA Institute's requests, and given CoA Institute's frequent use of the FOIA, it can be reasonably expected that any future requests for Section 232 reports—

44

such as the . . . titanium-sponge report . . . will similarly result in an unlawful withholding" and costly litigation, Compl. ¶ 38; Pl.'s SUMF ¶¶ 44 –46, absent a declaratory order and permanent injunction. Compl. ¶ 39. If anything, Commerce's argument confirms that it will continue course and not deviate from its current policy and practice, unless the President orders it to do so. This Court should intervene and clarify Commerce's statutory obligations.

## CONCLUSION

For these reasons, the Court should (1) deny Commerce's motion for summary judgment; (2) grant CoA Institute's cross-motion; (3) order Commerce to produce the Uranium Report, subject only to redaction of classified and proprietary information; (4) direct Commerce to conduct a supplemental search for records responsive to Item Two; (5) declare Commerce's policy or practice of withholding in full and delaying the production of Section 232 secretarial reports violative of the FOIA; (6) enjoin Commerce from withholding such reports in accordance with its unlawful policy or practice; and (7) grant such other relief as the Court deems appropriate.


Dated: April 3, 2020                                    Respectfully submitted,

                                                       */s/ Ryan P. Mulvey*
                                                       Ryan P. Mulvey
                                                       (D.C. Bar No. 1024362)
                                                       R. James Valvo, III
                                                       (D.C. Bar No. 1017390)

                                                       CAUSE OF ACTION INSTITUTE
                                                       1310 North Courthouse Road, Suite 700
                                                       Arlington, VA 22201
                                                       Telephone: (571) 482-4182
                                                       ryan.mulvey@causeofaction.org
                                                       james.valvo@causeofaction.org

                                                       *Counsel for Plaintiff CoA Institute*