UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CAUSE OF ACTION INSTITUTE,

        Plaintiff,

             v.                      Civ. A. No. 19-2698 (DLF)

UNITED STATES DEPARTMENT OF
COMMERCE,

        Defendant.

**DEFENDANT'S CORRECTED OPPOSITION TO PLAINTIFF'S MOTION TO
SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure 56 and Local Civil Rule 7, Defendant Department
of Commerce ("the Department") hereby opposes Plaintiff CoA Institute's motion for summary
judgment, ECF No. 43, and respectfully cross-moves for summary judgment. Filed in addition
in support of its cross-motion, the Department relies upon the attached Memorandum of Points
and Authorities, Defendant's Statement of Undisputed Material Facts, Defendant's Response to
Plaintiff's Statement of Undisputed Material Facts, 2d Declaration of Grace Agyekum,
Declaration of Matthew S. Borman, Declaration of Roberta Parsons, Declaration of Brian D.
Lieberman, and Supplemental Declaration of Brian D. Lieberman.

A Proposed Order also is attached.

Dated:  February 12, 2022

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

By: */s/ John Moustakas*
    John Moustakas, D.C. Bar #442076
    555 Fourth Street, N.W.
    Washington, D.C. 20530
    (202) 252-2518
    john.moustakas@usdoj.gov

    *Counsel for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAUSE OF ACTION INSTITUTE, | |
| Plaintiff, | |
| v. | Civ. A. No. 19-2698 (DLF) |
| UNITED STATES DEPARTMENT OF COMMERCE, | |
| Defendant. | |

**(PROPOSED ORDER)**

UPON CONSIDERATION OF Defendant's Cross-Motion for Summary Judgment, , and based upon the entire record herein, the motion is hereby **GRANTED.**

**SO ORDERED.**

**Dated:** _____         _____

**Hon. Dabney L. Friedrich**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CAUSE OF ACTION INSTITUTE,

        Plaintiff,

              v.

UNITED STATES DEPARTMENT OF
COMMERCE,

        Defendant.

Civ. A. No. 19-2698 (DLF)

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 7(h), Defendant, the United States Department of Commerce ("the Department"), submits this statement of material facts as to which there is no genuine issue:

1.      By correspondence dated February 18, 2019, Plaintiff submitted identical FOIA requests to the Bureau of Industry and Security ("BIS"), which is part of the Department, and to the Department seeking "a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts." Second Declaration of Grace Agyekum ("2d Agyekum Decl.") ¶ 7 & Ex. 1 and 2.

2.      The document to which Plaintiff referred is a report that the Secretary of Commerce ("Secretary") submitted to President Donald J. Trump on February 19, 2019 pursuant to Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. §1862 ("Section 232") regarding whether automobile and certain automobile part imports threaten to impair the national security

1

of the United States.  Three months later, on May 17, 2019, the President issued an Executive

Proclamation entitled Adjusting Imports of Automobiles and Automobile Parts Into the United

States, concurring with the Secretary that these imports constituted a threatened impairment of

American national security and requiring the United States Trade Representative (USTR) to

"pursue negotiations of agreements contemplated in 19 U.S.C. § 1862(c)(3)(A)(i) to address the

threatened impairment of the national security with respect to imported automobiles and  certain

automobile parts from the European Union, Japan and any other country the [USTR] deems

appropriate,  and to update me on the progress of such negotiations within 180 days."  *Id*. at  ¶ 7

n. 1 & Ex. 3.

3.    By email dated February 25, 2019, BIS advised Plaintiff that Plaintiff's request

for a waiver of the applicable fees was granted.  *Id*. at ¶ 9 & Ex. 5.

4.    On March 20, 2019, Plaintiff filed a lawsuit against DOC regarding the

withholding of the Automotive Report.  *Cause of Action Inst. v. Dep't of Commerce*, Docket No.

19-0778-CJN (D.D.C.), for which the court has taken the parties' cross-motions for summary

judgment under advisement  Id. at  ¶ 10 n. 3.

5.    By correspondence dated June 13, 2019, the Department advised Plaintiff, on

behalf of BIS and itself, that:

> We are currently reviewing, in conjunction with the Executive Office of the
> President, whether the Secretary's report constitutes a presidential record within
> the meaning of the Presidential Records Act, 44 U.S.C. 2201 et seq., in which
> case it would not be subject to disclosure under FOIA. However, to the extent
> that the Secretary's Section 232 report to the President of the United States may
> constitute an agency record within the meaning of FOIA, DOC and BIS are
> withholding it in full pursuant to 5 U.S.C. § 552(b)(5), which exempts from
> disclosure inter-agency or intra-agency memorandums or letters which would not
> be available by law to a party other than an agency in litigation with the agency.
> The report, if an agency record, would be exempted from disclosure under FOIA

> pursuant to the presidential communications privilege and/or the deliberative
> process privilege, until all actions deemed necessary to adjust the imports of
> automobiles and automobile parts so that such imports will not threaten to impair
> the national security have been completed. See 15 C.F.R. § 705.11.

*Id*. at ¶ 11 & Ex. 6.

6.    Upon completion of this review, the Department concluded that the Automotive

Report was subject to the presidential communication privilege and deliberative process

privilege pursuant to Exemption 5.  *Id.* at  ¶ 12.

7.    In connection with *Cause of Action Inst. v. Dep't of Commerce*, Docket No. 19-

0778-CJN (D.D.C.), Plaintiff submitted a declaration averring that DOC took 270 days to release

its 1999 report on "*The Effects of Imports of Crude Oil on National Security*" and "over 600

days" to publish its 1984 report on "The Impact of Ferroalloy Imports on the National Security."

See Declaration of R. James Valvo, III, ¶ 8 (ECF No. 23-3)(attached as Exhibit C to Defendant's

Motion for Summary Judgment).  An attached chart entitled "Section 232 Investigations Where

Reports Issued" reveals five reports being delayed between 106 and 659 days, including the two

mentioned above.  *Id*.

8.    By correspondence dated April 15, 2019, Plaintiff submitted identical FOIA

requests to BIS and the Department seeking "1. a copy of the Commerce Secretary's final report

to the President regarding the Section 232 Investigation on the Effect of Imports of Uranium on

the National Security (Uranium Report)" and "2. The DOD response letter to the Section 232

Investigation on the Effect of Imports of Uranium on the National Security."  Declaration of

Brian D. Lieberman ("Lieberman Decl."), at  ¶  10 & Ex. 1 and 2; 2d Agyekum Decl.,  at  ¶ 14 &

Ex. 7 and 8.

9.    The document to which Plaintiff referred in its April 15, 2019 correspondence is a report that the Secretary submitted to President Trump on February 19, 2019 pursuant to Section 232 regarding whether uranium imports threaten to impair the national security.  Lieberman Decl., at ¶¶ 6 and 25.  Subsequently, on July 12, 2019, the President issued a Presidential Memorandum entitled Memorandum on the Effect of Uranium Imports on the National Security and Establishment of the United States Nuclear Fuel Working Group (Presidential Memorandum), in which he did not concur that these imports constituted a threatened impairment of American national security, but agreed with the Secretary's finding that uranium imports affect national security and deciding further investigation was merited.  The President stated:

> Although I agree with the Secretary's findings raise significant concerns regarding the impact of uranium imports on the national security with respect to domestic uranium mining, I find that a fuller analysis of national security considerations with respect to the entire nuclear fuel supply chain is necessary.

*Id.* at  ¶¶  26 and 28 & Ex. 6 at Section 1(c).

10.    In the Presidential Memorandum, the President further stated, "[t]he United States requires domestically produced uranium to satisfy Department of Defense (DOD) requirements for maintaining effective military capabilities----including nuclear fuel for the United States Navy's fleet of nuclear-powered aircraft carriers and nuclear-powered submarines, source material for nuclear weapons and other functions."  In addition, he noted, "[d]omestic mining, milling, and conversion of uranium, however, while significant, are only a part of the nuclear supply chain necessary for national security, including DOD needs."  *Id*. at  ¶ 29 & Ex. 6 at Section 2(a).

4

11.    In the Presidential Memorandum, the President established the U.S. Nuclear Fuel Working Group (Working Group) "[t]o address the concerns identified by the Secretary regarding domestic uranium production and to ensure a comprehensive review of the entire domestic nuclear supply chain."  The President  appointed senior government officials, including the Secretaries of Commerce, Defense, Energy, Interior and State, to the Working Group.  The President directed the Working Group to "examine the current state of domestic nuclear fuel production to reinvigorate the entire nuclear fuel supply chain, consistent with United States national security and nonproliferation goals."  The President further directed the Working Group to "submit a report to the President setting forth the Working Group's findings and making recommendations to further enable domestic nuclear fuel production if needed."  *Id*. at  ¶ 31 & Ex. 6 at Section 2(c).

12.    The Department has determined that the Uranium Report is exempt from disclosure pursuant to the presidential communications privilege and the deliberative process privilege pursuant to Exemption 5.  *Id*., at  ¶¶ 9 and 34-47.

13.    In February 1959, "the Director of the Office of Civil and Defense Mobilization, who exercised the Secretary's authority under section 232's statutory predecessor" advised President Eisenhower "that imports of crude oil and its derivatives threatened to impair the national security."  See *Publication of a Report to the President on the Effect of Automobile and Automobile-Part Imports on National Security*, 44 Op. O.L.C. ---, --- (2020)(attached as Exhibit D to Defendant's Motion for Summary Judgment)(slip op. at 16).  The Report of Investigation of Imports of Crude Oil and its Derivatives and Products was not released until more than four months after President Eisenhower imposed import restrictions.  *Id*.  The report Effects of

Imported Articles on National Security, 40 Fed. Reg. 4457, 4457 (January 30, 1975), was not published until after President Ford's imposition of supplemental fees. Id. The same has been true of cases of presidential inaction. Section 232 reports were released after "no action" decisions in 1988, 1989, 1995 and 2000. *Id*. (slip op. at 17 & n.11).

14.    Plaintiff Cause of Action has requested, pursuant to FOIA, a total of two Section 232 Reports:  the Auto Report and the Uranium Report. *See* 2d Agyekum Decl. ¶¶ 3, 11, 18.

15.    Plaintiff Cause of Action did not request, pursuant to FOIA, the Section 232 Titanium Sponge report. *Id*. ¶¶ 18-19.

16.    Plaintiff Cause of Action did not request, pursuant to FOIA, the Section 232 Electrical Steel report. *Id*.

17.    Plaintiff Cause of Action did not request, pursuant to FOIA, the Section 232 Vanadium report. *Id.*

18.    The Department pro-actively published the Section 232 Titanium Sponge Report on its website. *See* Borman Decl. Exh. 1.

19.    The Department pro-actively published the Section 232 Electrical Steel Report on its website within a year of the Secretary transmitting the report to the President. *Id.*

20.    The Department pro-actively published the Section 232 Vanadium Report on its website within a year of the Secretary transmitting the report to the President. *Id.*

21.    Of the nine Section 232 Reports completed in the last 25 years, all have been published on BIS' website. Six of those nine, including the most recent two, were published within a year of the Secretary transmitting the report to the President. *See* Borman Decl. ¶¶ 5, 14; *id*. Exh. 2.

22.    The United States District Court for the District of Columbia held that the presidential communication privilege adheres to the Section 232 Auto Report. *See Cause of Action Inst. v. U.S. Department of Commerce*, 513 F. Supp. 3d 116, 125-26 (2021).

23.    The United States District Court for the District of Columbia has held that the enactment of the 2020 Appropriations Act did not diminish the presidential communication privilege adhering to the Section 232 Auto Report. *Id.* at 127, 129-30.

24.    The United States District Court for the District of Columbia has held that the Section 232 Auto Report is exempt from production under FOIA Exemption 5, in conjunction with at least the presidential communications privilege. *Cause of Action Inst. v. U.S. Department of Commerce*, 513 F. Supp. 3d 116, 120, 130, 130 n.3 (2021).

Dated:  February 12, 2022                   Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar # 481052
United States Attorney for the District of Columbia

BRIAN P. HUDAK
Acting Chief, Civil Division

By:  */s/ John Moustakas*
    John Moustakas
    Assistant United States Attorney
    555 Fourth Street, N.W.
    Washington, D.C. 20530
    (202) 252-2518
    john.moustakas@usdoj.gov
    *Counsel for Defendant*

7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
CAUSE OF ACTION INSTITUTE,           )
                                      )
        Plaintiff,                    )
                                      )
        v.                            )        Civ. A. No. 19-2698 (DLF)
                                      )
U.S. DEPARTMENT OF COMMERCE,         )
                                      )
        Defendant.                    )
———————————————————————

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 7(h), Defendant United States Department of Commerce

submits this response to Plaintiff Cause of Action Institute's ("Cause of Action") Statement of

Undisputed Material Facts, ECF No. 43-2.

**I.    The Section 232 Process Under the Trump Administration**

1.    Under the previous Administration, the Department of Commerce ("Commerce")

      undertook eight Section 232 secretarial investigations.  2d Decl. of Ryan P. Mulvey ¶ 4.

**Defendant's Response: Admitted.**

2.    Specifically, Commerce considered the national-security impacts of the continued

      importation of (1) steel, (2) aluminum, (3) automobiles and automobile parts, (4) uranium,

      (5) titanium sponge, (6) electrical steel, (7) mobile cranes, and (8) vanadium.  2d Mulvey

      Decl. ¶ 4.

**Defendant's Response: Admitted.**

1

3.    Commerce did not finish its investigation of mobile cranes and never produced a secretarial report.  2d Mulvey Decl. ¶¶ 48–49.

**Defendant's Response: Admitted.**

4.    Commerce finalized secretarial reports for the remaining seven investigations and transmitted them to the White House.  2d Mulvey Decl. ¶¶ 6, 8, 14, 29, 41, 45, 51.

**Defendant's Response: Admitted.**

### A.    Steel and Aluminum

5.    When Commerce finalized its secretarial reports on steel and aluminum in January 2018, it transmitted those reports to President Trump and, within one month, published them on the website of the Bureau of Industry and Security ("BIS").  2d Mulvey Decl. ¶ 8.

**Defendant's Response: Denied. The Section 232 Report titled The Effect of Imports of Steel on the National Security was transmitted to the President on January 11, 2018, and published on BIS' website on February 16, 2018, which is not "within one month" of the date of transmission. Borman Declaration Exh. 1. The Section 232 Report titled The Effect of Imports of Aluminum on the National Security was transmitted to the President on January 17, 2018, and published on BIS' website on February 16, 2018. Id. Furthermore, because Plaintiff never sought these reports through the Freedom of Information Act ("FOIA"), Defendant disputes that this fact is material to Plaintiff's claim in this FOIA lawsuit.**

6.     Separate proclamations concerning the President's determinations under 19 U.S.C. § 1862(c)(1) on steel and aluminum followed in March 2018.  2d Mulvey Decl. ¶ 9.

**Defendant's Response: Admitted. However, because Plaintiff never sought these reports through FOIA, Defendant disputes that this fact is material to Plaintiff's claim in this FOIA lawsuit.**

7.     In the years after President Trump received the steel and aluminum secretarial reports and first imposed tariffs on those articles, he continued to maintain he had authority under Section 232 to revisit or revise settle[d] tariff decisions. 2d Mulvey Decl. ¶ 11.

**Defendant's Response: Admitted. However, Defendant disputes that this fact is material to any party's claims or defenses in this FOIA lawsuit.**

8.     The current Administration continues to take action vis-à-vis the Trump-era steel tariffs and based solely on the secretarial report created under the previous Administration. 2d Mulvey Decl. ¶ 12.

**Defendant's Response: Admitted. However, Defendant disputes that this fact is material to any party's claims or defenses in this FOIA lawsuit.**

    B.    **Automobiles and Automobile Parts**

9.     As for more recent Section 232 secretarial reports, Commerce has changed course and started to withhold these reports in their entirety, thereby refusing to publish them in the *Federal Register* or to disclose them under the Freedom of Information Act ("FOIA").  2d Mulvey Decl. ¶¶ 17–18, 21–23, 63, 64–67; *see* 2d Mulvey Decl. ¶ 39.

**Defendant's Response: Denied. Commerce has not "refus[ed] to publish … or disclose" Section 232 Reports. In response to the alleged fact that Commerce refuses to disclose recent reports under FOIA, all three of the "more recent" completed Section 232 Reports**

**have been pro-actively published on BIS' website. Borman Exh. 2;** *accord* **2d Mulvey 2nd**

**Decl. ¶¶ 39, 43, 46, 53. Furthermore, neither Plaintiff nor any other party requested copies**

**of those reports when they were not public, thus calling into question whether the fact is**

**material to Plaintiff's policy and practice claim. 2d Agyekum Decl. ¶ 18; Borman Decl. ¶¶**

**11, 15. In response to the alleged fact that Commerce refuses to publish those reports in**

**the Federal Register, all three of the "more recent" completed Section 232 Reports have**

**been published in the Federal Register.** *See* **86 F.R. 59,115 (Oct. 26, 2021); 86 F.R. 64,606**

**(Nov. 18, 2021), 86 F.R. 64,748 (Nov. 18, 2021). Furthermore, Defendant disputes that this**

**fact is material to any party's claims or defenses in this FOIA lawsuit.**

10.    In February 2019, Commerce finalized and transmitted its secretarial report on automobiles

and automobile parts ("Autos Report") to the White House.  2d Mulvey Decl. ¶ 14.

**Defendant's Response: Admitted.**

11.    In the Autos Report, the Secretary of Commerce ("Secretary") concluded that continued

importation of automobiles and automobile parts threatened to impair the national security.

2d Mulvey Decl. ¶ 14.

**Defendant's Response: Admitted.**

12.    The White House subsequently issued a presidential proclamation that provided an

extensive summary of the Autos Report, including direct quotes. 2d Mulvey Decl. ¶ 15;

Decl. of Grace Agyekum Ex. 3 (May 17, 2019 Presidential Proclamation), ECF No. 17-1.

**Defendant's Response: Admitted.**

13. President Trump agreed with then-Secretary Ross's conclusions and directed the U.S. Trade Representative to "pursue negotiation of agreements [as] contemplated in 19 U.S.C. 1862(c)(3)(A)(i)." 2d Mulvey Decl. ¶ 15; Agyekum Decl. Ex. 3.

**Defendant's Response: Admitted.**

14. In February 2019, after Commerce failed to publish the Autos Report, CoA Institute filed two FOIA requests seeking access to it. 2d. Mulvey Decl. ¶ 16; *cf.* [Corrected] Answer ¶ 15, ECF No. 9.

**Defendant's Response: Denied. Defendant did not "fail[] to publish the Auto[] Report".**
**The Auto Report was published on BIS' website on July 6, 2021, subsequent to Cause of**
**Action initiating suit. 2d Agyekum Decl. ¶ 10; Borman Decl. ¶ 13; *accord* 2d Mulvey Decl.**
**¶ 26.**

15. Amid that litigation, Commerce sent a letter to CoA Institute stating the agency was "reviewing, in conjunction with the Executive Office of the President, whether the Secretary's report constitutes a presidential record within the meaning of the Presidential Records Act . . . in which case it would not be subject to disclosure under FOIA." Compl. Ex. 1, ECF No. 1-1; 2d Mulvey Decl. ¶ 17; *cf.* Answer ¶ 16.

**Defendant's Response: Admitted.**

16. Commerce also indicated, even if the Autos Report were subject to the FOIA, the agency would nonetheless withhold it "pursuant to the presidential communications privilege and/or the deliberative process privilege, until all actions deemed necessary to adjust the imports of automobiles and automobile parts so that such imports will not threaten to

impair the national security have been completed." Compl. Ex. 1.; 2d Mulvey Decl. ¶ 18; *cf.* Answer ¶ 17.

**Defendant's Response: Admitted.**

17. At the end of 2019, Congress passed, and President Trump signed into law, an appropriations bill that included a provision imposing a deadline on Commerce to publish the Autos Report in the *Federal Register*. 2d Mulvey Decl. ¶¶ 19–20; 2d Mulvey Decl. Ex. 3.

**Defendant's Response: Admitted. However, Defendant denies that this fact is material to any party's claim or defense in this FOIA lawsuit. *Cause of Action Institute v. U.S. Department of Commerce ("Cause of Action I")*, 513 F. Supp. 3d 116, 130 (D.D.C. 2021) ("The Court holds that the presidential communications privilege applies to the Report, and that Section 112's later-imposed requirement that the Report be made public by a specific deadline does not diminish the privilege in the context of FOIA.").**

18. Commerce refused to comply with the appropriations law and did not meet the congressionally imposed publication deadline. 2d Mulvey Decl. ¶ 21; Agyekum Decl. ¶ 13 ("BIS continue[d] to withhold the Automotive Report.").

**Defendant's Response: Admitted that Commerce did not publish the Auto Report in the Federal Register by Congressionally-imposed deadline. However, Defendant denies that this fact is material to any party's claim or defense in this FOIA lawsuit. *Cause of Action I*, 513 F. Supp. 3d 116, 130 (D.D.C. 2021) ("The Court holds that the presidential communications privilege applies to the Report, and that Section 112's later-imposed requirement that the Report be made public by a specific deadline does not diminish the privilege in the context of FOIA.").**

19.    Commerce instead adopted as its official position legal advice from the Department of Justice's Office of Legal Counsel that "the constitutional doctrine of executive privilege" overrode Congress's authority to condition its delegation of tariff authority on the publication of a Section 232 secretarial report.  2d Mulvey Decl. ¶¶ 22–23; 2d Mulvey Decl. Ex. 4.

**Defendant's Response: Admitted that Commerce heeded legal advice from DOJ. However, Defendant denies that this fact is material to Plaintiff's claim in this FOIA lawsuit.**

20.    Commerce finally publicly disclosed the Autos Report by posting it to the BIS website in July 2021, and thereafter published it in the *Federal Register* in early November 2021. 2d Mulvey Decl. ¶ 26.

**Defendant's Response: Admitted that the Auto Report was published on BIS' website on July 6, 2021 and in the Federal Register on November 8, 2021. However, Defendant denies that the date of publication (or even whether the report was published in the Federal Register) is material to any party's claim or defense in this FOIA lawsuit.**

C.    Uranium

21.    In April 2019, Commerce completed its secretarial investigation into the effect of imports of uranium on the national security and transmitted that final report ("Uranium Report") to President Trump.  2d Mulvey Decl. ¶ 28; Answer ¶ 19 (admitted); Decl. of Brian D. Lieberman 6, ECF No. 17-1.

**Defendant's Response: Admitted.**

22.    Commerce initiated that secretarial investigation upon "application" of two "interested part[ies]"—*viz.*, "two American companies," "Energy Fuels Resources (USA) Inc. and Ur-

Energy USA Inc."—as contemplated by 19 U.S.C. § 1862(b)(1)(A).  Lieberman ¶¶ 6 & 22–23; 2d Mulvey Decl. ¶ 28.

**Defendant's Response: Admitted. However, Defendant disputes that this fact is material to any party's claims or defenses in this FOIA lawsuit.**

23.    The Secretary concluded the current import levels of uranium threatened to impair the national security.  2d Mulvey Decl. ¶ 30; Lieberman Decl. ¶ 7.

**Defendant's Response: Admitted.**

24.    In July 2019, President Trump published a memorandum announcing he did "not concur with the Secretary's finding that uranium imports threaten to impair the national security[.]"  2d Mulvey Decl. ¶ 31; Lieberman Decl. Ex. 6; *see* 2d Mulvey Decl. Ex. 5.

**Defendant's Response: Admitted.**

25.    In lieu of acting under Section 232, President Trump directed the creation of an inter-agency "United States Nuclear Fuel Working Group," which would "submit a report to the President setting forth the Working Group's findings and . . . recommendations to further enable domestic nuclear fuel production" within "90 days."  2d Mulvey Decl. ¶ 32.

**Defendant's Response: Denied that the creation of an interagency Nuclear Fuel Working Group was not a step towards action under the Trade Enforcement Act in response to the Section 232 Report. Otherwise, admitted.**

26.    President Trump confirmed he was not "tak[ing] any action under section 232" in an August 2019 letter to the Speaker of the House of Representatives and the President of the

Senate, which was prepared "[c]onsistent with" the President's obligations under 19 U.S.C. § 1862(c)(2). 2d Mulvey Decl. ¶ 33; *see* 2d Mulvey Decl. Ex. 6.

**Defendant's Response: Admitted that the President made that representation. Denied that, although the President was not taking any immediate action under Section 232, the President had determined not to take any action. Defendant notes that the creation of a working group tasked to make further recommendations to deal with the risk posed by uranium imports, whether or not an "action" under Section 232, could lead to future action under Section 232.**

27. The Nuclear Fuel Working Group published its final report and recommendations in April 2020, and the working group is no longer meeting or operational. 2d Mulvey Decl. ¶ 34.

**Defendant's Response: Admitted.**

28. In July 2021, while the parties' initial cross-motions for summary judgment were pending, Commerce informed the Court and CoA Institute that Commerce intended to release the Uranium Report by posting it on BIS's website and publishing a copy in the *Federal Register*. 2d Mulvey Decl. ¶ 35.

**Defendant's Response: Admitted. However, Defendant denies that the date or fact of publication in the Federal Register is material to any party's claim or defense in this FOIA lawsuit.**

29. On July 29, 2021, Commerce posted the Uranium Report, with redactions, on the BIS website. 2d Mulvey Decl. ¶ 36.

**Defendant's Response: Admitted.**

30.  On August 2, 2021, Commerce published a copy of the redacted Uranium Report (without appendices) in the *Federal Register* and directed the public to BIS's website for all relevant materials associated with the report.  2d Mulvey Decl. ¶ 37.

**Defendant's Response: Admitted. However, Defendant denies that this fact is material to any party's claim or defense in this FOIA lawsuit.**

31.  Concurrent with its release of the Uranium Report, Commerce posted the final secretarial reports for titanium sponge, electrical steel, and vanadium on BIS's website.  2d Mulvey Decl. ¶ 39.

**Defendant's Response: Admitted. However, because Plaintiff (nor any other requester) did not request unpublished copies of these reports before they were posted, it calls into question whether the fact is material to Plaintiff's claim in this FOIA lawsuit. 2d Agyekum Decl. ¶ 18; Borman Decl. ¶¶ 11, 15.**

32.  Commerce did not concurrently publish related notices or copies of these additional reports in the *Federal Register*.  2d Mulvey Decl. ¶ 39.

**Defendant's Response: Denied. These reports were all published in the Federal Register within a matter of months of their publication on BIS' website, as time and constraints of paying for publication during a period of continuing resolution (i.e. without a Congressionally-passed budget) permitted. *See* 86 F.R. 59,115 (Oct. 26, 2021); 86 F.R. 64,606 (Nov. 18, 2021), 86 F.R. 64,748 (Nov. 18, 2021). Furthermore, Defendant denies that this fact is material to any party's claim or defense in this FOIA lawsuit.**

### D.    Titanium Sponge

33.   In November 2019, Commerce completed its secretarial investigation into the effect of imports of titanium sponge on the national security and transmitted a final report ("Titanium Sponge Report") to President Trump.  2d Mulvey Decl. ¶ 41.

**Defendant's Response: Admitted. However, because Plaintiff did not request this report pursuant to FOIA, Defendant denies that this fact is material to Plaintiff's claim in this FOIA lawsuit. 2d Agyekum Decl. ¶ 18.**

34.   The Secretary concluded continued importation of titanium sponge threatened to impair the national security.  2d Mulvey Decl. ¶ 41.

**Defendant's Response: Admitted.**

35.   President Trump concurred with the Secretary's conclusion and recommendation not to adjust imports on titanium sponge or otherwise act under Section 232. 2d Mulvey Decl. ¶ 42.

**Defendant's Response: Denied that the Secretary's recommendation was not to act under Section 232. The Secretary recommended "several potential actions … includ[ing] domestic initiatives and multilateral negotiations." 86 F.R. 59,119 (Oct. 26, 2021).**

36.   President Trump instead directed Commerce and the Department of Defense("DOD") to form a "working group" to participate in trade discussions with the government of Japan, and to provide the White House with "periodic updates."  2d Mulvey Decl. ¶ 42.

**Defendant's Response: Denied to the extent that Plaintiff is alleging this is not an action to address the threat of imports of titanium sponge to the national security. 86 F.R. 59,119 (Oct. 26, 2021). Otherwise, admitted.**

37.    Commerce only posted a copy of the Titanium Sponge Report to BIS's website in July

2021, along with the secretarial reports on uranium, electrical steel, and vanadium.  2d

Mulvey Decl. ¶ 43; *see* 2d Mulvey Decl. ¶ 39.

**Defendant's Response: Admitted that the four identified Section 232 Reports were**

**published on BIS' website in July 2021.**

38.    Commerce published a copy of the Titanium Sponge Report in the *Federal Register* several

months later in late October 2021.  *See* 2d Mulvey ¶ 43.

**Defendant's Response: Admitted. However, Defendant denies that this fact is material to**

**any party's claim or defense in this FOIA lawsuit.**

### E.    Electrical Steel

39.    Commerce concluded its investigation of electrical steel in October 2020 and transmitted

a copy of its final report ("Electrical Steel Report") to President Trump. 2d Mulvey Decl.

¶ 45.

**Defendant's Response: Admitted. However, because Plaintiff did not request this report**

**pursuant to FOIA, Defendant denies that this fact is material to Plaintiff's claim in this**

**FOIA lawsuit. 2d Agyekum Decl. ¶ 18.**

40.    The report reached a positive determination that continued importation of grain-oriented

electrical steel for transformers would impair national security, but President Trump took

no formal action under Section 232.  2d Mulvey Decl. ¶ 45; *see* 2d Mulvey Decl. Ex. 2 at

22.

**Defendant's Response: Although the allegation is vague with respect to what constitutes**

**"formal action", admitted. However, because Plaintiff did not request this report pursuant**

to FOIA, Defendant denies that this fact is material to Plaintiff's claim in this FOIA lawsuit. 2d Agyekum Decl. ¶ 18.

41.   Commerce only posted a copy of the Electrical Steel Report to BIS's website in July 2021, along with the secretarial reports on uranium, titanium sponge, and vanadium. 2d Mulvey Decl. ¶ 46; *see* 2d Mulvey Decl. ¶ 39.

**Defendant's Response: Admitted that the four identified Section 232 Reports were published on BIS' website in July 2021. However, because Plaintiff did not request this report pursuant to FOIA, Defendant denies that this fact is material to Plaintiff's claim in this FOIA lawsuit. 2d Agyekum Decl. ¶ 18.**

42.   Commerce published a copy of the Electrical Steel Report in the *Federal Register* several months later in mid-November 2021.  2d Mulvey Decl. ¶ 46.

**Defendant's Response: Admitted. However, Defendant denies that this fact is material to any party's claim or defense in this FOIA lawsuit.**

### F.     Mobile Cranes

43.   Commerce initiated an investigation into mobile cranes in May 2020 on petition by the Manitowoc Company, Inc.  2d Mulvey Decl. ¶ 47.

**Defendant's Response: Admitted. However, Defendant denies that this fact is material to any party's claim or defense in this FOIA lawsuit.**

44.   After the Manitowoc Company withdrew its petition in August 2020, Commerce suspended its investigation.  2d Mulvey Decl. ¶ 48.

**Defendant's Response: Admitted. However, Defendant denies that this fact is material to any party's claim or defense in this FOIA lawsuit.**

13

45.    Commerce did not complete a secretarial report pertaining to mobile cranes. 2dMulvey

Decl. ¶ 49.

**Defendant's Response: Admitted. However, Defendant denies that this fact is material to**

**any party's claim or defense in this FOIA lawsuit.**

### G.    Vanadium

46.    Commerce concluded its investigation of the national-security impacts of thecontinued

importation of vanadium in February 2021 and transmitted a copy of its report ("Vanadium

Report") to the White House.  2d Mulvey Decl. ¶ 51.

**Defendant's Response: Admitted. However, because Plaintiff did not request this report**

**pursuant to FOIA, Defendant denies that this fact is material to Plaintiff's claim in this**

**FOIA lawsuit. 2d Agyekum Decl. ¶ 18.**

47.    In that report, the Secretary concluded there was no national security threat caused by the

continued importation of vanadium.  2d Mulvey Decl. ¶ 51.

**Defendant's Response: Admitted. However, because Plaintiff did not request this report**

**pursuant to FOIA, Defendant denies that this fact is material to Plaintiff's claim in this**

**FOIA lawsuit. 2d Agyekum Decl. ¶ 18.**

48.    President Biden took no further action under Section 232.  2d Mulvey Decl. ¶ 52.

**Defendant's Response: Admitted. However, because Plaintiff did not request this report**

**pursuant to FOIA, Defendant denies that this fact is material to Plaintiff's claim in this**

**FOIA lawsuit. 2d Agyekum Decl. ¶ 18.**

49.    Commerce only posted a copy of the Vanadium Report to BIS's website in July 2021, when it concurrently published its secretarial reports on uranium, titanium sponge, and electrical steel.  2d Mulvey Decl. ¶ 53; *see* 2d Mulvey Decl. ¶ 39.

**Defendant's Response: Admitted that the four identified Section 232 Reports were published on BIS' website in July 2021. However, because Plaintiff did not request this report pursuant to FOIA, Defendant denies that this fact is material to Plaintiff's claim in this FOIA lawsuit. 2d Agyekum Decl. ¶ 18.**

50.    Commerce published a copy of the Vanadium Report in the *Federal Register* several months later, in mid-November 2021.  2d Mulvey Decl. ¶ 53.

**Defendant's Response: Admitted. However, Defendant denies that this fact is material to any party's claim or defense in this FOIA lawsuit.**

## II.    The Section 232 Process Under the Biden Administration

51.    On September 21, 2021, Commerce announced it was initiating an investigation into the national security effects of the continued importation of neodymium magnets.  2d Mulvey Decl. ¶ 54.

**Defendant's Response: Admitted.**

52.    Under Section 232, the Secretary has 270 days to complete this investigation and transmit a final report ("Neodymium Magnet Report") to President Biden.  2d Mulvey Decl. ¶ 55.

**Defendant's Response: Admitted. However, Defendant denies that this fact is material to any party's claim or defense in this FOIA lawsuit.**

53.    Commerce must finalize and transmit the Neodymium Magnet Report to the WhiteHouse by June 18, 2022.  2d Mulvey Decl. ¶ 55.

**Defendant's Response: Admitted. However, Defendant denies that this fact is material to any party's claim or defense in this FOIA lawsuit.**

### III.    CoA Institute's FOIA Requests for the Uranium Report

54.    In the face of Commerce's initial failure to publish or proactively disclose the Uranium Report as required by 19 U.S.C. § 1862(b)(3)(B), (d)(1), CoA Institute filed the two FOIA requests previously at issue in this lawsuit. 2d Mulvey Decl. ¶ 56; *see* Compl. Exs. 2 & 4, ECF Nos. 1-2 & 1-4; *cf.* Answer ¶ 21.

**Defendant's Response: Admitted that on April 15, 2019, Commerce and BIS each received a FOIA request from Plaintiff seeking a copy of the Section 232 Uranium Report transmitted from the Secretary to the President on April 14, 2019. Otherwise, denied.**

55.    At the time of the Complaint, Commerce had not communicated with CoA Institute about the FOIA request directed to the Office of the Secretary, except for an initial acknowledgment that the agency had received the request and assigned it a tracking number. 2d Mulvey Decl. ¶ 57.

**Defendant's Response: Admitted.**

56.    In May 2019, Commerce issued a final determination granting the FOIA request directed to BIS. 2d Mulvey Decl. ¶ 58.

**Defendant's Response: Denied. The letter did not constitute a final determination as to whether any exemptions to disclosure applied to the responsive documents. Moreover, under FOIA caselaw, a determination to withhold exempt documents or portions of documents is considered a denial or partial denial of a request.**

57.    In its determination letter, Commerce explained it "intend[ed] to provide all non-exempt documents responsive to [CoA Institute's] request." 2d Mulvey Decl. ¶ 58; *see* Compl. Ex. 5, ECF No. 1-5; *see also* Answer ¶ 28 (admitted).

**Defendant's Response: Admitted.**

58.    Commerce also advised "the [Uranium Report] will be made publicly available via publication in the Federal Register, pursuant to 15 C.F.R. § 710(c), after the President's review iscomplete."  2d Mulvey Decl. ¶ 58; *see* Compl. Ex. 5; *see also* Answer ¶ 28 (admitted).

**Defendant's Response: Admitted.**

59.    Between May 2019 and August 2019, CoA Institute employees exchanged e-mailswith Grace Agyekum, a BIS FOIA Officer and Public Liaison, concerning the availability of the Uranium Report. 2d Mulvey Decl. ¶¶ 59–60; *see* Compl. Ex. 6, ECF No. 1-6; *see also* Answer ¶ 29 (admitted).

**Defendant's Response: Admitted.**

60.    In July 2019, Ms. Agyekum informed CoA Institute, by email, that "an executive summary [of the Uranium Report] will be printed in the [*Federal Register*] within the next 30 daysand the full report will be on the BIS website." 2d Mulvey Decl. ¶ 60; *see* Compl. Ex. 6; *see also* Answer ¶ 30 (admitted).

**Defendant's Response: Admitted.**

61.    Commerce failed to provide any further clarification or update on the availability of the Uranium Report, despite repeated requests from CoA Institute.  2d Mulvey Decl. ¶ 61.

**Defendant's Response: Admitted that between July 16, 2019 and the filing of Plaintiff's complaint on September 9, 2019, BIS did not provide updates on when the Uranium Report**

would become disclosable, and that Plaintiff requested updates on August 14, 2019 and August 16, 2019.

62. At the time of the Complaint, Commerce had not produced the Uranium Report to CoA Institute, nor had it proactively disclosed the Uranium Report on BIS's website or published it in the *Federal Register*.  2d Mulvey Decl. ¶ 62.

**Defendant's Response: Admitted.**

63. During the instant case, Commerce has continued to rely on the OLC Opinion and its legal reasoning regarding the withholding of the Uranium Report—and, by extension, other Section 232 secretarial reports—under the presidential-communications and deliberative-process privileges.  2d Mulvey Decl. ¶ 63.

**Defendant's Response: Admitted that Commerce continues to utilize advice on complicated legal issues from the Department of Justice.**

IV.    **The Impact of Defendant's Policy and Practice of Withholding Secretarial Reports**

64. Commerce maintains a novel policy and practice of withholding Section 232 secretarial reports under the presidential-communications and deliberative-process privileges until "directed to [disclose them] . . . by the President." Agyekum Decl. ¶ 20; *see* Lieberman Decl. ¶ 48 ("[Section 232 secretarial reports are] exempt from disclosure . . . for such time as the President utilizes the report in determining what actions may be needed[.]"); *see also* 2d Mulvey Decl. ¶ 64.

**Defendant's Response: Denied. In context, those declarations indicate only that once Commerce determined it was necessary to withhold the report due to privileged advice and recommendations provided to the President and the negative impact that disclosing the report would have on the President's continuing actions, the agency could not unilaterally**

**determine that the harm of disclosure had dissipated to the point that the report could be published.**

65.    Commerce's policy and practice deprived CoA Institute of timely access to the Uranium Report, and accompanying DOD memorandum, as well as the Autos Report.  2d Mulvey Decl. ¶ 64.

**Defendant's Response: Denied.**

66.    Commerce's adoption of the OLC Opinion to justify its treatment of Section 232 secretarial reports further frustrates—and will continue to impede—CoA Institute's right to access secretarial reports under the FOIA.  2d Mulvey Decl. ¶ 65.

**Defendant's Response: Denied.**

67.    Commerce likely attempted to moot this case and evade judicial review by releasing the Uranium Report, along with all outstanding Section 232 secretarial reports, on the eve of oral argument on the parties' previous cross-motions for summary judgment in this case. 2d Mulvey Decl. ¶¶ 6 & 39.

**Defendant's Response: Denied. Commerce's publication of completed Section 232 Reports was a result of repeated consultation with the White House regarding whether disclosure of as-yet-unpublished reports would continue to harm the actions taken by the new administration in response to the reports.**

68.    CoA Institute is a frequent FOIA requester with a demonstrated interest in good government and transparency.  2d Mulvey Decl. ¶ 66.

**Defendant's Response: Admitted. However, Defendant denies that this fact is material to any party's claim or defense in this FOIA lawsuit.**

69.    CoA Institute has repeatedly sought records related to the Section 232 process. 2d Mulvey Decl. ¶ 66.

**Defendant's Response: Admitted that Plaintiff has sought the Section 232 Auto Report and the Section 232 Uranium Report. Defendant denies that Plaintiff has sought any other record relevant to any party's claims or defenses in this FOIA lawsuit.**

70.    CoA Institute will likely file future FOIA requests for Section 232 secretarial reports and related records, including the Neodymium Magnet Report, if Commerce continues to flout its publication obligations under 19 U.S.C. § 1862(b)(3)(B), (d)'(1).  2d Mulvey Decl. ¶ 66.

**Defendant's Response:  Denied that Commerce "flout[s] its publication obligations". Further denied that Plaintiff is "likely" to file future FOIA requests for Section 232 Reports. *See* 2d Agyekum Decl. ¶¶ 18-20 (detailing Plaintiff has requested only two reports out of nine completed in the last 25 years); Parsons Decl. ¶¶ 18-20 (same).**

71.    CoA Institute reasonably expects its Section 232-related request will be summarily denied or granted but ignored.  2d Mulvey Decl. ¶ 67.

**Defendant's Response:  Denied that Commerce or BIS will summarily deny or grant but ignore any FOIA request from Plaintiff seeking Section 232 Reports.**

72.    Alternatively, CoA Institute can expect Commerce to ignore these requests altogether, thus necessitating costly litigation.  2d Mulvey Decl. ¶ 67.

**Defendant's Response: Denied that Commerce or BIS will ignore any FOIA request from Plaintiff seeking Section 232 Reports.**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| CAUSE OF ACTION INSTITUTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 19-2698 (DLF) |
| | ) | |
| DEPARTMENT OF COMMERCE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMBINED MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant the Department of Commerce (the "Department"), by and through its undersigned counsel, respectfully submits this Combined Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment. For the reasons stated below, Plaintiff's Motion should be denied, and the Department's Cross-Motion should be granted pursuant to Federal Rule of Civil Procedure ("Rule") 56 on Plaintiff's claims in this action, which arise under the Freedom of Information Act ("FOIA").

**INTRODUCTION**

This lawsuit was brought under FOIA, with underlying FOIA requests directed to the Department's Bureau of Industry and Security ("BIS" or "Bureau") seeking a report (a "Section 232 Report") created pursuant to Section 232 of the Trade Expansion Act of 1962 analyzing whether the import of uranium threatens to impair the national security ("Uranium Report").

The Uranium Report was published on the Bureau's website on July 29, 2021. (Borman Decl. Exs. 1, 2.). "In the FOIA context, claims are normally mooted when the agency produces

all requested documents to the requesting party. However, our circuit court recognizes 'policy and practice' claims as an exception to this general rule, and holds that FOIA claims cannot be mooted by an agency's release of documents when the 'refusal to supply information evidences a policy or practice of delayed disclosure or some other failure to abide by the terms of [] FOIA, and not merely isolated mistakes[.]'" *Jud. Watch, Inc. v. Dep't of Homeland Sec.*, 211 F. Supp. 3d 143, 146 (D.D.C. 2016) (citations omitted) (quoting *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988)). Plaintiff alleges that the prior withholding by the Department of the Uranium Report, along with the withholding of the Section 232 Report analyzing whether the import of automobiles and automobile parts threatens the national security ("Auto Report"), evidences a policy and practice to routinely violate FOIA when responding to FOIA requests for Section 232 Reports.

In short, Plaintiff's claim lacks merit and flies in the face of Judge Nichols opinion in Plaintiff's Auto Report suit, *Cause of Action Inst. v. Dep't of Com.*, 513 F. Supp. 3d 116, 132 (D.D.C. 2021), where the Court upheld the Department's withholding of the Section 232 Auto Report as permissible under FOIA. Nowhere in Plaintiff's Motion does Plaintiff attempt to explain how the Department can have a pattern and practice of violating FOIA by withholding Section 232 reports when this Court has previously determined that such withholdings are consistent with FOIA. Moreover, even were past withholdings of Section 232 reports by the prior administration inconsistent with FOIA (which they were not), Plaintiff has pointed to no facts that the current administration is continuing the same practice. For these reasons and others, Plaintiff's pattern and practice claim is devoid of merit, and the Court should grant the Department summary judgment on it.

## BACKGROUND

Under enumerated circumstances, federal law requires the Secretary of Commerce (the "Secretary") to investigate whether the importation of certain articles of commerce, in such quantities or under such circumstances, threatens to impair United States national security. When an investigation is required, so too is a report. Explicitly designed for the President's benefit, the report must include the Secretary's findings and recommendations, and it must advise the President whether the subject imports threaten to impair national security. *See* 19 U.S.C. § 1862(b)(3)(A).[1] Consequential to a wide range of recommended options for eliminating the threat to national security, it is indispensable to one: the adjustment of imports and their derivatives turns on the report's national security finding. *See* Compl. ¶¶ 7, 8. Historically, once a final Presidential decision has signaled the diminished need to protect the deliberative process that generated the President's options, the Department has released for publication in the Federal Register the Secretary's report—a statutory requirement with no time limit. *See Cause of Action*, 513 F. Supp. 3d at 121 ("Section 232 does not [] include an express deadline by which the report must be published.").

By letter dated February 18, 2019, Plaintiff made a FOIA request for a copy of the Secretary's Auto Report to the President. 30 days later it sued the Department to compel the Auto Report's disclosure in *Cause of Action Institute v. Department of Commerce*, Civ. A. No. 19-0778 (CJN) (D.D.C.) ("the Auto Report Case"). That case was decided in the Department's favor by

---

[1]     "The Report is a confidential memorandum from the Secretary to the President, containing the Secretary's advice on decisions delegated to the President by statute." *Cause of Action*, 513 F. Supp. 3d at 125. Plaintiff's naked assertion (Mot. at 2) that "Section 232 secretarial reports are not solely for [the President's] benefit" is belied by the Report's simultaneous release to both the Congress and the public. *See* 19 U.S.C. § 1862(e)(1).

Judge Nichols on January 14, 2021.  *See* Declaration of Grace Agyekum ("Agyekum Decl.") ¶ 7, Ex. 5 (attaching decision in Auto Reports Case).

Underlying this action, by letter dated April 15, 2019, Plaintiff also requested a copy of the Secretary's Uranium Report to the President.  After constructively exhausting administrative remedies, Plaintiff filed this suit ("the Uranium Report Case"), to obtain the Uranium Report and a letter from the Department of Defense "Responding to the Section 232 Investigation on the Effects of Imports of Uranium on the National Security" ("Defense Response").  Agyekum Decl. ¶ 10, Ex. 6.

In responding to Plaintiff's request, the Department identified one document responsive to the first part of the request—the Uranium Report, a report that the Secretary submitted to the President on April 14, 2019, pursuant to Section 232 of the Trade Expansion Act, 19 U.S.C. § 1862, regarding whether imports of uranium threaten to impair the national security of the United States.  *Id*. ¶¶ 6, 25.  The Department identified no documents responsive to the second portion of Plaintiff's request – the Defense Response.  Lieberman Decl. ¶ 10, n.1.  Subsequently, in connection with eventual efforts to release the Uranium Report, the Department located the Defense Response and promptly informed about the discovery on Plaintiff on or about July 29, 2021.  *See* ECF No. 39, ¶3; ECF No. 41, ¶3.  Ultimately, the Defense Response was released to Plaintiff subject to redactions made pursuant to Exemption 3 – redactions to which Plaintiff has accepted without objection.  *See id*. ¶ 3; ECF No. 42, ¶¶ 7-8.  Accordingly, the Uranium Report is the only document at issue in this matter.

The first count of Plaintiff's two-count Complaint alleges a violation of FOIA on account of the Department's alleged failure to comply with statutory deadlines—to wit, release the

Uranium Report.  As the accompanying Lieberman Declaration demonstrates,[2] the Department previously and properly withheld the Uranium Report in its entirety pursuant to the presidential communications and deliberative process privileges under FOIA Exemption 5.  There is no genuine issue of material fact as to this issue as Judge Nichols in the parallel Auto Report Case concluded, and the Department is plainly entitled to judgment as a matter of law on that claim.

Asserting a purportedly unlawful and willful pattern of withholding Section 232 reports on the basis of the Department's recent assertion of presidential communications and deliberative process privileges in the Auto Report Case, the second count of Plaintiff's complaint alleges a "policy and practice" claim under FOIA.  This claim lacks merit as it is devoid of factual and legal support.  Notably, Plaintiff's complaint is internally inconsistent asserting that the Department's "policy and practice" is simultaneously both longstanding—Compl. ¶ 2 (the Department has "repeatedly withheld" reports—and recently changed—*id.* ¶¶ 13, 14 (the Department "recently [ ] changed course" and there has been a "shift in policy and practice illustrated" by Auto Report Case).

Plaintiff's position depends upon the unsupported, illogical, and presumptively unconstitutional premise that Congress both could, and did, categorically strip the President and the Secretary of executive privileges essential to the very task of preserving national security to which they were entrusted.  It defies logic and reason that Congress meant publicly to expose the administration's strategy and tactics—e.g., for negotiating import restrictions or other measures with foreign governments to blunt the harmful effects of certain imports—at the moment of its greatest importance.  As a matter of general historical practice, the Department has acted sensibly and in good faith when treating the Section 232 reports as protected from public disclosure until

---

[2]    The Lieberman Declaration describes in detail the nature of the withholding.

at least such time as the report's findings and recommendations have been fully considered, and the President has made the decision the report was intended to inform. This was the conclusion of Judge Nichols in the Auto Reports Case, *Cause of Action*, 513 F. Supp. 3d at 130. For these reasons, as discussed in detail below, Plaintiff's "policy and practice" claim also fails.

### LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the trier of fact must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party must show that the dispute is genuine and material to the case. A "genuine issue" is one whose factual dispute is capable of affecting the substantive outcome of the case and is supported by admissible evidence that a reasonably trier of fact could find for the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.,* 477 U.S. 242, 247-48 (1986). The burden on the moving party may be discharged by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

FOIA cases are typically and appropriately decided on motions for summary judgment. *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 130 (D.D.C. 2011). In a FOIA action, an agency that moves for summary judgment "bears the burden of showing that there is no genuine issue of material fact, even when the underlying facts are viewed in the light most favorable to the requester." *Weisberg v. Dep't of Just.*, 705 F. 2d 1344, 1350 (D.C. Cir. 1983). An agency can meet its burden by submitting declarations or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Summary judgment is justified in a FOIA lawsuit once the agency demonstrates that no material facts are in dispute and, if applicable, that each document

that falls within the class requested has been produced, is unidentifiable, or is exempt from disclosure. *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001).

## ARGUMENT

### I.    Plaintiff's Claim Is Moot.

Article III courts are courts of limited jurisdiction. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998). At the most elemental level, the constitutional minimum for the exercise of federal court jurisdiction is a dispute presenting a justiciable "case or controversy." U.S. Const. art. III, § 2; *Allen v. Wright*, 468 U.S. 737, 750 (1984). The courts have developed various doctrines of case-or-controversy jurisprudence designed to "test the fitness of controversies for judicial resolution." *Louisiana Env't Action Network v. Browner*, 87 F.3d 1379, 1382 (D.C. Cir. 1996). And, because of the interests that these doctrines of justiciability protect, a matter's fitness for judicial resolution remains at issue throughout the litigation. *See*, *e.g.*, *U.S. Parole Comm'n. v. Geraghty*, 445 U.S. 388, 397 (1980) ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).")

Though they differ in focus, the constitutional and prudential limitations on justiciability are animated by the same bedrock principle: redressability and "the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498-99 (citing *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 221-227 (1974); *United States v. Richardson*, 418 U.S. 166, 188-197 (1974) (Powell, J., concurring)). Temporally focused, the justiciability doctrines of mootness and ripeness guard opposite ends of the time continuum from the issuance of advisory opinions that could dilute the power inherent in judicial circumspection. Where mootness asks whether it is too late to ensure resolution of a live, concrete case or controversy, ripeness is concerned with whether it is too early. *See*, *e.g.*, *Winnett v. Caterpillar,*

*Inc.*, 609 F.3d 404, 414 (6th Cir. 2010); *Beacon Hill Farm Assocs. II Ltd. P'ship v. Loudoun Cty. Bd. of Supervisors*, 875 F.2d 1081, 1082 (4th Cir. 1989) ("case or controversy requirement prohibits federal courts from issuing opinions on claims which are [either] brought too late, and are moot, [or] which are brought too early, and are not yet ripe for adjudication").  Thus, just as "an intervening circumstance depriv[ing] the plaintiff of a personal stake in the outcome of [his] lawsuit, at any point during litigation," will render his claim moot, *see Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016), the prematurity of claim yet to be sufficiently crystallized to be considered fit for judicial resolution will require its dismissal on ripeness grounds.  *See Nat'l Park Hosp. Ass'n v. Dep''t of Interior*, 538 U.S. 803, 807-08 (2003) ("Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'") (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-149 (1967).

Under these standards, Plaintiff's retrospective and prospective claims are moot and unripe, respectively.  The impact of mootness on a FOIA claim is plain: "once all the documents are released to the requesting party, there no longer is a case or controversy."  *Bayala*, 827 F.3d at 34; *see also Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982) ("[H]owever fitful or delayed the release of information under the FOIA may be, once all requested records are surrendered, federal courts have no further statutory function to perform.").  This is so "[b]ecause the [FOIA] only authorizes a court 'to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld."  *Harvey v. Lynch*, 123 F. Supp. 3d 3, 7 (D.D.C. 2015) (quoting 5 U.S.C. § 552(a)(4)(B)). Therefore, "[o]nce the records are produced the

substance of the controversy disappears and becomes moot since the disclosure which the suit

seeks has already been made." *Perry*, 684 F.2d at 125 (alteration in original) (quoting *Crooker v.

Dep't of State*, 628 F.2d 9, 10 (D.C. Cir. 1980)).

In this case, Plaintiff sought the release of Secretary Ross's Uranium Report prepared for

former President Trump.  The Uranium Report was withheld pursuant to FOIA Exemption 5 under

both the "presidential communication" and "deliberative process" privileges.   2d Agyekum Decl.

¶ 7.  Having since determined that circumstances that warranted its protection—including the

deliberative processes which its purpose was to inform—have sufficiently diminished, the

Department has both published the Uranium Report.   2d Agyekum Decl. ¶17.   Coincident with

its publication, the Department contacted Plaintiff to alert it to the Report's availability on July 28,

2021, thereby discharging the obligation Plaintiff's complaint asserted.   *See* ECF No. 42, ¶ 2.  On

July 29, 2021, the Uranium Report was posted on the Bureau of Industry and Security ("BIS");

and on August 2, 2021 it was published in the *Federal Register* at 86 Fed. Reg 41,540 (Aug. 2,

2021.  *See* ECF No. 42, ¶¶ 4-5.  Ordinarily, a case is considered moot if the district court can no

longer grant effective relief.  *See*, *e.g.*, *Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660

(2019).  That being the case, release of the Uranium Report would seem to leave no relief for the

Court to grant, paving the way for a dismissal of the action as moot.

Certain exceptions to the mootness doctrine's presumption of a moribund claim developed

over time, the most relevant of which for present purposes is the voluntary cessation exception.[3]

The voluntary cessation exception applies when a defendant ceases its challenged conduct but

---

[3]    Although some courts address another prominent exception to mootness—relating to situations which are "capable of repetition, but evading review"—this alternative exception is less significant because the time horizons of most modern FOIA actions are sufficient to permit resolution before a loss of personal stake. *Cause of Action Inst. v. Dep't of Justice*, 282 F. Supp. 3d 66, 79 (D.D.C. 2017); *Hall v. CIA*, 437 F.3d 94, 99 (D.C. Cir. 2006).

would be free to return to the conduct after the Court ruled the case as moot.  *See, e.g., United States v. W.R. Grant Co.*, 345 U.S. 629, 632 (1953); *see also Friends of the Earth*, 528 U.S. at 213 (Scalia, J., dissenting) (describing the "voluntary cessation" exception as "nothing more than an evidentiary presumption that the controversy reflected by the violation of alleged rights continues to exist").  The voluntary cessation exception to mootness appears to the principal model for distinguishing between those claims that become moot and those which remain live in the FOIA context.  While obtaining all the requested records moots a specific records request under FOIA (insofar as it operates, constructively, as a voluntary cessation to the extent it represents abandoning an objected-to withholding or practice), it may not render moot a claim that an agency policy or practice will impair the party's lawful access to information in the future.  *Payne Enters.*, 837 F.2d at 491.  Such a claim is not to be blithely made, but once asserted turns on demonstrating that the requester will not suffer a continuing injury associated with a recurrence of the practice formerly abandoned.  The voluntary cessation exception applies only to those cases in which the defendant is likely to resume its challenged practices.[4]  And it is only that likelihood which can, in essence,  reanimate the otherwise extinguished case into a live controversy.

## II.    Plaintiff Cannot Establish that the Department had a Policy or Practice that <u>Violated FOIA</u>

At issue in this case is the treatment of two reports prepared for a former President by a member of his Cabinet.  In this case, Plaintiff sued the Department under FOIA to obtain a copy of the Uranium Report.  Parsons Decl. ¶ 14.  In the earlier Auto Report Case, Plaintiff sued the D

---

[4]      Both within and beyond the context of FOIA, the voluntary-cessation exception operates, in essence, to protect against double-crossing—that is, for example, where the infringing party "voluntarily exercises its own unilateral power not only to terminate the suit and evade judicial review," but also thereafter to "pick up where he left off." *See Guedes v. BATFE*, 920 F.3d 1, 15-16 (D.C. Circ. 2019) (*per curiam*) (non-FOIA); *Jud. Watch*, *Inc. v. Dep't of Homeland Sec.*, 895 F.3d 770, 783-84 (D.C. Cir. 2018) (FOIA).

Department to obtain a copy of the Auto Report.  Parsons Decl. ¶ 3.  As part of its suit here, Plaintiff filed a complaint that referenced the Auto Report and, although it did not request that Report's release in this case, it did include the Auto Report's withholding pursuant to FOIA Exemption 5 as a predicate to a "policy or practice" claim.  ECF No. 1 ¶ 53 ("policy and practice of withholding and delaying Section 232 Reports").  Although the complaint also referred to imports of steel, aluminum, and titanium sponge (*id.* at ¶¶ 11, 12, 38, 54), none of these commodities—or investigations into them—was ever made an element of this case.

Section 232 Reports are prepared for the President by the Secretary.  Here, the Department had determined that the Uranium Report was exempt from disclosure pursuant to the presidential communications and deliberative process privileges recognized by FOIA Exemption 5.  The Department had already determined that the Auto Report was likewise exempt from disclosure pursuant to the presidential communications and deliberative process privileges recognized by FOIA Exemption 5.  Over the course of the litigation, the Department had occasion to learn that the White House shared its views about the Exemption 5 withholdings.

Further, during the Auto Report Case, a Department of Justice, Office of Legal Counsel Memorandum Opinion for the Deputy Counsel to the President entitled *Publication of a Report to the President on the Effect of Automobile and Automobile-Part Imports on the National Security* ("OLC Opinion") was prepared. *See* ECF 17-1, Exhibit D, slip op.  Incident to that advice, the OLC Opinion expressed several opinions about issues arising in this litigation, including that the Section 232 Report is protected by both components of executive privilege—the presidential communication privilege and the deliberative process privilege.  Finally, during the pendency of this case, Judge Nichols issued his opinion in the Auto Reports Case.  The Court granted the

Department summary judgment.  *Cause of Action*, 513 F. Supp. 3d at 116.  Among other things, the Court affirmed the Section 232 Report's status as a privileged presidential communication.[5]

The crux of Plaintiff's case is that the Department adopted, endorsed, or implemented some policy or practice that constituted an ongoing failure to abide by the terms of the FOIA and that doing so caused Plaintiff to suffer a legally cognizable continuing injury.  ECF No. 43 at 9.  Neither contention, nor the several components baked into them, holds any water.  As such, Plaintiff's Motion should be denied, and the Department's Cross-Motion should be granted.

Fundamentally, the case is straightforward.  First, try as it might (and there are certainly multiple angles attempted),[6] Plaintiff cannot muster evidence of any "policy or practice" of a nature contemplated by the law—much less a "policy or practice" of unlawful dimension lawful action under the FOIA.  To prevail on a policy or practice claim, at the threshold a plaintiff must establish that an agency's withholdings were inconsistent with FOIA.  *See Nat'l Sec. Couns. v. CIA*, 898 F. Supp. 2d 233, 253 (D.D.C. 2012) (to establish a policy or practice claim a plaintiff must show an agency has an ongoing policy "that constitutes an ongoing 'failure to abide by the

---

[5]    Having concluded the Autos Report was covered by the presidential communication privilege, the Court chose not to address application of the deliberative process privilege—a fact that Plaintiff calls out without explanation.  Despite whatever critique Plaintiff choose to offer, it notably declined to appeal the Court's final adverse ruling.

[6]    Plaintiff charges the Department with having a: "policy and practice of categorically withholding secretarial reports until directed otherwise by the President" (ECF No. 43-1 at 1); "current nefarious policy and practice: (*id*. at 5); "policy and practice of withholding Section 232 secretarial reports, as a rule, under the presidential-communications and deliberative-process privileges until directed otherwise by the President" (*id.* at 9); "identifiable policy and practice of outsourcing its FOIA decision-making to the White House and withholding Section 232 secretarial reports" (*id.*); "policy and practice of withholding Section 232 secretarial reports in full under the presidential-communications and deliberative-process privileges until directed otherwise by the President" (*id.*); policy or practice of withholding Section 232 secretarial reports also relies on categorical application of the deliberative-process privilege policy and practice of invoking Exemption 5 relies on an impermissible theory of "temporary" privilege (*id.* at 27).

terms of the FOIA'"). Plaintiff cannot satisfy this threshold showing as all legal opinions—the OLC Opinion and Judge Nichols' decision in the Auto Report Case—have upheld the Department's withholding of Section 232 Reports as permissible under FOIA.

Indeed, the "policies or practices" that Plaintiff attributes to the Department are neither forbidden nor otherwise improper, and Plaintiff has asserted no authority otherwise. Withholding reports that meet the criteria for Exemption 5 privileges is proper. So, too, of consulting with the President regarding the constitutionally derived privileges that are personal to him. As for a passing reference to "categorically withholding" Section 232 Reports, no evidence of such a practice is asserted; nor could any be shown. On the contrary, as the Borman Declaration establishes, there is no categorical approach tilting toward withholding, but instead a decided tilt in favor of prompt disclosure. *See* Borman Decl. ¶ 6 (Bureau's proactive publication of Section 232 meets the requirements of 5 U.S.C. § 552(a)(2)). As the chart attached to the declaration shows, seven of nine reports referenced by Plaintiff were not requested pursuant to FOIA, and six of those seven were published in less than a year.[7] Moreover, the three reports completed in 2019 had several salient features in common that help to contextualize the attendant delays; and attempts were made to mitigate some of the delays' impact. In short, the facts belie Plaintiff's mischaracterizations.

Plaintiff's inability to cobble together "policy or practice" claim from a single-record FOIA suit should be of no surprise. It is an impossibility because a "policy or practice" is at basic odds with the facts and circumstances. None of the cases cited by Plaintiff cover the routine work for

---

[7]    The Section 232 Reports concerning those six subjects and the length of time between their release to the President and their public disclosure are as follows: Crude Oil and Refined Petroleum Products (8.5 mos.); Iron Ore and Semi-Finished Steel (2.5 mos.); Steel (36 days); Aluminum (31 days); Transformers and Transformer Components (9.5 mos.); Vanadium (5.25 mos.).

making a good faith assessment of the applicable exemptions in a single-record FOIA case in consultation with appropriate stakeholders. "Policy or practice" claims are not based upon a theory of "strict liability." In the absence of any evidence of impropriety or overreach, it is difficult to envision a basis from believing a current alleged wrong will be reprised on some future occasion to Plaintiff's detriment. In short, if Plaintiff did not suffer a wrong on account of some nefarious or sharp practice with respect to the events in this case, can be no basis beyond sheer speculation for believing that a future one will take hold.

Next, Plaintiff fails to come up with the threshold numerical evidence needed to put forward even the most anemic "policy or practice" claim. The courts uniformly require at least two instances of unlawful behavior. *See*, *e.g.*, *Cause of Action Inst. v. Eggleston*, 224 F. Supp. 3d 63, 72 (D.D.C. 2016) ("Plaintiff cannot state a 'policy or practice' claim based on a single incident."); *Swan View Coal. v. Dep't of Agric.*, 39 F. Supp. 2d 42, 46 (D.D.C. 1999) (noting that a policy or practice claim is alleged when "plaintiff challenges not just an isolated action"). *Jud. Watch v. Dep't of Homeland Sec.*, 895 F.3d 770, 787 (D.C. Cir. 2018) (Pillard, J., concurring) (29 qualifying incidents over six lawsuits). Plaintiff has at most one, the prior withholding of the Uranium Report in this case (which again all published legal opinions to date have determined was proper under FOIA).

Leaving aside that Plaintiff cannot establish that withholding the Uranium Report was even remotely a violation of FOIA, the disposition of the Auto Report Case in the Department's favor deals all that remains of its case a lethal blow. Without the Auto Report Case as an indispensable predicate to its "policy or practice claim," Plaintiff has nothing left to litigate. Its substantive FOIA claim before this Court is moot, the Uranium Report having since been released.

Moreover, if Plaintiff has not experienced a loss in connection with this case (*see supra*), it surely cannot "suffer continuing injury" due to an unproven and unprovable "policy or practice." In the absence of either of the two necessary predicates, it cannot establish the necessary link to reanimate its claims into a live controversy. As such, it cannot overcome a presumption of mootness. Summary judgment should be granted in the Department's favor.

III.    **The Department Properly Invoked Privileges to Temporary Withhold the Uranium Report from Disclosure Under FOIA.**

Despite Plaintiff's release claim being moot and its policy and practice claim failing at the threshold, were the Court to examine retrospectively the Department's prior withholding of the Uranium Report, it should join Judge Nichols in concluding the temporary withholding of that report was proper under FOIA's recognition of executive and common law privileges.

A.    **The Executive Privilege Applies to Communications that Directly Involve the President On Matters Entrusted to Presidential Decisionmaking.**

Plaintiff contends that the Department was unable invoke the presidential communication privilege to withhold the Uranium Report because the President did not "solicit" the conduct of the underlying investigation that led to the preparation of the report. (Pl. Open. Br. at 15-17). This claim, however, presents an inaccurate and misleadingly narrow view of the scope of the presidential communications privilege; it is decidedly broader than Plaintiff would have it. This Court aptly summarized the parameters of the privilege in a recent decision:

> It "applies to communications made in the process of arriving at presidential decisions, and it protect those communications in their entirety." *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997). Naturally, then, the privilege protects "communications directly involving and documents actually viewed by the President" during the process of shaping policies and making presidential decisions. *Judicial Watch v. Dep't of Justice ["Judicial Watch II"]*, 365 F.3d 1108, 1114 (D.C. Cir. 2004); *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977). But the privilege extends further as well: to communications "solicited and received' by immediate White House advisers'—"those with broad and significant responsibility for investigating and formulating the advice to be given to the

President." *Loving*, 550 F.3d at 37 (quoting *Judicial Watch v. Dep't of Justice*, 365
F.3d at 1114) (internal quotations omitted).

*Prop. of the People*, 394 F. Supp. 3d at 43 (emphasis added).

In *Loving v. Department of Defense*, 550 F.3d 32 (D.C. Cir. 2008), the D.C. Circuit upheld

the applicability of the presidential communications privilege to reports submitted by senior-level

advisers to the President. Specifically, the court found the agency properly invoked the privilege

for "memoranda from the Army and Defense Secretaries directly to the President advising him on

his review [under the Uniform Code of Military Justice] of [a soldier's] capital sentence." *Id.*

at 39. The Court reasoned "[s]uch memoranda fall squarely within the presidential

communications privilege because they directly involve the President . . . and their confidentiality

ensures that presidential decision-making is of the highest caliber, informed by honest advice and

full knowledge." *Id.* (internal citations omitted).

The plaintiff in *Loving*, like Plaintiff here, opposed the use of the privilege on the ground

that the memoranda were not "solicited and received" by the President. *Id.* at 39-40. The court,

however, deemed this position unsound. The *Loving* court went on to state that

> [t]his [solicited and received] requirement applies only to internal agency
> documents, that is, "agency documents that are not submitted for Presidential
> consideration." [*Judicial Watch II*, 365 F.3d] at 1112. (emphasis added). Nothing
> in Judicial Watch [II] disturbs the established principle that communications
> "directly involving" the President, *id.* at 1114—like [the Secretaries' memoranda
> to the President]—are entitled to the privilege, regardless of whether the President
> solicited them. *See In re Sealed Case*, 121 F.3d at 751-52 (taking as indisputable
> that the presidential communications privilege includes "communications that
> directly involve the President").

*Id.* at 40; *see also Am. Ctr. for Law & Just. v. Dep't of State*, 330 F. Supp. 3d 293, 307 (D.D.C.

2018) ("Communications directly involving the President are entitled to the [presidential

communications] privilege, regardless of whether the President solicited them")(citations

omitted). As such, the D.C. Circuit recognizes an agency may invoke the presidential

communications privilege for communications from high-level officials directly to the President on a matter for his determination.

Plaintiff argues that the Uranium Report, even had it directly involved the President, was not the type of communication related to "the performance of a President's responsibility of his office and made in the process of shaping policies and making decisions." Pl. Open. Br. at 17. That argument belies the facts. Here, as in *Loving*, a cabinet secretary submitted a report to the President providing analysis and recommendations for his use in reaching a decision entrusted to his authority by statute. *See* 550 F.3d at 35-36. These are both situations where the communication to the president concerned a matter about which the president is required by law to reach a decision. Therefore, the Uranium Report, like the memoranda from the Army and Defense Secretaries, represents the type of communication that "directly involves" the President and therefore triggers the presidential communication privilege. *In re Sealed Case*, 121 F.3d 729, 752 n.21 (cabinet secretaries in sufficient operational proximity to the President) (citing Raoul Berger, *The Incarnation of Executive Privilege*, 22 U.C.L.A. L. Rev 4, 23 (1974)).

The President has inherent constitutional authority to protect the national security, which provides the basis for the President's enabling this review of the Nation's capacity to produce fuel and other nuclear fuel sources. (Indeed, in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), the Supreme Court recognized the importance of the privilege to protect communications involving the President's exercise of constitutional authority. *Id.* at 705-06 ("Whatever the nature of the privilege of confidentiality of Presidential communications in the exercise of Art. II powers, the privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties. Certain powers and privileges flow from the nature of enumerated powers; the protection of the confidentiality of Presidential communications

has similar constitutional underpinnings").    Accordingly, the Uranium Report was properly subject to the presidential communications privilege before the Department released it.

### B. The Privilege Applies Both to the President's Exercise of Statutory Powers Under Section 232 and the Exercise of His Independent Constitutional Authority to Protect the National Security.

Plaintiff weakly argues that the type of power the President is exercising controls the scope of the presidential communications privilege, describing it alternatively as an "important factor," a subject of "special significance," or "relevant" to its invocation. Pl. Mot. at 14-19. But controlling authorities reject this view, finding that the type of the power being exercised does not limit the scope of the privilege. *See, e.g., Jud. Watch II*, 365 F.3d at 1123 (limiting protection of presidential communications privilege to only "'quintessential and nondelegable Presidential power' . . . draws an arbitrary line").[8] Plaintiff's argument that Uranium Report was not protected by the presidential communications privilege ignores the nature of the President's duties under Section 232.

To begin with, the President's authority under this statute overlaps with the exercise of his broader, fundamental constitutional responsibilities. The statute's title, "Safeguarding national security," reflects Congress' recognition of the constitutional provenance of the President's role under Section 232. That the Secretary of Defense is the only official singled out for compulsory

---

[8]    *See also Advocates for the W. v. Dep't of Just.*, 331 F. Supp. 3d 1150, 1163-65 (D. Idaho 2018) (noting there exists no known cases limiting privilege only to President's "core powers," collecting and noting that cases have refused to limit "the presidential communications privilege to communications regarding quintessential Article II powers, but [instead] have applied it to a multitude of communications, documents, and circumstances," and holding "the presidential communications privilege is not limited only to quintessential Article II powers"); *United States v. Philip Morris USA*, Civ. A. No. 99-2496 (GK), 2004 WL 3253662, at *2 (D.D.C. Sept. 9, 2004) (neither *In re Sealed Case* nor *Judicial Watch II* "turned on the fact that a non- delegable power was in question[;]" presence of non-delegable power was not a "*sine qua non*" of application of the privilege," but instead "a mere coincidence" of the cited cases).

notification in every Section 232 case further confirms that Congress was serious about the link between certain imports and national security. *See* 19 U.S.C. § 1862(b)(1)(B). The same is true of Congress' admonition to the President to "recognize the close relation of the economic welfare of the Nation to our national security . . . in determining whether such weakening of our internal economy may impair the national security[.]" 19 U.S.C. § 1862(d). As such, although the President's Section 232 authority flows from a legislative delegation, it plainly relates to his familiar constitutional role in conducting foreign affairs and protecting national security.

Here, after receiving and initially reviewing the Uranium Report from the Secretary, the President did not concur with the Secretary that uranium imports represent a threat to national security. But the President did not end the matter there. Rather, noting that the "Secretary's findings raised significant concerns regarding the impact on the national security with respect to domestic mining," he appointed a group of his senior-most advisers, including the Secretaries of Commerce, Defense, Energy, Interior and State, to the Working Group to further "examine the current state of domestic nuclear fuel production to reinvigorate the entire nuclear fuel supply chain." Lieberman Decl. ¶¶ 28, 31. The former-President then gained the Working Group's recommendations. Supp. Lieberman Decl. at ¶¶ 6, 8-9. It is beyond question that nuclear policy is intrinsically tied to national security.[9] Thus, the President's prior ongoing use of the Uranium

---

[9]    *See, e.g., Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1909-10 (2019) (Ginsburg, J., concurring) ("The Federal Government regulates much of th[e] process [of milling uranium], primarily to protect public health and safety from radiation, but also for national security reasons"); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 103 S. Ct. 1713, 1723-24 (1983) ("The Atomic Energy Act of 1954 . . . grew out of Congress' determination that the national interest would be best served if the Government encouraged the private sector to become involved in the development of atomic energy for peaceful purposes under a program of federal regulation and licensing. . . . We [have] observed . . . that the [Nuclear Regulatory] Commission's prime area of concern in the licensing context is national security, public health, and safety").

Report in his deliberations was grounded in his rightful exercise of his constitutional authority to protect national security.

### C.     Section 232 Did Not Require that the Secretary Publish the Uranium Report While the President Continued to Deliberate Upon the National Security Implications of Domestic Nuclear Fuel Production.

Section 232 sets no deadline for the publication of reports, but Plaintiff vainly seeks to graft onto the statute a purported mandate for immediate disclosure. Pl. Mot. at 19-20.  Plaintiff then jumps to the conclusion that this false deadline deprived the President of a confidentiality interest in the Uranium Report.  *Id.* at 24-27.  Plaintiff's argument, however, stands contrary to the clear language of the statute and the circumstances at hand.

"It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S. Tr.*, 540 U.S. 526, 534  (2010) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6  (2000)).  Moreover, a court must not adopt "an interpretation of the [statute] . . . [that] would have [it] read an absent word into the statute [as this] would result 'not in a construction of the statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope.'"  *Id.* at 538 (quoting *Iselin v. United States*, 270 U.S. 245, 251 (1926)).

Section 232 twice refers to publication.   First, it requires that "[a]ny portion of the report submitted by the Secretary [to the President] which does not contain classified information or proprietary information shall be published in the Federal Register."  19 U.S.C. § 1862(b)(3)(B). The statue also provides that "[u]pon disposition of each request, application or motion under subsection (b) of [Section 232], the Secretary shall submit to Congress and publish . . . a report on such disposition."  19 U.S.C. § 1862(d)(1).

Plaintiff wrongly insists "absent words" should be added to subsection (b)(3) in requesting that this Court impose a specific timeframe for publication of the Uranium Report.  It suggests this subsection should mean that the Department may only withhold classified or proprietary information, with the rest of a Section 232 report to be published immediately, regardless of other considerations, *see* Pl. Open. Br. at 23, when the subsection is in fact silent.  Plaintiff insists that "[t]o conclude otherwise would offend fundamental canons of statutory construction, which oblige the courts to 'read the language and design of a whole statute' and to give 'identical words used in different parts of the same act . . . the same meaning." *Id.* (citations omitted).  Plaintiff's statutory construction argument misses the point entirely.

The Department refers the Court to a more sound application of the principles of statutory construction contained in OLC Opinion.  The OLC Opinion examined this language in determining when publication must occur.  It began with the observation that "the statute does not require, and has never required, the Secretary's report to the President to be disclosed on any particular timeline."  OLC Op. at 15.   The OLC Opinion next considered the meaning of the term "disposition" in subsection (d)(1).    It pointed out that Congress amended Section 232 to include the publication requirement for the Secretary's report in 1988 by "codif[ying] the then-existing regulations requiring publication of [each] report upon the disposition of the investigation.  15 C.F.R. 359.10(c)."   *Id.* at 15; *see also id.* at 4.  Further, it noted that a "disposition" of an investigation could not occur until the President has decided whether to adjust imports.  *Id.* at 15. In support of this, the OLC Opinion cited to the legislative history, which stated: "Section 232(d) requires a report to be made and published on each *final* disposition of any request for investigation under section 232(b)."   *Id.* (quoting H.R. Rep. No. 87-1818, at 41 (1962)) (emphasis in OLC Opinion).  Where the Secretary has found the imported articles constitute a threat to national

security, this final disposition would necessarily occur after the President reaches a final decision and completes the deliberative process.  *Id*. at 16.

In the instant case, the President exercised his constitutional authority to have the Working Group provide a "fuller analysis" of the issues the Secretary raised in the Uranium Report regarding uranium production and other facets of domestic nuclear fuel production.    It would unreasonably limit the President's exercise of his Article II authority to interpret Section 232 as requiring publication of the Uranium Report at a prior point in time, when the President has authorized a continuing national security investigation and the careful analysis of the state of domestic uranium production in the Uranium Report remains, as noted above, distinctly pertinent. *See, e.g., Trump v. Hawaii*, 138 S. Ct. 2392, 2419-20 (2018) ("The upshot of our cases in this context is clear: 'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and our inquiry into matters of entry and national security is highly constrained"); *Bihani v. Obama*, 619 F.3d 1, 40 (D.C. Cir 2010) (Sentelle, C.J., concurring in denial of rehearing *en banc*) ("Courts are therefore properly reluctant to construe broad national security statutes . . . more restrictively than their statutory text lest the courts interfere with the President's independent constitutional authority or have to confront difficult constitutional questions regarding the scope of the President's Article II authority to act without congressional authorization"); *Am. Inst. for Int'l Steel, Inc. v. United States*, --- Fed. App'x ---, 2020 WL 967925 at *7 (Fed. Cir. Feb. 28, 2020) (observing, in decision upholding the constitutionality of Section 232, that "[t]he Supreme Court has recognized that the President has some independent constitutional authority over national security and dealings with foreign nations").  As such, the prior withholding of the Uranium Report from publication was warranted.

Plaintiff's misguided publication theory also ignores the overall structure of Section 232: the statute provides no deadline for the report publication requirement, yet, at the same time, sets forth specific time periods for other Section 232 activities. For instance, the Secretary has 270 days from the initiation of an investigation to "submit to the President a report on the findings of [an] investigation" and his recommendations "for action or inaction" under Section 232. 19 U.S.C. §1862(b)(3)(A). And, if the Secretary finds the imported articles "threaten to impair the national security," the President has 90 days to decide whether he agrees with that finding and take initial action. Id. § 1862(c)(1)(A).

The presence of deadlines in several subsections, while one is notably absent for the publication requirement in subsection (b), demonstrates that Congress intended for the Secretary to be able to decide, based upon the circumstances, when publication should occur. If Congress had deemed it necessary for the Secretary to publish a Section 232 report immediately upon its submission to the President, or within a set period, it would have explicitly stated this in subsection (b) as it did in other portions of the statute. To superimpose a deadline onto the subsection (b) publication requirement would violate Congress' purposeful exclusion of one.[10]

Plaintiff next claims that the historical record shows publication should occur immediately upon or near in time to transmittal to the President when the Secretary has found a national-security threat. Pl. Open. Br. at 26. Plaintiff cites one example: in 1979, the Secretary of the Treasury (then the official responsible for Section 232 investigations) published a report shortly after

---

[10]    "[A]statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *New York v. EPA*, 413 F.3d 3, 39 (D.C. Cir. 2005) (quoting *TRW v. Andrews*, 534 U.S. 19, 31 (2001)). "Moreover, when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* (quoting *Barnhart v. Sigmon Coal Co*., 534 U.S. 438, 452, (2002)).

transmittal to the President, and the President then refrained from acting on the report for a year. *Id.*

The OLC Opinion is equally instructive on this point. It cites to multiple examples indicating "the general practice appears to have been to disclose the report only after the President decides whether and how to adjust imports." OLC Op. at 16. For instance, in February 1959, "the Director of the Office of Civil and Defense Mobilization, who exercised the Secretary's authority under section 232's statutory predecessor, advised the President of his determination that imports of crude oil threatened to impair the national security." *Id.* The Director, however, did not release the report until four months after President Dwight D. Eisenhower imposed import restrictions. *Id.* The OLC Opinion also points to the fact that Secretaries of Commerce have in recent decades "typically waited until months after the President's decision before publishing a summary of the report." *Id.* at 16-17, n.10. The OLC Opinion reasons that this practice "is consistent with the Executive Branch's long-standing confidentiality interest in delaying the report's disclosure until its finding have been fully considered and the President has made his decision." *Id.* at 17. As such, prior Secretaries have largely adhered to a practice of withholding Section 232 reports finding the existence of a national security threat.

For these reasons, Section 232 does not require that the Secretary disclose the Uranium Report while the President continues to deliberate upon domestic nuclear fuel production.

**IV.** **The Department Properly Invoked the Deliberative Process Privilege.**

The Department also properly invoked the deliberative process privilege to previously withhold the Report.

**A.**    **Executive and Deliberative Process Privileges Are Not Mutually Exclusive.**

Plaintiff incorrectly asserts that both privileges cannot cover the same document, and mis-interprets the Department (Pl. Open. Br. at 28) "to claim the deliberative-process privilege in the

alternative and not along with the presidential-communications privilege." But just last year, the D.C. Circuit decided a case in which the Government had asserted the presidential communications and the deliberative process privileges over documents and gave no indication that the two privileges do not overlap. To the contrary, the court suggested that the two privileges can in fact apply to the same document, as they do here. *See Jud. Watch v. Dep't of Def.*, 913 F.3d 1106, 1113-14 (D.C. Cir. 2019) (observing that "there may be some overlap between the presidential communications and deliberative process privileges under Exemption 5"); *Protect Democracy Project, Inc. v. Dep't of Def.*, 320 F. Supp. 3d 162, 172 (D.D.C. 2018) ("find[ing] the withholding of the memorandum [to be] justified under the presidential communications privilege," thereby precluding the need to "decide whether the attorney-client or deliberative-process privileges would also support withholding"); *Comm. on Oversight & Gov't Reform v. Holder*, Civ. A. No. 12-1332 (ABJ), 2014 WL 12662665, at *1 (D.D.C. Aug. 20, 2014) ("the Court rejects [Plaintiff's] suggestion that the only privilege the executive can invoke in response to a subpoena is the Presidential communications privilege" and recognizing the propriety of the government also applying the deliberative process privilege); OLC Op. at 7-9. Accordingly, the Department correctly applied both the presidential communications and deliberative process privileges to the Uranium Report.

### B. The Department May Invoke the Deliberative Process Privilege for a Communication Containing Advice for the President to Use in Reaching a Decision.

Plaintiff asserts (Pl. Open. Br. at 28-29) that the Department did not describe a specific agency decision-making process implicated by the Uranium Report, and, in so doing, erroneously posits that the deliberative process privilege does not apply to the presidential use of the Uranium Report because the President is not an agency. *Id.* at 29-30.

First, it is well settled that the deliberative process privilege may apply to a memorandum from one agency advising a second agency that has the final decisional authority. *See supra* at 4; *Renegotiation Board v. Grumman Aircraft*, 421 U.S. 168, 188 (1975) ("By including inter-agency memoranda in Exemption 5, Congress plainly intended to permit one agency possessing decisional authority to obtain written recommendations and advice from a separate agency not possessing such decisional authority without requiring that the advice be any more disclosable than similar advice received from within the agency"); *Bureau of Nat'l Affs. v. Dep't of Just.*, 742 F.2d 1484, 1497 (D.C. Cir. 1984) ("Exemption 5 explicitly covers communications between agencies, not just within agencies. If we were to affirm the district court in this instance, it would be difficult to distinguish any interim recommendation or piece of advice from one policymaker to another, or at least from one agency to another. If no such recommendations were pre-decisional, Exemption 5 would be an empty shell").

Second, the courts do not recognize the artificial and unfounded distinction Plaintiff has sought to draw between the agencies of the Executive Branch and the President whom they serve. Instead, as the D.C. Circuit has stated:

> "Neither Exemption 5 nor the cases interpreting it distinguish between the decision-making activities of an "agency" subject to the FOIA and those of the President and his staff, who are not subject to the FOIA. On the contrary, both the Supreme Court and this circuit have expressly refused to draw that distinction."

*Judicial Watch v. Dep't of Energy ("Judicial Watch III")*, 412 F.3d 125, 129 (D.C. Cir. 2005).

Thus, the *Judicial Watch III* court rejected efforts to isolate the President from the agencies for FOIA purposes when he reviews information submitted by them for his deliberation:

> We are aware of no reason to believe—indeed, we think it inconceivable—the Congress intended Exemption 5 to protect the decision-making processes of the Executive Branch when the decision is to be made by "agency" officials subject to oversight by the President and not when the decision is to be made by the President himself and those same agency officials are acting in aid of his decision-making processes.

*Id.* at 130.

The Department created the Uranium Report for the President and his advisers, who is the ultimate decision-maker under Section 232. The President is also now continuing to use the Uranium Report in connection with the review of domestic nuclear fuel production. *See* Lieberman Decl. ¶¶ 43, 44; Supp. Lieberman Decl. ¶10.  Further, the Uranium Report reflects the Department's findings and recommendations for action regarding the impact of uranium imports on the national security.  Accordingly, the Department properly concluded that the provision of the Uranium Report to the President 232 serves as a basis for invoking the deliberative process privilege.

### C.    The Uranium Report Is Both Pre-decisional and Deliberative.

Plaintiff argues that the Uranium Report cannot be "pre-decisional" because the Department had to "finalize" it before submission to the President and it thus constitutes a final agency decision. PMSJ at 31.  This, however, is not the case.   As discussed above, the Uranium Report embodies analysis and recommendations regarding uranium imports provided for the President to decide whether these imports require adjustment to prevent a national security threat.  This meets the definition of a "pre-decisional" document as it was "prepared in order to assist an agency decisionmaker in arriving at his decision rather than to support a decision already made." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002) (citations omitted).  Further, "pre-decisional" includes documents containing advice that one agency provides to a second agency with decision-making power for its deliberations.   *See Grumman Aircraft*, 421 U.S. at 187-88.    And the President too is included within the reach of this definition for advisory documents provided to him by agency officials. *Judicial Watch III*, 412 F.3d at 129-130.

Here, the President, not the Department, makes the final decision.  The President found that an inadequate supply of domestic uranium and other nuclear fuel production threatens to impair the national security.  Thus, he exercised his statutory and constitutional authority to further evaluate the matter and weigh options to protect and promote this important domestic industry. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 581 (2004) (Thomas, J., dissenting) ("This Court has . . . held that the President has *constitutional* authority to protect the national security and that this authority carries with it broad discretion") (emphasis in original); *Am. Inst. for Int'l Steel*, 2020 WL 967925 at *7 (in upholding the constitutionality of Section 232, the court recognized that the President retains "independent constitutional authority over national security and dealings with foreign nations").  The President and his advisers must be free to consult, debate, deliberate over and choose advice embodied in the Uranium Report for this decision-making process.

Plaintiff next contends that the Uranium Report is not "deliberative" because it must ultimately be published.  PMSJ at 31.  This assertion is nonsensical.  As was detailed above, Section 232 provides a timetable for certain actions, but not the publication of a report under 19 U.S.C. § 1862(b)(3)(A).  The Department and the President reasonably understood Section 232 to confer discretion over the Uranium Report's release to a time when the very interests promoted by the asserted privileges and the design of Section 232 would not be harmed. Similarly, this reasonable understanding affords the President sufficient time and space to gather information from knowledgeable sources, execute the plan that Congress calls upon him to develop, monitor the progress of those efforts, and be prepared to escalate to additional solutions should the initial plan fail.  Moreover, this discretion logically extends to the President's continued deliberations regarding domestic nuclear fuel production.

## V.    Plaintiff Misunderstands the Temporal Nature of the Privileges Here

Plaintiff's next argues that because the privileges implicated generally have no temporal limitation, and because the Report must be published at some point in time, it cannot be privileged. Pl. Opp. at 26-32. Specifically, Plaintiff contends that "documents shielded by executive privilege remain privileged even after the decision to which they pertain may have been effected" and that privileges are "not list simply . . . because of the passage of time." From these unremarkable points, Plaintiff makes the leap that "[i]f [the Department] is correct that either privilege applies, they will apply even after the President decides whether to impose tariffs." Because Section 232 mandates publication, subject to withholding classified and/or proprietary information, Plaintiff reasons there can be no privilege. But this "rule" is merely a product of Plaintiff's own creative imagination and not the holding in any case cited.

Moreover, Plaintiff's arguments are internally contradictory. Plaintiff suggests earlier in its Opposition that Congress has the power to limit the Executive's privileges (Pl. Opp. at 17), but it ignores this suggestion when contending that there can be no temporal limitation as to the Executive's privileges. Without conceding that correctness of Plaintiff's suggestion that the Legislative Branch can limit the privileges of the Executive Branch, Plaintiff's internally confused presentation merely establishes that it has no reasoned basis to contend that the congressional mandate to publish the Report at some point in time limits the Executive's power to shield it from production when it is being actively used in a Presidential decisionmaking process.

That Congress requires that the Department publish its report at a point in the future does not deny the viability of the privilege up until that point. This result is also consistent with decisions recognizing that "even if [a] document is pre-decisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States Gas Corp., v. Dep't of Energy*,

617 F.2d 854, 866 (D.C. Cir. 1980). Once Section 232's mandate has been satisfied, not only is the reason to protect the substance of a report's recommendations and advice no longer it at zenith, but its implementation may have well converted advice into policy.

While the Department has described in detail the risks of prematurely releasing the Report and its roadmap for the Executive's negotiations, Plaintiff has brought forth no authority to refute it. Nor has Plaintiff provided any basis for concluding that the Department has defaulted on its statutory publication obligation. It does not explain why the very power it said Congress has to limit the privilege does not permit it to temporally limit the privilege. And it offers no explanation for why the temporal limitation—and hence the putative date of publication of the Report in the Federal Register—should not coincide with the conclusion of the trade-related national security negotiations and/or other measures that the naturally arising privileges and purpose of Section 232 would protect.

## VI.    Plaintiff's Request for Declaratory and Injunctive Relief is not Ripe

Even after establishing one's Article III standing to maintain the action, *see, e.g., Warth v. Seldin,* 422 U.S. 490, 517-18 (1975), and overcoming any other justiciability hurdles, a litigant's claim may not be entertained unless it is constitutionally and prudentially ripe. *See, e.g., Off. of Com. of United Church of Christ v. FCC*, 826 F.2d 101, 104 n.2 (D.C. Cir. 1987). Therefore, even assuming, *arguendo*, Plaintiff had been able to present undisputed evidence of a policy or practice sufficient to overcome its complaint's patent mootness, its case fails another Article III hurdle: ripeness. *See*, *e.g.*, *La. Envtl. Action Network v. Browner*, 87 F.3d 1379 (1996).

To determine whether a dispute is ripe, courts consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *VanderKam v. VanderKam*, 776 F.3d 883, 888 (D.C. Cir. 2015)(quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136 149 (1967)). Plaintiff's challenge to the Department's treatment of Section

232 Reports is unfit for judicial review.  "A claim is not ripe for adjudication if it rests upon 'contingent future events that may occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).  That is precisely the circumstance that obtains here.  As a preliminary matter, potential future claims about the Department's treatment of Section 232 Reports "are neither ripe for constitutional adjudication nor capable of supporting [a prospective] injunction, since courts should not reach out to raising the same concerns that this case implicates similar concerns to those the Court of Appeals very recently relied on in

Any potential future claims are neither ripe for constitutional adjudication nor capable of supporting this preliminary injunction, since courts should not reach out to evaluate a former President's executive privilege claim based on "future possibilities for constitutional conflict." *Trump v. Thompson*, No. 21-5254, 2021 U.S. App. LEXIS 36315, at \*25-26 (D.C. Cir. Dec. 9, 2021)(citing *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 444-45 (1977) and *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346-348 (1936) (Brandeis, J., concurring)("The Court will not anticipate a question of constitutional law in advance of the necessity of deciding it.") (internal quotation marks and citation omitted)).

The Court of Appeals recently addressed another "policy or practice" claim brought by Plaintiff, Cause of Action Institute—this one relating to the Justice Department's alleged policy of segmenting one record into multiple records.  *See Cause of Action Institute v. Dep't of Just.*, 999 F.3d 696 (D.C. Cir. 2021).  There at issue, among other things, was the Justice Department's adherence to *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.* ("*AILA*"), 830 F.3d 667, 677 (D.C. Cir. 2016) (holding that "once an agency identifies a record it deems responsive to a FOIA request, the statute compels disclosure of the responsive record—*i.e.*, as a unit—except insofar as the agency may redact information falling within a statutory exemption.").  Just as it asks this

Court to declare the Department's alleged policy or practice of invoking the presidential communication and deliberative process privileges unlawful and enjoin it from ever withholding another Section 232 from a FOIA requester in the future, Cause of Action asked the Circuit, on appeal, to "declare unlawful and enjoin further application of OIP's guidance on the definition of a record."  Opening Brief of Appellant Cause of Action Institute at 53, *Cause of Action Institute v. U.S. Dep't of Justice*, No. 20-5182 (Oct. 30, 2020); *see also Cause of Action*, 999 F.3d at 704.

The Court of Appeals rejected Cause of Action's request to declare DOJ's policy unlawful under any circumstances on justiciability grounds, concluding that the challenge to DOJ's guidance "is not ripe for review."  999 F.3d at 704.  Quoting the Supreme Court, the Court of Appeals went on to explain:

> "'We do not have sufficient confidence in our powers of imagination to affirm such a negative.  The operation of [FOIA] is better grasped when viewed in light of a particular application.  Here, as is often true, '[d]eterminations of the scope [of the purported policy] in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function.'" *See id.* [*Texas*, 523 U.S.] at 301 (second alteration in original)(quoting *Int'l Longshoremen's and Warehousemen's Union, Local 37 v. Boyd*, 347 U.S. 222, 224 (1954)).  Judicial appraisal [of the issue] is likely to stand on a much surer footing in the context of a specific application of [agency policy] than could be the case in the framework of [a] generalized challenge." *Am. Tort Reform Ass'n c. OSHA*, 738 F.3d 387, 396 (D.C Cir. 2013)(quoting *Toiler Goods Ass'n, Inc v. Gardner*, 387 U.S. 158, 164 (1967)).

999 F.3d at 704-705.  Cause of Action also asked the Court of Appeals to "go further and 'conclusive[ly]' 'provide a workable interpretation of [FOIA's] statutory term "record" to ensure consistent application across the Executive Branch'"—an "invitation to unnecessarily opine on an issue with such 'far-reaching' implications" that the Court declined.  *Id.* at 705.

That Cause of Action's challenge to a practice forbidden by Circuit authority in *AILA* was insufficient to render it fit for judicial review makes short work of this case.  Here, there was no Circuit authority contraindicating the Department's application of Exemption 5 to the Autos or

Uranium Reports. On the contrary, Department's treatment of the Section 232 Reports is consistent a careful reading of the statute, history and prior practice, and constitutional law principles by the Office of Legal Counsel. More importantly, Department prevailed on summary judgment against an identical attack on its reliance on Exemption 5 to protect the Uranium Report from release during the time it was being serving its intended purpose to advise the President. *See Cause of Action*, 513 F. Supp. 3d at 116. Moreover, the additional factors relied on by the Court of Appeals in concluding that ruling on prospective relief would be ill-advised apply with equal if not greater force here. *Cause of Action*, 999 F.3d at 704-05; *see also Am. Historical Ass'n v. Nat'l Archives & Records Admin*., 310 F. Supp. 2d 216, 230 (D.D.C. 2004) (dismissing on ripeness grounds order whose impact was likely to have been felt in some way because "it [was] not clear that it will inevitably impact them in the same way in the future").

The second part of the ripeness analysis is focused on hardship. Ripeness in this context implicates "the [plaintiff's] interest in prompt consideration of allegedly unlawful agency action[;] the agency's interest in crystallizing its policy before that policy is subjected to judicial review[;] and the court's interests in avoiding unnecessary djudication and in deciding issues in a concrete setting." *Eagle-Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985). Here, Plaintiff falls woefully short. As it knows from the recent dismissal of its premature claims for prospective relief from OIP's guidance that resulted in the segmentation of records, "no legally cognizable 'hardship' will come from this disposition." *Cause of Action*, 999 F.3d at 705. Plaintiff "is not required to engage in, or refrain from, any conduct." *Id.* (quoting *Texas,* 523 U.S. at 301). The **only** hardship it will endure is "the burden of having to file another suit"—the sole claim of hardship it asserts. *See* Pl. Memo at 31. But "[t]his is hardly the type of hardship which warrants immediate consideration of an issue presented in abstract form." 999 F.3d at 705.

- 33 -

For all these reasons, Plaintiff's requests for declaratory and injunctive relief are not ripe and must be alternatively dismissed.[11]

Dated:  February 12, 2022
         Washington, DC

                                     Respectfully submitted,

                                     MATTHEW M. GRAVES, D.C. Bar #481052
                                     United States Attorney

                                     BRIAN P. HUDAK
                                     Acting Chief, Civil Division

                                  By:         /s/
                                     JOHN MOUSTAKAS, D.C. Bar #442076
                                   Assistant United States Attorney
                                   555 Fourth Street, NW
                                   Washington, DC 20530
                                   (202) 252-2518
                                   john.moustakas@usdoj.gov

                                  *Attorneys for the United States of America*

---

[11]    One final point, if only of prudential consideration, bears mention as it suggests that Plaintiff's weak claim to declaratory and injunctive relief may have greater ambitions. Other than urging the impact of the Auto Report opinion on the singular issue of "policy or practice" liability to which it specially relates, the Department acknowledges that the prior opinion is otherwise merely persuasive authority. *See*, *e.g.*, *Camreta v. Greene*, 563 U.S. 692, 709, n.7 (2011). By contrast, Plaintiff's dubious argument for a contrary ruling here—coupled with prospective declaratory and injunctive relief—seem to target precisely what *Camreta* and principles of judicial comity would deny. Although amply foreclosed by both the absence of an unlawful policy or practice and the uncertainty and abstraction over what future threats to national security may require of the President and his advisors, a grant of prospective relief should likewise be denied, if there were to be genuine disagreement between members of this Court, to fairly permit the law to develop and be refined consistent with historical judicial practice. *See*, *e.g.*, *Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995) (Ginsburg, J., dissenting) ("[W]hen frontier legal problems are presented, periods of 'percolation' in, and diverse opinions from, state and federal appellate courts may yield a better informed and more enduring final pronouncement by [the Supreme] Court."); *see also* Richard A. Posner, *The Federal Courts: Crisis and Reform* 163 (1985) ("A difficult legal question is more likely to be answer correctly if it is allowed to engage the attention of different sets of judges decided factually different cases than if it answered finally by the first panel to consider it.").

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAUSE OF ACTION INSTITUTE,

      Plaintiff,

             v.                               Civ. A. No. 19-2968 (DLF)

UNITED STATES DEPARTMENT OF
COMMERCE,

      Defendant.

## SECOND DECLARATION OF GRACE AGYEKUM

I, Grace Agyekum, do hereby declare, subject to 28 U.S.C. § 1746, that the following statements are true and correct, to the best of my knowledge and belief:

1. I currently serve as the FOIA Officer for the Bureau of Industry and Security ("BIS" or "Bureau"), a component of the Department of Commerce ("Commerce" or "Department"). I have served in this position since October 2017. My official title is Management and Program Analyst for the Office of the Chief Financial Officer and Director of Administration, Office of Planning Evaluation and Management. In this role, my responsibilities include management of all requests for records under the Freedom of Information Act ("FOIA") and the Privacy Act, which includes receiving, processing, and responding to requests submitted for records, maintaining records, and preparing reports regarding FOIA requests submitted to the Bureau.

2. The statements contained in this declaration are based upon my personal knowledge, upon examination of the records I am charged to maintain, and upon information provided to me in my official capacity. I am personally familiar with the FOIA

requests that were submitted to the Bureau during my tenure as BIS' FOIA Officer, including Plaintiff Cause of Action Institute's requests related to final reports submitted by the Secretary of Commerce to the President of the United States pursuant to Section 232 of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862 ("Section 232 Reports").

**Plaintiff's FOIA Request for the Auto Report**

3.    On February 18, 2019, BIS received a FOIA request from Plaintiff[1] seeking a copy of the February 17, 2019, Section 232 Report analyzing whether the import of automobiles and automobile parts threatened to impair the national security of the United States ("Auto Report"). The request is attached as Exhibit 1.

4.    On March 4, 2019, BIS transferred the request to the Office of the Secretary for the Department of Commerce, and the request was issued a new FOIA tracking number.

5.    On March 20, 2019, Plaintiff filed a lawsuit pursuant to FOIA seeking the disclosure of the Auto Report. *See Cause of Action Institute v. U.S. Department of Commerce*, No. 19-cv-778 (D.D.C.). The complaint is attached as Exhibit 2.

6.    On May 17, 2019, a presidential proclamation was issued which summarized the findings of the Auto Report. The presidential proclamation is attached as Exhibit 3.

7.    On June 14, 2019,[2] Commerce provided a copy of the presidential proclamation to Plaintiff, and informed that the complete Auto Report was being withheld pursuant to FOIA Exemption 5, 5 U.S.C. 552(b)(5), in conjunction with the presidential communications privilege and the deliberative process privilege, until the publication of the Auto Report would not threaten the national security. ("The report [is exempt]

---

[1] BIS' FOIA request was dated February 18, 2019 on the first page, but dated February 15, 2019 on subsequent pages.
[2] The response was dated June 13, 2019, but not transmitted until June 14, 2019.

from disclosure under FOIA pursuant to the presidential communications privilege and/or the deliberative process privilege, until all actions deemed necessary to adjust the imports of automobiles and automobile parts so that such imports will not threaten to impair the national security have been completed.") The response is attached as Exhibit 4.[3]

8. On January 14, 2021, Judge Carl J. Nichols, ruling for the United States District Court for the District of Columbia, held that the Auto Report had been properly withheld "while the U.S. Trade Representative continues negotiations and the President continues to consider other options to deal with the national security threat", pursuant to FOIA Exemption 5 and the presidential communications privilege.[4] The Memorandum Opinion is attached as Exhibit 5.

9. In late June 2021, it was determined, in conjunction with White House Counsel's Office, that disclosure of the Auto Report would no longer threaten to impair the national security.

10. On July 6, 2021, BIS published the Auto Report on its website.

**Plaintiff's FOIA Request for the Uranium Report**

11. On April 15, 2019, BIS received a FOIA request from Plaintiff seeking, inter alia, a copy of the April 14, 2019, Section 232 Report analyzing whether the import of uranium threatens to impair the national security of the United States ("Uranium Report"). The request is attached as Exhibit 6.

---

[3] The response from Commerce referenced both the prior FOIA tracking number used by BIS and the tracking number used by the Office of the Secretary.

[4] Because the court found the report was exempt due to at least the presidential communications privilege, the Court did not consider whether the deliberative process privilege also operated to exempt the report from disclosure.

12.   On May 16, 2019, BIS informed Plaintiff that the Uranium Report would be provided if not exempt from disclosure, and that the report would be made publicly available after the President's review was complete. The response is attached as Exhibit 7.

13.   On July 12, 2019, the President issued a Presidential Memorandum announcing that uranium imports affect national security and further investigation was merited. The memorandum therefore established the U.S. Nuclear Fuel Working Group to make any recommendations needed to further enable domestic nuclear fuel production. The Presidential Memorandum is attached as Exhibit 8.

14.   The Department of Commerce concluded that the Uranium Report should be withheld pursuant to FOIA Exemption 5, in conjunction with the presidential communications privilege and the deliberative process privilege, until the President had completed his assessment (in response to the Uranium Report) as to whether any actions were needed to facilitate and promote domestic uranium mining.

15.   Plaintiff brought this lawsuit on September 9, 2019.

16.   In late June 2021, it was determined, in conjunction with White House Counsel's Office, that disclosure of the Uranium Report would no longer threaten to impair the national security.

17.   The Uranium Report was published on BIS' website on July 29, 2021.

**Plaintiff's FOIA Requests for Other Section 232 Reports**

18.   BIS has not received any other FOIA requests from Plaintiff seeking Section 232 Reports.

19. BIS has completed three additional Section 232 Reports subsequent to the Auto Report and the Uranium Report. Plaintiff did not submit FOIA requests for any of them.

20. BIS completed four additional Section 232 Reports prior to the Auto Report and the Uranium Report in the last 25 years. Plaintiff did not submit FOIA requests for any of them.

## Other FOIA Requests for Recent Section 232 Reports

21. There have been three Section 232 Reports completed after the Auto Report and the Uranium Report analyzing whether imports threaten to impair the national security of the United States. BIS has not received a single FOIA request from any requester seeking unpublished copies of those reports.

Executed February 1, 2022.

GRACE
AGYEKU
M

Digitally signed
by GRACE
AGYEKUM
Date: 2022.02.01
15:52:34 -05'00'

# Exhibit 1



## CAUSE *of* ACTION
### ═══ I N S T I T U T E ═══

Pursuing Freedom & Opportunity through Justice & Accountability℠

February 18, 2019

**VIA ELECTRONIC MAIL**

ATTN: FOIA Office
Bureau of Industry and Security
U.S. Department of Commerce
E-mail: EFOIARequest@bis.doc.gov

   **Re:**  **Freedom of Information Act Request**

Dear FOIA Officer:

  I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]

  Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, CoA Institute hereby requests a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts.[2]

  **Request for a Public Interest Fee Waiver**

  CoA Institute requests a waiver of any and all applicable fees.  FOIA and applicable regulations provide that the agency shall furnish requested records without or at reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[3]  In this case, the requested records unquestionably shed light on the "operations or activities of the government," as they reveal the reasoning behind increasing taxes on American consumers through tariffs.

  CoA Institute has both the intent and ability to make the results of this request available to a reasonably broad public audience through various media.  Its staff has significant experience and expertise in government oversight, investigative reporting, and federal public interest

---

[1] *See* CAUSE OF ACTION INSTITUTE, *About*, www.causeofaction.org/about/.

[2] Bureau of Industry and Security. *Section 232 National Security Investigation: Imports of Automobiles and Automotive Parts Survey, available at*: https://www.bis.doc.gov/index.php/autos232 (last visited Feb. 15, 2019); Bureau of Industry and Security. *Section 232 Investigations: The Effect of Imports on the National Security, available at*: https://www.bis.doc.gov/index.php/other-areas/office-of-technology-evaluation-ote/section-232-investigations (last visited Feb. 15, 2019).

[3] 5 U.S.C. § 552(a)(4)(A)(iii); *see also Cause of Action v. Fed. Trade Comm'n*, 799 F.3d 1108, 1115-19 (D.C. Cir. 2015) (discussing proper application of public-interest fee waiver test).

Department of Commerce Bureau of Industry and Security
February 15, 2019
Page 2

litigation. These professionals will analyze the information responsive to this request, use their editorial skills to turn raw materials into a distinct work, and share the resulting analysis with the public, whether through the Institute's regularly published online newsletter, memoranda, reports, or press releases.[4] In addition, as CoA Institute is a non-profit organization as defined under Section 501(c)(3) of the Internal Revenue Code, it has no commercial interest in making this request.

## <u>Request To Be Classified as a Representative of the News Media</u>

For fee status purposes, CoA Institute also qualifies as a "representative of the news media" under FOIA.[5] As the D.C. Circuit recently held, the "representative of the news media" test is properly focused on the requestor, not the specific FOIA request at issue.[6] CoA Institute satisfies this test because it gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience. Although it is not required by the statute, CoA Institute gathers the news it regularly publishes from a variety of sources, including FOIA requests, whistleblowers/insiders, and scholarly works. It does not merely make raw information available to the public, but rather distributes distinct work products, including articles, blog posts, investigative reports, newsletters, and congressional testimony and statements for the record.[7] These distinct works

---

[4] *See also Cause of Action*, 799 F.3d at 1125-26 (holding that public interest advocacy organizations may partner with others to disseminate their work).

[5] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[6] *See Cause of Action*, 799 F.3d at 1121.

[7] *See, e.g.*, COA INSTITUTE, EVADING OVERSIGHT: THE ORIGINS AND IMPLICATIONS OF THE IRM CLAIM THAT ITS RULES DO NOT HAVE AN ECONOMIC IMPACT (Jan. 2018), http://coainst.org/2mgpYAu; CoA Institute, *Documents Reveal Special Interest Groups Lobbied HUD for Mortgage Settlement Funds* (Aug. 8, 2017), http://coainst.org/2yLaTyF; CoA Institute, *The GSA Has No Records on its New Policy for Congressional Oversight Requests* (July 26, 2017), http://coainst.org/2eHooVq; COA INSTITUTE, SENSITIVE CASE REPORTS: A HIDDEN CAUSE OF THE IRS TARGETING SCANDAL (Mar. 2017), http://coainst.org/2y0fbOH; CoA Institute, *Sec. Vilsack followed ethics guidelines when negotiating his future employment*, (Feb. 3, 2017), http://coainst.org/2mJljJe; COA INSTITUTE, INVESTIGATIVE REPORT: PRESIDENTIAL ACCESS TO TAXPAYER INFORMATION (Oct. 2016), http://coainst.org/2d7qTRY; James Valvo, *There is No Tenth Exemption* (Aug. 17, 2016), http://coainst.org/2doJhBt; COA INSTITUTE, MEMORANDUM: LEGAL ANALYSIS OF FORMER SECRETARY OF STATE HILLARY CLINTON'S USE OF A PRIVATE SERVER TO STORE EMAIL RECORDS (Aug. 24, 2015), http://coainst.org/2eXhXe1; CoA Institute, *CIA too busy for transparency* (Aug. 11, 2016), http://coainst.org/2mtzhhP; *Hearing on Revisiting IRS Targeting: Progress of Agency Reforms and Congressional Options Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts of the S. Comm. on the Judiciary*, 114th Cong. (Aug. 5, 2015) (statement of Erica L. Marshall, Counsel, CoA Inst.), http://coainst.org/2mJC8DH; *Hearing on Watchdogs Needed: Top Government Investigator Positions Left Unfilled for Years Before the S. Comm. on Homeland Sec. & Gov't Affairs*, 114th Cong. (June 3, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2mrwHr1; *Hearing on Ongoing Oversight: Monitoring the Activities of the Justice Department's Civil, Tax and Environmental and Natural Resources Divisions and the U.S. Trustee Program Before the H. Comm. on the Judiciary*, 114th Cong. (May 19, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2n7LxWG; COA INSTITUTE, 2015 GRADING THE GOVERNMENT REPORT CARD (Mar. 16, 2015), http://coainst.org/2as088a; *Hearing on Potential Reforms to the Freedom of Information Act (FOIA) Before the H. Comm. on Oversight &*

Department of Commerce Bureau of Industry and Security
February 15, 2019
Page 3

are distributed to the public through various media, including the Institute's website, Twitter, and Facebook. CoA Institute also provides news updates to subscribers via e-mail.

The statutory definition of a "representative of the news media" contemplates that organizations such as CoA Institute, which electronically disseminate information and publications via "alternative media[,] shall be considered to be news-media entities."[8] In light of the foregoing, numerous federal agencies have appropriately recognized the Institute's news media status in connection with its FOIA requests.[9]

## Record Preservation Requirement

CoA Institute requests that the disclosure officer responsible for the processing of this request issue an immediate hold on all records responsive, or potentially responsive, to this request, so as to prevent their disposal until such time as a final determination has been issued on the request and any administrative remedies for appeal have been exhausted. It is unlawful for an agency to destroy or dispose of any record subject to a FOIA request.[10]

## Record Production and Contact Information

In an effort to facilitate document review, please provide the responsive documents in electronic form in lieu of a paper production. If a certain portion of responsive records can be

---

*Gov't Reform*, 114th Cong. (Feb. 27, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2lLsph8; *Hearing on IRS: TIGTA Update Before the H. Comm. on Oversight & Gov't Reform*, 114th Cong. (Feb. 26, 2015) (statement of Prashant K. Khetan, Chief Counsel, CoA Inst.), http://coainst.org/2nn5iFJ; CoA INSTITUTE, GRADING THE GOVERNMENT: HOW THE WHITE HOUSE TARGETS DOCUMENT REQUESTERS (Mar. 18, 2014), http://coainst.org/2aFWxUZ.

[8] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[9] *See, e.g.*, FOIA Request F-133-18, U.S. Agency for Int'l Dev. (Apr. 11, 2018); FOIA Request 18-HQ-F-487, Nat'l Aeronautics & Space Admin. (Apr. 11, 2018); FOIA Request 1403076-000, Fed. Bureau of Investigation (Apr. 11, 2018); FOIA Request 201800050F, Exp.-Imp. Bank (Apr. 11, 2018); FOIA Request 2016-11-008, Dep't of the Treasury (Nov. 7, 2016); FOIA Requests OS-2017-00057 & OS-2017-00060, Dep't of Interior (Oct. 31, 2016); FOIA Request 2017-00497, Office of Personnel Mgmt. (Oct. 21, 2016); FOIA Request 092320167031, Ctrs. for Medicare & Medicaid Servs. (Oct. 17, 2016); FOIA Request 17-00054-F, Dep't of Educ. (Oct. 6, 2016); FOIA Request DOC-OS-2016-001753, Dept. of Commerce (Sept. 27, 2016); FOIA Request 2016-366-F, Consumer Fin. Prot. Bureau (Aug. 11, 2016); FOIA Request F-2016-09406, Dept. of State (Aug. 11, 2016); FOIA Request 2016-00896, Bureau of Land Mgmt. (Aug. 10, 2016); FOIA Request 796939, Dep't of Labor (Mar. 7, 2016); FOIA Request 2015-HQFO-00691, Dep't of Homeland Sec. (Sept. 22, 2015); FOIA Request HQ-2015-01689-F, Dep't of Energy (Aug. 7, 2015); FOIA Request 2015-OSEC-04996-F, Dep't of Agric. (Aug. 6, 2015); FOIA Request 15-05002, Sec. & Exch. Comm'n (July 23, 2015); FOIA Request 145-FOI-13785, Dep't of Justice (Jun. 16, 2015); FOIA Request 2015-26, Fed. Energy Regulatory Comm'n (Feb. 13, 2015).

[10] *See* 36 C.F.R. § 1230.3(b) ("Unlawful or accidental destruction (also called unauthorized destruction) means . . . disposal of a record subject to a FOIA request, litigation hold, or any other hold requirement to retain the records."); *Chambers v. Dep't of the Interior*, 568 F.3d 998, 1004-05 (D.C. Cir. 2009) ("[A]n agency is not shielded from liability if it intentionally transfers or destroys a document after it has been requested under the FOIA or the Privacy Act."); *Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 41-44 (D.D.C. 1998).

Department of Commerce Bureau of Industry and Security
February 15, 2019
Page 4

produced more readily, CoA Institute requests that those records be produced first and the remaining records be produced on a rolling basis as circumstances permit.

       If you have any questions about this request, please contact me by telephone at (202) 499-2422 or by e-mail at thomas.kimbrell@causeofaction.org.  Thank you for your attention to this matter.


*Kevin Schmidt*
_____
KEVIN SCHMIDT
DIRECTOR OF INVESTIGATIONS

# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
CAUSE OF ACTION INSTITUTE                           )
1875 Eye St., NW, Suite 800                          )
Washington, DC 20006,                               )
                                                    )
                    Plaintiff,                       )
                                                    )
        v.                                          )          Civil Action No. 19-778
                                                    )
UNITED STATES                                        )
DEPARTMENT OF COMMERCE                               )
1401 Constitution Ave., NW                           )
Washington, DC 20230,                               )
                                                    )
                    Defendant.                       )
_____)

## COMPLAINT

1.     Plaintiff Cause of Action Institute ("CoA Institute") brings this action under the

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking disclosure of records responsive

to two FOIA requests submitted to Defendant United States Department of Commerce ("DOC").

The requests seek a copy of the Commerce Secretary's final report to the President regarding

Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs,

Vans and Light Trucks, and Automotive Parts ("Section 232 Auto Report").

## JURISDICTION AND VENUE

2.     Jurisdiction is asserted pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B).

3.     Venue is proper pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 552(a)(4)(B).

## PARTIES

4.     CoA Institute is a 501(c)(3) nonpartisan government oversight organization that

uses investigative, legal, and communications tools to educate the public about how government

accountability, transparency, and the rule of law protect individual liberty and economic

opportunity.  It regularly requests access under the FOIA to the public records of federal agencies, entities, and offices, and publicly disseminates its findings, analysis, and commentary.

5.     DOC is an agency within the meaning of 5 U.S.C. § 552(f)(1).  It has possession, custody, and control of records to which CoA Institute seeks access and that are the subject of this Complaint.

## FACTS

### I.     FOIA Request to Department of Commerce

6.     By letter, dated February 18, 2019, CoA Institute sent a FOIA request to the DOC Secretary's office seeking access to "a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts."  Ex. 1.

7.     CoA Institute sought a public interest fee waiver and to be classified as a representative of the news media for fee purposes.  *Id.* at 1–3.

8.     To date, DOC has not acknowledged receipt of the FOIA request, and CoA Institute has received no substantive communication from DOC regarding this FOIA request.

### II.     FOIA Request DOC-BIS-2019-742

9.     By letter, dated February 18, 2019 CoA Institute sent a FOIA request to the DOC's Bureau of Industry and Security ("BIS") seeking access to "a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts." Ex. 2.

10.     CoA Institute sought a public interest fee waiver and to be classified as a representative of the news media for fee purposes.  *Id.* at 1–3.

2

11.     By email, dated February 19, 2019, BIS acknowledged receipt of the request and assigned it tracking number DOC-BIS-2019-742.  Ex. 3.

12.     CoA Institute has received no further substantive communication from BIS regarding this FOIA request.

13.     CoA Institute sent a request to both the Secretary's Office and BIS seeking access to the same record because, based on information and belief, BIS prepared the Section 232 Auto Report and the Secretary's office transmitted it to the President.

## COUNT 1

### Violation of the FOIA: Failure to Comply with Statutory Deadlines

14.     CoA Institute repeats all of the above paragraphs.

15.     The FOIA requires agencies to respond to requests within twenty (20) business days or, in "unusual circumstances," thirty (30) business days.  5 U.S.C. §§ 552(a)(6)(A)–(B).

16.     More than twenty (20) business days have passed since DOC received the request sent to the Secretary's office, which it still has not acknowledged.

17.     More than twenty (20) business days have passed since BIS received FOIA request DOC-BIS-2019-742.

18.     Neither the DOC Secretary's Office nor BIS has not invoked FOIA's ten-day statutory response extension for unusual circumstances.

19.     Neither the DOC Secretary's Office nor BIS has provided a final determination on or produced any records responsive to either of the requests at issue in this Complaint within the statutory time limits.

20.     Defendant therefore has failed to comply with the FOIA's statutory deadline to issue a final determination.

21.    CoA Institute has exhausted its administrative remedies for the requests at issue in this Complaint under 5 U.S.C. § 552(a)(6)(C).

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff CoA Institute respectfully requests and prays that this Court:

a.    Order Defendant to issue a final determination on both of the requests at issue in this Complaint within twenty (20) days of the date of the Order;

b.    Order Defendant to produce all responsive records promptly upon issuing a final determination;

c.    Award CoA Institute its costs and reasonable attorney fees incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E); and

d.    Grant such other relief as the Court may deem just and proper.

Date: March 20, 2019                           Respectfully submitted,

                                               */s/ R. James Valvo, III*
                                               R. James Valvo, III (D.C. Bar. No. 1017390)
                                               Lee A. Steven (D.C. Bar No. 468543)

                                               CAUSE OF ACTION INSTITUTE
                                               1875 Eye St., NW, Suite 800
                                               Washington, DC 20006
                                               Telephone: (202) 499-4232
                                               Facsimile: (202) 330-5842
                                               james.valvo@causeofaction.org
                                               lee.steven@causeofaction.org

                                               *Counsel for Plaintiff*



CAUSE *of* ACTION
═══ I N S T I T U T E ═══

Pursuing Freedom & Opportunity through Justice & Accountability℠

February 18, 2019

**VIA ELECTRONIC MAIL**

Departmental Freedom of Information Officer
Office of Privacy and Open Government
14th and Constitution Avenue NW
Mail Stop 52010FB
Washington, DC 20230
E-mail: eFOIA@doc.gov

  Re:  **Freedom of Information Act Request**

Dear FOIA Officer:

  I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]

  Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, CoA Institute hereby requests a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts.[2]

  **Request for a Public Interest Fee Waiver**

  CoA Institute requests a waiver of any and all applicable fees. FOIA and applicable regulations provide that the agency shall furnish requested records without or at reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[3] In this case, the requested records unquestionably shed light on the "operations or activities of the government," as they reveal the reasoning behind increasing taxes on American consumers through tariffs.

---

[1] *See* CAUSE OF ACTION INSTITUTE, *About*, www.causeofaction.org/about/.

[2] Bureau of Industry and Security. *Section 232 National Security Investigation: Imports of Automobiles and Automotive Parts Survey*, *available at*: https://www.bis.doc.gov/index.php/autos232 (last visited Feb. 15, 2019); Bureau of Industry and Security. *Section 232 Investigations: The Effect of Imports on the National Security*, *available at*: https://www.bis.doc.gov/index.php/other-areas/office-of-technology-evaluation-ote/section-232-investigations (last visited Feb. 15, 2019).

[3] 5 U.S.C. § 552(a)(4)(A)(iii); *see also Cause of Action v. Fed. Trade Comm'n*, 799 F.3d 1108, 1115-19 (D.C. Cir. 2015) (discussing proper application of public-interest fee waiver test).

Department of Commerce
February 18, 2019
Page 2

        CoA Institute has both the intent and ability to make the results of this request available
to a reasonably broad public audience through various media.  Its staff has significant experience
and expertise in government oversight, investigative reporting, and federal public interest
litigation.  These professionals will analyze the information responsive to this request, use their
editorial skills to turn raw materials into a distinct work, and share the resulting analysis with the
public, whether through the Institute's regularly published online newsletter, memoranda,
reports, or press releases.[4]  In addition, as CoA Institute is a non-profit organization as defined
under Section 501(c)(3) of the Internal Revenue Code, it has no commercial interest in making
this request.

### **Request To Be Classified as a Representative of the News Media**

        For fee status purposes, CoA Institute also qualifies as a "representative of the news
media" under FOIA.[5]  As the D.C. Circuit recently held, the "representative of the news media"
test is properly focused on the requestor, not the specific FOIA request at issue.[6]  CoA Institute
satisfies this test because it gathers information of potential interest to a segment of the public,
uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an
audience.  Although it is not required by the statute, CoA Institute gathers the news it regularly
publishes from a variety of sources, including FOIA requests, whistleblowers/insiders, and
scholarly works.  It does not merely make raw information available to the public, but rather
distributes distinct work products, including articles, blog posts, investigative reports,
newsletters, and congressional testimony and statements for the record.[7]  These distinct works

---

[4] *See also Cause of Action*, 799 F.3d at 1125-26 (holding that public interest advocacy organizations may
partner with others to disseminate their work).

[5] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[6] *See Cause of Action*, 799 F.3d at 1121.

[7] *See, e.g.*, CoA INSTITUTE, EVADING OVERSIGHT: THE ORIGINS AND IMPLICATIONS OF THE IRM CLAIM THAT
ITS RULES DO NOT HAVE AN ECONOMIC IMPACT (Jan. 2018), http://coainst.org/2mgpYAu; CoA Institute,
*Documents Reveal Special Interest Groups Lobbied HUD for Mortgage Settlement Funds* (Aug. 8, 2017),
http://coainst.org/2yLaTyF; CoA Institute, *The GSA Has No Records on its New Policy for Congressional
Oversight Requests* (July 26, 2017), http://coainst.org/2eHooVq; CoA INSTITUTE, SENSITIVE CASE REPORTS:
A HIDDEN CAUSE OF THE IRS TARGETING SCANDAL (Mar. 2017), http://coainst.org/2y0fbOH; CoA Institute,
*Sec. Vilsack followed ethics guidelines when negotiating his future employment*, (Feb. 3, 2017),
http://coainst.org/2mJljJe; CoA INSTITUTE, INVESTIGATIVE REPORT: PRESIDENTIAL ACCESS TO TAXPAYER
INFORMATION (Oct. 2016), http://coainst.org/2d7qTRY; James Valvo, *There is No Tenth Exemption* (Aug. 17,
2016), http://coainst.org/2doJhBt; CoA INSTITUTE, MEMORANDUM: LEGAL ANALYSIS OF FORMER SECRETARY
OF STATE HILLARY CLINTON'S USE OF A PRIVATE SERVER TO STORE EMAIL RECORDS (Aug. 24, 2015),
http://coainst.org/2eXhXe1; CoA Institute, *CIA too busy for transparency* (Aug. 11, 2016),
http://coainst.org/2mtzhhP; *Hearing on Revisiting IRS Targeting: Progress of Agency Reforms and
Congressional Options Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts of the S.
Comm. on the Judiciary*, 114th Cong. (Aug. 5, 2015) (statement of Erica L. Marshall, Counsel, CoA Inst.),
http://coainst.org/2mJC8DH; *Hearing on Watchdogs Needed: Top Government Investigator Positions Left
Unfilled for Years Before the S. Comm. on Homeland Sec. & Gov't Affairs*, 114th Cong. (June 3, 2015)
(statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2mrwHr1; *Hearing on Ongoing
Oversight: Monitoring the Activities of the Justice Department's Civil, Tax and Environmental and Natural*

Department of Commerce
February 18, 2019
Page 3

are distributed to the public through various media, including the Institute's website, Twitter, and Facebook. CoA Institute also provides news updates to subscribers via e-mail.

The statutory definition of a "representative of the news media" contemplates that organizations such as CoA Institute, which electronically disseminate information and publications via "alternative media[,] shall be considered to be news-media entities."[8] In light of the foregoing, numerous federal agencies have appropriately recognized the Institute's news media status in connection with its FOIA requests.[9]

### Record Preservation Requirement

CoA Institute requests that the disclosure officer responsible for the processing of this request issue an immediate hold on all records responsive, or potentially responsive, to this request, so as to prevent their disposal until such time as a final determination has been issued on the request and any administrative remedies for appeal have been exhausted. It is unlawful for an agency to destroy or dispose of any record subject to a FOIA request.[10]

---

*Resources Divisions and the U.S. Trustee Program Before the H. Comm. on the Judiciary*, 114th Cong. (May 19, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2n7LxWG; COA INSTITUTE, 2015 GRADING THE GOVERNMENT REPORT CARD (Mar. 16, 2015), http://coainst.org/2as088a; *Hearing on Potential Reforms to the Freedom of Information Act (FOIA) Before the H. Comm. on Oversight & Gov't Reform*, 114th Cong. (Feb. 27, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2lLsph8; *Hearing on IRS: TIGTA Update Before the H. Comm. on Oversight & Gov't Reform*, 114th Cong. (Feb. 26, 2015) (statement of Prashant K. Khetan, Chief Counsel, CoA Inst.), http://coainst.org/2nn5iFJ; COA INSTITUTE, GRADING THE GOVERNMENT: HOW THE WHITE HOUSE TARGETS DOCUMENT REQUESTERS (Mar. 18, 2014), http://coainst.org/2aFWxUZ.

[8] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[9] *See, e.g.*, FOIA Request F-133-18, U.S. Agency for Int'l Dev. (Apr. 11, 2018); FOIA Request 18-HQ-F-487, Nat'l Aeronautics & Space Admin. (Apr. 11, 2018); FOIA Request 1403076-000, Fed. Bureau of Investigation (Apr. 11, 2018); FOIA Request 201800050F, Exp.-Imp. Bank (Apr. 11, 2018); FOIA Request 2016-11-008, Dep't of the Treasury (Nov. 7, 2016); FOIA Requests OS-2017-00057 & OS-2017-00060, Dep't of Interior (Oct. 31, 2016); FOIA Request 2017-00497, Office of Personnel Mgmt. (Oct. 21, 2016); FOIA Request 092320167031, Ctrs. for Medicare & Medicaid Servs. (Oct. 17, 2016); FOIA Request 17-00054-F, Dep't of Educ. (Oct. 6, 2016); FOIA Request DOC-OS-2016-001753, Dept. of Commerce (Sept. 27, 2016); FOIA Request 2016-366-F, Consumer Fin. Prot. Bureau (Aug. 11, 2016); FOIA Request F-2016-09406, Dept. of State (Aug. 11, 2016); FOIA Request 2016-00896, Bureau of Land Mgmt. (Aug. 10, 2016); FOIA Request 796939, Dep't of Labor (Mar. 7, 2016); FOIA Request 2015-HQFO-00691, Dep't of Homeland Sec. (Sept. 22, 2015); FOIA Request HQ-2015-01689-F, Dep't of Energy (Aug. 7, 2015); FOIA Request 2015-OSEC-04996-F, Dep't of Agric. (Aug. 6, 2015); FOIA Request 15-05002, Sec. & Exch. Comm'n (July 23, 2015); FOIA Request 145-FOI-13785, Dep't of Justice (Jun. 16, 2015); FOIA Request 2015-26, Fed. Energy Regulatory Comm'n (Feb. 13, 2015).

[10] *See* 36 C.F.R. § 1230.3(b) ("Unlawful or accidental destruction (also called unauthorized destruction) means . . . disposal of a record subject to a FOIA request, litigation hold, or any other hold requirement to retain the records."); *Chambers v. Dep't of the Interior*, 568 F.3d 998, 1004-05 (D.C. Cir. 2009) ("[A]n agency is not shielded from liability if it intentionally transfers or destroys a document after it has been requested under the FOIA or the Privacy Act."); *Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 41-44 (D.D.C. 1998).

Department of Commerce
February 18, 2019
Page 4

### Record Production and Contact Information

In an effort to facilitate document review, please provide the responsive documents in electronic form in lieu of a paper production.  If a certain portion of responsive records can be produced more readily, CoA Institute requests that those records be produced first and the remaining records be produced on a rolling basis as circumstances permit.

If you have any questions about this request, please contact me by telephone at (202) 499-2422 or by e-mail at kevin.schmidt@causeofaction.org.  Thank you for your attention to this matter.

*Kevin Schmidt*

_____

KEVIN SCHMIDT
DIRECTOR OF INVESTIGATIONS



# CAUSE *of* ACTION
## I N S T I T U T E

Pursuing Freedom & Opportunity through Justice & Accountability℠

February 18, 2019

**VIA ELECTRONIC MAIL**

ATTN: FOIA Office
Bureau of Industry and Security
U.S. Department of Commerce
E-mail: EFOIARequest@bis.doc.gov

      Re:    **Freedom of Information Act Request**

Dear FOIA Officer:

I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]

Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, CoA Institute hereby requests a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts. [2]

### Request for a Public Interest Fee Waiver

CoA Institute requests a waiver of any and all applicable fees.  FOIA and applicable regulations provide that the agency shall furnish requested records without or at reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[3]  In this case, the requested records unquestionably shed light on the "operations or activities of the government," as they reveal the reasoning behind increasing taxes on American consumers through tariffs.

CoA Institute has both the intent and ability to make the results of this request available to a reasonably broad public audience through various media.  Its staff has significant experience and expertise in government oversight, investigative reporting, and federal public interest

---

[1] *See* CAUSE OF ACTION INSTITUTE, *About*, www.causeofaction.org/about/.

[2] Bureau of Industry and Security. *Section 232 National Security Investigation: Imports of Automobiles and Automotive Parts Survey*, *available at*: https://www.bis.doc.gov/index.php/autos232 (last visited Feb. 15, 2019); Bureau of Industry and Security. *Section 232 Investigations: The Effect of Imports on the National Security*, *available at*: https://www.bis.doc.gov/index.php/other-areas/office-of-technology-evaluation-ote/section-232-investigations (last visited Feb. 15, 2019).

[3] 5 U.S.C. § 552(a)(4)(A)(iii); *see also Cause of Action v. Fed. Trade Comm'n*, 799 F.3d 1108, 1115-19 (D.C. Cir. 2015) (discussing proper application of public-interest fee waiver test).

Department of Commerce Bureau of Industry and Security
February 15, 2019
Page 2

litigation.  These professionals will analyze the information responsive to this request, use their editorial skills to turn raw materials into a distinct work, and share the resulting analysis with the public, whether through the Institute's regularly published online newsletter, memoranda, reports, or press releases.[4]  In addition, as CoA Institute is a non-profit organization as defined under Section 501(c)(3) of the Internal Revenue Code, it has no commercial interest in making this request.

## <u>Request To Be Classified as a Representative of the News Media</u>

For fee status purposes, CoA Institute also qualifies as a "representative of the news media" under FOIA.[5]  As the D.C. Circuit recently held, the "representative of the news media" test is properly focused on the requestor, not the specific FOIA request at issue.[6]  CoA Institute satisfies this test because it gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience.  Although it is not required by the statute, CoA Institute gathers the news it regularly publishes from a variety of sources, including FOIA requests, whistleblowers/insiders, and scholarly works.  It does not merely make raw information available to the public, but rather distributes distinct work products, including articles, blog posts, investigative reports, newsletters, and congressional testimony and statements for the record.[7]  These distinct works

---

[4] *See also Cause of Action*, 799 F.3d at 1125-26 (holding that public interest advocacy organizations may partner with others to disseminate their work).

[5] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[6] *See Cause of Action*, 799 F.3d at 1121.

[7] *See, e.g.*, CoA INSTITUTE, EVADING OVERSIGHT: THE ORIGINS AND IMPLICATIONS OF THE IRM CLAIM THAT ITS RULES DO NOT HAVE AN ECONOMIC IMPACT (Jan. 2018), http://coainst.org/2mgpYAu; CoA Institute, *Documents Reveal Special Interest Groups Lobbied HUD for Mortgage Settlement Funds* (Aug. 8, 2017), http://coainst.org/2yLaTyF; CoA Institute, *The GSA Has No Records on its New Policy for Congressional Oversight Requests* (July 26, 2017), http://coainst.org/2eHooVq; CoA INSTITUTE, SENSITIVE CASE REPORTS: A HIDDEN CAUSE OF THE IRS TARGETING SCANDAL (Mar. 2017), http://coainst.org/2y0fbOH; CoA Institute, *Sec. Vilsack followed ethics guidelines when negotiating his future employment*, (Feb. 3, 2017), http://coainst.org/2mJljJe; CoA INSTITUTE, INVESTIGATIVE REPORT: PRESIDENTIAL ACCESS TO TAXPAYER INFORMATION (Oct. 2016), http://coainst.org/2d7qTRY; James Valvo, *There is No Tenth Exemption* (Aug. 17, 2016), http://coainst.org/2doJhBt; CoA INSTITUTE, MEMORANDUM: LEGAL ANALYSIS OF FORMER SECRETARY OF STATE HILLARY CLINTON'S USE OF A PRIVATE SERVER TO STORE EMAIL RECORDS (Aug. 24, 2015), http://coainst.org/2eXhXe1; CoA Institute, *CIA too busy for transparency* (Aug. 11, 2016), http://coainst.org/2mtzhhP; *Hearing on Revisiting IRS Targeting: Progress of Agency Reforms and Congressional Options Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts of the S. Comm. on the Judiciary*, 114th Cong. (Aug. 5, 2015) (statement of Erica L. Marshall, Counsel, CoA Inst.), http://coainst.org/2mJC8DH; *Hearing on Watchdogs Needed: Top Government Investigator Positions Left Unfilled for Years Before the S. Comm. on Homeland Sec. & Gov't Affairs*, 114th Cong. (June 3, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2mrwHr1; *Hearing on Ongoing Oversight: Monitoring the Activities of the Justice Department's Civil, Tax and Environmental and Natural Resources Divisions and the U.S. Trustee Program Before the H. Comm. on the Judiciary*, 114th Cong. (May 19, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2n7LxWG; CoA INSTITUTE, 2015 GRADING THE GOVERNMENT REPORT CARD (Mar. 16, 2015), http://coainst.org/2as088a; *Hearing on Potential Reforms to the Freedom of Information Act (FOIA) Before the H. Comm. on Oversight &*

Department of Commerce Bureau of Industry and Security
February 15, 2019
Page 3

are distributed to the public through various media, including the Institute's website, Twitter, and Facebook.  CoA Institute also provides news updates to subscribers via e-mail.

The statutory definition of a "representative of the news media" contemplates that organizations such as CoA Institute, which electronically disseminate information and publications via "alternative media[,] shall be considered to be news-media entities."[8]  In light of the foregoing, numerous federal agencies have appropriately recognized the Institute's news media status in connection with its FOIA requests.[9]

## Record Preservation Requirement

CoA Institute requests that the disclosure officer responsible for the processing of this request issue an immediate hold on all records responsive, or potentially responsive, to this request, so as to prevent their disposal until such time as a final determination has been issued on the request and any administrative remedies for appeal have been exhausted.  It is unlawful for an agency to destroy or dispose of any record subject to a FOIA request.[10]

## Record Production and Contact Information

In an effort to facilitate document review, please provide the responsive documents in electronic form in lieu of a paper production.  If a certain portion of responsive records can be

---

*Gov't Reform*, 114th Cong. (Feb. 27, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2lLsph8; *Hearing on IRS: TIGTA Update Before the H. Comm. on Oversight & Gov't Reform*, 114th Cong. (Feb. 26, 2015) (statement of Prashant K. Khetan, Chief Counsel, CoA Inst.), http://coainst.org/2nn5iFJ; CoA INSTITUTE, GRADING THE GOVERNMENT: HOW THE WHITE HOUSE TARGETS DOCUMENT REQUESTERS (Mar. 18, 2014), http://coainst.org/2aFWxUZ.

[8] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[9] *See, e.g.*, FOIA Request F-133-18, U.S. Agency for Int'l Dev. (Apr. 11, 2018); FOIA Request 18-HQ-F-487, Nat'l Aeronautics & Space Admin. (Apr. 11, 2018); FOIA Request 1403076-000, Fed. Bureau of Investigation (Apr. 11, 2018); FOIA Request 201800050F, Exp.-Imp. Bank (Apr. 11, 2018); FOIA Request 2016-11-008, Dep't of the Treasury (Nov. 7, 2016); FOIA Requests OS-2017-00057 & OS-2017-00060, Dep't of Interior (Oct. 31, 2016); FOIA Request 2017-00497, Office of Personnel Mgmt. (Oct. 21, 2016); FOIA Request 092320167031, Ctrs. for Medicare & Medicaid Servs. (Oct. 17, 2016); FOIA Request 17-00054-F, Dep't of Educ. (Oct. 6, 2016); FOIA Request DOC-OS-2016-001753, Dept. of Commerce (Sept. 27, 2016); FOIA Request 2016-366-F, Consumer Fin. Prot. Bureau (Aug. 11, 2016); FOIA Request F-2016-09406, Dept. of State (Aug. 11, 2016); FOIA Request 2016-00896, Bureau of Land Mgmt. (Aug. 10, 2016); FOIA Request 796939, Dep't of Labor (Mar. 7, 2016); FOIA Request 2015-HQFO-00691, Dep't of Homeland Sec. (Sept. 22, 2015); FOIA Request HQ-2015-01689-F, Dep't of Energy (Aug. 7, 2015); FOIA Request 2015-OSEC-04996-F, Dep't of Agric. (Aug. 6, 2015); FOIA Request 15-05002, Sec. & Exch. Comm'n (July 23, 2015); FOIA Request 145-FOI-13785, Dep't of Justice (Jun. 16, 2015); FOIA Request 2015-26, Fed. Energy Regulatory Comm'n (Feb. 13, 2015).

[10] *See* 36 C.F.R. § 1230.3(b) ("Unlawful or accidental destruction (also called unauthorized destruction) means . . . disposal of a record subject to a FOIA request, litigation hold, or any other hold requirement to retain the records."); *Chambers v. Dep't of the Interior*, 568 F.3d 998, 1004-05 (D.C. Cir. 2009) ("[A]n agency is not shielded from liability if it intentionally transfers or destroys a document after it has been requested under the FOIA or the Privacy Act."); *Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 41-44 (D.D.C. 1998).

Department of Commerce Bureau of Industry and Security
February 15, 2019
Page 4

produced more readily, CoA Institute requests that those records be produced first and the remaining records be produced on a rolling basis as circumstances permit.

       If you have any questions about this request, please contact me by telephone at (202) 499-2422 or by e-mail at thomas.kimbrell@causeofaction.org.  Thank you for your attention to this matter.

*Kevin Schmidt*

_____
KEVIN SCHMIDT
DIRECTOR OF INVESTIGATIONS

## James Valvo

**From:** admin@foiaonline.gov
**Sent:** Tuesday, February 19, 2019 12:37 PM
**To:** Kevin Schmidt
**Subject:** FOIA Request DOC-BIS-2019-000742 Submitted

This message is to confirm your request submission to the FOIAonline application: <u>View Request</u>. Request information is as follows:

- Tracking Number: DOC-BIS-2019-000742
- Requester Name: Kevin Schmidt
- Date Submitted: 02/18/2019
- Request Status: Submitted
- Description: requests a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts.

**CIVIL COVER SHEET**

JS-44 (Rev. 6/17 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR
PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)**

○ **A.** *Antitrust*

410 Antitrust

○ **B.** *Personal Injury/
Malpractice*

310 Airplane
315 Airplane Product Liability
320 Assault, Libel & Slander
330 Federal Employers Liability
340 Marine
345 Marine Product Liability
350 Motor Vehicle
355 Motor Vehicle Product Liability
360 Other Personal Injury
362 Medical Malpractice
365 Product Liability
367 Health Care/Pharmaceutical
   Personal Injury Product Liability
368 Asbestos Product Liability

○ **C.** *Administrative Agency
Review*

151 Medicare Act

**Social Security**
861 HIA (1395ff)
862 Black Lung (923)
863 DIWC/DIWW (405(g))
864 SSID Title XVI
865 RSI (405(g))
**Other Statutes**
891 Agricultural Acts
893 Environmental Matters
890 Other Statutory Actions (If
   Administrative Agency is
   Involved)

○ **D.** *Temporary Restraining
Order/Preliminary
Injunction*

Any nature of suit from any category
may be selected for this category of
case assignment.

***(If Antitrust, then A governs)***

○ **E.** *General Civil (Other)*          OR          ○ **F.** *Pro Se General Civil*

**Real Property**
210 Land Condemnation
220 Foreclosure
230 Rent, Lease & Ejectment
240 Torts to Land
245 Tort Product Liability
290 All Other Real Property

**Personal Property**
370 Other Fraud
371 Truth in Lending
380 Other Personal Property
   Damage
385 Property Damage
   Product Liability

**Bankruptcy**
422 Appeal 27 USC 158
423 Withdrawal 28 USC 157

**Prisoner Petitions**
535 Death Penalty
540 Mandamus & Other
550 Civil Rights
555 Prison Conditions
560 Civil Detainee – Conditions
   of Confinement

**Property Rights**
820 Copyrights
830 Patent
835 Patent – Abbreviated New
   Drug Application
840 Trademark

**Federal Tax Suits**
870 Taxes (US plaintiff or
   defendant)
871 IRS-Third Party 26 USC
   7609

**Forfeiture/Penalty**
625 Drug Related Seizure of
   Property 21 USC 881
690 Other

**Other Statutes**
375 False Claims Act
376 Qui Tam (31 USC
   3729(a))
400 State Reapportionment
430 Banks & Banking
450 Commerce/ICC
   Rates/etc.
460 Deportation

462 Naturalization
   Application
465 Other Immigration
   Actions
470 Racketeer Influenced
   & Corrupt Organization
480 Consumer Credit
490 Cable/Satellite TV
850 Securities/Commodities/
   Exchange
896 Arbitration
899 Administrative Procedure
   Act/Review or Appeal of
   Agency Decision
950 Constitutionality of State
   Statutes
890 Other Statutory Actions
   (if not administrative agency
   review or Privacy Act)

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/Privacy Act* | ○ **J.** *Student Loan* |
|---|---|---|---|
| **530** Habeas Corpus – General<br>**510** Motion/Vacate Sentence<br>**463** Habeas Corpus – Alien Detainee | **442** Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | **895** Freedom of Information Act<br>**890** Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | **152** Recovery of Defaulted Student Loan (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| **710** Fair Labor Standards Act<br>**720** Labor/Mgmt. Relations<br>**740** Labor Railway Act<br>**751** Family and Medical Leave Act<br>**790** Other Labor Litigation<br>**791** Empl. Ret. Inc. Security Act | **441** Voting (if not Voting Rights Act)<br>**443** Housing/Accommodations<br>**440** Other Civil Rights<br>**445** Americans w/Disabilities – Employment<br>**446** Americans w/Disabilities – Other<br>**448** Education | **110** Insurance<br>**120** Marine<br>**130** Miller Act<br>**140** Negotiable Instrument<br>**150** Recovery of Overpayment & Enforcement of Judgment<br>**153** Recovery of Overpayment of Veteran's Benefits<br>**160** Stockholder's Suits<br>**190** Other Contracts<br>**195** Contract Product Liability<br>**196** Franchise | **441** Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi-district Litigation  ○ 7 Appeal to District Judge from Mag. Judge  ○ 8 Multi-district Litigation – Direct File

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 | **DEMAND $**<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>YES       NO |
|---|---|---|---|
| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES          NO | If yes, please complete related case form |

DATE: _____    SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI.     CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.     RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| _____ | ) | |
| *Defendant* | ) | |

## SUMMONS IN A CIVIL ACTION

To:     *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 30 days after service of this summons on you (not counting the day you received it) you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default may be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

FOIA Summons (1/13) (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

FOIA Summons
1/13

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | ) | |
|---|---|---|
| _____ | ) | |
| _Plaintiff_ | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| _____ | ) | |
| _Defendant_ | ) | |

## SUMMONS IN A CIVIL ACTION

To:     _(Defendant's name and address)_

A lawsuit has been filed against you.

Within 30 days after service of this summons on you (not counting the day you received it) you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default may be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

_ANGELA D. CAESAR, CLERK OF COURT_

Date: _____        _____
                                        _Signature of Clerk or Deputy Clerk_

FOIA Summons (1/13) (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏  I returned the summons unexecuted because _____ ; or

❏  Other *(specify):*

_____ .


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

FOIA Summons
1/13

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

*Plaintiff*

v.

_____

*Defendant*

)
)
)
)
)
)
)
)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To:     *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 30 days after service of this summons on you (not counting the day you received it) you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default may be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____          _____
                                                        *Signature of Clerk or Deputy Clerk*

FOIA Summons (1/13) (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏  I returned the summons unexecuted because _____ ; or

❏  Other *(specify):*

_____ .


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .


I declare under penalty of perjury that this information is true.


Date: _____        _____
                                                          *Server's signature*

                                          _____
                                                          *Printed name and title*


                                          _____
                                                          *Server's address*

Additional information regarding attempted service, etc:

Exhibit 3



**PROCLAMATIONS**

# Adjusting Imports of Automobiles and Automobile Parts Into the United States

—— **ECONOMY & JOBS**

Issued on: **May 17, 2019**

★ ★ ★

1. On February 17, 2019, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effects of imports of passenger vehicles (sedans, sport utility vehicles, crossover utility vehicles, minivans, and cargo vans) and light trucks (collectively "automobiles") and certain automobile parts (engines and engine parts, transmissions and powertrain parts, and electrical components) on the national security of the United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862).

2. The report found that automotive research and development (R&D) is critical to national security. The rapid application of commercial breakthroughs in automobile technology is necessary for the United States to retain competitive military advantage and meet new defense requirements. Important innovations are occurring in the areas of engine and powertrain technology, electrification, lightweighting, advanced connectivity, and autonomous driving. The United States defense industrial base depends on the American-owned automotive sector for the development of technologies that are essential to maintaining our military superiority.

3. Thus, the Secretary found that American-owned automotive R&D and manufacturing are vital to national security. Yet, increases in imports of automobiles and automobile parts, combined with other circumstances, have over the past three decades given foreign-owned producers a competitive advantage over American-owned producers.

4. American-owned producers' share of the domestic automobile market has contracted sharply, declining from 67 percent (10.5 million units produced and sold in the United States) in 1985 to 22 percent (3.7 million units produced and sold in the United States) in 2017. During the same time period, the volume of imports nearly doubled, from 4.6 million units to 8.3 million units. In 2017, the United States imported over 191 billion dollars' worth of automobiles.

5. Furthermore, one circumstance exacerbating the effects of such imports is that protected foreign markets, like those in the European Union and Japan, impose significant barriers to automotive imports from the United States, severely disadvantaging American-owned producers and preventing them from developing alternative sources of revenue for R&D in the face of declining domestic sales. American-owned producers' share of the global automobile market fell from 36 percent in 1995 to just 12 percent in 2017, reducing American-owned producers' ability to fund necessary R&D.

6. Because "[d]efense purchases alone are not sufficient to support . . . R&D in key automotive technologies," the Secretary found that "American-owned automobile and automobile parts manufacturers must have a robust presence in the U.S. commercial market" and that American innovation capacity "is now at serious risk as imports continue to displace American-owned production." Sales revenue enables R&D expenditures that are necessary for long-term automotive technological superiority, and automotive technological superiority is essential for the national defense. The lag in R&D expenditures by American-owned producers is weakening innovation and, accordingly, threatening to impair our national security.

7. In light of all of these factors, domestic conditions of competition must be improved by reducing imports. American-owned producers must be able to increase R&D expenditures to ensure technological leadership that can meet national defense requirements.

8. The Secretary found and advised me of his opinion that automobiles and certain automobile parts are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States. The Secretary found that these imports are "weakening our internal economy" and that "[t]he contraction of the American-owned automotive industry, if continued, will significantly impede the United States' ability to develop technologically advanced products that are essential to our ability to maintain technological superiority to meet defense requirements and cost effective global power projection."

9. The Secretary therefore concluded that the present quantities and circumstances of automobile and certain automobile parts imports threaten to impair the national security as defined in section 232 of the Trade Expansion Act of 1962, as amended.

10. In reaching this conclusion, the Secretary considered the extent to which import penetration has displaced American-owned production, the close relationship between economic welfare and national security, see 19 U.S.C. 1862(d), the expected effect of the recently negotiated United States-Mexico-Canada Agreement (USMCA), and what would happen should the United States experience another economic downturn comparable to the 2009 recession.

11. In light of the report's findings, the Secretary recommended actions to adjust automotive imports so that they will not threaten to impair the national security. One recommendation was to pursue negotiations to obtain agreements that address the threatened impairment of national security. In the Secretary's judgment, successful negotiations could allow American-owned automobile

producers to achieve long-term economic viability and increase R&D spending to develop cutting-edge technologies that are critical to the defense industry.

12. I concur in the Secretary's finding that automobiles and certain automobile parts are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, and I have considered his recommendations.

13. I have also considered the renegotiated United States-Korea Agreement and the recently signed USMCA, which, when implemented, could help to address the threatened impairment of national security found by the Secretary.

14. Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to take action to adjust the imports of an article and its derivatives that are being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security. If that action is the negotiation of an agreement contemplated in 19 U.S.C. 1862(c)(3)(A)(i), and such an agreement is not entered into within 180 days of the proclamation or is not being carried out or is ineffective, then the statute authorizes the President to take other actions he deems necessary to adjust imports and eliminate the threat that the imported article poses to national security. *See* 19 U.S.C. 1862(c)(3)(A).

15. I have decided to direct the United States Trade Representative (Trade Representative) to pursue negotiation of agreements contemplated in 19 U.S.C. 1862(c)(3)(A)(i) to address the threatened impairment of the national security with respect to imported automobiles and certain automobile parts from the European Union, Japan, and any other country the Trade Representative deems appropriate, and to update me on the progress of such negotiations within 180 days. Under current circumstances, this action is necessary and appropriate to remove the threatened impairment of the national security.

Now, Therefore, I, Donald J. Trump, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 301 of title 3, United States Code, and section 232 of the Trade Expansion Act of 1962, as amended, do hereby proclaim as follows:

(1)  The Trade Representative, in consultation with the Secretary, the Secretary of the Treasury, and any other senior executive branch officials the Trade Representative deems appropriate, shall pursue negotiation of agreements contemplated in 19 U.S.C. 1862(c)(3)(A)(i) to address the threatened impairment of the national security with respect to imported automobiles and certain automobile parts from the European Union, Japan, and any other country the Trade Representative deems appropriate.

(2)  Within 180 days of the date of this proclamation, the Trade Representative shall update me on the outcome of the negotiations directed under clause (1) of this proclamation.

(3)  The Secretary shall continue to monitor imports of automobiles and certain automobile parts and shall, from time to time, in consultation with any senior executive branch officials the Secretary deems appropriate, review the status of such imports with respect to the national security.  The Secretary shall inform the President of any circumstances that in the Secretary's opinion might indicate the need for further action by the President under section 232 of the Trade Expansion Act of 1962, as amended.

(4)  Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

IN WITNESS WHEREOF, I have hereunto set my hand this
seventeenth day of May, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-third.

Case 1:19-cv-02698-DLF    Document 51-1    Filed 02/12/22    Page 103 of 236

DONALD J. TRUMP

Exhibit 4



**UNITED STATES DEPARTMENT OF COMMERCE**
Chief Financial Officer and
Assistant Secretary for Administration
Washington, D.C. 20230

June 13, 2019

Kevin Schmidt
Director of Investigations
Cause of Action Institute
1875 Eye Street, NW
Suite 800
Washington, DC 20006

Re:    Freedom of Information Request DOC-IOS-2019-000827
       Freedom of Information Request DOC-BIS-2019-000742

Dear Mr. Schmidt:

This letter is in further response to your above-referenced Freedom of Information
(FOIA) requests to the Department of Commerce (DOC) and the Bureau of Industry &
Security (BIS), respectively, both of which were received February 18, 2019. In both of
these FOIA requests, you requested:
A copy of the Commerce Secretary's final report to the President regarding Section 232
National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans
and Light Trucks, and Automotive Parts.

Please see the attached presidential proclamation dated May 17, 2019, which provides a
summary of the findings in the Secretary's report.

We are currently reviewing, in conjunction with the Executive Office of the President,
whether the Secretary's report constitutes a presidential record within the meaning of the
Presidential Records Act, 44 U.S.C. 2201 et seq., in which case it would not be subject to
disclosure under FOIA. However, to the extent that the Secretary's Section 232 report to
the President of the United States may constitute an agency record within the meaning of
FOIA, DOC and BIS are withholding it in full pursuant to 5 U.S.C. § 552(b)(5), which
exempts from disclosure inter-agency or intra-agency memorandums or letters which
would not be available by law to a party other than an agency in litigation with the
agency. The report, if an agency record, would be exempted from disclosure under FOIA
pursuant to the presidential communications privilege and/or the deliberative process
privilege, until all actions deemed necessary to adjust the imports of automobiles and
automobile parts so that such imports will not threaten to impair the national security
have been completed. See 15 C.F.R. § 705.11.

Although we are aware that this matter is already in litigation, we are required to notify
you that if you are dissatisfied with this determination, you have the right to file an
administrative appeal if you are not satisfied with our response to your FOIA request. All
appeals should include a statement of the reasons why you believe the FOIA response
was not satisfactory. An appeal based on documents in this release must be received
within 90 calendar days of the date of this response letter at the following address:

Kevin Schmidt
DOC-IOS-2019-000827 and
    DOC-BIS-2019-000742
Page 2

      Assistant General Counsel for Employment, Litigation, and Information
      U.S. Department of Commerce
      Office of General Counsel, Room 5896
      1401 Constitution Ave. NW,
      Washington, DC 20230

An appeal may also be sent by e-mail to FOIAAppeals@doc.gov, or by FOIAonline at
https://foiaonline.regulations.gov/foia/action/public/home#.

For your appeal to be complete, it must include the following items:
- a copy of the original request,
- our response to your request,
- a statement explaining why the withheld records should be made available, and why the denial of the records was in error, and
- "Freedom of Information Act Appeal" must appear on your appeal letter. It should also be written on your envelope, or e-mail subject line.

FOIA appeals posted to the e-mail box, FOIAonline, or Office after normal business hours will be deemed received on the next business day. If the 90th calendar day for submitting an appeal falls on a Saturday, Sunday or legal public holiday, an appeal received by 5:00 p.m., Eastern Time, the next business day will be deemed timely.

Again, although we are aware this matter is in litigation, we are required to inform you that FOIA grants requesters the right to challenge an agency's final action in federal court. Before doing so, an adjudication of an administrative appeal is ordinarily required.

The Office of Government Information Services (OGIS), an office created within the National Archives and Records Administration, offers free mediation services to FOIA requesters. Its contact information is:

      Office of Government Information Services
      National Archives and Records Administration
      8601 Adelphi Road, Room 2510
      College Park, MD 20740-6001
      Email: ogis@nara.gov
      Phone: 301-837-1996
      Fax: 301-837-0348
      Toll-free: 1-877-684-6448

Because these requests are in litigation in Cause of Action v. DOC (D.D.C. No. 19-cv-778), if you have questions regarding this correspondence, please contact Ms. Melanie

Kevin Schmidt
DOC-IOS-2019-000827 and
    DOC-BIS-2019-000742
Page 3

Hendry, Assistant U.S. Attorney and counsel of record for DOC in this matter, at
melanie.hendry2@usdoj.gov, or by phone at (202) 252-2510.

Sincerely,

ROBERTA
PARSONS

Digitally signed by
ROBERTA PARSONS
Date: 2019.06.14
14:35:30 -04'00'

Bobbie Parsons
FOIA Officer, Immediate Office of the Secretary
Office of Privacy and Open Government
U.S. Department of Commerce

Enclosure:
        One (1) document Six (6) pages

Exhibit 5

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CAUSE OF ACTION INSTITUTE,

     *Plaintiff*,

     v.

U.S. DEPARTMENT OF COMMERCE,

     *Defendant*.

Civil Action No. 1:19-cv-00778 (CJN)

## MEMORANDUM OPINION

In this suit under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Plaintiff Cause of Action Institute seeks to compel the Department of Commerce to release a report prepared by the agency for the President regarding the national-security impact of the importation of passenger vehicles and automobile parts. *See generally* Compl., ECF No. 1. Although the Secretary of Commerce was required by Section 232 of the Trade Expansion Act of 1962 to prepare the report and make it public, Commerce contends that the report is covered by the presidential communications and the deliberative process components of executive privilege and therefore need not be produced under FOIA Exemption 5. *See generally* Defendant's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 20. The Court agrees, and grants Commerce's Motion for Summary Judgment and denies Cause of Action's Cross-Motion.

## I.    Background

The United States Constitution gives Congress the authority to set tariffs and "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. Section 232 of the Trade Expansion Act of 1962 ("Section 232"), delegates some of that authority to the President, allowing the President to modify imports to ensure that domestic industrial capacity remains sufficient to

safeguard the national security. 19 U.S.C. § 1862. The President's statutory authority is broad. He is permitted to take actions—including modifying tariffs—that in his estimation "must be taken to adjust" imports "so that such imports will not threaten to impair the national security." *Id.* § 1862(c)(1)(A)(ii).

But Congress's delegation is not unconditional. Before the President can exercise his Section 232 authority, the Secretary of Commerce must, on request or on his motion, initiate "an appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request." *Id.* § 1862(b)(1)(A). After concluding the investigation, the Secretary must submit to the President a report detailing the factual findings and recommendations on how to neutralize a threat to national security, if one exists. *Id.* § 1862(b)(3)(A). If the Secretary's report finds that "an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," the President must determine whether he agrees with that finding and, if so, "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article[s]" such that they "will not threaten to impair the national security." *Id.* § 1862(c)(1)(A).

Section 232 also requires publication of the Secretary's report. The statute states that "[a]ny portion of the report submitted by the Secretary . . . which does not contain classified information or proprietary information shall be published in the Federal Register." *Id.* § 1862(b)(3)(B). Section 232 does not, however, include an express deadline by which the report must be published.

In May 2018, the President "instructed" the Secretary "to consider initiating a Section 232 investigation into imports of automobiles, including trucks, and automotive parts to determine their effects on America's national security," Statement from the President on Potential National

Security Investigation into Automobile Imports, ECF No. 20-3, Exhibit 6, which the Secretary did later that month.  *See* Def.'s Mot., ECF No. 20, at 2; *see also* Notice of Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts, 83 Fed. Reg. 24,735 (May 30, 2018).  After concluding his investigation, the Secretary transmitted a report (hereafter, the "Report") to the President containing his factual findings and proposed recommendations.  In particular, the Secretary found that "present quantities and circumstances of automobile and certain automobile parts imports threaten to impair the national security," and recommended that the President take certain actions to correct the issue.  Proclamation No. 988, 84 Fed. Reg. 23,433, 23,434 (May 21, 2019).

Three months later, the President issued a proclamation concurring with the Secretary's determination that the United States is currently importing automobiles and certain automobile parts at such a rate and under such circumstances that it threatens to impair the national security. *See* 84 Fed. Reg. 23,433.  The proclamation itself summarizes the Report's conclusions, including the Secretary's proposed recommendations, and directly quotes the Report five times.  *See id.* Most of the quotes are only sentence fragments, but the proclamation does include one quotation that is a full sentence long.  *See id.*

Although the President agreed with the Secretary's findings, he did not invoke his statutory authority to impose tariffs on the imports of automobiles or their parts.  Instead, based on the Secretary's determination that successful trade negotiations could remedy the threatened impairment to national security, the presidential proclamation directed the U.S. Trade Representative to engage in negotiations with Japan, the European Union, and others to address

the threat. *Id.* at 23,434. Those negotiations remain ongoing and have not yet produced an agreement.

In February 2019, Cause of Action sent two FOIA requests to Commerce—one to the Bureau of Industry and Science, which prepared the Report, and one to the Office of the Secretary, which was responsible for transmitting the Report to the President—seeking the Report. A month later, Cause of Action filed this lawsuit, alleging that Commerce failed to provide a timely determination on or produce records responsive to the FOIA requests. *See* Compl. ¶¶ 14–21, ECF No. 1. Shortly thereafter, Commerce informed Cause of Action that it would be withholding the Report in its entirety under Exemption 5 of FOIA, claiming the document was protected from disclosure by both the presidential communications privilege and the deliberative process privilege. The Parties ultimately filed cross-motions for summary judgment, and the Court held a hearing on the motions. *See generally* Def.'s Mot., ECF No. 20; *see also generally* Pl.'s Opp'n, ECF No. 23.

Subsequent to the Parties' briefing on their cross-motions, Congress passed and the President signed into law the Commerce, Justice, Science, and Related Agencies Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317 (2019). Section 112 of the 2020 Appropriations Act expressly directs the Secretary to publish the Report within thirty days of the enactment of the Act, that is, by January 19, 2020. Consolidated Appropriations Act, 2020, § 112, 133 Stat. at 2395.

However, when the President signed the Act into law, he stated that certain provisions "purport to mandate or regulate the dissemination of information that may be protected by executive privilege." Presidential Statement on Signing the Consolidated Appropriations Act, 2020, 2019 Daily Comp. Pres. Doc. No. DCPD201900881, at 2 (Dec. 20, 2019). The President also stated that his administration would "treat these provisions consistent with the President's

constitutional authority to control information, the disclosure of which could impair the national security, foreign relations, the deliberative process of the executive branch, or the performance of the President's constitutional duties." *Id.*

On January 17, 2020, two days before the new congressionally imposed deadline for release, the Department of Justice's Office of Legal Counsel issued an opinion concluding that the Secretary need not comply with the deadline because the statute did not overcome the executive privileges that apply to the Report. *See generally* Publication of a Report to the President on the Effect of Automobile and Automobile-Part Imports on the National Security (Slip Opinion), ECF No. 31. Specifically, the OLC Opinion found that the Report fell within the presidential communications component and the deliberative process component of executive privilege, *id.* at 7, and further concluded that Congress could not override the privilege here. *Id.* at 23.

The Court held an additional hearing on the motions and permitted the Parties to submit supplemental briefs on the effect of the Appropriations Act and the OLC opinion. The Court also required Commerce to submit the Report for *in camera* review. Commerce complied, first submitting the Report in redacted form, *see* Def.'s Notice of Ex Parte Submission for In Camera Review, ECF No. 34, and later without redactions, *see* Def.'s Notice of Ex Parte Submission for In Camera Review, ECF No. 45. To date, the government has not released the Report, either to the public or Cause of Action.

## II. Legal Standard

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). "FOIA . . . mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011). "FOIA mandates a 'strong presumption in favor of disclosure,'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting

*U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991))—so much so that FOIA "expressly places the burden 'on the agency to sustain its action' and directs the district courts 'to determine the matter *de novo*,'" *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).  FOIA permits the Court to review the records *in camera* "to determine whether such records or any part thereof shall be withheld under any of the exemptions." 5 U.S.C. § 552(a)(4)(B).

FOIA requires federal agencies to release all records responsive to a request for production unless a specific exemption is applicable.  5 U.S.C. § 552(a)(3)(A), (a)(4)(B), (b).  "[D]isclosure, not secrecy, is the dominant objective of the Act." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).  Even with this chief objective, Congress recognized that the release of certain information "may harm legitimate governmental or private interests." *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998).  The statute therefore allows agencies to withhold those documents that fall under one of nine specific exemptions.  *Pub. Citizen, Inc. v Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010).  These exceptions are to be interpreted "narrowly." *Nat'l Ass'n of Home Builders*, 309 F.3d at 32.

When an agency makes a withholding based on a FOIA exemption, the agency must explain the exemptions claimed and the applicability of those exemptions.  *Reporters Comm. for Freedom of the Press*, 489 U.S. at 753.  "The Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.' "

*Citizens for Responsibility & Ethics in Wash. v. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).

### III.     Analysis

### A.     Exemption 5

Commerce has asserted FOIA Exemption 5 to justify its withholding of the Report. Exemption 5 allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  Two conditions must be met for a record to qualify for this exemption:  (1) "its source must be a Government agency;" and (2) "it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  As relevant here, Exemption 5 encompasses privileges including the presidential communications and deliberative process privilege.  *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004).

The presidential communications privilege is a "presumptive privilege for Presidential communications."  *United States v. Nixon*, 418 U.S. 683, 708 (1974).  "[T]he privilege itself is rooted in the need for confidentiality to ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge."  *In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997).  The privilege is "fundamental to the operation" of the federal government as it permits the "effective discharge of a President's powers."  *Judicial Watch, Inc. v. Dep't of Justice*, 913 F.3d 1106, 1110 (D.C. Cir. 2019) (quoting *Nixon*, 418 U.S. at 711).

The presidential communications privilege protects "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential."  *In re Sealed Case*, 121 F.3d at 744.  It therefore protects "communications directly

7

involving and documents actually viewed by the President" when the president is engaged in making presidential decisions. *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1114. But it also stretches beyond communications "made directly to the President to include all communications solicited and received by the President's 'immediate White House advisers' or even certain members of their staff." *Judicial Watch, Inc. v. Dep't of Justice*, 913 F.3d at 1111 (quoting *In re Sealed Case*, 121 F.3d at 752). Because the President's advisers must receive information and recommendations from a variety of sources, the privilege gives these advisers the "elbow room" they need to advise the President effectively. *In re Sealed Case*, 121 F.3d at 752.

The presidential communications privilege is broad—covering both pre-decisional and post-decisional materials and protecting those materials in their entirety. *Elec. Privacy Info. Ctr. ("EPIC") v. Dep't of Justice*, 320 F. Supp. 3d 110, 115 (D.D.C. 2018) (citing *In re Sealed Case*, 121 F.3d at 745). In the FOIA context, it is well settled in this District that an agency maintains the authority to apply the presidential communications privilege. *See, e.g.*, *EPIC*, 320 F. Supp. 3d at 117 ("[T]he Court is persuaded by earlier decisions from this District that an agency has the authority to invoke the presidential communications privilege when making FOIA Exemption 5 withholdings.").

The deliberative process privilege, though "closely affiliated" with the presidential communications privilege, has a distinct scope. *In re Sealed Case*, 121 F.3d at 745. This privilege allows for documents created during the government's decision-making process to be protected from disclosure. *See id.* The deliberative process privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front-page news." *Klamath Water Users Protective Ass'n.*, 532 U.S. at 8–9. The "ultimate purpose" of the privilege is to "prevent injury to the quality of agency decisions." *Nat'l*

*Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51 (1975).  To qualify for protection under the deliberative process privilege, the agency must show that the information is both (1) "predecisonal" and (2) "deliberative."  *Nat'l Ass'n of Home Builders*, 309 F.3d at 39.

### 1. Inter- or Intra-Agency Memorandum

In a threshold attack, Cause of Action argues that Exemption 5 is inapplicable here because the Report is not an "inter-agency or intra-agency memorandum[] or letter[]."  5 U.S.C. § 552(b)(5); *see* Pl.'s Opp'n, ECF No. 23, at 7–8.  The main thrust of this argument is that the recipients of the Report—the President and his immediate White House staff—are not agencies under FOIA.  *See* Pl.'s Opp'n, ECF No. 23, at 8–9.  To be sure, FOIA defines "agency" as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency."  5 U.S.C. § 552(f)(1).  The President himself and his close advisors are not captured within this definition.  Because the Report was transmitted to the President, Cause of Action argues, it cannot be considered an "inter-agency or intra-agency memorandum[] or letter[]."  *See* Pl.' Opp'n, ECF No. 23, at 8–9.

Whatever the initial textual force of this argument, the D.C. Circuit has held "that, in at least some circumstances, a record need not necessarily be addressed both to and from employees of a single agency to qualify as 'intra-agency' and need not necessarily be exchanged among two entities defined as agencies under FOIA to qualify as 'inter-agency.'"  *Judicial Watch, Inc. v. Dep't of State*, 306 F. Supp. 3d 97, 106 (D.D.C. 2018).  Instead of adopting the narrow construction of Exemption 5 that Cause of Action urges here, the D.C. Circuit (along with several other circuits) has adopted a functional approach to interpreting the statute's inter- and intra-agency requirement. *See Nat'l Inst. Of Military Justice v. Dep't of Def.*, 512 F.3d 677, 679–86 (D.C. Cir. 2008) (detailing the D.C. Circuit's early adoption of the functional approach and affirming its continued

validity).  In *Judicial Watch, Inc. v. Department of Energy,* 412 F.3d 125 (D.C. Cir. 2005), the D.C. Circuit held that the deliberations of a presidential advisory group could be protected from disclosure under Exemption 5, even though the group, whose "sole function [was] to advise and assist the President," was not an "agency" subject to FOIA.  *Id.* at 129.  Reaffirming its functionalist approach to the intra- and inter-agency requirement, the Court found it "inconceivable" that "Congress intended Exemption 5 to protect the decision-making processes of the Executive Branch when the decision is made by 'agency' officials subject to oversight by the President and not when the decision is to be made by the President himself and those same agency officials acting in aid of his decision-making processes." *Id.* at 130.  As other courts in this district have noted, *Judicial Watch, Inc. v. Department of Energy* and other decisions stand "for the proposition that 'the threshold requirement is satisfied for communications exchanged between agencies and the Office of the President, even though that office is not an agency for the purposes of FOIA.'" *Judicial Watch, Inc. v. Dep't of State*, 306 F. Supp. 3d at 109 (quoting *Judicial Watch, Inc. v. Consumer Fin. Prot. Bureau*, 60 F. Supp. 3d. 1, 10 (D.D.C. 2014)).

Following this precedent, courts in this District have concluded that documents exchanged between an Executive Branch agency and the President and his close advisors qualify as inter-agency or intra-agency memorandums or letters.  *See, e.g., Judicial Watch, Inc. v. Consumer Fin. Prot. Bureau*, 60 F. Supp. 3d. at 11 (communications between CFPB, an agency under FOIA, and White House staff could be considered inter-agency or intra-agency memorandums for the purposes of Exemption 5).  The Court will do the same here, and holds that the Automotive Report meets the threshold requirement of being an inter-agency or intra-agency memorandum or letter under Exemption 5 of the FOIA.

2.       **Presidential Communications Privilege**

That does not end the matter, of course; Commerce must also establish that the Report is subject to an Exemption 5 privilege.

As most relevant here, the presidential communications privilege protects documents "solicited and received" by the President or "communications made in the process of arriving at presidential decisions." *In re Sealed Case*, 121 F.3d at 745.  The Report is a confidential memorandum from the Secretary to the President, containing the Secretary's advice on decisions delegated to the President by statute.  The Report was prepared for the President after he requested the Secretary to consider initiating a Section 232 investigation into automobiles and automobile imports.  *See* Statement from the President on Potential National Security Investigation into Automobile Imports, ECF No. 20-3, Exhibit 6.  The President relied on the Report in deciding that the current rate of importation and circumstances surrounding the importation of automobiles and automobile parts posed a threat to the national security, and in directing the U.S. Trade Representative to negotiate agreements with the European Union, Japan, and other nations was the appropriate response to the threat.  The President has an interest in keeping the Report non-public until the U.S. Trade Representative has finished conducting negotiations and the President has made a final decision on how to remedy the potential national security threat.

a.       *Pre-Enactment of the 2020 Appropriations Act*

Prior to the passage of Section 112 of the 2020 Appropriations Act, Cause of Action raised three arguments why the Report should not be shielded by the presidential communications privilege, even without a congressionally mandated deadline for release.  Pl.'s Opp'n, ECF No. 23, at 14.  Cause of Action first suggested that the Report is not protected by the presidential communications privilege because the communication was not "made in support of the President exercising an inherent Article II power," Pl.'s Opp'n, ECF No. 23, at 14, but was instead used in

11

aid of the President's decision-making process regarding a delegated authority. *Id.* Cause of Action argues that the Supreme Court has noted that the presidential communications privilege is grounded in Article II, *see Nixon*, 418 U.S. at 705 ("Whatever the nature of the privilege of confidentiality of Presidential communications in the exercise of Art[icle] II powers, the privilege . . . derive[s] from the supremacy of each branch within its own assigned area of constitutional duties."); *N.Y. Times Co. v. Jascalevich*, 439 U.S. 1317, 1323 (1978) (the "privilege protect[s] Presidential communications in the exercise of Art[icle] II powers"), and cites decisions in which the D.C. Circuit and courts in this district have considered whether a power is a core Article II power when assessing whether the presidential communications privilege applies. *See, e.g., In re Sealed Case*, 121 F.3d at 752–53 (holding the privilege applied where "the documents in question were generated in the course of advising the President in the exercise of his appointment and removal power, a quintessential and nondelegable Presidential power"); *see also Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 25 (D.D.C. 2013) (finding the privilege inapplicable and noting "this is not a case involving 'quintessential and nondelegable Presidential power' . . . where separation of powers concerns are at their highest").

This argument misapprehends the scope of the presidential communications privilege. The D.C. Circuit has consistently cautioned that limiting the protection of the presidential communications privilege to only "quintessential and nondelegable Presidential power . . . draws an arbitrary line." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1123. Courts in this district have therefore consistently refused to narrow the scope of the privilege to only communications relating to the President's exercise of core Article II powers. *See United States v. Philip Morris USA, Inc.*, Civ. Action No. 99-2496, 2004 WL 3253662, at *1–2 (D.D.C. Sept. 9, 2004) ("[L]imiting the privilege to only those communications regarding non-delegable powers would

12

undermine the very purposes for which it exists."). Other courts have similarly refused to cabin the privilege to the President's core Article II powers. *See, e.g.*, *Advocates for the W. v. Dep't of Justice*, 331 F. Supp. 3d 1150, 1163–65 (D. Idaho 2018) (concluding that "the presidential communications privilege is not limited only to quintessential Article II powers" and noting that courts have applied the privilege "to a multitude of communications, documents, and circumstances"). And various courts, including in this district, have recognized the privilege even where the President is not exercising core Article II duties. *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. Dep't of Homeland Security*, No. 06-cv-0173 (RJL), 2008 WL 2872183, at *2–3 (D.D.C. July 22, 2008); *Ctr. for Biological Diversity v. Office of Mgmt. & Budget*, No. 07-cv-4997, 2009 WL 2940204, at *6 (N.D. Cal. Aug. 25 2009), *as amended* (Sept 9, 2009); *Berman v. CIA*, 378 F. Supp. 2d 1209, 1218–22 (E.D. Cal. 2005); *N.Y. Times Co. v. Dep't of Def.*, 499 F. Supp. 2d 501, 516 (S.D.N.Y. 2007). Cause of Action's argument is unpersuasive.

Second, Cause of Action asserts that Commerce cannot rely on the presidential communications privilege because the President lacks any confidentiality interest in the Report. *See* Pl.'s Opp'n, ECF No. 23, at 20. The presidential communication privilege is "construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *In re Sealed Case*, 121 F.3d at 752. Cause of Action asserts that because the Report must be published at some time, the President cannot have any interest in keeping it confidential. *See* Pl.'s Opp'n, ECF No. 23, at 20. Because all parties knew that disclosure of the Report was required, Cause of Action argues, neither the Secretary nor any other Commerce official drafting the Automotive Report should have reasonably believed that their recommendations and advice to the President would not be made public.

This argument, however, ignores the President's strong short-term interest in keeping the Report confidential while the U.S. Trade Representative continues negotiations and the President continues to consider other options to deal with the national security threat. Courts in this district have previously recognized a strong confidentiality interest in documents relating to treaty negotiations containing information that, if made public, might weaken the United States' negotiating position. *See, e.g.*, *Fulbright & Jaworski v. Dep't of Treasury*, 545 F. Supp. 615, 619–20 (D.D.C. 1982) (holding notes of an agency employee reflecting positions taken and issues raised in treaty negotiations properly withheld under Exemption 5 because their release would harm the agency's negotiation process); *see also Brayton*, 657 F. Supp. 2d at 145 (concluding that the U.S. Trade Representative was entitled to withhold a document revealing its own sensitive negotiation position). So too here. As Commerce puts it, any "premature release of [the report] would harm the President's Section 232 decision-making process by revealing information pertinent to the [U.S. Trade Representative's] ongoing negotiations and compromise any such further action that the President may deem necessary." *See* Def.'s Mot., ECF No. 23, at 13; *see* Lieberman Decl. ¶ 39 ("To publish the . . . Report while negotiations remain ongoing . . . could compromise or undermine the government's efforts.").

Furthermore, although Cause of Action contends that Congress struck a balance between the public's need for access to the reports and the government's need for nondisclosure, its argument fails to account adequately for the fact that Section 232 does not require disclosure by a particular deadline. In fact, the statute contains numerous *other* deadlines, indicating that Congress knew well how to set a timetable for disclosure of Section 232 reports if it wished to impose one. For example, the Secretary must submit a report to the President within 270 days after an investigation is initiated, 19 U.S.C. § 1862(b)(3)(A); the President must agree or disagree with the

Secretary's findings within 90 days of receiving the report, *id.* § 1862(c)(1)(A); and if the President chooses to adjust imports, he must do so within 15 days of his concurrence with the Secretary's findings, *id* § 1862(c)(1)(B), and must inform Congress of that decision within 30 days, *id* § 1862(c)(2). When the Report here was drafted, no similar deadline applied to its publication, and Plaintiff essentially urges this Court to impose a deadline on disclosure where Congress originally did not.[1]

Based on the harms that could result from releasing the report during trade negotiations, the absence of a deadline for disclosure of the Secretary's report in Section 232, and past practice in delaying the release of a Section 232 report until after trade negotiations have concluded, the Court concludes that the Executive Branch has a legitimate and significant confidentiality interest

---

[1] Recognizing that a Section 232 report can remain confidential until the President has determined how to address a reported national security threat and until that course of action has been fully effectuated appears to be consistent with past practice. In 1959, pursuant to section 232's statutory predecessor, the Trade Agreements Extension Act of 1955, Pub. L. No. 84-86, § 7, 69 Stat. 162, 166, which charged the Director of the Office of Defense Mobilization with the investigation of imports that pose a threat to the national security, the Director advised President Eisenhower on the effects of crude oil imports. President Eisenhower took action in March 1959, imposing import restrictions on crude oil. Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 12, 1959). But the Director did not submit his statutory report to Congress until four months later. In 1975, the Secretary of the Treasury advised President Ford through a Section 232 report that imports of crude oil posed a threat to the national security. *See* Effects of Imported Articles on the National Security, 40 Fed. Reg. 4457, 4457 (Jan. 30, 1975). The Secretary did not publish that report in the Federal Register until after the President issued a presidential proclamation adjusting fees on imports. Proclamation No. 4341, 40 Fed. Reg. 3965 (Jan. 27, 1975). Furthermore, in recent practice the Secretary has often waited for months after the President's decision to disclose the report. *See, e.g.*, Summary of Secretarial Report Under Section 232 of the Trade Expansion Act of 1962, as Amended, on the Effect of Imports of Crude Oil on the National Security, 65 Fed. Reg. 46,427, 46,427 (July 28, 2000) (President decided to take no action on March 24, 2000); Summary of Secretarial Report Under Section 232 of the Trade Expansion Act of 1962, as Amended, 60 Fed. Reg. 30,514, 30,515 (June 9, 1995) (President decided to take no action on February 16, 1995). At a minimum, past practice suggests that the President has an interest in keeping a section 232 report confidential until final action is taken with respect to its subject matter.

in delaying the publication of the Report until the President has addressed the national security concerns raised in it.

Finally, Cause of Action argues that the Commerce Report cannot be a presidential communication because it was not a document solicited and received by the President under the statutory process outlined in Section 232. *See* Pl.'s Reply, ECF No. 27, at 12. Commerce disagrees, contending that the "Report was indisputably 'solicited and received' by the White House pursuant to Section 232." Def.'s Reply, ECF No. 25, at 13.

Section 232 specifies that a report is to be created after an investigation has been initiated "[u]pon request of the head of any department or agency, upon application of an interested party, or upon [the Secretary of Commerce's] own motion." 19 U.S.C. § 1862(b)(1)(A). As Cause of Action points out, the President is not an agency or department head, and he cannot be an "interested party," as that term is defined in the Trade Expansion Act. *See id.* § 1677(9). The President could not have formally requested the Report under the statute, Cause of Action argues, and thus the President has not "solicited and received" the Report.

This argument, too, is misguided. Whether the Report is subject to the presidential communications privilege does not (and cannot) hinge on whether the President solicited the Report in the express manner provided by the Act. Cause of Action has cited no authority standing for the proposition that the President must make a formal request in order for a Section 232 report to qualify for the presidential communications privilege. In any event, here the President "instructed" the "Secretary to consider initiating a Section 232 investigation" into the importation of automobiles and automobile parts. *See* Statement from the President on Potential National Security Investigation into Automobile Imports, ECF No. 20-3, Exhibit 6. *Cf. Formaldehyde*

*Institute v. Dep't of Health and Human Servs.*, 889 F.2d 1118, 1124 (D.C. Cir. 1989) (interpreting "solicited and received" broadly in the context of the deliberative process protection).

More important, the Report memorializes Commerce's analysis and recommendations that have been used, and may be used in the future, to inform the President's decision-making on how to address a potential national security threat. Because it was a communication "directly involving . . . the President," *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1114, was "made in the process of arriving at [a] presidential decision[]," *In re Sealed Case*, 121 F.3d at 745, and was "essential to the conduct of the office of the President," *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977), the Report is covered by the presidential communications privilege regardless of whether the President formally triggered the Section 232 investigation under 19 U.S.C. § 1862(b)(1)(A).

The Court therefore concludes that the presidential communications privilege applied to the Report prior to the enactment of the 2020 Appropriations Act.

                b.     *Post-Enactment of the 2020 Appropriations Act*

The remaining question is whether Congress's subsequent action in the 2020 Appropriations Act—which provided a date certain (January 19, 2020) for public disclosure of the Report—affects the analysis and makes Exemption 5 inapplicable here. The Court concludes that it does not.

When the Report was prepared, Section 232 did not require that it be published by a particular date. The Secretary was therefore able to provide his findings and recommendations to the President knowing that the Report would not become public before its advice and recommendations were acted upon. *See Dellums*, 561 F.2d at 246 (reaffirming that the presidential communications privilege is "premised on the needs of present and future Presidents to maintain the confidentiality of communications with their advisors in order to encourage the candid advice

17

necessary for effective decisionmaking").  That is particularly important where, as here, the Secretary's recommendations included pursuing trade agreement negotiations to remedy an assessed national security threat, and where disclosure of the Report could reveal the United States' sensitive negotiating position, potentially undermining the President's ability to mollify the identified national security threat.  *See Fulbright*, 545 F. Supp. at 619–20 (holding notes of an agency employee reflecting positions taken and issues raised in treaty negotiations properly withheld under Exemption 5 because their release would harm the agency's negotiation process). Those concerns and interests still exist, regardless of the 2020 Appropriations Act.[2]

Cause of Action contends that the Report is the product of Commerce's performance of a statutory duty in an area that otherwise belongs to Congress, and thus the agency cannot keep the document secret when Congress requires its immediate publication.  *See* Pl.'s Supp. Br., ECF No. 36, at 4.  Cause of Action notes, and Commerce does not dispute, that Congress can attach preconditions to grants of authority to the Executive Branch, including requiring the publication of documents created by an agency.  *See* Pl.'s Supp. Br., ECF No. 36, at 11; *see also* Amici Curiae Br., ECF No. 37, at 6–7.  Cause of Action argues that in this case Congress attached a condition (publication of the Report by a particular date) to the executive branch's exercise of a delegated duty (the investigation of imports and any future actions regarding them).  But Section 112's

---

[2] Indeed, permitting Congress to override the presidential communications privilege by accelerating the required date of publication after a report has already been created would have a chilling effect on the Secretary's ability to provide candid advice and recommendations in the future.  If Cause of Action's position here were correct, at any moment after the Secretary creates a Section 232 report Congress could require its immediate publication.  The Secretary may have to moderate the contents of his report to ensure that he does not disclose information that, if publicized because of a later statutory enactment, could harm ongoing trade negotiations by revealing negotiation strategy and key objectives.  The underlying purpose of the presidential communications privilege—to ensure that the President receives candid and frank advice— would be harmed if the Court found that disclosure was required.

deadline-for-publication requirement does not represent a precondition imposed upon a future decision within the Executive Branch's discretion. Here, the Executive Branch could not avoid the immediate publication condition (if it deemed the condition too arduous) by not initiating a Section 232 investigation. Instead, Section 112 is mandatory, and in any event, it is backward looking, requiring the publication by a specific date of a report that the Executive Branch had already created before that deadline existed. Congress cannot override the presidential communications privilege in the FOIA context by imposing a mandatory, retroactive condition on a grant of authority that the Executive Branch has already executed. *Cf. Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981) (Congress cannot "supris[e] participating States with post-acceptance or 'retroactive' conditions" on federal funding).

The Court holds that the presidential communications privilege applies to the Report, and that Section 112's later-imposed requirement that the Report be made public by a specific deadline does not diminish the privilege in the context of FOIA.[3]

## B.     Waiver

Cause of Action argues that even if the presidential communications privilege (or deliberative process privilege) could apply to the Report, Commerce waived its right to claim an exemption when the President publicized aspects of the Report by directly quoting from and summarizing portions of it in the presidential proclamation. *See* Pl.'s Opp'n, ECF No. 23, at 20–23. In the interest of resolving the dispute, Commerce has agreed to treat the presidential proclamation's direct quotes of the Report as waived, and to release those portions of the Report to Plaintiff. Def.'s Supp. Br., ECF No. 44, at 12. Commerce argues, however, that the remainder

---

[3] Because the presidential communications privilege applies to the Report, the Court need not consider Commerce's second argument that the deliberative process privilege applies.

of the Report is still subject to the presidential communications privilege.  *See* Def.'s Supp. Br.,
ECF No. 44, at 11–12.

An agency may waive its right to claim a FOIA exemption over information already in the
public domain.  *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013).  But the mere fact that similar
information is already available to the public does "not necessarily mean that official disclosure
will not cause harm" that the FOIA exemptions seek to prevent.  *Wolf v. CIA*, 473 F.3d 370, 378
(D.C. Cir. 2007).  A FOIA plaintiff must therefore do more than point to the fact that *similar*
information has been made public.  Rather, the plaintiff bears the burden of showing that "specific
information in the public domain . . . appears to duplicate that being withheld."  *Afshar v. Dep't of
State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

Three stringent requirements must be satisfied to demonstrate waiver.  First, the record
sought "must be as specific as the information previously released."  *Fitzgibbon v CIA*, 911 F.2d
755, 765 (D.C. Cir. 1990).  Second, it "must match the information previously disclosed."  *Id.*  And
finally, "the information requested must already have been made public through an official and
documented disclosure."  *Id.*  Previously generalized disclosures do not result in waiver, if they do
"not precisely track the records sought to be released."  *Assassination Archives & Research Ctr.
v. CIA*, 334 F.3d 55, 60 (D.C. Cir. 2003); *see also Judicial Watch, Inc. v. Nat'l Archives & Records
Admin.*, 214 F. Supp. 3d 43, 57 (D.D.C. 2016) (rejecting waiver arguments relying on "paraphrased
and quoted grand jury testimony," and concluding that "plaintiff has not point to specific items of
information in the public domain that sufficiently demonstrate that the information contained in
the drafts of the proposed indictment are publicly available to warrant disclosure"), *aff'd on other
grounds*, 876 F.3d 346 (D.C. Cir. 2017).

The government waived the presidential communications privilege as to those portions of the Report that are directly quoted in the President's Proclamation. But as to the remainder of the Report, Cause of Action cannot meet the second prong of the *Fitzgibbon* test. The Court has reviewed the Report *in camera*, and the presidential proclamation's brief summary of the findings and recommendations in the Report were not made in terms that match exactly the unredacted information contained in the Report.

## C.    Segregability

Having found that Exemption 5 properly applies to the Report and that the presidential proclamation did not waive executive privilege as to the entire Report, the Court turns to Cause of Action's final argument—that Commerce failed to disclose all reasonably segregable content. *See* Pl.'s Opp'n, ECF No. 23, at 32–35.

When an agency withholds a requested record based on an enumerated FOIA exemption, the agency must still disclose "[a]ny reasonably segregable," non-exempt portions of the requested record. 5 U.S.C. § 552(b). This requirement applies to all records and all FOIA exceptions. *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 21 (D.C. Cir. 1984). And courts are required to expressly find that the agency produced all reasonably segregable portions of the record. *Morley v. C.I.A.*, 508 F.3d 1108, 1123 (D.C. Cir. 2007). District courts cannot "simply approve the withholding of an entire document without entering a finding on segregability." *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993) (quoting *Powell v. Bureau of Prisons*, 927 F.2d 1239, 1242 n.4 (D.C. Cir. 1991)). .

In making such a finding, courts recognize that "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshalls Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). To establish that all reasonably segregable, non-exempt information has been disclosed, the agency need only show with

"reasonable specificity" that the information withheld cannot be further segregated. *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 580 (D.C. Cir. 1996).  An agency satisfies this standard if it can demonstrate that disclosure of the non-exempt portion of the document would result in the release of "only incomplete, fragmented, unintelligible sentences composed of isolated meaningless words." *Brown v. Dep't of Justice*, 734 F. Supp. 2d 99, 111 (D.D.C. 2010) (quoting *Nat'l Sec. Archive v. CIA*, 402 F. Supp. 2d 211, 220–21 (D.D.C. 2005)).  Once the agency has put forward a declaration to this effect, the agency is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117.  The burden shifts to the plaintiff "to produce a 'quantum of evidence' to rebut the presumption, at which point 'the burden lies with the government to demonstrate that no segregable, nonexempt portions were withheld.'" *Am. Ctr. for Law & Justice v. Dep't of State*, 330 F. Supp. 3d 293, 306 (D.D.C. 2018) (quoting *Sussman*, 494 F.3d at 1117).

Here, Commerce has met its initial burden.  Through the Lieberman Declaration, Commerce has demonstrated "with reasonable specificity" that the information withheld could not be further segregated.  *See generally* Lieberman Declaration ("Lieberman Decl."), ECF No. 20-3, Exhibit A.  Commerce's "careful review of the Automotive Report" revealed that the nonexempt information in the Report could not be successfully untangled from the protected information.  Lieberman Decl. ¶ 43.  Any disclosure of exempt information would have resulted in the disclosure of "a meaningless set of words or phrases which have no or minimal information content."  *Id.* Because Commerce met its burden and is thus entitled to a presumption that it complied with its obligation to disclose reasonably segregable material, the burden shifted to Cause of Action, which has not rebutted this presumption.  The Court concludes that the segregability requirement is satisfied with respect to the Report.

22

## IV.   Conclusion

For the foregoing reasons, the Court grants the Commerce's motion for summary judgment and denies Cause of Action's cross-motion for summary judgment.  An Order will be issued contemporaneously with this Memorandum Opinion.


DATE: January 14, 2021

_____
CARL J. NICHOLS
United States District Judge

# Exhibit 6

# CAUSE *of* ACTION
## ═══ I N S T I T U T E ═══

Pursuing Freedom & Opportunity through Justice & Accountability℠

April 15, 2019

**VIA ELECTRONIC MAIL**

Freedom of Information Officer
Bureau of Industry and Security, Room 6622
U.S. Department of Commerce
Washington, DC 20230

      **Re:**    **Freedom of Information Act Request**

Dear FOIA Officer:

      I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]

      Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C.§ 552, CoA Institute hereby requests:

1. A copy of the Commerce Secretary's final report to the President regarding the Section 232 Investigation on the Effect of Imports of Uranium on the National Security.[2]

2. The DOD response letter to the Section 232 Investigation on the Effect of Imports of Uranium on the National Security.[3]

      **Request for a Public Interest Fee Waiver**

      CoA Institute requests a waiver of any and all applicable fees. FOIA and applicable regulations provide that the agency shall furnish requested records without or at reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[4] In this case, the requested records

---

[1] *See* CAUSE OF ACTION INSTITUTE, *About*, www.causeofaction.org/about/.

[2] Regulations.gov. *Notice of Request for Public Comments on Section 232 National Security Investigation of Imports of Uranium, available at*: https://www.regulations.gov/docket?D=BIS-2018-0011 (last visited Apr. 15, 2019); Bureau of Industry and Security. *Section 232 Investigations: The Effect of Imports on the National Security, available at*: https://www.bis.doc.gov/index.php/other-areas/office-of-technology-evaluation-ote/section-232-investigations (last visited Apr. 15, 2019).

[3] See Exhibit 1 attached for the DOD Memorandum for Secretary of Commerce with regards to steel and aluminum tariffs. We seek the same memorandum for the uranium investigation.

[4] 5 U.S.C. § 552(a)(4)(A)(iii); *see also Cause of Action v. Fed. Trade Comm'n*, 799 F.3d 1108, 1115-19 (D.C. Cir. 2015) (discussing proper application of public-interest fee waiver test).

A 501(C)(3) NONPROFIT CORPORATION

Department of Commerce Bureau of Industry and Security
April 15, 2019
Page 2

unquestionably shed light on the "operations or activities of the government," as they reveal the reasoning behind increasing taxes on American consumers through tariffs. And because they have not yet been made public, their contents would contribute significantly to public understanding of the Administration's trade policy.

CoA Institute has both the intent and ability to make the results of this request available to a reasonably broad public audience through various media. Its staff has significant experience and expertise in government oversight, investigative reporting, and federal public interest litigation. These professionals will analyze the information responsive to this request, use their editorial skills to turn raw materials into a distinct work, and share the resulting analysis with the public, whether through the Institute's regularly published online newsletter, memoranda, reports, or press releases.[5] In addition, as CoA Institute is a non-profit organization as defined under Section 501(c)(3) of the Internal Revenue Code, it has no commercial interest in making this request.

### Request To Be Classified as a Representative of the News Media

For fee status purposes, CoA Institute also qualifies as a "representative of the news media" under FOIA.[6] As the D.C. Circuit recently held, the "representative of the news media" test is properly focused on the requestor, not the specific FOIA request at issue.[7] CoA Institute satisfies this test because it gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience. Although it is not required by the statute, CoA Institute gathers the news it regularly publishes from a variety of sources, including FOIA requests, whistleblowers/insiders, and scholarly works. It does not merely make raw information available to the public, but rather distributes distinct work products, including articles, blog posts, investigative reports, newsletters, and congressional testimony and statements for the record.[8] These distinct works

---

[5] *See also Cause of Action*, 799 F.3d at 1125-26 (holding that public interest advocacy organizations may partner with others to disseminate their work).

[6] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[7] *See Cause of Action*, 799 F.3d at 1121.

[8] *See, e.g.*, CoA INSTITUTE, EVADING OVERSIGHT: THE ORIGINS AND IMPLICATIONS OF THE IRM CLAIM THAT ITS RULES DO NOT HAVE AN ECONOMIC IMPACT (Jan. 2018), http://coainst.org/2mgpYAu; CoA Institute, *Documents Reveal Special Interest Groups Lobbied HUD for Mortgage Settlement Funds* (Aug. 8, 2017), http://coainst.org/2yLaTyF; CoA Institute, *The GSA Has No Records on its New Policy for Congressional Oversight Requests* (July 26, 2017), http://coainst.org/2eHooVq; CoA INSTITUTE, SENSITIVE CASE REPORTS: A HIDDEN CAUSE OF THE IRS TARGETING SCANDAL (Mar. 2017), http://coainst.org/2y0fbOH; CoA Institute, *Sec. Vilsack followed ethics guidelines when negotiating his future employment*, (Feb. 3, 2017), http://coainst.org/2mJljJe; COA INSTITUTE, INVESTIGATIVE REPORT: PRESIDENTIAL ACCESS TO TAXPAYER INFORMATION (Oct. 2016), http://coainst.org/2d7qTRY; James Valvo, *There is No Tenth Exemption* (Aug. 17, 2016), http://coainst.org/2doJhBt; COA INSTITUTE, MEMORANDUM: LEGAL ANALYSIS OF FORMER SECRETARY OF STATE HILLARY CLINTON'S USE OF A PRIVATE SERVER TO STORE EMAIL RECORDS (Aug. 24, 2015), http://coainst.org/2eXhXe1; CoA Institute, *CIA too busy for transparency* (Aug. 11, 2017), http://coainst.org/2mtzhhP; *Hearing on Revisiting IRS Targeting: Progress of Agency Reforms and Congressional Options Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts of the S.*

Department of Commerce Bureau of Industry and Security
April 15, 2019
Page 3

are distributed to the public through various media, including the Institute's website, Twitter, and Facebook. CoA Institute also provides news updates to subscribers via e-mail.

The statutory definition of a "representative of the news media" contemplates that organizations such as CoA Institute, which electronically disseminate information and publications via "alternative media[,] shall be considered to be news-media entities."[9] In light of the foregoing, numerous federal agencies have appropriately recognized the Institute's news media status in connection with its FOIA requests.[10]

### Record Preservation Requirement

CoA Institute requests that the disclosure officer responsible for the processing of this request issue an immediate hold on all records responsive, or potentially responsive, to this request, so as to prevent their disposal until such time as a final determination has been issued on the request and any administrative remedies for appeal have been exhausted. It is unlawful for an agency to destroy or dispose of any record subject to a FOIA request.[11]

---

*Comm. on the Judiciary*, 114th Cong. (Aug. 5, 2015) (statement of Erica L. Marshall, Counsel, CoA Inst.), http://coainst.org/2mJC8DH; *Hearing on Watchdogs Needed: Top Government Investigator Positions Left Unfilled for Years Before the S. Comm. on Homeland Sec. & Gov't Affairs*, 114th Cong. (June 3, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2mrwHr1; *Hearing on Ongoing Oversight: Monitoring the Activities of the Justice Department's Civil, Tax and Environmental and Natural Resources Divisions and the U.S. Trustee Program Before the H. Comm. on the Judiciary*, 114th Cong. (May 19, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2n7LxWG; CoA INSTITUTE, 2015 GRADING THE GOVERNMENT REPORT CARD (Mar. 16, 2015), http://coainst.org/2as088a; *Hearing on Potential Reforms to the Freedom of Information Act (FOIA) Before the H. Comm. on Oversight & Gov't Reform*, 114th Cong. (Feb. 27, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2ILsph8; CoA INSTITUTE, GRADING THE GOVERNMENT: HOW THE WHITE HOUSE TARGETS DOCUMENT REQUESTERS (Mar. 18, 2014), http://coainst.org/2aFWxUZ.

[9] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[10] *See, e.g.*, FOIA Request F-133-18, U.S. Agency for Int'l Dev. (Apr. 11, 2018); FOIA Request 18-HQ-F-487, Nat'l Aeronautics & Space Admin. (Apr. 11, 2018); FOIA Request 1403076-000, Fed. Bureau of Investigation (Apr. 11, 2018); FOIA Request 201800050F, Exp.-Imp. Bank (Apr. 11, 2018); FOIA Request 2016-11-008, Dep't of the Treasury (Nov. 7, 2016); FOIA Requests OS-2017-00057 & OS-2017-00060, Dep't of Interior (Oct. 31, 2016); FOIA Request 2017-00497, Office of Personnel Mgmt. (Oct. 21, 2016); FOIA Request 092320167031, Ctrs. for Medicare & Medicaid Servs. (Oct. 17, 2016); FOIA Request 17-00054-F, Dep't of Educ. (Oct. 6, 2016); FOIA Request DOC-OS-2016-001753, Dept. of Commerce (Sept. 27, 2016); FOIA Request 2016-366-F, Consumer Fin. Prot. Bureau (Aug. 11, 2016); FOIA Request F-2016-09406, Dept. of State (Aug. 11, 2016); FOIA Request 2016-00896, Bureau of Land Mgmt. (Aug. 10, 2016); FOIA Request 796939, Dep't of Labor (Mar. 7, 2016); FOIA Request 2015-HQFO-00691, Dep't of Homeland Sec. (Sept. 22, 2015); FOIA Request HQ-2015-01689-F, Dep't of Energy (Aug. 7, 2015); FOIA Request 2015-OSEC-04996-F, Dep't of Agric. (Aug. 6, 2015); FOIA Request 15-05002, Sec. & Exch. Comm'n (July 23, 2015); FOIA Request 145-FOI-13785, Dep't of Justice (Jun. 16, 2015); FOIA Request 2015-26, Fed. Energy Regulatory Comm'n (Feb. 13, 2015).

[11] *See* 36 C.F.R. § 1230.3(b) ("Unlawful or accidental destruction (also called unauthorized destruction) means . . . disposal of a record subject to a FOIA request, litigation hold, or any other hold requirement to retain the records."); *Chambers v. Dep't of the Interior*, 568 F.3d 998, 1004-05 (D.C. Cir. 2009) ("[A]n agency is not

Department of Commerce Bureau of Industry and Security
April 15, 2019
Page 4

### Record Production and Contact Information

In an effort to facilitate document review, please provide the responsive documents in electronic form in lieu of a paper production. If a certain portion of responsive records can be produced more readily, CoA Institute requests that those records be produced first and the remaining records be produced on a rolling basis as circumstances permit.

If you have any questions about this request, please contact me by telephone at (202) 499-2422 or by e-mail at kevin.schmidt@causeofaction.org. Thank you for your attention to this matter.

*Kevin Schmidt*

KEVIN SCHMIDT
DIRECTOR OF INVESTIGATIONS

---

shielded from liability if it intentionally transfers or destroys a document after it has been requested under the FOIA or the Privacy Act."); *Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 41-44 (D.D.C. 1998).

# Exhibit 7



**UNITED STATES DEPARTMENT OF COMMERCE**
**Under Secretary for Industry and Security**
Washington, D.C. 20230

MAY 1 6 2019

Mr. Kevin Schmidt
Director of Investigations
Cause of Action Institute
1875 Eye Street, Suite 800
Washington, DC  20006

Via electronic mail: kevin.schmidt@casueofaction.org

BIS Tracking Number:  BIS 19-088

Re:  Freedom of Information Act Request

Dear Mr. Schmidt:

This is in response to your April 15, 2019, Freedom of Information Act (FOIA), 5 U.S.C. § 552, request to the Department of Commerce's Bureau of Industry and Security (BIS) for "a copy of the Commerce Secretary's final report to the President regarding the section 232 investigation on the effect of imports of uranium on the national security, and the DOD response letter to the Section 232 investigation on the effect of imports of uranium on the national security."

We intend to provide all non-exempt documents responsive to your request. Furthermore, please be advised that the report will be made publicly available via publication in the Federal Register, pursuant to 15 C.F.R. § 15 CFR 705.10(c)., after the President's review is complete.

If you have any questions or concerns or would like to discuss any aspect of your request, you may contact the Bureau's FOIA Public Liaison:

> Grace Agyekum
> Bureau of Industry and Security
> Office of Planning, Evaluation and Management
> 1401 Constitution Ave. NW, Room 6622
> Washington, DC 20230
> Tel: (202) 482-7893
> email: grace.agyekum@bis.doc.gov

Please refer to your FOIA request tracking number when contacting us.

In addition, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows:

> Office of Government Information Services
> National Archives and Records Administration



8601 Adelphi Road-OGIS
College Park, Maryland 20740-6001
e-mail at ogis@nara.gov;
telephone at 202-741-5770
toll free at 1-877-684-6448
facsimile at 202-741-5769

You have the right to appeal this decision of your FOIA request. An appeal must be received within 90 calendar days of the date of this response letter. Address your appeal to the following office:

Assistant General Counsel for Employment, Litigation and Information
U.S. Department of Commerce
Office of the General Counsel, Room 5896
1401 Constitution Ave., NW
Washington, D.C. 20230

You may also appeal by e-mail to FOIAAppeals@doc.gov or by FOIAonline, if you have an account in FOIAonline, at https://foiaonline.regulations.gov/foia/action/public/home#. The appeal should include a copy of the original request and initial denial, if any. All appeals should include a statement of the reasons why the requested records should be made available and why the adverse determination was in error.

The appeal letter, the envelope, and the e-mail subject line should be clearly marked "Freedom of Information Act Appeal." The e-mail, FOIAonline, and office mail are monitored only on working days during normal business hours (8:30 a.m. to 5:00 p.m., Eastern Time, Monday through Friday). FOIA appeals posted to the e-mail box, FOIAonline, or the office after normal business hours will be deemed received on the next normal business day. If the 90th calendar day for submitting an appeal falls on a Saturday, Sunday or legal public holiday, an appeal received by 5:00 p.m., Eastern Time, the next business day will be deemed timely.

Sincerely,

Fernandez Boards
Acting Chief Financial Officer and
Director of Administration

# Exhibit 8



PRESIDENTIAL MEMORANDA

# Memorandum on the Effect of Uranium Imports on the National Security and Establishment of the United States Nuclear Fuel Working Group

—— **NATIONAL SECURITY & DEFENSE**

Issued on: July 12, 2019

★ ★ ★

MEMORANDUM FOR THE SECRETARY OF STATE

THE SECRETARY OF THE TREASURY

THE SECRETARY OF DEFENSE

THE SECRETARY OF THE INTERIOR

THE SECRETARY OF COMMERCE

THE SECRETARY OF ENERGY

THE DIRECTOR OF THE OFFICE OF MANAGEMENT AND

BUDGET

THE ASSISTANT TO THE PRESIDENT FOR NATIONAL

SECURITY AFFAIRS

THE ASSISTANT TO THE PRESIDENT FOR ECONOMIC

POLICY

THE DIRECTOR OF THE OFFICE OF SCIENCE AND

TECHNOLOGY POLICY

THE CHAIRMAN OF THE COUNCIL OF ECONOMIC ADVISERS

THE CHAIRMAN OF THE NUCLEAR REGULATORY COMMISSION

THE CHAIRMAN OF THE FEDERAL ENERGY REGULATORY

COMMISSION

SUBJECT:     The Effect of Uranium Imports on the National
Security and Establishment of the United States
Nuclear Fuel Working Group

By the authority vested in me as President by the Constitution and the laws of the
United States of America, including section 232 of the Trade Expansion Act of 1962,
as amended (19 U.S.C. 1862) (the "Act"), it is hereby ordered as follows:

Section 1. The Secretary of Commerce's Investigation into the Effect of Uranium
Imports on the National Security. (a) On April 14, 2019, the Secretary of Commerce
(Secretary) transmitted to me a report on his investigation into the effect of imports
of uranium (uranium ore, uranium concentrate, uranium hexafluoride, enriched
uranium, and enriched uranium in fuel assemblies) on the national security of the
United States under section 232 of the Act.

(b) The Secretary found and advised me of his opinion that uranium is being
imported into the United States in such quantities and under such circumstances as
to threaten to impair the national security of the United States as defined under
section 232 of the Act. Currently, the United States imports approximately 93
percent of its commercial uranium, compared to 85.8 percent in 2009. The
Secretary found that this figure is because of increased production by foreign state-
owned enterprises, which have distorted global prices and made it more difficult for
domestic mines to compete.

(c) At this time, I do not concur with the Secretary's finding that uranium imports
threaten to impair the national security of the United States as defined under
section 232 of the Act. Although I agree that the Secretary's findings raise
significant concerns regarding the impact of uranium imports on the national
security with respect to domestic mining, I find that a fuller analysis of national
security considerations with respect to the entire nuclear fuel supply chain is
necessary at this time.

Sec. 2. Establishment of the United States Nuclear Fuel Working Group. (a) I agree with the Secretary that the United States uranium industry faces significant challenges in producing uranium domestically and that this is an issue of national security. The United States requires domestically produced uranium to satisfy Department of Defense (DOD) requirements for maintaining effective military capabilities — including nuclear fuel for the United States Navy's fleet of nuclear-powered aircraft carriers and nuclear-powered submarines, source material for nuclear weapons, and other functions. Domestic mining, milling, and conversion of uranium, however, while significant, are only a part of the nuclear supply chain necessary for national security, including DOD needs.

(b) On June 29, 2017, I announced an initiative to revive and expand the nuclear energy sector and directed a complete review of United States nuclear energy policy to help find new ways to revitalize this crucial energy resource. Nuclear fuel production is critical to a vibrant nuclear energy sector. Over many prior administrations, the Federal Government has neglected to consider the impacts on key components of our nuclear fuel production infrastructure, while simultaneously increasing regulatory barriers for private-sector innovation in this technology.

(c) To address the concerns identified by the Secretary regarding domestic uranium production and to ensure a comprehensive review of the entire domestic nuclear supply chain:

(i)   The Assistant to the President for National Security Affairs and the Assistant to the President for Economic Policy shall establish a United States Nuclear Fuel Working Group (Working Group) to develop recommendations for reviving and expanding domestic nuclear fuel production.

(ii)   The Working Group shall include the following members or their designees:

(A) the Assistant to the President for National Security Affairs, who shall serve as one of the Co-Chairs;

(B) the Assistant to the President for Economic Policy, who shall serve as the other Co-Chair;

(C) the Secretary of State;

(D) the Secretary of the Treasury;

(E) the Secretary of Defense;

(F) the Secretary of the Interior;

(G) the Secretary of Commerce;

(H) the Secretary of Energy;

(I) a designee of the Nuclear Regulatory Commission;

(J) a designee of the Federal Energy Regulatory Commission;

(K) the Director of the Office of Management and Budget;

(L) the Director of the Office of Science and Technology Policy;

(M) the Chairman of the Council of Economic Advisers; and

(N) such other officials of the Federal Government as the Assistant to the President for National Security Affairs or the Assistant to the President for Economic Policy may invite to participate.

(iii) The Working Group shall examine the current state of domestic nuclear fuel production to reinvigorate the entire nuclear fuel supply chain, consistent with United States national security and nonproliferation goals.

(iv)  Within 90 days of the date of this memorandum, the Working Group, through the Assistant to the President for National Security Affairs and the Assistant to the President for Economic Policy, shall submit a report to the President setting forth the Working Group's findings and making recommendations to further enable domestic nuclear fuel production if needed.

Sec. 3.  General Provisions.  (a)  Nothing in this memorandum shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof;

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals; or

(iii)  existing rights or obligations under international agreements.

(b)  This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAUSE OF ACTION INSTITUTE,<br><br>       Plaintiff,<br><br>       v.<br><br>UNITED STATES DEPARTMENT OF<br>COMMERCE,<br><br>       Defendant. | Civ. A. No. 19-2968  (DLF) |

**DECLARATION OF MATTHEW S. BORMAN**

I, Matthew S. Borman, do hereby declare, subject to 28 U.S.C. § 1746, that the following statements are true and correct, to the best of my knowledge and belief:

1. I currently serve as the as the Deputy Assistant Secretary of Commerce for Export Administration within the Bureau of Industry and Security ("BIS" or "Bureau"), a component of the Department of Commerce ("Commerce" or "Department"). I have served in this position since 2001. In this role, my responsibilities include overseeing the preparation of investigatory reports pursuant to Section 232 of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862 ("Section 232 Reports"), and publishing the reports when appropriate. These reports consider the effect of imports of various materials on the national security of the United States, and each report concludes whether that material is being imported "in such quantities" and "under such circumstances" as to "threaten to impair the national security." 19 U.S.C. § 1862(b)(3)(A).

2.    The statements contained in this declaration are based upon my personal knowledge, upon examination of Bureau records, and upon information provided to me in my official capacity. I am personally familiar with the Section 232 Reports transmitted by the Secretary to the President during my tenure, including the Section 232 Reports for Uranium and for Automobiles and Automobile Parts.

### BIS Pro-Actively Publishes Section 232 Reports

3.    BIS' standard operating procedure, once a Section 232 Report has been completed and transmitted by the Secretary to the President, is to publish the report unless doing so would interfere with the President's actions to address the imports' threat to the national security.

4.    Over the last 25 years, BIS has completed nine Section 232 Reports. All of those reports are publicly available on BIS' website. A table is attached as Exhibit 1 indicating when each report was transmitted by the Secretary to the President, published on BIS' website, and whether the report concluded that imports of the material threatened the national security.

5.    The table demonstrates that, except for reports completed in 2019, all Section 232 Reports have been published on BIS' website within a year of being transmitted to the President.

6.    BIS' proactive publication of Section 232 Reports meets the requirements of the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") to make non-exempt final opinions available to the public within one year of their creation. 5 U.S.C. § 552(a)(2) ("Each agency … shall make available for public inspection in an electronic format

final opinions… For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available.")

7.  The reports completed in 2019 had these features in common: a) the report concluded that imports of the material threatened the national security; b) the President took action upon the report which was not completed within a year of the report's transmission to the President; c) in consultation with White House Counsel's Office, BIS concluded that publication of the report before the President's actions had been completed would interfere with the President's efforts to address the imports' threat to the national security; and d) summaries of the reports' findings were made publicly available, even though the complete report was not immediately disclosed.

8.  Consequently, for any FOIA requester seeking the Uranium Report or the Automobile Report prior to its publication, the reports were withheld in full pursuant to FOIA Exemption 5 in conjunction with the presidential communications and deliberative process privileges.

9.  Judge Carl J. Nichols, ruling for the United States District Court for the District of Columbia, held that the Auto Report had been properly withheld "while the U.S. Trade Representative continues negotiations and the President continues to consider other options to deal with the national security threat", pursuant to FOIA Exemption 5 and the presidential communications privilege.[1] The Memorandum Opinion is attached as Exhibit 5 to the Agyekum Declaration.

---

[1] Because the court found the report was exempt due to at least the presidential communications privilege, the Court did not consider whether the deliberative process privilege also operated to exempt the report from disclosure.

10.    No court has opined on whether the Uranium Report was properly withheld prior to its publication.

11.    No FOIA requester sought an unpublished copy of the Titanium Report from BIS prior to its publication on BIS' website.

12.    In late June 2021 it was determined, in conjunction with White House Counsel's Office for the current administration[2], that disclosure of the not-yet-published reports would no longer interfere with the current President's actions to address the imports' threat to the national security.

13.    Consequently, BIS published the Auto Report on its website within approximately a week of that determination, and the other unpublished reports within approximately a month of that determination.

14.    Since the 2019 Section 232 Reports, the two subsequent completed reports have been pro-actively published on BIS' website within a year of their transmission to the President.

15.    No FOIA requester, including the Plaintiff, sought the two most recent Section 232 reports from BIS prior to their pro-active publication on BIS' website.

16.    All Section 232 Reports – not just those completed in the last 25 years – are readily available from BIS' website at https://www.bis.doc.gov/index.php/other-areas/office-of-technology-evaluation-ote/section-232-investigations. A current printout of that webpage is attached as Exhibit 2.


Executed this ___ day of February, 2022.    MATTHEW BORMAN    Digitally signed by MATTHEW BORMAN
Date: 2022.02.01 18:55:04 -05'00'

---

[2] The 2019 reports were completed during the prior administration.

# Exhibit 1

**Section 232 Reports Completed within the Last 25 Years**

| Subject of National Security Investigation | Date of Section 232 Report | Date of Publication on BIS Website | Conclusion: Whether Imports Threaten to Impair the National Security |
|---|---|---|---|
| Vanadium | February 22, 2021 | July 29, 2021 | No |
| Transformers and Transformer Components | October 15, 2020 | July 29, 2021 | Yes |
| Titanium Sponge | November 29, 2019 | July 29, 2021 | Yes |
| Uranium | April 14, 2019 | July 29, 2021 | Yes |
| Automobiles and Automobile Parts | February 17, 2019 | July 6, 2021 | Yes |
| Aluminum | January 17, 2018 | February 16, 2018 | Yes |
| Steel | January 11, 2018 | February 16, 2018 | Yes |
| Iron Ore and Semi-Finished Steel | October 29, 2001 | at least by January 10, 2002 | No |
| Crude Oil and Refined Petroleum Products | November 2, 1999 | at least by July 18, 2000 | Yes |

Exhibit 2

Search ...

# Bureau of Industry and Security
## U.S. Department of Commerce
### *Where Industry and Security Intersect*

| Home | About BIS | Regulations | Compliance & Training | Policy Guidance | Licensing | Enforcement | Add'l Programs | Data | TAC |

## Section 232 Investigations : The Effect of Imports on the National Security

Print

A Section 232 investigation is conducted under the authority of the Trade Expansion Act of 1962, as amended. The purpose of the investigation is to determine the effect of imports on the national security. Investigations may be initiated based on an application from an interested party, a request from the head of any department or agency, or may be self-initiated by the Secretary of Commerce.

The Secretary's report to the President, prepared within 270 days of initiation, focuses on whether the importation of the article in question is in such quantities or under such circumstances as to threaten to impair the national security. The President can concur or not with the Secretary's recommendations, and take action to "adjust the imports of an article and its derivatives" or other non-trade related actions as deemed necessary.

Want to learn more about Section 232 investigations? Download a Section 232 booklet in Adobe Acrobat format, which provides an explanation of the law and regulations, as well as provides a brief history of every case conducted under this authority.

Section 232 Steel and Aluminum Exclusions:

Section 232 Steel Exclusions Page

Section 232 Aluminum Exclusions Page

Section 232 Steel and Aluminum Exclusions FAQs

Completed Reports:

The Effect of Imports of Vanadium on the National Security – February 2021

The Effect of Imports of Laminations for Stacked Cores for Incorporation into Transformers, Stacked Cores for Incorporation Into Transformers, Wound Cores for Incorporation Into Transformers, Electrical Transformers, and Transformer Regulators on the National Security – October 2020

The Effect of Imports of Titanium Sponge on the National Security – November 2019

The Effect of Imports of Uranium on the National Security – April 2019

The Effect of Imports of Automobiles and Automobile Parts on the National Security – February 2019/The Effect of Imports of Automobiles and Automobile Parts on the National Security Appendices B through H – February 2019 (ITA)

The Effect of Imports of Steel on the National Security – Jan. 2018

The Effect of Imports of Aluminum on the National Security – Jan. 2018

Iron Ore and Semi-Finished Steel – 2001

The Effect of Imports of Crude Oil on National Security – 1999

Crude Oil and Petroleum Products – 1994

Ceramic Semiconductor Packaging – 1993

Gears and Gearing Products – 1992

Crude Oil and Petroleum Products – 1989

Plastic Injection Molding – 1989

Uranium – 1989

Antifriction Bearings – 1988

Crude Oil from Libya – 1982 (47 F.R. 10507)

Chromium, Manganese and Silicon Ferroalloys and Related Materials –1981 (49 F.R. 21391)

The Effect of Imports of Nuts, Bolts, and Large Screws on the National Security - 1983

Metal-Cutting and Metal-Forming Machine Tools – 1983 (48 F.R. 15174)

Glass-lined Chemical Processing Equipment – 1981 (47 F.R. 11746)

© BIS 2020

FOIA | Disclaimer | Privacy Policy | SORN | Information Quality | Open Government Plan | Strategic Plan | Annual Performance Plan
Department of Commerce | BIS Jobs | No FEAR ACT | USA.gov | Contact Us |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAUSE OF ACTION INSTITUTE, | |
| Plaintiff, | |
| v. | Civ. A. No.19-2968 (DLF) |
| UNITED STATES DEPARTMENT OF COMMERCE, | |
| Defendant. | |

**DECLARATION OF ROBERTA PARSONS**

I, Roberta "Bobbie" Parsons, do hereby declare, subject to 28 U.S.C. § 1746, that the following statements are true and correct, to the best of my knowledge and belief:

1. I currently serve as the FOIA Officer for the Immediate Office of the Secretary ("Office"), a component of the Department of Commerce ("Commerce" or "Department"). I have served in this position since 1994. In this role, my responsibilities include receiving, processing, and responding to requests for records submitted pursuant to the Freedom of Information Act ("FOIA"), as well as maintaining records and preparing reports regarding FOIA requests submitted to the Office. I also currently serve as the Acting Deputy Chief FOIA Officer for the entire Department, where my responsibilities include receiving, processing, and responding to requests that span multiple components of the Department.

2. The statements contained in this declaration are based upon my personal knowledge, upon examination of the records I am charged to maintain, and upon information provided to me in my official capacity. I am personally familiar with the FOIA

requests that were submitted to the Department or Office during my tenure in these roles, including Plaintiff Cause of Action Institute's requests related to final reports submitted by the Secretary of Commerce to the President of the United States pursuant to Section 232 of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862 ("Section 232 Reports").

**Plaintiff's FOIA Request for the Auto Report**

3.  On March 20, 2019, Plaintiff filed a lawsuit pursuant to FOIA seeking the disclosure of the Auto Report. *See Cause of Action Institute v. U.S. Department of Commerce*, No. 19-cv-778 (D.D.C.). The complaint is attached as Exhibit 2 to the 2d Agyekum Declaration.

4.  On March 22, 2019, the Office received a FOIA request from Plaintiff[1] seeking a copy of the February 17, 2019 Section 232 Report analyzing whether the import of automobiles and automobile parts threatened to impair the national security of the United States ("Auto Report"). The request is attached as Exhibit 1.

5.  On May 17, 2019, a presidential proclamation was issued which summarized the findings of the Auto Report. The presidential proclamation is attached as Exhibit 3 to the 2d Agyekum Declaration.

6.  On June 14, 2019,[2] Commerce provided a copy of the presidential proclamation to Plaintiff, and informed that the complete Auto Report was being withheld pursuant to FOIA Exemption 5, 5 U.S.C. 552(b)(5), in conjunction with the presidential communications privilege and the deliberative process privilege, until the publication

---

[1] Although Plaintiff alleged that it had submitted a FOIA request to the Office on February 18, 2019, our records do not support that contention.
[2] The response was dated June 13, 2019, but not transmitted until June 14, 2019.

of the Auto Report would not interfere with the President's actions to address the imports' threat to the national security. ("The report [is exempt] from disclosure under FOIA pursuant to the presidential communications privilege and/or the deliberative process privilege, until all actions deemed necessary to adjust the imports of automobiles and automobile parts so that such imports will not threaten to impair the national security have been completed.") The response is attached as Exhibit 4 to the 2d Agyekum Declaration.

7.    On January 14, 2021, Judge Carl J. Nichols, ruling for the United States District Court for the District of Columbia, held that the Auto Report had been properly withheld "while the U.S. Trade Representative continues negotiations and the President continues to consider other options to deal with the national security threat", pursuant to FOIA Exemption 5 and the presidential communications privilege.[3] The Memorandum Opinion is attached as Exhibit 5 to the 2d Agyekum Declaration.

8.    In late June 2021 it was determined, in conjunction with White House Counsel's Office, that disclosure of the Auto Report would no longer interfere with the current President's actions to address the imports' threat to the national security.

9.    On July 6, 2021, the Bureau of Industry and Security ("BIS"), a component of Commerce, published the Auto Report on its website.

**Plaintiff's FOIA Request for the Uranium Report**

10.   On April 15, 2019, the Office of the Secretary received a FOIA request from Plaintiff seeking a copy of the April 14, 2019 Section 232 Report analyzing whether the import

---

[3] Because the court found the report was exempt due to at least the presidential communications privilege, the Court did not consider whether the deliberative process privilege also operated to exempt the report from disclosure.

of uranium threatens to impair the national security of the United States ("Uranium Report"). The request is attached as Exhibit 2.

11.    On May 16, BIS informed Plaintiff that the Uranium Report would be provided if not exempt from disclosure, and that the report would be made publicly available after the President's review was complete. The response is attached as Exhibit 7 of the 2d Agyekum Declaration.

12.    On July 12, 2019, the President issued a Presidential Memorandum announcing that uranium imports affect national security and further investigation was merited. The memorandum therefore established the U.S. Nuclear Fuel Working Group to make any recommendations needed to further enable domestic nuclear fuel production. The Presidential Memorandum is attached as Exhibit 8 of the 2d Agyekum Declaration.

13.    The Department of Commerce concluded that the Uranium Report should be withheld pursuant to FOIA Exemption 5, in conjunction with the presidential communications privilege and the deliberative process privilege, until the President had completed his assessment (in response to the Uranium Report) as to whether any actions were needed to facilitate and promote domestic uranium mining.

14.    Plaintiff brought this lawsuit on September 9, 2019.

15.    On August 30, 2020, the Office sent Plaintiff a letter asking if it was still interested in a response to its FOIA request. Plaintiff did not respond to the letter, and its request was therefore administratively closed on October 1, 2020.

16.    In late June 2021 it was determined, in conjunction with White House Counsel's Office, that disclosure of the Uranium Report would no longer interfere with the current President's actions to address the imports' threat to the national security.

17.   The Uranium Report was published on BIS' website on July 29, 2021.

**Plaintiff's FOIA Requests for Other Section 232 Reports**

18.   The Office of the Secretary of the Department of Commerce has not received any other FOIA requests from Plaintiff seeking Section 232 Reports.

19.   The Secretary has transmitted three additional Section 232 Reports to the President subsequent to the Auto Report and the Uranium Report. Plaintiff did not submit FOIA requests for any of them.

20.   The Secretary transmitted four additional Section 232 Reports prior to the Auto Report and the Uranium Report in the last 25 years. Plaintiff did not submit FOIA requests for any of them.

**Other FOIA Requests for Recent Section 232 Reports**

21.   There have been three Section 232 Reports transmitted by the Secretary to the President after the Auto Report and the Uranium Report analyzing whether imports threaten to impair the national security of the United States. The Office of the Secretary of the Department of Commerce has not received a single FOIA request seeking unpublished copies of those reports.

I declare under penalty of perjury that the foregoing is true and correct.

ROBERTA PARSONS
Digitally signed by ROBERTA PARSONS
Date: 2022.02.08 19:31:23 -05'00'

_____

Roberta Parsons

# Exhibit 1

# CAUSE *of* ACTION
## ═══ I N S T I T U T E ═══

Pursuing Freedom & Opportunity through Justice & Accountability℠

March 22, 2019

**VIA CERTIFIED MAIL**

Departmental Freedom of Information Officer
Office of Privacy and Open Government
14th and Constitution Avenue NW
Mail Stop 52010FB
Washington, DC 20230

Re:    **Freedom of Information Act Request**

Dear FOIA Officer:

I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]

Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C.§ 552, CoA Institute hereby requests:

1. The notification letter sent to the Department of Defense ("DOD") regarding the initiation of the of the Section 232 National Security Investigation: Imports of Automobiles and Automotive Parts.[2]

2. The DOD response letter to the Section 232 National Security Investigation: Imports of Automobiles and Automotive Parts.[3]

3. All e-mail communications between the Department of Commerce and DOD regarding the Section 232 National Security Investigation: Imports of Automobiles and Automotive Parts.[4]

---

[1] *See* CAUSE OF ACTION INSTITUTE, *About*, www.causeofaction.org/about/.

[2] The Department of Commerce May 23, 2018 announcement of the 232 investigation into imported autos states that "Secretary Ross sent a letter to Secretary of Defense James Mattis informing him of the investigation." That letter has not been made publicly available, but the steel and aluminum tariff notification letter can be found on the Department of Commerce website here:
https://www.commerce.gov/sites/default/files/media/files/2017/2017-04-19_2.pdf

[3] See Exhibit 1 attached for the DOD Memorandum for Secretary of Commerce with regards to steel and aluminum tariffs. We seek the same memorandum for the auto investigation.

[4] The Department of Commerce May 23, 2018 announcement of the 232 investigation into imported autos states that "Secretary Ross sent a letter to Secretary of Defense James Mattis informing him of the investigation." That letter has not been made publicly available, but the steel and aluminum tariff notification

A 501(C)(3) NONPROFIT CORPORATION

Department of Commerce
March 22, 2019
Page 2

The time period for this request is May 1, 2018 to the present.[5]

### Request for a Public Interest Fee Waiver

CoA Institute requests a waiver of any and all applicable fees. FOIA and applicable regulations provide that the agency shall furnish requested records without or at reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[6] In this case, the requested records unquestionably shed light on the "operations or activities of the government," as they reveal the reasoning behind a potential tax increase on American consumers through auto tariffs. And because they have not yet been made public, their contents would contribute significantly to public understanding of the Administration's efforts to impose tariffs under Section 232.

CoA Institute has both the intent and ability to make the results of this request available to a reasonably broad public audience through various media. Its staff has significant experience and expertise in government oversight, investigative reporting, and federal public interest litigation. These professionals will analyze the information responsive to this request, use their editorial skills to turn raw materials into a distinct work, and share the resulting analysis with the public, whether through the Institute's regularly published online newsletter, memoranda, reports, or press releases.[7] In addition, as CoA Institute is a non-profit organization as defined under Section 501(c)(3) of the Internal Revenue Code, it has no commercial interest in making this request.

### Request To Be Classified as a Representative of the News Media

As the D.C. Circuit recently held, the "representative of the news media" test is properly focused on the requestor, not the specific FOIA request at issue.[8] CoA Institute satisfies this test because it gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience.

---

letter can be found on the Department of Commerce website here:
https://www.commerce.gov/sites/default/files/media/files/2017/2017-04-19_2.pdf

[5] For purposes of this request, the term "present" should be construed as the date on which the agency begins its search for responsive records. *See Pub. Citizen v. Dep't of State*, 276 F.3d 634 (D.C. Cir. 2002). The term "record" means the entirety of the record any portion of which contains responsive information. *See Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 677-78 (D.C. Cir. 2016) (admonishing agency for withholding information as "non-responsive" because "nothing in the statute suggests that the agency may parse a responsive record to redact specific information within it even if none of the statutory exemptions shields that information from disclosure").

[6] 5 U.S.C. § 552(a)(4)(A)(iii); *see also Cause of Action v. Fed. Trade Comm'n*, 799 F.3d 1108, 1115-19 (D.C. Cir. 2015) (discussing proper application of public-interest fee waiver test).

[7] *See also Cause of Action*, 799 F.3d at 1125-26 (holding that public interest advocacy organizations may partner with others to disseminate their work).

[8] *See id.* at 1121.

Department of Commerce
March 22, 2019
Page 3

Although it is not required by the statute, CoA Institute gathers the news it regularly publishes
from a variety of sources, including FOIA requests, whistleblowers/insiders, and scholarly
works.  It does not merely make raw information available to the public, but rather distributes
distinct work products, including articles, blog posts, investigative reports, newsletters, and
congressional testimony and statements for the record.[9]  These distinct works are distributed to
the public through various media, including CoA Institute's website, Twitter, and Facebook.
CoA Institute also provides news updates to subscribers via e-mail.

The statutory definition of a "representative of the news media" contemplates that
organizations such as CoA Institute, which electronically disseminate information and
publications via "alternative media[,] shall be considered to be news-media entities."[10]  In light
of the foregoing, numerous federal agencies have appropriately recognized the Institute's news
media status in connection with its FOIA requests.[11]

---

[9] *See, e.g.,* COA INSTITUTE, EVADING OVERSIGHT: THE ORIGINS AND IMPLICATIONS OF THE IRM CLAIM THAT
ITS RULES DO NOT HAVE AN ECONOMIC IMPACT (Jan. 2018), http://coainst.org/2mgpYAu; CoA Institute,
*Documents Reveal Special Interest Groups Lobbied HUD for Mortgage Settlement Funds* (Aug. 8, 2017),
http://coainst.org/2yLaTyF; CoA Institute, *The GSA Has No Records on its New Policy for Congressional
Oversight Requests* (July 26, 2017), http://coainst.org/2eHooVq; COA INSTITUTE, SENSITIVE CASE REPORTS:
A HIDDEN CAUSE OF THE IRS TARGETING SCANDAL (Mar. 2017), http://coainst.org/2y0fbOH; CoA Institute,
*Sec. Vilsack followed ethics guidelines when negotiating his future employment*, (Feb. 3, 2017),
http://coainst.org/2mJljJe; COA INSTITUTE, INVESTIGATIVE REPORT: PRESIDENTIAL ACCESS TO TAXPAYER
INFORMATION (Oct. 2016), http://coainst.org/2d7qTRY; James Valvo, *There is No Tenth Exemption* (Aug. 17,
2016), http://coainst.org/2doJhBt; COA INSTITUTE, MEMORANDUM: LEGAL ANALYSIS OF FORMER SECRETARY
OF STATE HILLARY CLINTON'S USE OF A PRIVATE SERVER TO STORE EMAIL RECORDS (Aug. 24, 2015),
http://coainst.org/2eXhXe1; CoA Institute, *CIA too busy for transparency* (Aug. 11, 2016),
http://coainst.org/2mtzhhP; *Hearing on Revisiting IRS Targeting: Progress of Agency Reforms and
Congressional Options Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts of the S.
Comm. on the Judiciary*, 114th Cong. (Aug. 5, 2015) (statement of Erica L. Marshall, Counsel, CoA Inst.),
http://coainst.org/2mJC8DH; *Hearing on Watchdogs Needed: Top Government Investigator Positions Left
Unfilled for Years Before the S. Comm. on Homeland Sec. & Gov't Affairs*, 114th Cong. (June 3, 2015)
(statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2mrwHr1; *Hearing on Ongoing
Oversight: Monitoring the Activities of the Justice Department's Civil, Tax and Environmental and Natural
Resources Divisions and the U.S. Trustee Program Before the H. Comm. on the Judiciary*, 114th Cong. (May
19, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2n7LxWG; COA
INSTITUTE, 2015 GRADING THE GOVERNMENT REPORT CARD (Mar. 16, 2015), http://coainst.org/2as088a;
*Hearing on Potential Reforms to the Freedom of Information Act (FOIA) Before the H. Comm. on Oversight &
Gov't Reform*, 114th Cong. (Feb. 27, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.),
http://coainst.org/2lLsph8; *Hearing on IRS: TIGTA Update Before the H. Comm. on Oversight & Gov't
Reform*, 114th Cong. (Feb. 26, 2015) (statement of Prashant K. Khetan, Chief Counsel, CoA Inst.),
http://coainst.org/2nn5iFJ; COA INSTITUTE, GRADING THE GOVERNMENT: HOW THE WHITE HOUSE TARGETS
DOCUMENT REQUESTERS (Mar. 18, 2014), http://coainst.org/2aFWxUZ.

[10] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[11] *See, e.g.*, FOIA Request No. HQ-2019-00123-F, Dep't of Energy (Nov. 26, 2018); FOIA Request No. OS-
2019-00118, Dep't of the Interior (Oct. 31, 2018); FOIA Request No. 2018-HQFO-01215, Dep't of Homeland
Sec. (July 10, 2018); FOIA Request No. CFA2018-05, U.S. Comm'n for Fine Arts (June 25, 2018); FOIA

Department of Commerce
March 22, 2019
Page 4

### Record Preservation Requirement

CoA Institute requests that the disclosure officer responsible for the processing of this request issue an immediate hold on all records responsive, or potentially responsive, to this request, so as to prevent their disposal until such time as a final determination has been issued on the request and any administrative remedies for appeal have been exhausted. It is unlawful for an agency to destroy or dispose of any record subject to a FOIA request.[12]

### Record Production and Contact Information

In an effort to facilitate document review, please provide the responsive documents in electronic form in lieu of a paper production. If a certain portion of responsive records can be produced more readily, CoA Institute requests that those records be produced first and the remaining records be produced on a rolling basis as circumstances permit.

If you have any questions about this request, please contact me by telephone at (202) 499-2422 or by e-mail at kevin.schmidt@causeofaction.org. Thank you for your attention to this matter.

*Kevin Schmidt*
KEVIN SCHMIDT
DIRECTOR OF INVESTIGATIONS

---

Request F-133-18, U.S. Agency for Int'l Dev. (Apr. 11, 2018); FOIA Request 18-HQ-F-487, Nat'l Aeronautics & Space Admin. (Apr. 11, 2018); FOIA Request 1403076-000, Fed. Bureau of Investigation (Apr. 11, 2018); FOIA Request 201800050F, Exp.-Imp. Bank (Apr. 11, 2018); FOIA Request 2016-11-008, Dep't of the Treasury (Nov. 7, 2016); FOIA Requests OS-2017-00057 & OS-2017-00060, Dep't of Interior (Oct. 31, 2016); FOIA Request 2017-00497, Office of Personnel Mgmt. (Oct. 21, 2016); FOIA Request 092320167031, Ctrs. for Medicare & Medicaid Servs. (Oct. 17, 2016); FOIA Request 17-00054-F, Dep't of Educ. (Oct. 6, 2016); FOIA Request DOC-OS-2016-001753, Dept. of Commerce (Sept. 27, 2016); FOIA Request 2016-366-F, Consumer Fin. Prot. Bureau (Aug. 11, 2016); FOIA Request F-2016-09406, Dept. of State (Aug. 11, 2016); FOIA Request 2016-00896, Bureau of Land Mgmt. (Aug. 10, 2016); FOIA Request 796939, Dep't of Labor (Mar. 7, 2016); FOIA Request 2015-HQFO-00691, Dep't of Homeland Sec. (Sept. 22, 2015); FOIA Request HQ-2015-01689-F, Dep't of Energy (Aug. 7, 2015); FOIA Request 2015-OSEC-04996-F, Dep't of Agric. (Aug. 6, 2015); FOIA Request 15-05002, Sec. & Exch. Comm'n (July 23, 2015); FOIA Request 145-FOI-13785, Dep't of Justice (Jun. 16, 2015); FOIA Request 2015-26, Fed. Energy Regulatory Comm'n (Feb. 13, 2015).

[12] *See* 36 C.F.R. § 1230.3(b) ("Unlawful or accidental destruction (also called unauthorized destruction) means . . . disposal of a record subject to a FOIA request, litigation hold, or any other hold requirement to retain the records."); *Chambers v. Dep't of the Interior*, 568 F.3d 998, 1004-05 (D.C. Cir. 2009) ("[A]n agency is not shielded from liability if it intentionally transfers or destroys a document after it has been requested under the FOIA or the Privacy Act."); *Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 41-44 (D.D.C. 1998).

# EXHIBIT

# 1

**Note: This page is part of Cause of Action's March 22, 2019 letter. It is therefore included within Exhibit 1 to the Parsons Declaration, but is not a separate (duplicately numbered) exhibit to the Parsons Declaration.**



SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MEMORANDUM FOR SECRETARY OF COMMERCE

SUBJECT: Response to Steel and Aluminum Policy Recommendations

This memo provides a consolidated position from the DoD on the investigation of the effect of steel mill imports and the effects of imports of aluminum on national security, conducted by the Department of Commerce under Section 232 of the Trade Expansion Act of 1962 (hereinafter "Section 232 Report").

Regarding the December 15, 2017 reports on steel and aluminum, DoD believes that the systematic use of unfair trade practices to intentionally erode our innovation and manufacturing industrial base poses a risk to our national security. As such, DoD concurs with the Department of Commerce's conclusion that imports of foreign steel and aluminum based on unfair trading practices impair the national security. As noted in both Section 232 reports, however, the U.S. military requirements for steel and aluminum each only represent about three percent of U.S. production. Therefore, DoD does not believe that the findings in the reports impact the ability of DoD programs to acquire the steel or aluminum necessary to meet national defense requirements.

DoD continues to be concerned about the negative impact on our key allies regarding the recommended options within the reports. However, DoD recognizes that among these reports' alternatives, targeted tariffs are more preferable than a global quota or global tariff. In addition, we recommend an inter-agency group further refine the targeted tariffs, so as to create incentives for trade partners to work with the U.S. on addressing the underlying issue of Chinese transshipment.

If the Administration moves forward with targeted tariffs or quotas on steel, DoD recommends that the management and labor leaders of the respective industries be convened by the President, so that they may understand that these tariffs and quotas are conditional. Moreover, if the Administration takes action on steel, DoD recommends waiting before taking further steps on aluminum. The prospect of trade action on aluminum may be sufficient to coerce improved behavior of bad actors. In either case, it remains important for the President to continue to communicate the negative consequences of unfair trade practices.

This is an opportunity to set clear expectations domestically regarding competitiveness and rebuild economic strength at home while preserving a fair and reciprocal international economic system as outlined in the National Security Strategy. It is critical that we reinforce to

our key allies that these actions are focused on correcting Chinese overproduction and countering their attempts to circumvent existing antidumping tariffs – not the bilateral U.S. relationship.

cc:
Secretary of the Treasury
Secretary of State
Chief of Staff to the President
Assistant to the President for National Security Affairs
Chairman, National Economic Council
United States Trade Representative

2

# Exhibit 2

# CAUSE *of* ACTION
## ═══ I N S T I T U T E ═══

Pursuing Freedom & Opportunity through Justice & Accountability™

April 15, 2019

**VIA CERTIFIED MAIL**

Departmental Freedom of Information Officer
Office of Privacy and Open Government
14th and Constitution Avenue NW
Mail Stop 52010FB
Washington, DC 20230

Re:    **Freedom of Information Act Request**

Dear FOIA Officer:

I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]

Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C.§ 552, CoA Institute hereby requests:

1. A copy of the Commerce Secretary's final report to the President regarding the Section 232 Investigation on the Effect of Imports of Uranium on the National Security.[2]

2. The DOD response letter to the Section 232 Investigation on the Effect of Imports of Uranium on the National Security.[3]

**Request for a Public Interest Fee Waiver**

CoA Institute requests a waiver of any and all applicable fees. FOIA and applicable regulations provide that the agency shall furnish requested records without or at reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[4] In this case, the requested records

---

[1] *See* CAUSE OF ACTION INSTITUTE, *About*, www.causeofaction.org/about/.

[2] Regulations.gov. *Notice of Request for Public Comments on Section 232 National Security Investigation of Imports of Uranium, available at*: https://www.regulations.gov/docket?D=BIS-2018-0011 (last visited Apr. 15, 2019); Bureau of Industry and Security. *Section 232 Investigations: The Effect of Imports on the National Security, available at*: https://www.bis.doc.gov/index.php/other-areas/office-of-technology-evaluation-ote/section-232-investigations (last visited Apr. 15, 2019).

[3] See Exhibit 1 attached for the DOD Memorandum for Secretary of Commerce with regards to steel and aluminum tariffs. We seek the same memorandum for the uranium investigation.

[4] 5 U.S.C. § 552(a)(4)(A)(iii); *see also Cause of Action v. Fed. Trade Comm'n*, 799 F.3d 1108, 1115-19 (D.C. Cir. 2015) (discussing proper application of public-interest fee waiver test).

Department of Commerce
April 15, 2019
Page 2

unquestionably shed light on the "operations or activities of the government," as they reveal the reasoning behind increasing taxes on American consumers through tariffs. And because they have not yet been made public, their contents would contribute significantly to public understanding of the Administration's trade policy.

CoA Institute has both the intent and ability to make the results of this request available to a reasonably broad public audience through various media. Its staff has significant experience and expertise in government oversight, investigative reporting, and federal public interest litigation. These professionals will analyze the information responsive to this request, use their editorial skills to turn raw materials into a distinct work, and share the resulting analysis with the public, whether through the Institute's regularly published online newsletter, memoranda, reports, or press releases.[5] In addition, as CoA Institute is a non-profit organization as defined under Section 501(c)(3) of the Internal Revenue Code, it has no commercial interest in making this request.

### Request To Be Classified as a Representative of the News Media

For fee status purposes, CoA Institute also qualifies as a "representative of the news media" under FOIA.[6] As the D.C. Circuit recently held, the "representative of the news media" test is properly focused on the requestor, not the specific FOIA request at issue.[7] CoA Institute satisfies this test because it gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience. Although it is not required by the statute, CoA Institute gathers the news it regularly publishes from a variety of sources, including FOIA requests, whistleblowers/insiders, and scholarly works. It does not merely make raw information available to the public, but rather distributes distinct work products, including articles, blog posts, investigative reports, newsletters, and congressional testimony and statements for the record.[8] These distinct works

---

[5] See also Cause of Action, 799 F.3d at 1125-26 (holding that public interest advocacy organizations may partner with others to disseminate their work).

[6] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[7] See Cause of Action, 799 F.3d at 1121.

[8] See, e.g., COA INSTITUTE, EVADING OVERSIGHT: THE ORIGINS AND IMPLICATIONS OF THE IRM CLAIM THAT ITS RULES DO NOT HAVE AN ECONOMIC IMPACT (Jan. 2018), http://coainst.org/2mgpYAu; CoA Institute, Documents Reveal Special Interest Groups Lobbied HUD for Mortgage Settlement Funds (Aug. 8, 2017), http://coainst.org/2yLaTyF; CoA Institute, The GSA Has No Records on its New Policy for Congressional Oversight Requests (July 26, 2017), http://coainst.org/2eHooVq; COA INSTITUTE, SENSITIVE CASE REPORTS: A HIDDEN CAUSE OF THE IRS TARGETING SCANDAL (Mar. 2017), http://coainst.org/2y0fbOH; CoA Institute, Sec. Vilsack followed ethics guidelines when negotiating his future employment, (Feb. 3, 2017), http://coainst.org/2mJljJe; COA INSTITUTE, INVESTIGATIVE REPORT: PRESIDENTIAL ACCESS TO TAXPAYER INFORMATION (Oct. 2016), http://coainst.org/2d7qTRY; James Valvo, There is No Tenth Exemption (Aug. 17, 2016), http://coainst.org/2doJhBt; COA INSTITUTE, MEMORANDUM: LEGAL ANALYSIS OF FORMER SECRETARY OF STATE HILLARY CLINTON'S USE OF A PRIVATE SERVER TO STORE EMAIL RECORDS (Aug. 24, 2015), http://coainst.org/2eXhXe1; CoA Institute, CIA too busy for transparency (Aug. 11, 2016), http://coainst.org/2mtzhhP; Hearing on Revisiting IRS Targeting: Progress of Agency Reforms and

Department of Commerce
April 15, 2019
Page 3

are distributed to the public through various media, including the Institute's website, Twitter, and Facebook.  CoA Institute also provides news updates to subscribers via e-mail.

The statutory definition of a "representative of the news media" contemplates that organizations such as CoA Institute, which electronically disseminate information and publications via "alternative media[,] shall be considered to be news-media entities."[9]  In light of the foregoing, numerous federal agencies have appropriately recognized the Institute's news media status in connection with its FOIA requests.[10]

### Record Preservation Requirement

CoA Institute requests that the disclosure officer responsible for the processing of this request issue an immediate hold on all records responsive, or potentially responsive, to this request, so as to prevent their disposal until such time as a final determination has been issued on

---

*Congressional Options Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts of the S. Comm. on the Judiciary*, 114th Cong. (Aug. 5, 2015) (statement of Erica L. Marshall, Counsel, CoA Inst.), http://coainst.org/2mJC8DH; *Hearing on Watchdogs Needed: Top Government Investigator Positions Left Unfilled for Years Before the S. Comm. on Homeland Sec. & Gov't Affairs*, 114th Cong. (June 3, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2mrwHr1; *Hearing on Ongoing Oversight: Monitoring the Activities of the Justice Department's Civil, Tax and Environmental and Natural Resources Divisions and the U.S. Trustee Program Before the H. Comm. on the Judiciary*, 114th Cong. (May 19, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2n7LxWG; COA INSTITUTE, 2015 GRADING THE GOVERNMENT REPORT CARD (Mar. 16, 2015), http://coainst.org/2as088a; *Hearing on Potential Reforms to the Freedom of Information Act (FOIA) Before the H. Comm. on Oversight & Gov't Reform*, 114th Cong. (Feb. 27, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2lLsph8; COA INSTITUTE, GRADING THE GOVERNMENT: HOW THE WHITE HOUSE TARGETS DOCUMENT REQUESTERS (Mar. 18, 2014), http://coainst.org/2aFWxUZ.

[9] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[10] *See, e.g.*, FOIA Request F-133-18, U.S. Agency for Int'l Dev. (Apr. 11, 2018); FOIA Request 18-HQ-F-487, Nat'l Aeronautics & Space Admin. (Apr. 11, 2018); FOIA Request 1403076-000, Fed. Bureau of Investigation (Apr. 11, 2018); FOIA Request 201800050F, Exp.-Imp. Bank (Apr. 11, 2018); FOIA Request 2016-11-008, Dep't of the Treasury (Nov. 7, 2016); FOIA Requests OS-2017-00057 & OS-2017-00060, Dep't of Interior (Oct. 31, 2016); FOIA Request 2017-00497, Office of Personnel Mgmt. (Oct. 21, 2016); FOIA Request 092320167031, Ctrs. for Medicare & Medicaid Servs. (Oct. 17, 2016); FOIA Request 17-00054-F, Dep't of Educ. (Oct. 6, 2016); FOIA Request DOC-OS-2016-001753, Dept. of Commerce (Sept. 27, 2016); FOIA Request 2016-366-F, Consumer Fin. Prot. Bureau (Aug. 11, 2016); FOIA Request F-2016-09406, Dept. of State (Aug. 11, 2016); FOIA Request 2016-00896, Bureau of Land Mgmt. (Aug. 10, 2016); FOIA Request 796939, Dep't of Labor (Mar. 7, 2016); FOIA Request 2015-HQFO-00691, Dep't of Homeland Sec. (Sept. 22, 2015); FOIA Request HQ-2015-01689-F, Dep't of Energy (Aug. 7, 2015); FOIA Request 2015-OSEC-04996-F, Dep't of Agric. (Aug. 6, 2015); FOIA Request 15-05002, Sec. & Exch. Comm'n (July 23, 2015); FOIA Request 145-FOI-13785, Dep't of Justice (Jun. 16, 2015); FOIA Request 2015-26, Fed. Energy Regulatory Comm'n (Feb. 13, 2015).

Department of Commerce
April 15, 2019
Page 4

the request and any administrative remedies for appeal have been exhausted.  It is unlawful for
an agency to destroy or dispose of any record subject to a FOIA request.[11]

### Record Production and Contact Information

In an effort to facilitate document review, please provide the responsive documents in
electronic form in lieu of a paper production.  If a certain portion of responsive records can be
produced more readily, CoA Institute requests that those records be produced first and the
remaining records be produced on a rolling basis as circumstances permit.

If you have any questions about this request, please contact me by telephone at (202)
499-2422 or by e-mail at kevin.schmidt@causeofaction.org.  Thank you for your attention to this
matter.

*Kevin Schmidt*

KEVIN SCHMIDT
DIRECTOR OF INVESTIGATIONS

---

[11] *See* 36 C.F.R. § 1230.3(b) ("Unlawful or accidental destruction (also called unauthorized destruction) means
. . . disposal of a record subject to a FOIA request, litigation hold, or any other hold requirement to retain the
records."); *Chambers v. Dep't of the Interior*, 568 F.3d 998, 1004-05 (D.C. Cir. 2009) ("[A]n agency is not
shielded from liability if it intentionally transfers or destroys a document after it has been requested under the
FOIA or the Privacy Act."); *Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 41-44 (D.D.C.
1998).

# EXHIBIT

# 1

Note: This page is part of Cause of Action's April 15, 2019 letter. It is therefore included within Exhibit 2 to the Parsons Declaration, but is not a separate (duplicately numbered) exhibit to the Parsons Declaration.



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MEMORANDUM FOR SECRETARY OF COMMERCE

SUBJECT: Response to Steel and Aluminum Policy Recommendations

This memo provides a consolidated position from the DoD on the investigation of the effect of steel mill imports and the effects of imports of aluminum on national security, conducted by the Department of Commerce under Section 232 of the Trade Expansion Act of 1962 (hereinafter "Section 232 Report").

Regarding the December 15, 2017 reports on steel and aluminum, DoD believes that the systematic use of unfair trade practices to intentionally erode our innovation and manufacturing industrial base poses a risk to our national security. As such, DoD concurs with the Department of Commerce's conclusion that imports of foreign steel and aluminum based on unfair trading practices impair the national security. As noted in both Section 232 reports, however, the U.S. military requirements for steel and aluminum each only represent about three percent of U.S. production. Therefore, DoD does not believe that the findings in the reports impact the ability of DoD programs to acquire the steel or aluminum necessary to meet national defense requirements.

DoD continues to be concerned about the negative impact on our key allies regarding the recommended options within the reports. However, DoD recognizes that among these reports' alternatives, targeted tariffs are more preferable than a global quota or global tariff. In addition, we recommend an inter-agency group further refine the targeted tariffs, so as to create incentives for trade partners to work with the U.S. on addressing the underlying issue of Chinese transshipment.

If the Administration moves forward with targeted tariffs or quotas on steel, DoD recommends that the management and labor leaders of the respective industries be convened by the President, so that they may understand that these tariffs and quotas are conditional. Moreover, if the Administration takes action on steel, DoD recommends waiting before taking further steps on aluminum. The prospect of trade action on aluminum may be sufficient to coerce improved behavior of bad actors. In either case, it remains important for the President to continue to communicate the negative consequences of unfair trade practices.

This is an opportunity to set clear expectations domestically regarding competitiveness and rebuild economic strength at home while preserving a fair and reciprocal international economic system as outlined in the National Security Strategy. It is critical that we reinforce to

our key allies that these actions are focused on correcting Chinese overproduction and countering their attempts to circumvent existing antidumping tariffs – not the bilateral U.S. relationship.

cc:
Secretary of the Treasury
Secretary of State
Chief of Staff to the President
Assistant to the President for National Security Affairs
Chairman, National Economic Council
United States Trade Representative

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CAUSE OF ACTION INSTITUTE,

      Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
COMMERCE,

      Defendant.

Civil No. 19-2968 (DLF)

**DECLARATION OF BRIAN D. LIEBERMAN**

I, Brian D. Lieberman, do hereby declare, subject to 28 U.S.C. § 1746, that the following

statements are true and correct, to the best of my knowledge and belief:

1.    I currently serve as Senior Counsel with the General Litigation Division of the

Office of the General Counsel for the United States Department of Commerce

("DOC" or "Department").  I have served in this position since January 2019.  My

responsibilities include advising the Department and its component agencies

regarding requests submitted for records made under both the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. §

552a, and litigation related to such requests. In this capacity, I routinely consult

with the FOIA offices for the Department and agencies regarding requests.

2.    The statements contained in this declaration are based upon my personal

knowledge, upon information provided to me in my official capacity, upon

conclusions and determinations reached and made in accordance therewith, and

upon my personal examination of the withheld document. I am personally familiar

with the FOIA requests of Plaintiff Cause of Action ("Plaintiff"), which are at issue

in this case.

3.   This Declaration is being submitted in support of DOC's Motion for Summary

Judgment.

### Preliminary Statement

4.   Plaintiff made a request under FOIA for a copy of a report that the Secretary of

Commerce ("Secretary") submitted to President Donald J. Trump pursuant to

Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862 ("Section 232")

regarding whether the import of uranium threatens to impair the national security of

the United States (the "Uranium Report").

5.   Section 232 authorizes the President to impose restrictions on certain imports based

upon an affirmative determination by the Secretary that an article is being imported

into the United States "in such quantities or under such circumstances as to threaten

or impair the national security. "  19 U.S.C. § 1862.

6.   Section 232 permits "interested part[ies]" to apply to the Secretary to initiate "an

appropriate investigation to determine the effects on the national security of imports

of the article which is the subject of such" application. *Id.* § 1862(b)(1)(A). In this

case, two American companies filed a petition requesting that the Secretary initiate

an investigation to determine the effect of uranium imports on the national security.

Following a diligent and thorough review, the Secretary accepted the petition and

initiated the investigation.  Subsequently, on April 14, 2019, the Secretary

submitted the Uranium Report to the President as required by Section 232.

7.    Following his initial review of the Uranium Report, on July 12, 2019, the President

issued a Presidential Memorandum in which he stated that, while he did not concur

with the Secretary's finding that uranium imports threaten to impair the national

security, he nevertheless agreed with the Secretary that the adverse impact of these

imports on domestic uranium production had national security implications

warranting further evaluation.  The President expressed particular concern

regarding whether domestic uranium production could meet U.S. military

requirements.  The President established the U.S. Nuclear Fuel Working Group,

consisting of senior Administration officials, to review the nation's overall nuclear

fuel production infrastructure, including uranium, and provide recommendations for

its revival and expansion.

8.    The U.S. Nuclear Fuel Working Group is still in  the process of conducting its

review  and will provide its recommendations to the President once completed.  The

President will consider that report, along with the Uranium Report, in deciding what

actions the government must take to protect and promote domestic nuclear fuel

production.

9.    DOC has determined that the Uranium Report is exempt from disclosure pursuant

to the presidential communications privilege  or the deliberative process privilege

under FOIA Exemption 5, 5 U.S.C. 552(b)(5).   The presidential communications

privilege applies because the Secretary prepared and submitted it directly to the

President, for the purpose of advising the President, in accordance with the requirements of Section 232, and the President is continuing to utilize the Uranium Report in connection with his decision-making concerning a matter critical to national security and nuclear policy. The deliberative process privilege applies because the Uranium Report, drafted by DOC and submitted to the President, consists of the analysis of carefully selected economic, market, scientific, statistical and other data and information by DOC for the President to consider in determining what measures may be required to best address the requirements for domestic nuclear fuel production.

### Plaintiff's FOIA Request

10.    By correspondence dated April 15, 2019, Plaintiff submitted identical FOIA requests to the Bureau of Industry and Security ("BIS") and DOC seeking "1. a copy of the Commerce Secretary's final report to the President regarding the Section 232 Investigation on the Effect of Imports of Uranium on the National Security" and  "2. The DOD [Department of Defense] response letter to the Section 232 Investigation on the Effects of Imports of Uranium on the National Security."[1] (See Exhibits 1 and 2 respectively). The history of the handling of this FOIA request is detailed in the accompanying Declaration of BIS FOIA Officer Grace Agyekum.

---

[1] Neither BIS nor DOC has a document responsive to the second portion of Plaintiff's FOIA request.

**The President Has Authority to Adjust Imports That Threaten to Impair the National Security Under Section 232. The President Also Has Constitutional Authority to Protect the National Security.**

11. Section 232, entitled "Safeguarding national security," authorizes the President, upon receipt of a report from the Secretary finding that an "article is being imported into the United States [a] in such quantities or [b] under such circumstances as to threaten to impair the national security," to take actions that "in the judgment of the President" will "adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A).

12. Section 232 permits "interested part[ies]" to apply to the Secretary to initiate "an appropriate investigation to determine the effects on the national security of imports" of particular articles. *Id.* § 1862(b)(1)(A).

13. The statute requires the Secretary to consult with the Secretary of Defense and other United States officials, and, if appropriate, to hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to the investigation. *Id.* § 1862(b)(2)(A).

14. Section 232 also sets forth particular matters that the Secretary must, "in the light of the requirements of national security and without excluding other relevant factors, give consideration," such as, *inter alia*, "domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availability of the human resources, products,

raw materials, and other supplies and services essential to the national defense..."
*Id*. § 1862(d).

15. The Secretary has 270 days from the initiation date to prepare and submit to the President a report advising him on whether the importation of the article constitutes a threat to national security and providing recommendations for action or inaction based upon the report's findings. *Id*. § 1862(b)(3)(A).

16. Once the President receives the report, he has 90 days to decide whether he concurs with DOC's finding and recommendations, and, if the President concurs with a finding of the Secretary that an article is being imported in such quantities or under such circumstances as to threaten to impair the national security, to determine the nature and duration of any initial action or actions he considers necessary to adjust the importation of the article, so it no longer threatens to impair national security. *Id*. § 1862(c)(1)(A). The President may implement the recommendations that DOC has suggested, take other actions or take no action.

17. Section 232 does impose certain publication requirements. Here, the provision requires that the Secretary make publicly available "[a]ny portion of the report submitted by the Secretary [to the President] which does not contain classified information or proprietary information." *Id*. § 1862(b)(3)(B). Additionally, pursuant to the applicable regulations, "[a]n Executive Summary of the Secretary's report . . . excluding any classified or proprietary information, shall be" made publicly available. Copies of the full report, excluding any classified or proprietary information, will be available for public inspection and copying in the [BIS]

Freedom of Information Records Inspection Facility[.]"  15 C.F.R. §705.10 (c).

The statute and regulation, however, do not specify the time at which the Secretary

must make publicly available a Section 232 report.

18.    The Secretary's report plays an integral role in the President's exercise of the broad

authority granted to him under Section 232 in determining the actions the President

deems necessary to adjust imports of the article.   The statute makes the report,

which embodies the Secretary's analysis and advice to the President, the lynchpin

of presidential action.  Accordingly, the President is vested with the discretion to

withhold the report, during the pendency of his determining what if any measures to

take consistent with the Secretary's report.

19.    Even though the President did not concur with the Secretary's recommendation that

uranium imports represent a threatened impairment to national security, he agreed

with the Secretary that uranium production raises national security considerations

for which he is seeking additional information from a group of senior advisers.

20.    The President possesses independent constitutional authority to protect the national

security.  He requested additional information from his senior advisers for this

purpose.  The Uranium Report remains pertinent to the President's ongoing

deliberations regarding this national security matter.

**The Secretary's Report on the Effects of Uranium Imports on National Security and the President's Directive for Further Analysis Regarding the Domestic Nuclear Supply Chain Necessary to U.S. National Security.**

21.    On June 29, 2017, President Trump announced the commencement of a federal

initiative to "begin to revive and expand our nuclear energy sector." The President

envisioned this as a key component of an overall effort to "lift barriers to domestic

energy production," (See *Remarks by President Trump at the Unleashing*

*American Energy Event*, a copy of which is attached as Exhibit 3, at 7). To this

end, the President proclaimed that the U.S. government would undertake "a

complete review of U.S. nuclear energy policy which will help us find ways to

revitalize this crucial energy source." (*Id.* ).

22.    On January 18, 2018, two American businesses, Energy Fuels Resources (USA)

Inc. and Ur-Energy USA Inc., filed a joint petition requesting that the Secretary

investigate the effect of uranium imports on national security.[2]

23.    Six months later, on July 18, 2019, after having carefully evaluated the companies'

request, the Secretary decided to accept the petition and initiated the requested

investigation. A week later, on July 25, 2018, DOC formally announced the

initiation of the investigation with the publication in the Federal Register of a

*Notice of Request for Public Comments on Section 232 National Security*

*Investigation of Imports of Uranium,* a copy of which is attached as Exhibit 4.

---

[2] A copy of the petition and the exhibits are available at: http://www.energyfuels.com/exhibits-petition-relief-section-232-trade-expansion-act-1962-imports-uranium-products-threaten-national-security.

24.    On September 10, 2018, DOC published in the Federal Register a notice of a

*Change in Comment Deadline for Section 232 National Security Investigation of*

*Imports of Uranium*, a copy of which is attached as Exhibit 5.

25.    Subsequently, on April 14, 2019, the Secretary submitted the Uranium Report to the

President.  In the Uranium Report, following an exhaustive analysis, including a

review of a body of industry, market, economic, scientific, statistical and other data

and factual information from governmental and non-governmental sources, DOC

determined that these imports threatened to impair U.S. national security and

recommended that the President take specific action to adjust these imports.

26.    Thereafter, on July 12, 2019, the President issued a Presidential Memorandum

entitled *Memorandum on the Effect of Uranium Imports on the National Security*

*and Establishment of the United States Nuclear Fuel Working Group* (Presidential

Memorandum), copy of which is attached as Exhibit 6.

27.    The President began by noting the Secretary found that uranium imports are

occurring "in such quantities and under such circumstances as to threaten to impair

the national security of the United States as defined under Section 232." (*Id.* at

Section 1(b)).  The President pointed out that "the United States imports

approximately 93 percent of its commercial uranium, compared to 85.8 percent in

2009." (*Id.*).  Further, he stated, "the Secretary found that this figure is because of

increased production by foreign state-owned enterprises, which have distorted

global prices and made it more difficult for domestic mines to compete." (*Id.*).

28.   The President did not concur with the Secretary's finding that uranium imports

threatened to impair the national security. (*Id*. at Section 1(c)). Nevertheless, the

President agreed with the Secretary that uranium imports affect national security

and decided further investigation of the matter was merited:

> Although I agree that the Secretary's findings raise significant concerns regarding
> the impact of uranium imports on the national security with respect to domestic
> mining, I find that a fuller analysis of national security considerations with respect
> to the entire nuclear fuel supply chain is necessary at this time.

(*Id*.).

29.   The President cited to the national security implications of imperiled domestic

uranium production. (*Id*. at Section 2a)). In particular, he observed, "[t]he United

States requires domestically produced uranium to satisfy Department of Defense

(DOD) requirements for maintaining effective military capabilities----including

nuclear fuel for the United States Navy's fleet of nuclear-powered aircraft carriers

and nuclear-powered submarines, source material for nuclear weapons and other

functions." (*Id*.). However, he placed uranium mining within the broader context

of all domestic nuclear fuel production, emphasizing that "[d]omestic mining,

milling, and conversion of uranium, however, while significant, are only a part of

the nuclear supply chain necessary for national security, including DOD needs."

(*Id*.).

30.   The President also cited to the June 29, 2017 announcement of his initiative to

expand and strengthen the nuclear energy sector. (*Id*. at Section 2(b)). The

President emphasized that domestic "[n]uclear fuel production is critical to a vibrant nuclear energy sector." (Id.).

31.  The President established the U.S. Nuclear Fuel Working Group (Working Group) "[t]o address the concerns identified by the Secretary regarding domestic uranium production and to ensure a comprehensive review of the entire domestic nuclear supply chain." (Id. at Section 2(c)). The President placed some of the most senior government officials on the Working Group, including the Secretaries of Commerce, Defense, Energy, Interior and State, and the Assistant to the President for National Security Affairs. (Id. at Section 2(c)(i) and (ii)). The President directed the Working Group to "examine the current state of domestic nuclear fuel production to reinvigorate the entire nuclear fuel supply chain, consistent with United States national security and nonproliferation goals." (Id. at Section 2(c)(iii)).

32.  The President required the Working Group to, within 90 days of the date of issuance of the Presidential Memorandum (i.e., October 10, 2019), "submit a report to the President setting forth the Working Group's findings and making recommendations to further enable domestic nuclear fuel production if needed." (Id. at Section 2(c)(iv)).

33.  The Working Group was not able to complete its report by the original 90-day deadline. The Working Group, however, remains actively engaged in conducting the additional analysis required by the President and will be providing the President with its report. Once the President has this report, he will utilize it, along with the Uranium Report, in determining what actions by the U.S. government may be

required to facilitate and promote domestic uranium mining and other elements of

domestic nuclear fuel production.

## JUSTIFICATION FOR THE WITHHOLDING OF THE URANIUM REPORT PURSUANT TO FOIA EXEMPTION 5

34.    Exemption 5 protects "interagency or intra-agency memorandums or letters which

would not be available by law to a party other than an agency in litigation with the

agency." 5 U.S.C. 552(b)(5). Exemption 5 has been construed to exempt

documents or information normally privileged in the civil discovery context and

incorporates, *inter alia*, the attorney-client, deliberative process and presidential

communication privileges. As a threshold matter, the responsive records must be

inter-agency or intra-agency documents in order to be protected from disclosure

under this exemption.

35.    The withheld information consists of the entirety of the Uranium Report. This

report contains DOC's analysis and presentation of industry, market, economic,

scientific, statistical and other data and information from DOC and other

governmental and non-governmental sources, including proprietary sources,

relating to whether the importation of uranium threatens to impair U.S. national

security. This includes carefully selected and organized factual information

regarding the characteristics, composition, and status of domestic uranium

production. It also contains, among other things, the Secretary's interpretation of

the requirements of Section 232, including the relevant factors for consideration

pursuant to subsection (d), 19 U.S.C. § 1862(d), that are addressed in the

Secretary's analysis. The Secretary also sets forth the reasoning underlying his findings and recommendations.

36. DOC determined that the Uranium Report, a document prepared by DOC and submitted to the President, in accordance with the requirements of Section 232, and now being utilized by the President in connection with the exercise of his independent constitutional authority to protect the national security and to determine nuclear policy, constitutes an inter-agency or intra-agency document.

**Presidential Communications Privilege**

37. DOC determined that the Uranium Report is protected by the presidential communications privilege. The privilege protects communications or documents that relate to presidential decision-making, including communications which directly involve the President and documents actually viewed by the President, and documents solicited and received by the President or his immediate White House advisers. The presidential communications privilege is broader than the deliberative process privilege in that it applies to documents in their entireties and includes decisional and post-decisional records.

38. The Secretary submitted the Uranium Report, embodying the fruits of his investigation into whether uranium imports threatened to impair the national security, to the President, in accordance with the requirements of Section 232. The President specifically stated in the Presidential Memorandum that, "[o]n April 14, 2019, the [Secretary] transmitted to me his report on his investigation into the effect

of imports of uranium…on the national security of the United States under section 232[.]"  (*Id.* at Section 1)."

39.    The President reviewed the Uranium Report as required by Section 232, and determined that, although he did not concur with the Secretary that uranium imports threaten to impair the national security, he agreed "that the Secretary's findings raise significant concerns regarding the impact of uranium imports on the national security with respect to domestic mining" and that these findings justified the conduct of "a fuller analysis of national security considerations with respect to the entire nuclear fuel supply chain."  (Presidential Memorandum, at Section 1(c)). The Working Group is in the process of completing this further analysis.

40.    For these reasons, DOC concluded that the Uranium Report directly involved the President and, therefore, constitutes a presidential communication.

41.    By protecting communications concerning or made in performance of the President's official responsibilities, and in the process of shaping policies and making decisions, the presidential communications privilege ensures the President's ability to discharge his constitutional powers.  Here, the President established the Working Group to provide additional information for him to consider along with the Uranium Report regarding the expansion of domestic uranium mining and other facets of the domestic nuclear supply chain.  To publish the Uranium Report while this matter of national security and nuclear policy remains under review could compromise the government's efforts.

**Deliberative Process Privilege**

42. DOC determined that the Uranium Report contains information protected by the deliberative process privilege. To qualify for protection, the information must be pre-decisional and deliberative.

43. The content of the Uranium Report is pre-decisional because it is provided to the President for him and his advisers to consult in deciding what actions if any are required. The report presents the fruits of DOC's investigation, as evaluated by DOC experts, with policy options provided for the President's consideration in reaching a final decision. Specifically, a Section 232 report contains the Secretary's findings, "the recommendations for action or inaction...[and] [i]f the Secretary finds that such article is being imported into the United States in such quantities or under such circumstances as to threaten or impair the national security, the Secretary shall so advise the President. " 19 U.S.C. § 1862(b)(3)(A).

44. Although the President did not concur with the Secretary's conclusion that uranium imports represent a threatened impairment of American national security, the President is utilizing the Uranium Report in connection with reaching a decision concerning fundamental matters of national security and nuclear policy. Specifically, the President agreed "that the Secretary's findings raise significant concerns regarding the impact of uranium imports on the national security with respect to domestic mining" and that these findings justified the conduct of "a fuller analysis of national security considerations with respect to the entire nuclear fuel supply chain." (Presidential Memorandum, at Section 1(c)). The Working

Group is in the process of completing this further analysis. The President will use the Working Group's report, along with the Secretary's analysis, in evaluating ways to promote and protect domestic uranium mining and other facets of the domestic nuclear supply chain.

45. The Uranium Report is deliberative because it contains DOC's analysis of the issue whether uranium imports pose a threat to impair national security, the findings premised upon this analysis and recommended actions for the President to consider. The report presents carefully selected data and factual information and opinions concerning uranium imports. Moreover, the report deals extensively with the state of domestic uranium production and domestic nuclear requirements.

46. While the Uranium Report here is not being used for the purpose of adjusting imports to prevent a threatened impairment of national security under Section 232, it is nevertheless critical to presidential decision-making regarding national security and nuclear policy. The President's independent constitutional authority to protect the national security provides the basis for his use of the Uranium Report for these purposes. The President must assess the options available to him to facilitate an efficient and effective domestic nuclear supply chain to support the military and the civilian sector. Because the President has not reached a final decision concerning the national security implications of the problems confronting domestic nuclear fuel production, it would be premature to release this deliberative information at this time.

47. DOC conducted a line-by-line analysis of the Uranium Report in reaching its
    determination that the document is exempt from disclosure under Exemption 5.    It
    withheld the record in full because the exempt information, consisting of carefully
    selected and organized data and factual information, analysis, findings and
    recommendations, is so inextricably intertwined with nonexempt information such
    that segregation would result in a meaningless set of words or phrases which have
    no or minimal information content.

### CONCLUSION

48. The Secretary of Commerce's report to the President regarding whether the
    importation of uranium poses a threat of impairment to United States national
    security pursuant to Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. §
    1862, is exempt from disclosure pursuant to the presidential communications
    privilege or the deliberative process privilege under FOIA Exemption 5, 5 U.S.C. §
    552(b)(5), for such time as the President utilizes the report in determining what
    actions may be needed, as a matter of national security, to increase domestic nuclear
    fuel production.

I declare under penalty of perjury that the foregoing is true and correct:

Executed this $\underline{27}^{TH}$ day of February, 2019.

BRIAN D. LIEBERMAN

# EXHIBIT 1

# CAUSE *of* ACTION
## ═══ I N S T I T U T E ═══

Pursuing Freedom & Opportunity through Justice & Accountability™

April 15, 2019

## VIA ELECTRONIC MAIL

Freedom of Information Officer
Bureau of Industry and Security, Room 6622
U.S. Department of Commerce
Washington, DC 20230

### Re: Freedom of Information Act Request

Dear FOIA Officer:

I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]

Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C.§ 552, CoA Institute hereby requests:

1. A copy of the Commerce Secretary's final report to the President regarding the Section 232 Investigation on the Effect of Imports of Uranium on the National Security.[2]

2. The DOD response letter to the Section 232 Investigation on the Effect of Imports of Uranium on the National Security.[3]

### Request for a Public Interest Fee Waiver

CoA Institute requests a waiver of any and all applicable fees. FOIA and applicable regulations provide that the agency shall furnish requested records without or at reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[4] In this case, the requested records

---

[1] *See* CAUSE OF ACTION INSTITUTE, *About*, www.causeofaction.org/about/.

[2] Regulations.gov. *Notice of Request for Public Comments on Section 232 National Security Investigation of Imports of Uranium, available at*: https://www.regulations.gov/docket?D=BIS-2018-0011 (last visited Apr. 15, 2019); Bureau of Industry and Security. *Section 232 Investigations: The Effect of Imports on the National Security, available at*: https://www.bis.doc.gov/index.php/other-areas/office-of-technology-evaluation-ote/section-232-investigations (last visited Apr. 15, 2019).

[3] See Exhibit 1 attached for the DOD Memorandum for Secretary of Commerce with regards to steel and aluminum tariffs. We seek the same memorandum for the uranium investigation.

[4] 5 U.S.C. § 552(a)(4)(A)(iii); *see also Cause of Action v. Fed. Trade Comm'n*, 799 F.3d 1108, 1115-19 (D.C. Cir. 2015) (discussing proper application of public-interest fee waiver test).

A 501(c)(3) NONPROFIT CORPORATION

Department of Commerce Bureau of Industry and Security
April 15, 2019
Page 2

unquestionably shed light on the "operations or activities of the government," as they reveal the reasoning behind increasing taxes on American consumers through tariffs. And because they have not yet been made public, their contents would contribute significantly to public understanding of the Administration's trade policy.

CoA Institute has both the intent and ability to make the results of this request available to a reasonably broad public audience through various media. Its staff has significant experience and expertise in government oversight, investigative reporting, and federal public interest litigation. These professionals will analyze the information responsive to this request, use their editorial skills to turn raw materials into a distinct work, and share the resulting analysis with the public, whether through the Institute's regularly published online newsletter, memoranda, reports, or press releases.[5] In addition, as CoA Institute is a non-profit organization as defined under Section 501(c)(3) of the Internal Revenue Code, it has no commercial interest in making this request.

### Request To Be Classified as a Representative of the News Media

For fee status purposes, CoA Institute also qualifies as a "representative of the news media" under FOIA.[6] As the D.C. Circuit recently held, the "representative of the news media" test is properly focused on the requestor, not the specific FOIA request at issue.[7] CoA Institute satisfies this test because it gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience. Although it is not required by the statute, CoA Institute gathers the news it regularly publishes from a variety of sources, including FOIA requests, whistleblowers/insiders, and scholarly works. It does not merely make raw information available to the public, but rather distributes distinct work products, including articles, blog posts, investigative reports, newsletters, and congressional testimony and statements for the record.[8] These distinct works

---

[5] *See also Cause of Action*, 799 F.3d at 1125-26 (holding that public interest advocacy organizations may partner with others to disseminate their work).

[6] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[7] *See Cause of Action*, 799 F.3d at 1121.

[8] *See, e.g.*, CoA INSTITUTE, EVADING OVERSIGHT: THE ORIGINS AND IMPLICATIONS OF THE IRM CLAIM THAT ITS RULES DO NOT HAVE AN ECONOMIC IMPACT (Jan. 2018), http://coainst.org/2mgpYAu; CoA Institute, *Documents Reveal Special Interest Groups Lobbied HUD for Mortgage Settlement Funds* (Aug. 8, 2017), http://coainst.org/2yLaTyF; CoA Institute, *The GSA Has No Records on its New Policy for Congressional Oversight Requests* (July 26, 2017), http://coainst.org/2eHooVq; CoA INSTITUTE, SENSITIVE CASE REPORTS: A HIDDEN CAUSE OF THE IRS TARGETING SCANDAL (Mar. 2017), http://coainst.org/2y0fbOH; CoA Institute, *Sec. Vilsack followed ethics guidelines when negotiating his future employment*, (Feb. 3, 2017), http://coainst.org/2mJljJe; CoA INSTITUTE, INVESTIGATIVE REPORT: PRESIDENTIAL ACCESS TO TAXPAYER INFORMATION (Oct. 2016), http://coainst.org/2d7qTRY; James Valvo, *There is No Tenth Exemption* (Aug. 17, 2016), http://coainst.org/2doJhBt; CoA INSTITUTE, MEMORANDUM: LEGAL ANALYSIS OF FORMER SECRETARY OF STATE HILLARY CLINTON'S USE OF A PRIVATE SERVER TO STORE EMAIL RECORDS (Aug. 24, 2015), http://coainst.org/2eXhXe1; CoA Institute, *CIA too busy for transparency* (Aug. 11, 2016), http://coainst.org/2mtzhhP; *Hearing on Revisiting IRS Targeting: Progress of Agency Reforms and Congressional Options Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts of the S.*

Department of Commerce Bureau of Industry and Security
April 15, 2019
Page 3

are distributed to the public through various media, including the Institute's website, Twitter, and Facebook. CoA Institute also provides news updates to subscribers via e-mail.

The statutory definition of a "representative of the news media" contemplates that organizations such as CoA Institute, which electronically disseminate information and publications via "alternative media[,] shall be considered to be news-media entities."[9] In light of the foregoing, numerous federal agencies have appropriately recognized the Institute's news media status in connection with its FOIA requests.[10]

### Record Preservation Requirement

CoA Institute requests that the disclosure officer responsible for the processing of this request issue an immediate hold on all records responsive, or potentially responsive, to this request, so as to prevent their disposal until such time as a final determination has been issued on the request and any administrative remedies for appeal have been exhausted. It is unlawful for an agency to destroy or dispose of any record subject to a FOIA request.[11]

---

*Comm. on the Judiciary*, 114th Cong. (Aug. 5, 2015) (statement of Erica L. Marshall, Counsel, CoA Inst.), http://coainst.org/2mJC8DH; *Hearing on Watchdogs Needed: Top Government Investigator Positions Left Unfilled for Years Before the S. Comm. on Homeland Sec. & Gov't Affairs*, 114th Cong. (June 3, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2mrwHr1; *Hearing on Ongoing Oversight: Monitoring the Activities of the Justice Department's Civil, Tax and Environmental and Natural Resources Divisions and the U.S. Trustee Program Before the H. Comm. on the Judiciary*, 114th Cong. (May 19, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2n7LxWG; COA INSTITUTE, 2015 GRADING THE GOVERNMENT REPORT CARD (Mar. 16, 2015), http://coainst.org/2as088a; *Hearing on Potential Reforms to the Freedom of Information Act (FOIA) Before the H. Comm. on Oversight & Gov't Reform*, 114th Cong. (Feb. 27, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2lLsph8; COA INSTITUTE, GRADING THE GOVERNMENT: HOW THE WHITE HOUSE TARGETS DOCUMENT REQUESTERS (Mar. 18, 2014), http://coainst.org/2aFWxUZ.

[9] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[10] *See, e.g.*, FOIA Request F-133-18, U.S. Agency for Int'l Dev. (Apr. 11, 2018); FOIA Request 18-HQ-F-487, Nat'l Aeronautics & Space Admin. (Apr. 11, 2018); FOIA Request 1403076-000, Fed. Bureau of Investigation (Apr. 11, 2018); FOIA Request 201800050F, Exp.-Imp. Bank (Apr. 11, 2018); FOIA Request 2016-11-008, Dep't of the Treasury (Nov. 7, 2016); FOIA Requests OS-2017-00057 & OS-2017-00060, Dep't of Interior (Oct. 31, 2016); FOIA Request 2017-00497, Office of Personnel Mgmt. (Oct. 21, 2016); FOIA Request 092320167031, Ctrs. for Medicare & Medicaid Servs. (Oct. 17, 2016); FOIA Request 17-00054-F, Dep't of Educ. (Oct. 6, 2016); FOIA Request DOC-OS-2016-001753, Dept. of Commerce (Sept. 27, 2016); FOIA Request 2016-366-F, Consumer Fin. Prot. Bureau (Aug. 11, 2016); FOIA Request F-2016-09406, Dept. of State (Aug. 11, 2016); FOIA Request 2016-00896, Bureau of Land Mgmt. (Aug. 10, 2016); FOIA Request 796939, Dep't of Labor (Mar. 7, 2016); FOIA Request 2015-HQFO-00691, Dep't of Homeland Sec. (Sept. 22, 2015); FOIA Request HQ-2015-01689-F, Dep't of Energy (Aug. 7, 2015); FOIA Request 2015-OSEC-04996-F, Dep't of Agric. (Aug. 6, 2015); FOIA Request 15-05002, Sec. & Exch. Comm'n (July 23, 2015); FOIA Request 145-FOI-13785, Dep't of Justice (Jun. 16, 2015); FOIA Request 2015-26, Fed. Energy Regulatory Comm'n (Feb. 13, 2015).

[11] *See* 36 C.F.R. § 1230.3(b) ("Unlawful or accidental destruction (also called unauthorized destruction) means . . . disposal of a record subject to a FOIA request, litigation hold, or any other hold requirement to retain the records."); *Chambers v. Dep't of the Interior*, 568 F.3d 998, 1004-05 (D.C. Cir. 2009) ("[A]n agency is not

Department of Commerce Bureau of Industry and Security
April 15, 2019
Page 4

### **Record Production and Contact Information**

In an effort to facilitate document review, please provide the responsive documents in electronic form in lieu of a paper production. If a certain portion of responsive records can be produced more readily, CoA Institute requests that those records be produced first and the remaining records be produced on a rolling basis as circumstances permit.

If you have any questions about this request, please contact me by telephone at (202) 499-2422 or by e-mail at kevin.schmidt@causeofaction.org. Thank you for your attention to this matter.

*Kevin Schmidt*
_____
KEVIN SCHMIDT
DIRECTOR OF INVESTIGATIONS

_____

shielded from liability if it intentionally transfers or destroys a document after it has been requested under the FOIA or the Privacy Act."); *Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 41-44 (D.D.C. 1998).

# EXHIBIT

# 1



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MEMORANDUM FOR SECRETARY OF COMMERCE

SUBJECT: Response to Steel and Aluminum Policy Recommendations

      This memo provides a consolidated position from the DoD on the investigation of the effect of steel mill imports and the effects of imports of aluminum on national security, conducted by the Department of Commerce under Section 232 of the Trade Expansion Act of 1962 (hereinafter "Section 232 Report").

      Regarding the December 15, 2017 reports on steel and aluminum, DoD believes that the systematic use of unfair trade practices to intentionally erode our innovation and manufacturing industrial base poses a risk to our national security. As such, DoD concurs with the Department of Commerce's conclusion that imports of foreign steel and aluminum based on unfair trading practices impair the national security. As noted in both Section 232 reports, however, the U.S. military requirements for steel and aluminum each only represent about three percent of U.S. production. Therefore, DoD does not believe that the findings in the reports impact the ability of DoD programs to acquire the steel or aluminum necessary to meet national defense requirements.

      DoD continues to be concerned about the negative impact on our key allies regarding the recommended options within the reports. However, DoD recognizes that among these reports' alternatives, targeted tariffs are more preferable than a global quota or global tariff. In addition, we recommend an inter-agency group further refine the targeted tariffs, so as to create incentives for trade partners to work with the U.S. on addressing the underlying issue of Chinese transshipment.

      If the Administration moves forward with targeted tariffs or quotas on steel, DoD recommends that the management and labor leaders of the respective industries be convened by the President, so that they may understand that these tariffs and quotas are conditional. Moreover, if the Administration takes action on steel, DoD recommends waiting before taking further steps on aluminum. The prospect of trade action on aluminum may be sufficient to coerce improved behavior of bad actors. In either case, it remains important for the President to continue to communicate the negative consequences of unfair trade practices.

      This is an opportunity to set clear expectations domestically regarding competitiveness and rebuild economic strength at home while preserving a fair and reciprocal international economic system as outlined in the National Security Strategy. It is critical that we reinforce to

our key allies that these actions are focused on correcting Chinese overproduction and countering their attempts to circumvent existing antidumping tariffs – not the bilateral U.S. relationship.

cc:
Secretary of the Treasury
Secretary of State
Chief of Staff to the President
Assistant to the President for National Security Affairs
Chairman, National Economic Council
United States Trade Representative

2

# EXHIBIT 2

# CAUSE *of* ACTION
## ═══ I N S T I T U T E ═══

Pursuing Freedom & Opportunity through Justice & Accountability™

April 15, 2019

**VIA CERTIFIED MAIL**

Departmental Freedom of Information Officer
Office of Privacy and Open Government
14th and Constitution Avenue NW
Mail Stop 52010FB
Washington, DC 20230

Re:    **Freedom of Information Act Request**

Dear FOIA Officer:

I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]

Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C.§ 552, CoA Institute hereby requests:

1. A copy of the Commerce Secretary's final report to the President regarding the Section 232 Investigation on the Effect of Imports of Uranium on the National Security.[2]

2. The DOD response letter to the Section 232 Investigation on the Effect of Imports of Uranium on the National Security.[3]

**Request for a Public Interest Fee Waiver**

CoA Institute requests a waiver of any and all applicable fees. FOIA and applicable regulations provide that the agency shall furnish requested records without or at reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[4] In this case, the requested records

---

[1] *See* CAUSE OF ACTION INSTITUTE, *About*, www.causeofaction.org/about/.

[2] Regulations.gov. *Notice of Request for Public Comments on Section 232 National Security Investigation of Imports of Uranium, available at*: https://www.regulations.gov/docket?D=BIS-2018-0011 (last visited Apr. 15, 2019); Bureau of Industry and Security. *Section 232 Investigations: The Effect of Imports on the National Security, available at*: https://www.bis.doc.gov/index.php/other-areas/office-of-technology-evaluation-ote/section-232-investigations (last visited Apr. 15, 2019).

[3] See Exhibit 1 attached for the DOD Memorandum for Secretary of Commerce with regards to steel and aluminum tariffs. We seek the same memorandum for the uranium investigation.

[4] 5 U.S.C. § 552(a)(4)(A)(iii); *see also Cause of Action v. Fed. Trade Comm'n*, 799 F.3d 1108, 1115-19 (D.C. Cir. 2015) (discussing proper application of public-interest fee waiver test).

A 501(C)(3) NONPROFIT CORPORATION

Department of Commerce
April 15, 2019
Page 2

unquestionably shed light on the "operations or activities of the government," as they reveal the reasoning behind increasing taxes on American consumers through tariffs. And because they have not yet been made public, their contents would contribute significantly to public understanding of the Administration's trade policy.

CoA Institute has both the intent and ability to make the results of this request available to a reasonably broad public audience through various media. Its staff has significant experience and expertise in government oversight, investigative reporting, and federal public interest litigation. These professionals will analyze the information responsive to this request, use their editorial skills to turn raw materials into a distinct work, and share the resulting analysis with the public, whether through the Institute's regularly published online newsletter, memoranda, reports, or press releases.[5] In addition, as CoA Institute is a non-profit organization as defined under Section 501(c)(3) of the Internal Revenue Code, it has no commercial interest in making this request.

### Request To Be Classified as a Representative of the News Media

For fee status purposes, CoA Institute also qualifies as a "representative of the news media" under FOIA.[6] As the D.C. Circuit recently held, the "representative of the news media" test is properly focused on the requestor, not the specific FOIA request at issue.[7] CoA Institute satisfies this test because it gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience. Although it is not required by the statute, CoA Institute gathers the news it regularly publishes from a variety of sources, including FOIA requests, whistleblowers/insiders, and scholarly works. It does not merely make raw information available to the public, but rather distributes distinct work products, including articles, blog posts, investigative reports, newsletters, and congressional testimony and statements for the record.[8] These distinct works

---

[5] *See also Cause of Action*, 799 F.3d at 1125-26 (holding that public interest advocacy organizations may partner with others to disseminate their work).

[6] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[7] *See Cause of Action*, 799 F.3d at 1121.

[8] *See, e.g.*, COA INSTITUTE, EVADING OVERSIGHT: THE ORIGINS AND IMPLICATIONS OF THE IRM CLAIM THAT ITS RULES DO NOT HAVE AN ECONOMIC IMPACT (Jan. 2018), http://coainst.org/2mgpYAu; CoA Institute, *Documents Reveal Special Interest Groups Lobbied HUD for Mortgage Settlement Funds* (Aug. 8, 2017), http://coainst.org/2yLaTyF; CoA Institute, *The GSA Has No Records on its New Policy for Congressional Oversight Requests* (July 26, 2017), http://coainst.org/2eHooVq; COA INSTITUTE, SENSITIVE CASE REPORTS: A HIDDEN CAUSE OF THE IRS TARGETING SCANDAL (Mar. 2017), http://coainst.org/2y0fbOH; CoA Institute, *Sec. Vilsack followed ethics guidelines when negotiating his future employment*, (Feb. 3, 2017), http://coainst.org/2mJljJe; COA INSTITUTE, INVESTIGATIVE REPORT: PRESIDENTIAL ACCESS TO TAXPAYER INFORMATION (Oct. 2016), http://coainst.org/2d7qTRY; James Valvo, *There is No Tenth Exemption* (Aug. 17, 2016), http://coainst.org/2doJhBt; COA INSTITUTE, MEMORANDUM: LEGAL ANALYSIS OF FORMER SECRETARY OF STATE HILLARY CLINTON'S USE OF A PRIVATE SERVER TO STORE EMAIL RECORDS (Aug. 24, 2015), http://coainst.org/2eXhXe1; CoA Institute, *CIA too busy for transparency* (Aug. 11, 2016), http://coainst.org/2mtzhhP; *Hearing on Revisiting IRS Targeting: Progress of Agency Reforms and*

Department of Commerce
April 15, 2019
Page 3

are distributed to the public through various media, including the Institute's website, Twitter, and Facebook. CoA Institute also provides news updates to subscribers via e-mail.

The statutory definition of a "representative of the news media" contemplates that organizations such as CoA Institute, which electronically disseminate information and publications via "alternative media[,] shall be considered to be news-media entities."[9] In light of the foregoing, numerous federal agencies have appropriately recognized the Institute's news media status in connection with its FOIA requests.[10]

## Record Preservation Requirement

CoA Institute requests that the disclosure officer responsible for the processing of this request issue an immediate hold on all records responsive, or potentially responsive, to this request, so as to prevent their disposal until such time as a final determination has been issued on

---

*Congressional Options Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts of the S. Comm. on the Judiciary*, 114th Cong. (Aug. 5, 2015) (statement of Erica L. Marshall, Counsel, CoA Inst.), http://coainst.org/2mJC8DH; *Hearing on Watchdogs Needed: Top Government Investigator Positions Left Unfilled for Years Before the S. Comm. on Homeland Sec. & Gov't Affairs*, 114th Cong. (June 3, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2mrwHr1; *Hearing on Ongoing Oversight: Monitoring the Activities of the Justice Department's Civil, Tax and Environmental and Natural Resources Divisions and the U.S. Trustee Program Before the H. Comm. on the Judiciary*, 114th Cong. (May 19, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2n7LxWG; COA INSTITUTE, 2015 GRADING THE GOVERNMENT REPORT CARD (Mar. 16, 2015), http://coainst.org/2as088a; *Hearing on Potential Reforms to the Freedom of Information Act (FOIA) Before the H. Comm. on Oversight & Gov't Reform*, 114th Cong. (Feb. 27, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2lLsph8; COA INSTITUTE, GRADING THE GOVERNMENT: HOW THE WHITE HOUSE TARGETS DOCUMENT REQUESTERS (Mar. 18, 2014), http://coainst.org/2aFWxUZ.

[9] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[10] *See, e.g.*, FOIA Request F-133-18, U.S. Agency for Int'l Dev. (Apr. 11, 2018); FOIA Request 18-HQ-F-487, Nat'l Aeronautics & Space Admin. (Apr. 11, 2018); FOIA Request 1403076-000, Fed. Bureau of Investigation (Apr. 11, 2018); FOIA Request 201800050F, Exp.-Imp. Bank (Apr. 11, 2018); FOIA Request 2016-11-008, Dep't of the Treasury (Nov. 7, 2016); FOIA Requests OS-2017-00057 & OS-2017-00060, Dep't of Interior (Oct. 31, 2016); FOIA Request 2017-00497, Office of Personnel Mgmt. (Oct. 21, 2016); FOIA Request 092320167031, Ctrs. for Medicare & Medicaid Servs. (Oct. 17, 2016); FOIA Request 17-00054-F, Dep't of Educ. (Oct. 6, 2016); FOIA Request DOC-OS-2016-001753, Dept. of Commerce (Sept. 27, 2016); FOIA Request 2016-366-F, Consumer Fin. Prot. Bureau (Aug. 11, 2016); FOIA Request F-2016-09406, Dept. of State (Aug. 11, 2016); FOIA Request 2016-00896, Bureau of Land Mgmt. (Aug. 10, 2016); FOIA Request 796939, Dep't of Labor (Mar. 7, 2016); FOIA Request 2015-HQFO-00691, Dep't of Homeland Sec. (Sept. 22, 2015); FOIA Request HQ-2015-01689-F, Dep't of Energy (Aug. 7, 2015); FOIA Request 2015-OSEC-04996-F, Dep't of Agric. (Aug. 6, 2015); FOIA Request 15-05002, Sec. & Exch. Comm'n (July 23, 2015); FOIA Request 145-FOI-13785, Dep't of Justice (Jun. 16, 2015); FOIA Request 2015-26, Fed. Energy Regulatory Comm'n (Feb. 13, 2015).

Department of Commerce
April 15, 2019
Page 4

the request and any administrative remedies for appeal have been exhausted. It is unlawful for an agency to destroy or dispose of any record subject to a FOIA request.[11]

### Record Production and Contact Information

In an effort to facilitate document review, please provide the responsive documents in electronic form in lieu of a paper production. If a certain portion of responsive records can be produced more readily, CoA Institute requests that those records be produced first and the remaining records be produced on a rolling basis as circumstances permit.

If you have any questions about this request, please contact me by telephone at (202) 499-2422 or by e-mail at kevin.schmidt@causeofaction.org. Thank you for your attention to this matter.

*Kevin Schmidt*

KEVIN SCHMIDT
DIRECTOR OF INVESTIGATIONS

---

[11] *See* 36 C.F.R. § 1230.3(b) ("Unlawful or accidental destruction (also called unauthorized destruction) means . . . disposal of a record subject to a FOIA request, litigation hold, or any other hold requirement to retain the records."); *Chambers v. Dep't of the Interior*, 568 F.3d 998, 1004-05 (D.C. Cir. 2009) ("[A]n agency is not shielded from liability if it intentionally transfers or destroys a document after it has been requested under the FOIA or the Privacy Act."); *Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 41-44 (D.D.C. 1998).

# EXHIBIT

# 1



SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MEMORANDUM FOR SECRETARY OF COMMERCE

SUBJECT: Response to Steel and Aluminum Policy Recommendations

This memo provides a consolidated position from the DoD on the investigation of the effect of steel mill imports and the effects of imports of aluminum on national security, conducted by the Department of Commerce under Section 232 of the Trade Expansion Act of 1962 (hereinafter "Section 232 Report").

Regarding the December 15, 2017 reports on steel and aluminum, DoD believes that the systematic use of unfair trade practices to intentionally erode our innovation and manufacturing industrial base poses a risk to our national security. As such, DoD concurs with the Department of Commerce's conclusion that imports of foreign steel and aluminum based on unfair trading practices impair the national security. As noted in both Section 232 reports, however, the U.S. military requirements for steel and aluminum each only represent about three percent of U.S. production. Therefore, DoD does not believe that the findings in the reports impact the ability of DoD programs to acquire the steel or aluminum necessary to meet national defense requirements.

DoD continues to be concerned about the negative impact on our key allies regarding the recommended options within the reports. However, DoD recognizes that among these reports' alternatives, targeted tariffs are more preferable than a global quota or global tariff. In addition, we recommend an inter-agency group further refine the targeted tariffs, so as to create incentives for trade partners to work with the U.S. on addressing the underlying issue of Chinese transshipment.

If the Administration moves forward with targeted tariffs or quotas on steel, DoD recommends that the management and labor leaders of the respective industries be convened by the President, so that they may understand that these tariffs and quotas are conditional. Moreover, if the Administration takes action on steel, DoD recommends waiting before taking further steps on aluminum. The prospect of trade action on aluminum may be sufficient to coerce improved behavior of bad actors. In either case, it remains important for the President to continue to communicate the negative consequences of unfair trade practices.

This is an opportunity to set clear expectations domestically regarding competitiveness and rebuild economic strength at home while preserving a fair and reciprocal international economic system as outlined in the National Security Strategy. It is critical that we reinforce to

our key allies that these actions are focused on correcting Chinese overproduction and countering their attempts to circumvent existing antidumping tariffs – not the bilateral U.S. relationship.

cc:
Secretary of the Treasury
Secretary of State
Chief of Staff to the President
Assistant to the President for National Security Affairs
Chairman, National Economic Council
United States Trade Representative

2

# EXHIBIT 3



**REMARKS**

# Remarks by President Trump at the Unleashing American Energy Event

— **ENERGY & ENVIRONMENT**

Issued on: **June 29, 2017**

★ ★ ★

U.S. Department of Energy
Washington, D.C.

3:31 P.M. EDT

THE PRESIDENT: Thank you, everybody. Thank you very much. (Applause.) How are you?

Well I want to thank everybody on stage. They are really a terrific team. We have some of the real winners in the audience, too, that I can tell you — some great, great people.

I want to thank Vice President Pence. As always, he's right there and he has really been a help to this administration. We have some big things happening today, and we have some very big things happening over the next month, and I guess probably I can say over the next eight years. I suspect I can say that. (Applause.)

It's wonderful to be here with so many pioneers and visionaries from America's energy industry — great industry. I want to thank the leaders of our great energy

Case 1:19-cv-02698-DLF    Document 51-1    Filed 02/12/22    Page 212 of 236

companies for joining us today and for supporting our efforts to bring true wealth and prosperity to our people. That's true. Come on, give yourself a hand. (Applause.)

You deserve it. You deserve it. You've gone through eight years of hell, and actually I could say even a little bit more than that. You deserve it.

I also want to express our sincere gratitude to the labor union leaders and members who have joined us today. Thank you, fellas. Thank you, thank you. (Applause.) Your workers embody the skill, grit and courage that has always been the true source of American strength. They are great people. They break through rock walls, mine the depths of the earth, and reach through the ocean floor, to bring every ounce of energy into our homes and commerce and into our lives. Our nation salutes you. You're brave and you are great workers. Thank you very much. Thank you, fellas. (Applause.)

Before turning to the topic at hand, I want to provide a brief update on two crucial votes taking place this afternoon on the House Floor — very important. These bills are vital to public safety and national security, and I want to thank Chairman Bob Goodlatte for his efforts. Bob has been working very hard and really for a long time, but we got it going.

First, the House will be voting on Kate's Law — legislation named for Kate Steinle, who was killed by an illegal immigrant with five prior deportations and lots of bad things on his record.

The second is the No Sanctuary for Criminals Act, which blocks federal grants to cities that release dangerous criminal aliens back into the streets, including the vicious and disgusting and horrible MS-13 gang members. And we're getting them out. We are getting them out. They're going — fast. (Applause.)

General Kelly and his whole group — they've gotten rid of 6,000 so far. We're about 50 percent there, and we're actually liberating towns. Like on long Island, where I grew up — we're liberating towns. Those people are so happy to see our guys, and our guys are a lot tougher than the MS-13 characters. That I can tell you. Liberation. (Applause.)

I'm calling on all lawmakers to put the safety of American families first. And let's pass these bills through the House, through the Senate, and send them to my desk. I will give you the fastest approval, the fastest signature that you have ever seen. Right, Mike? We will get that signed so fast. (Applause.) So when we get back, the first thing I'm going to do is how did we do on the vote? I expect good things; otherwise I probably wouldn't be talking about it to be honest with you. I'd just sort of low-key it a little bit. (Laughter.) I don't like losing. I don't like losing. (Laughter.) Neither do you folks. Every member of Congress should vote to save American lives. Many great members of Congress are here with us this afternoon — some great people, some great, great people. Thank you very much. Not only are they working with us on border security, but they share our desire to unleash American energy.

I especially want to thank Secretary Perry for his tremendous leadership in this department. He has really done a terrific job, and he's also a cheerleader — he's really a cheerleader. I watched that in Texas. The thing that I loved about him — he was always saying how great Texas was. And if you don't say it, I don't know. You got to say it, right? And you're doing it right now with energy.

SECRETARY PERRY: Ain't bragging if you can do it.

THE PRESIDENT: That's true.

Along with Secretary of the Interior Ryan Zinke and EPA Administrator Scott Pruitt. And we've been through our battles, Scott. Not with each other, with the world. And now the world is starting to say I think they're right. (Laughter.) They'll find

out. We have no doubt. But all three of them strongly believe in putting America first, which is what I believe in, which is why I got elected. It's called Make America Great Again — that's what we're doing — Make America Great Again.

We're here today to usher in a new American energy policy — one that unlocks million and millions of jobs and trillions of dollars in wealth. For over 40 years, America was vulnerable to foreign regimes that used energy as an economic weapon. Americans' quality of life was diminished by the idea that energy resources were too scarce to support our people. We always thought that, and actually at the time it was right to think. We didn't think we had this tremendous wealth under our feet. Many of us remember the long gas lines and the constant claims that the world was running out of oil and natural gas.

Americans were told that our nation could only solve this energy crisis by imposing draconian restrictions on energy production. But we now know that was all a big, beautiful myth. It was fake. Don't we love that term, "fake"? What we've learned about fake over the last little while — fake news, CNN. Fake. (Laughter and Applause.) Whoops, their camera just went off. (Laughter.) Okay, you can come back. I won't say — I promise I won't say anything more about you. I see that red light go off, I say, whoa. The truth is that we have near-limitless supplies of energy in our country. Powered by new innovation and technology, we are now on the cusp of a true energy revolution.

Our country is blessed with extraordinary energy abundance, which we didn't know of, even five years ago and certainly ten years ago. We have nearly 100 years' worth of natural gas and more than 250 years' worth of clean, beautiful coal. We are a top producer of petroleum and the number-one producer of natural gas. We have so much more than we ever thought possible. We are really in the driving seat. And you know what? We don't want to let other countries take away our sovereignty and tell us what to do and how to do it. That's not going to happen. (Applause.) With these incredible resources, my administration will seek not only

American energy independence that we've been looking for so long, but American energy dominance.

And we're going to be an exporter — exporter. (Applause.) We will be dominant. We will export American energy all over the world, all around the globe. These energy exports will create countless jobs for our people, and provide true energy security to our friends, partners, and allies all across the globe.

But this full potential can only be realized when government promotes energy development — that's this guy right here, and he'll do it better than anybody — instead of obstructing it like the Democrats. They obstruct it. But we get through it. We cannot have obstruction. We have to get out and do our job better and faster than anybody in the world, certainly when it comes to one of our great assets — energy. This vast energy wealth does not belong to the government. It belongs to the people of the United States of America. (Applause.) Yet, for the past eight years, the federal government imposed massive job-killing barriers to American energy development.

Since my very first day in office, I have been moving at record pace to cancel these regulations and to eliminate the barriers to domestic energy production, like never before. Job-killing regulations are being removed and vital infrastructure projects are being approved at a level that they've never seen before. As you all know, I approved the Keystone XL Pipeline and the Dakota Access Pipeline in my first week. Thousands of jobs — tremendous things are happening. And, by the way, I thought I'd take a lot of heat. I didn't take any heat. I approved them and that was it. I figured we'd have all sorts of protests. We didn't have anything.

But I have to do — whether it's protesting or not, I have to do what's right. But people celebrate those two transactions, as opposed to protesting. But sometimes you have to go out and just do it, and you find out. Whatever happens, happens. But you have to be right for the American people. (Applause.) Thank you.

I'm dramatically reducing restrictions on the development of natural gas. I cancelled the moratorium on a new coal leasing — and you know what was happening — the new coal leasing on federal lands, it was being so terribly restricted. And now with Ryan and with a group, it's going to be open, and the land will be left in better shape than it is right now. Is that right? Better shape. (Applause.)

We have finally ended the war on coal. And I am proud to report that Corsa Coal, here with us today, just opened a brand-new coal mine in the state of Pennsylvania, the first one in many, many, many years. Corsa, stand up. Come on. (Applause.) Congratulations. Congratulations. Employing a lot of people, and we are putting the coal miners back to work just like I promised — just like I promised when I went through Ohio and West Virginia, Wyoming and all of the different places. And I see Bob back there. Congratulations, Bob. He's in great shape, right? You in good shape, Bob? Right from the beginning. Good. You just take care of yourself, all right?

We're ending intrusive EPA regulations that kill jobs, hurt family farmers and ranchers, and raise the price of energy so quickly and so substantially.

In order to protect American jobs, companies and workers, we've withdrawn the United States from the one-sided Paris Climate Accord. (Applause.)

And I won't get into it, but believe me, that really put this country at a disadvantage. Number one, we weren't playing on the same field. It kicked in for us, and it doesn't kick in for others. The money that we had to pay was enormous. It was not even close. And maybe we'll be back into it someday, but it will be on better terms. It will be on fair terms — not on terms where we're the people that don't know what we're doing.

So we'll see what happens. But I will tell you we're proud of it. And when I go around, there are so many people that say thank you. You saved the sovereignty of

our country.  You saved our wealth because we would have a hard time getting to
this newfound wealth.  And that's not going to happen with our country.
(Applause.)

Today, I am proudly announcing six brand-new initiatives to propel this new era of
American energy dominance.  First, we will begin to revive and expand our nuclear
energy sector — which I'm so happy about — which produces clean, renewable and
emissions-free energy.  A complete review of U.S. nuclear energy policy will help us
find new ways to revitalize this crucial energy resource.  And I know you're very
excited about that, Rick.

Second, the Department of the Treasury will address barriers to the financing of
highly efficient, overseas coal energy plants.  Ukraine already tells us they need
millions and millions of metric tons right now.  There are many other places that
need it, too.  And we want to sell it to them, and to everyone else all over the globe
who need it.

Third, my administration has just approved the construction of a new petroleum
pipeline to Mexico, which will further boost American energy exports, and that will
go right under the wall, right?  It's going under, right?  (Laughter and applause.)
Have it go down a little deeper in that one section.  You know, a little like this.
Right under the wall.

Fourth, just today, a major U.S. company, Sempra Energy, signed an agreement to
begin negotiations for the sale of more American natural gas to South Korea.  And,
as you know, the leaders of South Korea are coming to the White House today, and
we've got a lot of discussion to do.  But we will also be talking about them buying
energy from the United States of America, and I'm sure they'll like to do it.  They
need it.  Thank you.  (Applause.)

Fifth, the United States Department of Energy is announcing today that it will
approve two long-term applications to export additional natural gas from the Lake

Charles LNG terminal in Louisiana. It's going to be a big deal. It's a great announcement.

Finally, in order to unlock more energy from the 94 percent of offshore land closed to development, under the previous administration, so much of our land was closed to development. We're opening it up, the right areas, but we're opening it up — we're creating a new offshore oil and gas leasing program. America will be allowed to access the vast energy wealth located right off our shores. And this is all just the beginning — believe me.

The golden era of American energy is now underway. And I'll go a step further: The golden era of America is now underway. Believe me. (Applause.)

And you're all going to be a part of it in creating this exciting new future. We will bring new opportunity to the heartland, new prosperity to our inner cities, and new infrastructure all across our nation. When it comes to the future of America's energy needs, we will find it, we will dream it, and we will build it.

American energy will power our ships, our planes and our cities. American hands will bend the steel and pour the concrete that brings this energy into our homes and that exports this incredible, newfound energy all around the world. And American grit will ensure that what we dream, and what we build, will truly be second to none. We will be number one again all the way. We're going to make America great again.

Thank you, God bless you, and God bless America. Thank you. (Applause.)

END
3:49 P.M. EDT

# EXHIBIT 4



Regional Programs Unit at (213) 894–3437.

Records and documents discussed during the meeting will be available for public viewing prior to and after the meeting at *https://facadatabase.gov/committee/meetings.aspx?cid=234*. Please click on the "Meeting Details" and "Documents" links. Records generated from this meeting may also be inspected and reproduced at the Regional Programs Unit, as they become available, both before and after the meeting. Persons interested in the work of this Committee are directed to the Commission's website, *https://www.usccr.gov*, or may contact the Regional Programs Unit at the above email or street address.

*Agenda:*

I. Welcome

II. Presentations by Virgene Hanna and Jessica Passini

III. Public Comment

IV. Next Steps

V. Adjournment

*Exceptional Circumstance:* Pursuant to 41 CFR 102–3.150, the notice for this meeting is given less than 15 calendar days prior to the meeting because of the exceptional circumstance of staffing limitations that require immediate action.

Dated: July 20, 2018.

**David Mussatt,**

*Supervisory Chief, Regional Programs Unit.*

[FR Doc. 2018–15931 Filed 7–24–18; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF COMMERCE

### Economic Development Administration

**Notice of Petitions by Firms for Determination of Eligibility To Apply for Trade Adjustment Assistance**

**AGENCY:** Economic Development Administration, U.S. Department of Commerce.

**ACTION:** Notice and opportunity for public comment.

**SUMMARY:** The Economic Development Administration (EDA) has received petitions for certification of eligibility to apply for Trade Adjustment Assistance from the firms listed below. Accordingly, EDA has initiated investigations to determine whether increased imports into the United States of articles like or directly competitive with those produced by each of the firms contributed importantly to the total or partial separation of the firms' workers, or threat thereof, and to a decrease in sales or production of each petitioning firm.

**SUPPLEMENTARY INFORMATION:**

LIST OF PETITIONS RECEIVED BY EDA FOR CERTIFICATION OF ELIGIBILITY TO APPLY FOR TRADE ADJUSTMENT ASSISTANCE

[07/11/2018 through 07/17/2018]

| Firm name | Firm address | Date accepted for investigation | Product(s) |
|---|---|---|---|
| Mectron Engineering Company, Inc.. | 400 South Industrial Drive, Saline, MI 48176. | 7/13/2018 | The firm manufactures high-speed industrial inspection machinery. |
| Seidel, LLC ..................................... | 2223 Thomaston Avenue, Waterbury, CT 06704. | 7/13/2018 | The firm provides aluminum anodizing finishes for various industries and applications. |
| Meyer Wells, Inc. ............................ | 421 3rd Avenue West, Seattle, WA 98119. | 7/17/2018 | The firm manufactures commercial and residential furniture, mostly made of reclaimed wood. |

Any party having a substantial interest in these proceedings may request a public hearing on the matter. A written request for a hearing must be submitted to the Trade Adjustment Assistance Division, Room 71030, Economic Development Administration, U.S. Department of Commerce, Washington, DC 20230, no later than ten (10) calendar days following publication of this notice. These petitions are received pursuant to section 251 of the Trade Act of 1974, as amended.

Please follow the requirements set forth in EDA's regulations at 13 CFR 315.9 for procedures to request a public hearing. The Catalog of Federal Domestic Assistance official number and title for the program under which these petitions are submitted is 11.313, Trade Adjustment Assistance for Firms.

**Irette Patterson,**

*Program Analyst.*

[FR Doc. 2018–15850 Filed 7–24–18; 8:45 am]

**BILLING CODE 3510–WH–P**

---

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

**Notice of Request for Public Comments on Section 232 National Security Investigation of Imports of Uranium**

**AGENCY:** Bureau of Industry and Security, Office of Technology Evaluation, U.S. Department of Commerce.

**ACTION:** Notice of request for public comments.

**SUMMARY:** The Secretary of Commerce has initiated an investigation to determine the effects on the national security of imports of uranium. This investigation has been initiated under section 232 of the Trade Expansion Act of 1962, as amended.

Interested parties are invited to submit written comments, data, analyses, or other information pertinent to the investigation to the Department of Commerce's Bureau of Industry and Security. This notice identifies issues on which the Department is especially interested in obtaining the public's views.

**DATES:** Comments may be submitted at any time but must be received by September 10, 2018.

**ADDRESSES:** All written comments on the notice must be submitted by one of the following methods:

• *By the Federal eRulemaking Portal: http://www.regulations.gov.* Comments on this notice may be submitted to *regulations.gov* docket number BIS–2018–0011.

• By mail or delivery to Michael Vaccaro, Acting Director, Office of Technology Evaluation, Bureau of Industry and Security, U.S. Department of Commerce, 1401 Constitution Avenue NW, Room 1093, Washington, DC 20230.

• By email directly to *Uranium232@bis.doc.gov.*

**FOR FURTHER INFORMATION CONTACT:**
Michael Vaccaro, Acting Director, Office
of Technology Evaluation, Bureau of
Industry and Security, U.S. Department
of Commerce (202) 482–4060,
*Uranium232@bis.doc.gov.* For more
information about the section 232
program, including the regulations and
the text of previous investigations, see
*www.bis.doc.gov/232.*

**SUPPLEMENTARY INFORMATION:**

**Background**

On July 18, 2018, the Secretary of
Commerce ("Secretary") initiated an
investigation under section 232 of the
Trade Expansion Act of 1962, as
amended (19 U.S.C. 1862), to determine
the effects on the national security of
imports of uranium.

**Written Comments**

This investigation is being undertaken
in accordance with part 705 of the
National Security Industrial Base
Regulations (15 CFR parts 700 to 709)
("NSIBR"). Interested parties are invited
to submit written comments, data,
analyses, or information pertinent to
this investigation to the Office of
Technology Evaluation, U.S.
Department of Commerce ("the
Department"), no later than September
10, 2018.

The Department is particularly
interested in comments and information
directed to the criteria listed in § 705.4
of the regulations as they affect national
security, including the following: (a)
Quantity of or other circumstances
related to the importation of uranium;
(b) Domestic production and productive
capacity needed for uranium to meet
projected national defense
requirements; (c) Existing and
anticipated availability of human
resources, products, raw materials,
production equipment, and facilities to
produce uranium; (d) Growth
requirements of the uranium industry to
meet national defense requirements
and/or requirements to assure such
growth; (e) The impact of foreign
competition on the economic welfare of
the uranium industry; (f) The
displacement of any domestic uranium
production causing substantial
unemployment, decrease in the
revenues of government, loss of
investment or specialized skills and
productive capacity, or other serious
effects; (g) Relevant factors that are
causing or will cause a weakening of our
national economy; and (h) Any other
relevant factors.

Material submitted by members of the
public that is business confidential
information will be exempted from
public disclosure as provided for by

§ 705.6 of the regulations. Anyone
submitting business confidential
information should clearly identify the
business confidential portion of the
submission, file a statement justifying
nondisclosure and referring to the
specific legal authority claimed, and
provide a non-confidential submission
which can be placed in the public file.
Communications from agencies of the
United States Government will not be
made available for public inspection. If
public hearings are held in support of
this investigation, a separate **Federal
Register** notice will be published.

The Bureau of Industry and Security
does not maintain a separate public
inspection facility. Requesters should
first view the Bureau's web page, which
can be found at *https://
efoia.bis.doc.gov/* (see "Electronic
FOIA" heading). If requesters cannot
access the website, they may call 202–
482–0795 for assistance. The records
related to this assessment are made
accessible in accordance with the
regulations published in part 4 of title
15 of the Code of Federal Regulations
(15 CFR 4.1 *et seq.*).

Dated: July 19, 2018.

**Wilbur Ross,**

*Secretary of Commerce.*

[FR Doc. 2018–15891 Filed 7–24–18; 8:45 am]

**BILLING CODE 3510–33–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–570–814]**

**Carbon Steel Butt-Weld Pipe Fittings
From the People's Republic of China:
Preliminary Affirmative Determination
of Circumvention of the Antidumping
Duty Order**

**AGENCY:** Enforcement and Compliance,
International Trade Administration,
Department of Commerce.

**SUMMARY:** The Department of Commerce
(Commerce) preliminarily determines
that carbon steel butt-weld pipe fittings
(butt-weld pipe fittings) exported from
Malaysia, which were completed in
Malaysia using finished or unfinished
butt-weld pipe fittings sourced from the
People's Republic of China (China), are
circumventing the antidumping duty
(AD) order on butt-weld pipe fittings
from China.

**DATES:** Applicable July 25, 2018.

**FOR FURTHER INFORMATION CONTACT:** Jerry
Huang or Susan Pulongbarit, AD/CVD
Operations, Office V, Enforcement and
Compliance, International Trade
Administration, U.S. Department of
Commerce, 1401 Constitution Avenue

NW, Washington, DC 20230; telephone:
(202) 482–4047 or (202) 482–4031,
respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

On July 6, 1992, Commerce issued the
AD order on imports of butt-weld pipe
fittings from China.[1] Additionally, on
March 31, 1994, Commerce issued an
affirmative final anti-circumvention
determination finding that imports into
the United States of pipe fittings that
were finished in Thailand from
unfinished pipe fittings produced in
China constituted circumvention of the
*Order* within the meaning of section
781(b) of the Tariff Act of 1930, as
amended (the Act).[2] Commerce applied
this finding of circumvention to all
imports of butt-weld pipe fittings from
Thailand, regardless of manufacturer/
producer, unless accompanied by a
certification stating that such pipe
fittings have not been produced from
unfinished pipe fittings sourced from
China.[3]

On May 22, 2017, Tube Forgings of
America, Inc., Mills Iron Works, Inc.,
and Hackney Ladish, Inc., (collectively,
the domestic parties), alleged that
imports of butt-weld pipe fittings which
were completed in Malaysia using
finished or unfinished butt-weld pipe
fittings sourced from China are
circumventing the *Order.*[4] In their
allegation, the domestic parties
requested that Commerce initiate an
anti-circumvention inquiry pursuant to
section 781(b) of the Act, and 19 CFR
351.225(h), to determine whether
imports of butt-weld pipe fittings
sourced from unfinished or finished
butt-weld pipe fittings from the PRC
have undergone minor finishing
processes, or were simply marked with
"Malaysia" as the country of origin, in
Malaysia, before export to the United
States constitutes circumvention of the
*Order.* The domestic parties also
requested that Commerce reach an
affirmative determination of
circumvention for all imports of butt-

---

[1] *See Antidumping Duty Order and Amendment
to the Final Determination of Sales at Less Than
Fair Value; Certain Carbon Steel Butt-Weld Pipe
Fittings from the People's Republic of China,* 57 FR
29702 (July 6, 1992) (*Order*).

[2] *See Certain Carbon Steel Butt-Weld Pipe Fittings
from the People's Republic of China; Affirmative
Final Determination of Circumvention of
Antidumping Duty Order,* 59 FR 15155 (March 31,
1994).

[3] *Id.,* at 15158–59.

[4] *See* Letter from the domestic parties to the
Secretary of Commerce, "Carbon Steel Butt-Weld
Pipe Fittings from the People's Republic of China,
A–570–814; Request for Circumvention Ruling
Pursuant to Section 781(b) of the Tariff Act of
1930," dated May 22, 2017.

# EXHIBIT 5

email address prior to placing callers into the conference room. Callers can expect to incur regular charges for calls they initiate over wireless lines, according to their wireless plan. The Commission will not refund any incurred charges. Callers will incur no charge for calls they initiate over land-line connections to the toll-free telephone number. Persons with hearing impairments may also follow the proceedings by first calling the Federal Relay Service at 1–800–877–8339 and providing the Service with the conference call number and conference ID number.

Members of the public are also entitled to submit written comments; the comments must be received in the regional office within 30 days following the meeting. Written comments may be mailed to the Midwestern Regional Office, U.S. Commission on Civil Rights, 230 S Dearborn St., Suite 2120, Chicago, IL 60604. They may also be faxed to the Commission at (312) 353–8324, or emailed to Carolyn Allen at *callen@ usccr.gov*. Persons who desire additional information may contact the Midwestern Regional Office at (312) 353–8311.

Records generated from this meeting may be inspected and reproduced at the Midwestern Regional Office, as they become available, both before and after the meeting. Records of the meeting will be available via *www.facadatabase.gov* under the Commission on Civil Rights, Michigan Advisory Committee link (*http://www.facadatabase.gov/ committee/meetings.aspx?cid=255*). Persons interested in the work of this Committee are directed to the Commission's website, *http:// www.usccr.gov*, or may contact the Midwestern Regional Office at the above email or street address.

**Agenda**

Welcome and Introductions
Discussion: Civil Rights in Michigan:
   Voting Rights
Public Comment
Future Plans and Actions
Adjournment

Dated: September 4, 2018.

**David Mussatt,**

*Supervisory Chief, Regional Programs Unit.*

[FR Doc. 2018–19503 Filed 9–7–18; 8:45 am]

**BILLING CODE 6335–01–P**

---

**DEPARTMENT OF COMMERCE**

**Submission for OMB Review; Comment Request**

The Department of Commerce will submit to the Office of Management and Budget (OMB) for clearance the following proposal for collection of information under the provisions of the Paperwork Reduction Act (44 U.S.C. Chapter 35).

*Agency:* National Institute of Standards and Technology, Commerce.

*Title:* Analysis of Exoskeleton-Use for Enhancing Human Performance Data Collection.

*OMB Control Number:* 0693–XXXX.
*Form Number(s):* None (new submission).

*Type of Request:* Regular.
*Number of Respondents:* 180.
*Average Hours per Response:* 10 minutes.

*Burden Hours:* 30 hours.

*Needs and Uses:* NIST's Engineering Laboratory will be developing methods to evaluate performance of exoskeletons in two key areas (1) The fit and motion of the exoskeleton device with respect to the users' body and (2) The impact that using an exoskeleton has on the performance of users executing tasks that are representative of activities in industrial settings. The results of these experiments will inform future test method development at NIST, other organizations, and under the purview of the new American Society for Testing Materials (ASTM) Committee F48 on Exoskeletons and Exosuits.

*Affected Public:* Individuals participating in the study.

*Frequency:* On occasion.

*Respondent's Obligation:* Voluntary.

This information collection request may be viewed at *reginfo.gov*. Follow the instructions to view Department of Commerce collections currently under review by OMB.

Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *OIRA_Submission@ omb.eop.gov* or fax to (202) 395–5806.

**Sheleen Dumas,**

*Departmental Lead PRA Officer, Office of the Chief Information Officer.*

[FR Doc. 2018–19504 Filed 9–7–18; 8:45 am]

**BILLING CODE 3510–13–P**

---

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**Change in Comment Deadline for Section 232 National Security Investigation of Imports of Uranium**

**AGENCY:** Bureau of Industry and Security, Office of Technology Evaluation, U.S. Department of Commerce.

**ACTION:** Notice on change in comment period for previously published notice of request for public comments.

**SUMMARY:** On July 25, 2018, the Bureau of Industry and Security (BIS) published the Notice of Inquiry for Public Comments on Section 232 National Security Investigation of Imports of Uranium. The July 25 notice specified that the Secretary of Commerce initiated an investigation to determine the effects on the national security of imports of uranium. This investigation has been initiated under section 232 of the Trade Expansion Act of 1962, as amended. The July 25 notice invited interested parties to submit written comments, data, analyses, or other information pertinent to the investigation to the Department of Commerce's Bureau of Industry and Security. The deadline for the written comments was September 10, 2018. Today's notice changes the comment deadline to September 25, 2018.

**DATES:** Comments may be submitted at any time but must be received by September 25, 2018.

**ADDRESSES:** All written comments on the notice must be submitted by one of the following methods:

• *By the Federal eRulemaking Portal: http://www.regulations.gov*. Comments on this notice may be submitted to *regulations.gov* docket number BIS–2018–0011.

• By mail or delivery to Michael Vaccaro, Acting Director, Office of Technology Evaluation, Bureau of Industry and Security, U.S. Department of Commerce, 1401 Constitution Avenue NW, Room 1093, Washington, DC 20230.

• By email directly to *Uranium232@ bis.doc.gov*.

**FOR FURTHER INFORMATION CONTACT:** Michael Vaccaro, Acting Director, Office of Technology Evaluation, Bureau of Industry and Security, U.S. Department of Commerce (202) 482–4506, *Uranium232@bis.doc.gov*. For more information about the section 232 program, including the regulations and the text of previous investigations, see *www.bis.doc.gov/232*.

**SUPPLEMENTARY INFORMATION:**

**Background**

On July 25, 2018, (83 FR 35204), the Bureau of Industry and Security (BIS) published the *Notice of Request for Public Comments on Section 232 National Security Investigation of Imports of Uranium*. The July 25 notice specified that on July 18, 2018, the Secretary of Commerce had initiated an investigation to determine the effects on

the national security of imports of uranium. This investigation was initiated under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862). (*See* the July 25 notice for additional details on the investigation and the request for public comments.)

**Change in Comment Period Deadline**

The July 25 notice included a comment period deadline of September 10, 2018. The Department received three requests from the public to extend the comment period deadline, including one request from a trade association. The Department of Commerce has determined at this time that it is warranted to extend the comment period by fifteen calendar days. Today's notice specifies that comments may be submitted at any time but must be received by September 25, 2018, to be considered in the drafting of the final report. Today's notice extends the comment period by fifteen days to allow for additional time for the public to submit comments on the investigation of imports of uranium.

Dated: September 5, 2018.

**Richard E. Ashooh,**
*Assistant Secretary for Export Administration.*
[FR Doc. 2018-19651 Filed 9-7-18; 8:45 am]
**BILLING CODE 3510-33-P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**Initiation of Antidumping and Countervailing Duty Administrative Reviews**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.
**SUMMARY:** The Department of Commerce (Commerce) has received requests to conduct administrative reviews of various antidumping and countervailing duty orders and findings with July anniversary dates. In accordance with Commerce's regulations, we are initiating those administrative reviews.
**DATES:** Applicable September 10, 2018.
**FOR FURTHER INFORMATION CONTACT:** Brenda E. Brown, Office of AD/CVD Operations, Customs Liaison Unit, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230, telephone: (202) 482-4735.
**SUPPLEMENTARY INFORMATION:**

**Background**

Commerce has received timely requests, in accordance with 19 CFR

351.213(b), for administrative reviews of various antidumping and countervailing duty orders and findings with July anniversary dates.

All deadlines for the submission of various types of information, certifications, or comments or actions by Commerce discussed below refer to the number of calendar days from the applicable starting time.

**Notice of No Sales**

If a producer or exporter named in this notice of initiation had no exports, sales, or entries during the period of review (POR), it must notify Commerce within 30 days of publication of this notice in the **Federal Register**. All submissions must be filed electronically at *http://access.trade.gov* in accordance with 19 CFR 351.303.[1] Such submissions are subject to verification in accordance with section 782(i) of the Tariff Act of 1930, as amended (the Act). Further, in accordance with 19 CFR 351.303(f)(1)(i), a copy must be served on every party on Commerce's service list.

**Respondent Selection**

In the event Commerce limits the number of respondents for individual examination for administrative reviews initiated pursuant to requests made for the orders identified below, Commerce intends to select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports during the period of review. We intend to place the CBP data on the record within five days of publication of the initiation notice and to make our decision regarding respondent selection within 30 days of publication of the initiation **Federal Register** notice. Comments regarding the CBP data and respondent selection should be submitted seven days after the placement of the CBP data on the record of this review. Parties wishing to submit rebuttal comments should submit those comments five days after the deadline for the initial comments.

In the event Commerce decides it is necessary to limit individual examination of respondents and conduct respondent selection under section 777A(c)(2) of the Act:

In general, Commerce has found that determinations concerning whether particular companies should be "collapsed" (*e.g.*, treated as a single entity for purposes of calculating antidumping duty rates) require a substantial amount of detailed information and analysis, which often

require follow-up questions and analysis. Accordingly, Commerce will not conduct collapsing analyses at the respondent selection phase of this review and will not collapse companies at the respondent selection phase unless there has been a determination to collapse certain companies in a previous segment of this antidumping proceeding (*e.g.*, investigation, administrative review, new shipper review or changed circumstances review). For any company subject to this review, if Commerce determined, or continued to treat, that company as collapsed with others, Commerce will assume that such companies continue to operate in the same manner and will collapse them for respondent selection purposes. Otherwise, Commerce will not collapse companies for purposes of respondent selection. Parties are requested to (a) identify which companies subject to review previously were collapsed, and (b) provide a citation to the proceeding in which they were collapsed. Further, if companies are requested to complete the Quantity and Value (Q&V) Questionnaire for purposes of respondent selection, in general each company must report volume and value data separately for itself. Parties should not include data for any other party, even if they believe they should be treated as a single entity with that other party. If a company was collapsed with another company or companies in the most recently completed segment of this proceeding where Commerce considered collapsing that entity, complete Q&V data for that collapsed entity must be submitted.

**Deadline for Withdrawal of Request for Administrative Review**

Pursuant to 19 CFR 351.213(d)(1), a party that has requested a review may withdraw that request within 90 days of the date of publication of the notice of initiation of the requested review. The regulation provides that Commerce may extend this time if it is reasonable to do so. Determinations by Commerce to extend the 90-day deadline will be made on a case-by-case basis.

**Separate Rates**

In proceedings involving non-market economy (NME) countries, Commerce begins with a rebuttable presumption that all companies within the country are subject to government control and, thus, should be assigned a single antidumping duty deposit rate. It is Commerce's policy to assign all exporters of merchandise subject to an administrative review in an NME country this single rate unless an exporter can demonstrate that it is

---

[1] *See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures*, 76 FR 39263 (July 6, 2011).

# EXHIBIT 6



**PRESIDENTIAL MEMORANDA**

# Memorandum on the Effect of Uranium Imports on the National Security and Establishment of the United States Nuclear Fuel Working Group

**NATIONAL SECURITY & DEFENSE**

Issued on: **July 12, 2019**

★ ★ ★

MEMORANDUM FOR THE SECRETARY OF STATE

THE SECRETARY OF THE TREASURY

THE SECRETARY OF DEFENSE

THE SECRETARY OF THE INTERIOR

THE SECRETARY OF COMMERCE

THE SECRETARY OF ENERGY

THE DIRECTOR OF THE OFFICE OF MANAGEMENT AND

BUDGET

THE ASSISTANT TO THE PRESIDENT FOR NATIONAL

SECURITY AFFAIRS

THE ASSISTANT TO THE PRESIDENT FOR ECONOMIC

POLICY

THE DIRECTOR OF THE OFFICE OF SCIENCE AND

TECHNOLOGY POLICY

THE CHAIRMAN OF THE COUNCIL OF ECONOMIC ADVISERS

THE CHAIRMAN OF THE NUCLEAR REGULATORY COMMISSION

THE CHAIRMAN OF THE FEDERAL ENERGY REGULATORY

COMMISSION

SUBJECT:    The Effect of Uranium Imports on the National
Security and Establishment of the United States
Nuclear Fuel Working Group

By the authority vested in me as President by the Constitution and the laws of the
United States of America, including section 232 of the Trade Expansion Act of 1962,
as amended (19 U.S.C. 1862) (the "Act"), it is hereby ordered as follows:

Section 1. The Secretary of Commerce's Investigation into the Effect of Uranium
Imports on the National Security. (a) On April 14, 2019, the Secretary of Commerce
(Secretary) transmitted to me a report on his investigation into the effect of imports
of uranium (uranium ore, uranium concentrate, uranium hexafluoride, enriched
uranium, and enriched uranium in fuel assemblies) on the national security of the
United States under section 232 of the Act.

(b) The Secretary found and advised me of his opinion that uranium is being
imported into the United States in such quantities and under such circumstances as
to threaten to impair the national security of the United States as defined under
section 232 of the Act. Currently, the United States imports approximately 93
percent of its commercial uranium, compared to 85.8 percent in 2009. The
Secretary found that this figure is because of increased production by foreign state-
owned enterprises, which have distorted global prices and made it more difficult for
domestic mines to compete.

(c) At this time, I do not concur with the Secretary's finding that uranium imports
threaten to impair the national security of the United States as defined under
section 232 of the Act. Although I agree that the Secretary's findings raise
significant concerns regarding the impact of uranium imports on the national
security with respect to domestic mining, I find that a fuller analysis of national
security considerations with respect to the entire nuclear fuel supply chain is
necessary at this time.

Sec. 2. Establishment of the United States Nuclear Fuel Working Group. (a) I agree with the Secretary that the United States uranium industry faces significant challenges in producing uranium domestically and that this is an issue of national security. The United States requires domestically produced uranium to satisfy Department of Defense (DOD) requirements for maintaining effective military capabilities — including nuclear fuel for the United States Navy's fleet of nuclear-powered aircraft carriers and nuclear-powered submarines, source material for nuclear weapons, and other functions. Domestic mining, milling, and conversion of uranium, however, while significant, are only a part of the nuclear supply chain necessary for national security, including DOD needs.

(b) On June 29, 2017, I announced an initiative to revive and expand the nuclear energy sector and directed a complete review of United States nuclear energy policy to help find new ways to revitalize this crucial energy resource. Nuclear fuel production is critical to a vibrant nuclear energy sector. Over many prior administrations, the Federal Government has neglected to consider the impacts on key components of our nuclear fuel production infrastructure, while simultaneously increasing regulatory barriers for private-sector innovation in this technology.

(c) To address the concerns identified by the Secretary regarding domestic uranium production and to ensure a comprehensive review of the entire domestic nuclear supply chain:

(i)  The Assistant to the President for National Security Affairs and the Assistant to the President for Economic Policy shall establish a United States Nuclear Fuel Working Group (Working Group) to develop recommendations for reviving and expanding domestic nuclear fuel production.

(ii)  The Working Group shall include the following members or their designees:

(A) the Assistant to the President for National Security Affairs, who shall serve as one of the Co-Chairs;

(B)  the Assistant to the President for Economic Policy, who shall serve as the other Co-Chair;

(C)  the Secretary of State;

(D)  the Secretary of the Treasury;

(E)  the Secretary of Defense;

(F)  the Secretary of the Interior;

(G)  the Secretary of Commerce;

(H)  the Secretary of Energy;

(I)  a designee of the Nuclear Regulatory Commission;

(J)  a designee of the Federal Energy Regulatory Commission;

(K)  the Director of the Office of Management and Budget;

(L)  the Director of the Office of Science and Technology Policy;

(M)  the Chairman of the Council of Economic Advisers; and

(N)  such other officials of the Federal Government as the Assistant to the President for National Security Affairs or the Assistant to the President for Economic Policy may invite to participate.

(iii)  The Working Group shall examine the current state of domestic nuclear fuel production to reinvigorate the entire nuclear fuel supply chain, consistent with United States national security and nonproliferation goals.

(iv)  Within 90 days of the date of this memorandum, the Working Group, through the Assistant to the President for National Security Affairs and the Assistant to the President for Economic Policy, shall submit a report to the President setting forth the Working Group's findings and making recommendations to further enable domestic nuclear fuel production if needed.

Sec. 3.  General Provisions.  (a)  Nothing in this memorandum shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof;

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals; or

(iii)  existing rights or obligations under international agreements.

(b)  This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CAUSE OF ACTION INSTITUTE,

        Plaintiff,

            v.                          CASE NO. 19-cv-2968

UNITED STATES DEPARTMENT OF
COMMERCE,

        Defendant.

**SUPPLEMENTAL DECLARATION OF BRIAN D. LIEBERMAN**

I, Brian D. Lieberman, do hereby declare, subject to 28 U.S.C. § 1746, that the following statements are true and correct, to the best of my knowledge and belief:

1. I currently serve as Senior Counsel with the General Litigation Division of the Office of the General Counsel for the United States Department of Commerce ("DOC" or "Department"). I have served in this position since January 2019. My responsibilities include advising the Department and its component agencies regarding requests submitted for records made under both the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a, and litigation related to such requests. In this capacity, I routinely consult with the FOIA offices for the Department and agencies regarding requests.

2. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, upon conclusions and determinations reached and made in accordance therewith,

and upon my personal examination of the withheld document. I am

personally familiar with the FOIA requests of Plaintiff Cause of Action

("Plaintiff"), which are at issue in this case.

3.      This Declaration is being submitted in further support of DOC's Motion for

Summary Judgment.

**The U.S. Nuclear Fuel Working Group Report**

4.      This case concerns Plaintiff's request for the report that the Secretary of

Commerce (Secretary) prepared concerning the effect of uranium imports on

the domestic uranium industry (Uranium Report) pursuant to 19 U.S.C. §

1862, Section 232 of the Trade Expansion Act of 1962 (Section 232), which

the Secretary submitted to the President on April 14, 2019. (See Declaration

of Brian D. Lieberman, "Initial Lieberman Decl.," at Para. 25).

5.      At the time that DOC submitted its Motion for Summary Judgment, the U.S.

Nuclear Fuel Working Group (Working Group) had not yet completed the

report that the President had directed it to provide him "address[ing] the

concerns identified by the Secretary regarding domestic uranium production

and to ensure a comprehensive review of the entire domestic nuclear fuel

supply chain." (Id. at Para. 31 & Ex. 6 thereto). As DOC noted, the

Working Group was actively engaged in providing this analysis and would

be submitting its report to him. (Id. at Para. 33).

6.      Subsequently, on April 23, 2020, the Working Group submitted its report,

entitled *Restoring America's Competitive Nuclear Energy Advantage: A*

*Strategy to Assure U.S. National Security* (Working Group Report), to the

President.  The U.S. government has made the Working Group Report

publicly available.[1]

**The Continued Withholding of the Uranium Report Is Justified**

7.      Although the Working Group Report is publicly available, DOC has

determined that it must continue to withhold the Uranium Report while the

President remains engaged in determining what further measures may be

required to enable domestic nuclear fuel production.  DOC has decided this

is necessary because the Uranium Report remains pertinent to the

President's decision-making regarding domestic uranium, including the

many recommendations made in the Working Group Report to support this

domestic industry and enhance national security.

8.      By way of example, the Working Group Report concluded that "[u]ranium

is a critical mineral" and that "[w]e must reduce vulnerabilities and build

supply chain resilience to reclaim U.S. nuclear leadership and reassert

America's ability to govern the use of uranium, before it is too late."

(Working Group Report at 8).  Further, the Working Group found that "all

sectors of the U.S. nuclear fuel cycle are fragile," including uranium, and

that the U.S. must take steps to ensure uranium availability.  (Id. at 9).

9.      Specific measures to facilitate domestic uranium production include, *inter*

*alia*, establishing a national Uranium Reserve, streamlining regulatory

reform and land access for uranium extraction and supporting DOC efforts

---

[1] The full report is available at
https://www.energy.gov/sites/prod/files/2020/04/f74/Restoring%20America%27s%20Competitive%20Nuclear%20
Advantage_1.pdf.

to protect against "uranium dumping" by Russia through extension of the Russian Suspension Agreement. (Id. at 15-16, 18-20).

10.  The Uranium Report addresses the particular needs and concerns of the domestic uranium industry in detail and remains salient to the President's assessment of the options identified to assist this industry by the Working Group Report.  Therefore, DOC has concluded the Uranium Report must still be withheld from disclosure pursuant to the presidential communications and deliberative process privileges under Freedom of Information Act (FOIA) Exemption 5, 5 U.S.C. § 552(b)(5).

**There Is No Response Letter to DOC From the  Department of Defense Regarding the Uranium Report**

11.  In DOC's initial motion papers, DOC indicated that neither it nor the Bureau of Industry and Security (BIS) had a document responsive to the second portion of Plaintiff's request, which sought, "The DOD [Department of Defense] response letter to the Section 232 Investigation Into the Effects of Imports of Uranium on the National Security."  (Initial Lieberman Decl., at Para. 10 n. 1).

12.  DOC stated this because no such document exists. DOC did, as required by Section 232, consult with the Secretary of Defense and other United States officials in connection with the investigation into uranium imports and preparation of the Uranium Report.  See 19 U.S.C. § 1862(b)(2)(A).  DOD did not, however, submit a specific response letter to DOC regarding this matter.

**Disclosing the  Uranium Report While the President Is Still Determining What Actions May Be Needed to Revitalize Domestic Uranium Production Would Impose A Reasonably Foreseeable Risk of Harm.**

13.    The FOIA states that an agency shall only withhold information if the

agency reasonably foresees that disclosure would  harm an interest protected

by an exemption to disclosure or disclosure is prohibited by law.  5 U.S.C. §

552(a)(8).

14.    DOC explained in its initial moving papers that the Uranium Report pertains

to the President's ongoing evaluation of whether, as a matter of national

security, governmental action is required to protect and promote domestic

uranium production and other elements of domestic nuclear fuel production

(Initial Lieberman Decl., at Paras. 27-33).  DOC further explained that the

Uranium Report consists of the thorough analysis and presentation of

industry, market, economic, scientific, statistical and other data and

information, including proprietary sources, relating to the assessment of

uranium imports, and that interwoven with the analysis is selected factual

information concerning the state of the domestic uranium industry.  (Id. at

Para. 35).  It also detailed the basis for its determination that the presidential

communications and deliberative process privileges applied to the Uranium

Report.  (Id. at Paras. 37-46).  In so doing, DOC pointed out that it had

determined releasing the Uranium Report while the President's decision-

making is continuing could compromise the government's ability to

properly evaluate the needs of domestic nuclear fuel production and

effectively implement selected measures, contrary to the very purpose of the privileges DOC had invoked.  (Id. at Paras. 41 and 46).

15. DOC considered this analysis  to clearly encompass and speak to the concern that premature release could cause a foreseeable risk of harm to governmental interests.  Nonetheless, by way of clarification, DOC states that it considered and concluded that disclosing the Uranium Report while the government continues to evaluate whether it must act to protect domestic uranium production threatens to compromise presidential deliberations.  Specifically, premature release could undermine or adversely effect the selection and implementation of specific actions related to the Uranium Report, which provides significant information concerning the domestic uranium mining industry.

16. The release of the Working Group Report does not change DOC's determination.  The Uranium Report focuses upon the analysis and assessment of the condition of the domestic uranium industry and potential actions to assist that industry.  To disclose that while the government is still weighing options based on the particulars of the Uranium Report could interfere with the efficacy of this  process.

I declare under penalty of perjury that the foregoing is true and correct:

Executed this 29th day of May, 2020

*Brian D. Lieberman*
_____
Brian D. Lieberman