## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CAUSE OF ACTION INSTITUTE, <br><br> *Plaintiff*, <br><br> v. <br><br> U.S. DEPARTMENT OF COMMERCE <br><br> *Defendant*. | No. 19-cv-2698 (DLF) |

## <u>MEMORANDUM OPINION</u>

Cause of Action Institute brings this suit alleging that the Department of Commerce has engaged in a policy or practice of violating the Freedom of Information Act (FOIA), 5 U.S.C. § 552 *et seq*.  In particular, the plaintiffs challenge Commerce's practice of invoking executive privilege to withhold documents involving Section 232 of the Trade Expansion Act of 1962. Compl. ¶ 2, Dkt. 1.  Before the Court is Cause of Action's Motion for Summary Judgment, Dkt. 43, and Commerce's Cross-Motion for Summary Judgment, Dkts. 50, 55.  For the reasons that follow, the Court will deny Cause of Action's motion and grant Commerce's cross-motion.

## I.     BACKGROUND

On April 15, 2019, Cause of Action submitted identical FOIA requests to two offices within Commerce, seeking two documents.  *See* Def.'s Rev. Stmt. of Material Facts ¶ 8, Dkt. 53. First, Cause of Action requested "a copy of the Commerce Secretary's final report to the President regarding the Section 232 Investigation on the Effect of Imports of Uranium on the National Security" (Uranium Report); and second, it sought the "DOD response letter to the Section 232 Investigation on the Effect of Imports of Uranium on the National Security" (DOD response letter). *Id.*; *see also* Second Agyekum Decl. Ex. 6 at 1, Dkt. 48.

Both documents relate to Section 232 of the Trade Expansion Act, which requires the Secretary of Commerce, by request or on his own motion, to investigate the national security effects flowing from the importation of an article of commerce. 19 U.S.C. § 1862(b). Within 270 days after initiating an investigation, the Secretary of Commerce must submit a report to the President containing the investigation's "findings" and his "recommendations . . . for action or inaction." *Id.* § 1862(b)(3)(A). In preparing the report, the Secretary of Commerce must "consult with the Secretary of Defense regarding the methodological and policy questions raised in any investigation" and "seek information and advice from, and consult with," other officers and cabinet members. *Id.* § 1862(b)(2)(A)(i)–(ii). The Secretary of Commerce can also "request" that the Secretary of Defense "provide . . . an assessment of the defense requirements" of the article under investigation. *Id.* § 1862(b)(2)(B).

Once the President receives a report finding a national security threat, within 90 days, he must review it and determine whether he concurs with its findings. *Id.* § 1862(c)(1)(A). If so, he must also decide whether to take action "to adjust the imports of the article," *id.* § 1862(c)(1)(A)(ii), which may include "negotiation of an agreement which limits or restricts imports, *id.* § 1862(c)(3)(A), to mitigate the national security threat.

Section 232 also has multiple provisions related to publication. First, it provides that "[a]ny portion of the report submitted by the Secretary . . . which does not contain classified information or proprietary information shall be published in the Federal Register." *Id.* § 1862(b)(3)(B). It next specifies that within 30 days of his determination, the President must submit a "written statement" to explain his decision, which "shall be included in the report published" by the Secretary of Commerce. *Id.* § 1862(c)(2). It also provides that "[u]pon the disposition of each request [for an

investigation], . . . the Secretary shall submit to the Congress, and publish in the Federal Register, a report on such disposition." *Id.* § 1862(d)(1).[1]

Commerce submitted the Uranium Report to the President on April 14, 2019. Lieberman Decl. ¶ 6, Dkt. 17-1. On July 12, 2019, the President issued a Presidential Memorandum, disagreeing with Secretary of Commerce's finding that uranium imports threatened to impair the national security of the United States. But the President noted that he agreed with the Secretary's determination that the issue had national security implications warranting further evaluation. *Id.* ¶ 7. As a result, instead of acting pursuant to Section 232, the President established a "Nuclear Fuel Working Group" to provide a "fuller analysis of the national security considerations with respect to the entire nuclear fuel supply chain" and "address the concerns identified by the Secretary." Mem. on the Effect of Uranium Imports on the National Security and Establishment of the United States Nuclear Fuel Working Group § 1(c), *id.* Ex. 6. As required by Section 232, on August 8, 2019, the President provided a written statement to Congress explaining why he refused to take action. *See* Donald J. Trump, Letter to Congressional Leaders on the Effect of Uranium Imports on the National Security and Establishment of the United States Nuclear Fuel Working Group, August 8, 2019, Mulvey Decl. Ex. C, Dkt. 18-4.

Cause of Action submitted its FOIA request for the Uranium Report and the DOD response letter on April 15, 2019, the day after the report was submitted to the President. *See* Second Agyekum Decl. ¶ 11. Commerce responded that it would "provide all non-exempt documents responsive" to Cause of Action's request and explained that the report would be published in the

---

[1] On this point, the statute is not a model of draftsmanship. Section 1862(c)(2) states that the President must submit a written statement of reasons to be included with any report published "under subsection (e)." But the statute as passed does not include a subsection (e). Instead, the statute has two subsections labeled (d), the second of which addresses the Secretary of Commerce's report. *Id.* § 1862(d)(1).

Federal Register "after the President's review is complete."  *See* Letter from Fernandez Boards dated May 16, 2019, *id.* Ex. 7.  Subsequently, Commerce informed Cause of Action that it would withhold the Uranium Report under FOIA Exemption 5, *see* 5 U.S.C. § 552(b)(5), claiming the documents were exempt from FOIA's disclosure requirements under the presidential communications privilege and the deliberative process privilege.  Second Agyekum Decl. ¶ 14.

Cause of Action filed its complaint on September 9, 2019, seeking production of the two documents and challenging Commerce's alleged "policy or practice" of unlawfully withholding Section 232 reports.  *See* Compl.  ¶ 1–2.  On March 5, 2020, Commerce filed a Motion for Summary Judgment, Dkt. 17, and Cause of Action filed a Cross-Motion for Summary Judgment on April 3, 2020, Dkt. 18.  Before the Court resolved those motions, Commerce voluntarily released both the Uranium Report and the DOD response letter.  *See* Joint Status Report of August 26, 2021 ¶ 2–3, Dkt. 41.  Accordingly, the Court denied both parties' motions for summary judgment without prejudice.  Minute Order of August 5, 2021.

Cause of Action subsequently filed a new Motion for Summary Judgment on November 19, 2021, pressing its policy-or-practice claim.  Dkt. 43.  Commerce filed a Cross-Motion for Summary Judgment on February 3, 2022.  Dkts. 50, 55.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When a federal agency moves for summary judgment in a FOIA case, all facts and inferences must be viewed in the light most favorable to the requester, and the agency bears the burden of showing that it complied with FOIA.  *Chambers v. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009).

To prevail under Rule 56, a federal agency "must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from [FOIA's] inspection requirements." *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (per curiam) (internal quotation marks omitted). "The system of disclosure established by the FOIA is simple in theory[:] [a] federal agency must disclose agency records unless they may be withheld pursuant to one of the nine enumerated exemptions listed in [5 U.S.C.] § 552(b)." *Dep't of Just. v. Julian*, 486 U.S. 1, 8 (1988). "The agency bears the burden of justifying the applicability of [any] FOIA exemptions, which are exclusive and must be narrowly construed." *Mobley v. CIA*, 806 F.3d 568, 580 (D.C. Cir. 2015).

Federal courts rely on agency affidavits to determine whether an agency complied with FOIA. *Perry*, 684 F.2d. at 126. Agency affidavits are entitled to a presumption of good faith, *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and a court may grant summary judgment based on an affidavit if it contains reasonably specific detail and is not called into question by contradictory record evidence or evidence of bad faith, *Judicial Watch v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013). "[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

## III.   ANALYSIS

### A.   Standing

Before reaching the merits, the Court must determine whether Cause of Action has Article III standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–95 (1998). Although there is no dispute that Cause of Action had standing to bring its FOIA claim in the first instance, Commerce argues that the claim became moot once it produced the two documents Cause of

Action sought.  *See* Def.'s Mem. in Supp. of Summ. J. at 8–9, Dkt. 48.  This contention is without merit.

As a general matter, it is "true that . . . once all requested records are surrendered, federal courts have no further statutory function to perform with respect to the particular records that were requested."  *Payne Enters., Inc. v. United States*, 837 F.2d 486, 490–91 (D.C. Cir. 1988) (internal quotation marks omitted).  But it is likewise well-established that "even though a party may have obtained relief as to a *specific request* under the FOIA, this will not moot a claim that an agency *policy or practice* will impair the party's lawful access to information in the future."  *Id.* at 491.

To pursue its policy-or-practice claim "once its request for specific relief is no longer at issue, [Cause of Action] must still demonstrate [its] standing to challenge the disputed policy or practice."  *Cause of Action Inst. v. Dep't of Just.*, 999 F.3d 696, 704 (D.C. Cir. 2021).  Cause of Action has satisfied this requirement by adequately alleging that it "is likely to be subject to the same deprivation of access in the future."  Pl.'s Mem. in Supp. of Summ. J. at 30, Dkt. 43-1.  Cause of Action is a "frequent FOIA requester[]," *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 91 (D.C. Cir. 1986), and it intends to continue requesting Section 232 reports in the future.  *See* Schmidt Decl. ¶ 15, Dkt. 56-2; Pl.'s Reply at 23, Dkt. 56.  And at the same time, it alleges that Commerce will continue to delay the release of all Section 232 reports under claims of executive privilege.  *See* Pl.'s Mem. at 9–11.  Because Cause of Action has "alleged a continuing injury due to this practice," its "facial challenges are not moot."  *Better Gov't Ass'n*, 780 F.2d at 91.

Commerce further argues that even if Cause of Action has Article III standing, its claim for prospective relief is not ripe for review.  Def.'s Mem. at 30–33.  "Generally, in ascertaining whether a suit is ripe, courts must balance the petitioner's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that

policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Payne*, 837 F.2d at 492 (internal quotation marks omitted). An action is "not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted).

To support its ripeness argument, Commerce cites *Cause of Action Institute v. Department of Justice*, which dismissed a different policy-or-practice claim as unripe. *See* 999 F.3d at 704. At issue there was the Department of Justice's "alleged policy of segmenting one record into multiple records," which the plaintiff argued "cannot be lawful under any circumstances." *Id.* The court disagreed, noting that there were "[n]o bright line rules" to determine how the Department's policy would be implemented in future FOIA requests, and its lawfulness depended on how it was applied to a particular request. *Id.* at 704–05. Because the "possible future applications of the [Department] Guidance" were uncertain, the policy-or-practice claim was unripe. *Id.* at 704.

That is not the case here. Cause of Action alleges that "Commerce maintains a policy and practice of withholding in full and delaying the production of Section 232 reports until such time as directed by the White House to release the records." Compl. ¶ 49. That allegation requires no speculation about future application, nor does it depend on the facts of a particular case. Rather, Cause of Action contends that Commerce responds to all FOIA requests for Section 232 reports the same way: by withholding them until the President says otherwise. Such a case "presents a concrete legal dispute; no further factual development is essential to clarify the issues." *Payne*, 837 F.2d at 492 (finding an agency's repeated invocation of FOIA exemptions ripe for review in a policy-or-practice claim). Therefore, Cause of Action's policy-or-practice claim is ripe for judicial review.

### B.      Policy-or-Practice Claim

"When an agency's non-compliance [with FOIA] shifts from a singular instance to a 'policy or practice to impair the party's lawful access to information,' . . . a court can order broader equitable relief." *Am. Ctr. for Law & Just. v. Dep't of State*, 289 F. Supp. 3d 81, 87 (D.D.C. 2018) (quoting *Payne*, 837 F.2d at 491) (alteration adopted).  To succeed on such a claim, Cause of Action must show that Commerce "has adopted, endorsed, or implemented a policy or practice that constitutes an ongoing 'failure to abide by the terms of the FOIA.'" *Nat'l Sec. Couns. v. CIA*, 898 F. Supp. 2d 233, 253 (D.D.C. 2012) (quoting *Payne*, 837 F.2d at 491).  In other words, "a plaintiff must plead (1) some policy or practice that (2) results in a repeated violation of FOIA." *Am. Ctr. for Law & Just. v. Dep't of State*, 249 F. Supp. 3d 275, 282 (D.D.C. 2017).

Cause of Action alleges that Commerce has a policy or practice of withholding Section 232 reports under FOIA Exemption 5.  It points to three examples in which Commerce invoked Exemption 5 in response to Cause of Action's FOIA requests: the Uranium Report and two other Section 232 reports on automobile importation and neodymium magnets.[2]  Compl. ¶¶ 14–17, 53; Notice of Factual Dev., Dkt. 62.  But even assuming that Commerce does have such a practice, the Court finds that it does not constitute a failure to abide by the terms of FOIA.  *See Cause of Action Inst. v. Dep't of Com.*, 513 F. Supp. 3d 116, 131 (D.D.C. 2021) (likewise finding that the initial withholding of the Automobile Report was justified under Exemption 5).

Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the

---

[2] Although Cause of Action references several other Section 232 reports whose publication was allegedly delayed, Cause of Action did not submit FOIA requests for those reports.  Pl.'s Resp. to Def.'s Rev. Statement of Material Facts ¶ 14–17, Dkt. 56-1.  They are therefore irrelevant to its policy-or-practice claim under FOIA.

agency." 5 U.S.C. § 552(b)(5).   To qualify under Exception 5, a document must satisfy two conditions: "its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  Exemption 5 "incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant," including, as relevant here, the presidential communications privilege and the deliberative process privilege.  *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (internal quotation marks omitted).

Commerce first invoked the presidential communications privilege in response to Cause of Action's FOIA request for the Uranium Report.[3]   *See* Second Agyekum Decl. ¶ 14.   This "presumptive privilege for [p]residential communications," *United States v. Nixon*, 418 U.S. 683, 708 (1974), protects "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential."  *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997).  The function of this privilege is to "preserve the President's access to candid advice" from his advisors and to make decisions confidentially.  *Id.* at 745–46.  "At core, the presidential communications privilege is rooted in the President's need for confidentiality in the communications of his office, in order to effectively and faithfully carry out his Article II duties

---

[3] The Court focuses its analysis on Commerce's initial withholding of the Uranium Report, which formed the basis for Count One of the Complaint.  *See* Compl. ¶ 1–2.  A conclusion that Commerce lawfully withheld the Uranium Report dooms Cause of Action's policy-or-practice claim because it shows that Commerce did not repeatedly violate FOIA—either in the instant case or in either of the other two cases where Commerce gave the exact same justification for withholding the reports. *See* Def.'s Rev. Statement of Material Facts ¶ 6; Notice of Factual Dev. Ex. 2, Dkt. 62-1.  And in that the automobile importation report case, the court applied a similar analysis to conclude that the report was lawfully withheld.  *See Cause of Action Inst.*, 513 F. Supp. 3d at 130.

and to protect the effectiveness of the executive decision-making process."  *Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 885 (D.C. Cir. 2021) (quotation marks omitted).

The privilege applies to "communications directly involving and documents actually viewed by the President, as well as documents solicited and received by the President or his immediate White House advisers."  *Loving*, 550 F.3d at 37 (internal quotation marks omitted). And it "applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones."  *In re Sealed Case*, 121 F.3d at 745.  Further, the President himself need not invoke the privilege; instead, an agency may invoke the presidential communications privilege if it makes a finding that the privilege applies to a requested document.  *See, e.g.*, *Am. Ctr. for Law & Just. v. Dep't of State*, 330 F. Supp. 3d 293, 308–09 (D.D.C. 2018); *Elec. Privacy Info. Ctr. v. Dep't of Just.*, 584 F. Supp. 2d 65, 80 (D.D.C. 2008).

The Uranium Report falls squarely within this privilege.  It is a confidential report from a Cabinet Secretary to the President, created to advise him on matters of national security and "made in the process of shaping policies and making decisions."  *See Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 28 (D.D.C. 2013) (internal quotation marks omitted).  Section 232 investigations contain back-and-forth consultation between the President's most senior advisors. *See* 19 U.S.C. § 1862(b)(2)(A) (requiring the Secretary of Commerce to "consult with the Secretary of Defense" and "seek information and advice from, and consult with, appropriate officers of the United States").  And the reports include the Secretary's "findings" and "recommendations" for what the President should do.  *Id.* § 1862(b)(3)(A).  Thus, as another judge in this District recently concluded, Section 232 reports constitute "confidential memorand[a]" "containing the Secretary's advice on decisions delegated to the President by statute" and upon which the President "relie[s]" in making policy concerning the nation's security.  *Cause of Action*

*Inst.*, 513 F. Supp. 3d at 125–26.  Almost by definition, then, it constitutes a communication covered by the presidential communications privilege.  *See id.* at 129; *Loving*, 550 F.3d at 39.

Cause of Action's four arguments to the contrary are unpersuasive.  First, even assuming Cause of Action is correct that the President does not "solicit" Section 232 reports, that would not mean that the reports are not covered by the presidential communications privilege. "[C]ommunications 'directly involving' the President . . . are entitled to the privilege, regardless of whether the President solicited them."  *Loving*, 550 F.3d at 40 (quoting *In re Sealed Case*, 121 F.3d at 751–52).  The Uranium Report, like other Section 252 reports, is such a communication. It is a memorandum prepared for the President.  It then serves as an input to "the process of arriving at [a] presidential decision[]," *In re Sealed Case*, 121 F.3d at 745, since the President must rely on the report to decide whether "imports of the article . . .threaten to impair the national security" and whether to adjust imports.  19 U.S.C. § 1862(c)(1)(A).  Thus, the reports are covered by the presidential communications privilege regardless of who solicits them.  *See Cause of Action Inst.*, 513 F. Supp. 3d at 129.

Second, whether the President's review of the Uranium Report implicates an "inherent Article II power," Pl.'s Mem. at 14, does not change the Court's analysis.  That argument "misapprehends the scope of the presidential communications privilege."  *Cause of Action Inst.*, 513 F. Supp. 3d at 126.  To be sure, the Supreme Court rooted the presidential communications privilege in the "supremacy of each branch within its own assigned area of constitutional duties." *Nixon*, 418 U.S. at 705; *see also N.Y. Times Co. v. Jascalevich*, 439 U.S. 1317, 1323 (1978) (noting that the "privilege protect[s] Presidential communications in the exercise of Art. II powers").  But the presidential communications privilege is not *only* available when the underlying decision flows from inherent Article II power.  Such a view would "draw[] an arbitrary line."  *Judicial Watch,*

*Inc. v. Dep't of Just.*, 365 F.3d 1108, 1123 (D.C. Cir. 2004); *see also Loving*, 550 F.3d at 35 (applying presidential communications privilege in context of statutory duty).  Because the President must "take care that the laws be faithfully executed," U.S. Const. Art. II, including laws that do not implicate a core Article II power, such a rule would inevitably work to deprive the President of candid advice and criticism when faithfully executing some laws but permit it when taking care to implement others. *See United States v. Philip Morris USA, Inc.*, 99-cv-2496, 2004 WL 3253662, at *1–2 (D.D.C. Sept. 9, 2004) ("[L]imiting the privilege to only those communications regarding non-delegable powers would undermine the very purposes for which it exists.").

Instead, the key limiting principle is that "[t]he presidential communications privilege should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President."  *In re Sealed Case*, 121 F.3d at 752.  For inherent Article II authorities, the inquiry is straightforward, because the President must necessarily be involved in the decision.  *Id.*  But as explained above, the privilege is no less justified for statutory authorities that also require the President's direct involvement.  Here, the President's statutory responsibility to review and act on the Uranium Report makes it a communication that necessarily involves his direct decisionmaking.  Thus, the presidential communications privilege applies.[4]

---

[4] Cause of Action cites a case from this District that declined to apply the presidential communications privilege, stating, among several reasons for its decision, that "this is not a case involving a quintessential and nondelegable Presidential power."  *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 25 (internal quotation marks omitted).  But that observation was made only in the context of determining that the President did not necessarily need to be directly involved in creating the documents at issue.  *See id.*  Nor was that statement necessary to the holding, since the court also found that documents "distributed widely . . . for non-advisory purposes" were not "confidential for the purposes of the presidential communications privilege."  *Id.* at 25–29.

Third, Cause of Action argues that Section 232's publication requirement "limit[s] the reach of the privilege." Pl.'s Mem. at 16 (emphasis omitted); *see also id.* at 19–20.  But the statute does not mandate publishing the report before the President has concluded his decisionmaking. While it is true that Section 232 requires publication of reports generated by Commerce, the statute does not set an express deadline for publication.[5]  *See* 19 U.S.C. § 1862(b)(2)(B) ("[T]he report . . . shall be published in the Federal Register."); *id.* § 1862(d)(1) ("Upon the disposition of each request . . . under subsection (b), the Secretary shall submit to the Congress, and publish in the Federal Register, a report on such disposition.").  Several other provisions within Section 232 include explicit and precise deadlines, *see e.g.*, *id.* § 1862(b)(3)(A) (requiring the Secretary to submit its report to the President within 270 days); *id.* § 1862(c)(1)(A) (requiring the President to make his determination within 90 days); *id.* § 1862(c)(2) (requiring the President to submit a written statement to Congress within 30 days of his decision)—demonstrating that "Congress knew well how to set a timetable for disclosure of Section 232 reports if it wished to impose one." *Cause of Action Inst.*, 513 F. Supp. 3d at 128.  And "[w]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002).  Congress did not include an explicit deadline for publication, and the Court will not read one into the statute.

---

[5] Cause of Action suggests that reading the statute this way could create a constitutional problem, because Congress could not compel the President to publish privileged materials. Pl.'s Mem. at 29.  But that issue is not within the scope of this case.  This case concerns whether the President and Commerce may withhold the Section 232 reports from FOIA disclosure for a limited period of time.  Both reports identified in the complaint were eventually released and published, and Commerce does not challenge the constitutionality of Section 232's publication requirement.

Cause of Action counters that a "clear disclosure deadline" *is* present in the statute: the prepositional phrase "upon the disposition" in subsection (d).  Pl.'s Mem. at 24; *see also* Pl.'s Reply at 14–15.  As explained, however, the phrase is anything but clear when compared with the explicit deadlines in other subsections.  Furthermore, while it is unclear on the face of the statute whether the report referenced in subsection (d) is the same as the Secretary's investigative report in subsection (b), Cause of Action's argument fails either way.  If they refer to different reports, then the statute does not impose *any* deadline for publishing the Secretary's investigative report, which is what Cause of Action seeks.  And if they refer to the same report, then subsection (d)'s prepositional phrase is best read to refer to the final disposition of the entire process, as it must include the President's "written statement of the reasons" for his final decision.  19 U.S.C. § 1862(c)(2).  Dictionary definitions and past practice suggest the same.  The term "disposition" is defined as "the final determination of a legal matter." *See Disposition*, Merriam-Webster Unabridged Dictionary.  Past practice likewise suggests that since its earliest days the Act has been understood to refer to the final disposition of the entire process: Section 232 reports under President Eisenhower in 1959, President Ford in 1975, and President Clinton in 1995 and 2000 were not published until after the respective president had made his final decision based on the report.  *See Cause of Action Inst.*, 513 F. Supp. 3d at 128 n.1 (collecting sources and examples); *see also* H.R. Rep. No. 87-1818, at 41 (1962) ("Section 232(d) requires a report to be made and published on each *final* disposition of any request for investigation under section 232(b)." (emphasis added)).  Either way, the statute's language did not compel Commerce to release the Uranium Report when Cause of Action first submitted its FOIA request—the day after Commerce submitted the report to the President for his consideration.

Fourth and finally, Cause of Action argues that the President does not have a confidentiality interest in the Uranium Report.   According to Cause of Action, because the Secretary knows that Section 232 reports must be published eventually, confidentiality is "impossible" and the whole reason for having a privilege is undermined.  Pl.'s Mem. at 20–21.  This contention is both an overstatement and an understatement.  It first overstates Section 232's reporting requirement: as discussed, there is no express deadline for publication.  The publication provision is thus consistent with temporary nondisclosure while presidential action is pending.  Indeed, based on the statute, the Secretary of Commerce would likely expect that his advice "would not become public before . . . [his] recommendations were acted upon." *Cause of Action Inst.*, 513 F. Supp. 3d at 129.

At the same time, Cause of Action construes the privilege too narrowly, such that it is no longer "consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *In re Sealed Case*, 121 F.3d at 752.  In the Section 232 context, the President "must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers" through the reports. *Id.* at 750.  "The non-disclosure of that advice thereby protects the President's ability to obtain frank and informed opinions from his senior advisers, an acute concern in the national security context, particularly in situations where the President is formulating a decision on a sensitive operation with substantial foreign policy impacts." *Judicial Watch*, 913 F.3d at 1111–12 (quotation marks omitted and alterations adopted). Accordingly, "[i]f these materials are not protected by the presidential privilege" even temporarily, "the President's access to candid and informed advice could well be significantly circumscribed." *In re Sealed Case*, 121 F.3d at 750.

This is true even if the report must be published eventually.  One can imagine that the Secretary would draft a report, especially one dealing with sensitive national security and foreign

15

relations issues, differently if he expected the report to be published while the President was still navigating those issues, as opposed to after-the-fact. For instance, the President may, on the basis of Section 232 reports, negotiate with other countries to address national security threats. 19 U.S.C. § 1862(c)(3)(A). If the report were released before those actions were finalized, the Secretary "may have to moderate the contents of his report to ensure that he does not disclose information" that "could harm ongoing trade negotiations by revealing negotiation strategy and key objectives." *Cause of Action Inst.*, 513 F. Supp. 3d at 130 n.2; *see also* George Washington to the House of Representatives (Mar. 30, 1796), *reprinted in* 1 *Messages and Papers of the Presidents* 186–87 (James D. Richardson ed., 1897) (noting that "disclosure of all the measures, demands, or eventual concessions which may have been proposed or contemplated" would harm negotiation efforts); Andrew Jackson, Fourth Annual Message (Dec. 4, 1832), *reprinted in* 3 *id.* 1154, 1158 (noting that "publication of the details" "on the subject of our affairs with Buenos [Aires]" was "inexpedient" while a negotiation was "still pending"). Thus, the President retains a confidentiality interest in preventing the Report's disclosure, at least until he has decided how to act. *Id.* at 127.

Cause of Action objects that there is no such thing as a "temporary" presidential privilege. *See* Pl.'s Mem. at 27–28. This contention misses the mark, because even privileged materials are sometimes subject to FOIA. "[U]nder the FOIA Improvement Act of 2016, the government may not withhold even . . . privileged materials unless it also 'reasonably foresees that disclosure would harm an interest protected by' the FOIA exemption." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (citing 5 U.S.C. § 552(a)(8)(A)(i)(I)). Once the "foreseeable harm" to presidential decisionmaking and/or national security has subsided, FOIA and Section 232 may well require releasing the documents. That a document may be privileged

and covered by a FOIA exemption at one point in time, but subject to FOIA release at another time, is not a novel concept.  *See, e.g.*, *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (explaining that deliberative-process privileged documents under Exemption 5 "can lose that status if [they are] adopted, formally or informally, as the agency position on an issue or [are] used by the agency in its dealings with the public"); *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999) (explaining the "public domain doctrine," under which "materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record").

In sum, Commerce has satisfied the standard for invoking Exemption 5: showing it was "reasonably foresee[able]" that disclosure of the Uranium Report at the time it was requested would "harm an interest protected by" the exemption.  5 U.S.C. 552(a)(8).  Commerce's delay in producing the Uranium Report under Exemption 5, as a document subject to the presidential communications privilege, was therefore not contrary to the terms of FOIA.[6]  Because Cause of Action has been unable to show that Commerce unlawfully invoked FOIA Exemption 5 on even a single occasion to withhold documents involving Section 232 of the Trade Expansion Act, its policy-or-practice claim necessarily fails.

## CONCLUSION

For the foregoing reasons, the Court will deny Cause of Action's motion and grant Commerce's cross-motion.  A separate order consistent with this decision accompanies this memorandum opinion.

---

[6] Accordingly, the Court need not address Commerce's alternative argument that the deliberative process privilege permits withholding.  *See In re Sealed Case*, 121 F.3d at 746 (declining to address deliberative process argument after concluding that the document was covered by the presidential communications privilege); *see also Cause of Action Inst.*, 513 F. Supp. 3d at 130 n.3 (same).

September 12, 2022

DABNEY L. FRIEDRICH
United States District Judge